IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

JUN 1 5 2018

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

CRYSTAL VL RIVERS

    Plaintiff

v.

GARY M BOWMAN, VSB #28866
UNITED STATES OF AMERICA
FEDERAL BUREAU OF INVESTIGATIONS
VIRGINIA STATE POLICE                   Civil No **6:18-CV-061**
BEDFORD COUNTY VIRGINIA
CAMPBELL COUNTY
CITY OF LYNCHBURG VIRGINIA
KAREN DEER
MARYLOU PRILLIMAN
BILL TALBOTT
KEVIN HARTH
VIRGINIA BANKERS ASSOCIATION
VIRGINIA STATE CORPORATION COMMISSION
JAMES DIMITRI, COMMISSIONER RETIRED
JUDITH WILLIAMS JAGDMANN, COMMISSIONER
MARK C. CHRISTIE, COMMISSIONER
BUREAU OF FINANCIAL INSTITUTIONS – SCC
E. JOSEPH FACE, JR, COMMISSIONER
BANK OF THE JAMES FINANCIAL GROUP INC.a/k/a BANK OF THE JAMES
ROBERT R. CHAPMAN III
SELECT BANK FINANCIAL CORP
SELECT BANK
J. MICHAEL THOMAS
T. CLAY DAVIS
T. SCOTT GARRETT, M.D.
ROBERT T BEACH
OLD DOMINION NATIONAL BANK
MARK MERRILL
CHARLES DARNELL
MARYLOU HOPKINS
KELLY POTTER
DAVID FRANZEN
UNION BANKSHARES CORPORATION
UNION BANK AND TRUST, *successor of and formerly StellarOne Bank,*
*formerly Planters Bank& Trust Company of Virginia*
STEPHEN J. EAGER
ADVANTAGE TITLE AND CLOSING LLC
JENNIFER RICHARDSON
MATT FARISS
SHANA BECK LESTER
RALPH H BECK

1

S & R FARM LLC
BBOYZ LLC
SERENITY ACRES FARM LLC
TRUSTEES IN LIQUIDATION OF S&R FARM LLC
LIBERTY UNIVERSITY INC
LAURA J. WALLACE
NORTHWOOD NMG GROUP, INC
NORTHWOOD GROUP a/k/a NORTHWOOD.
WILLIAM L WALLIS JR
SHEILA WALLIS
FAC ACQUISITION CORPORATION a/k/a FAC INC. a/k/a FAC
ROBERT NITTI
JULIE G NITTI
MICHAEL E WALLIS
EILEEN M WALLIS
SANZONE AND BAKER VSB #
JOSEPH SANZONE VSB #
SETH TWERY, VSB # 20031
LISA SCHENKEL, VSB #21521
SHERWOOD DAY, VSB #15128
FRANK W. MORRISON, VSB #07549
STEVEN R. GRANT, VSB #27178
EUSTICE – MERCHANT FORD, INC. *a/k/a* BATTLEFIELD FORD
NORTHCREEK INC.  NORTH CREEK CONSTRUCTION
DAVID EDMUNDSON
KELLY EDMUNDSON
ADD HENRY BECK
ADD HELGA BECK
SERENE CREEK RUN ASSOCIATION
TRAVIS BAKER
JENNIFER BAKER
MICHAEL FRIEDMAN
LOREN FRIEDMAN
RICHARD ROGERS
BETH ROGERS
MATTHEW KRYCINSKI
SARAH KRYCINSKI
MICHAEL BRADBURY
HOWARD FREAR
BARBARA FREAR
WILLIAM FLUKER
MICHELLE FLUKER
MARGIE CALLAHAN
STATE FARM MUTUAL AUTOMOBIEL INSURANCE COMPANY
TERESA POLINEK GRANT
TED COUNTS REALTY GROUP AND AUCTION CO INC
AMERICAN NATIONAL BANK AND TRUST COMPANY
AMERICAN NATIONAL BANKSHARES INC
CLEMENT & WHEATLEY A PROFESSIONAL CORPORATION
                    Defendants

2

## AMENDED COMPLAINT WITH ADDITIONAL DEFENDANTS

COMES NOW Crystal VL Rivers, Pro Se, "Rivers", files this complaint, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et. seq.,* and other federal and state laws against the United States of America, the Federal Bureau of Investigation, the U.S. Department of Justice, the Virginia State Police, Special Agents Karen Deer, Bill Talbott, and MaryLou Prilliman (Federal Defendants), and the Virginia State Corporation Commission, the Bureau of Financial Institutions – SCC, the Commissioners of the SCC, the City of Lynchburg, the County of Bedford Virginia, Virginia State Police and the Virginia Bankers Association, (State Defendants), and pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C § 1961 *et. seq.* and other federal and state laws, including among others money laundering and obtaining money under false pretense, and moves this Court to enter judgment in her favor against the Defendants for the grounds stated in this complaint. See *Pennhurst State Sch. V Halderman,* 465 U.S. 89 (1984)*, and Great Northern Life Ins. Co v Read,* 322 U.S. 47, 322 U.S. 59 (1944)

### I. JURISDICTION AND VENUE

1. Pursuant to 28 U.S.C. §1331 (federal subject matter jurisdiction), this Court has original jurisdiction over the subject matter of this case as all of part of the claims arise from the Defendant's violations federal laws and of the United States Code, including, *inter alia,* the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. §1961, *et. seq., See Poindexter v Greenhow,* 114 U.S. 270, 290, 291 (1885), *See also Gibbons,* The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation, 83 Colum. L. Rev. 1889 (1983)

2. At all times relevant to this complaint, each of the Defendants was and is a "person" as that term is defined in 18 U.S.C §1961 and used in 18 U.S.C §1962

3

3.  This Court has supplemental jurisdiction over the subject matter of the claims asserted herein that arise under state law pursuant to 28 U.S.C. §1367 (supplemental jurisdiction) and the doctrines of pendent and ancillary jurisdiction, as the state law claims arise from a common nucleus of operative fact giving rise to the federal claims alleged in this case.

4.  The jurisdiction of this Court is founded upon 28 U.S.C §1367, as the Complaint states causes of action so related to claims in the action within the original jurisdiction of the federal investigation and of this Court that they form part of the same case or controversy under Article III of the United States Constitution

5.  The jurisdiction of this Court is founded upon 28 U.S.C. § 1346, as the Complaint states causes of action under the Federal Tort Claim Act 28 U.S.C §2671, *et seq.*

6.  The amount in dispute exceeds $75,000, exclusive of interest and costs.  This Court has subject matter jurisdiction over the case under Title 28 U.S.C §1332

7.  Venue is proper in this district pursuant to 18 U.S.C §1965 and 28 U.S.C §1391 as one or more of the Defendants reside, are found, have agents, or transact their affairs within the jury division of this Court and conducted their fraudulent scheme, through use of the United States Mail or interstate wire communications in an illegal manner, from this District.

8.  Venue is appropriate in this Court pursuant to § § 18.2-430 and 18.2-517 because all transactions occurred between Rivers, many victims and Defendant(s) in the State of Virginia

9.  Venue is proper because a substantial part of the events or omissions giving rise to the claims of Rivers occurred in the Western District of Virginia Lynchburg and Roanoke Division under 28 U.S.C §1391

10. This case is also brought to recover damages under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.,* alleging that Rivers loss and damages were caused by the negligent or wrongful acts or omissions of certain employees and agents of the United

4

States Government for violating "federal laws", while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to Rivers as an aggrieved party. The real party in interest in this case is not the state of Virginia.

## II. PERSONAL JURISDICTION

11. The United States of America "USA" is a Defendant in this action pursuant the Federal Tort Claims Act, 28 U.S.C §2671 *et seq.* arising from the acts and/or omissions of employees and agents of the defendants, Federal Bureau of Investigation "FBI", U.S. Department of Justice "DOJ", Criminal Division of the Internal Revenue Service "IRS/CI", agencies of the Defendant, and a party Defendant for violating "federal laws" and claims arising from individual agents of the FBI, DOJ and IRS/CI that are named as Defendants for negligent and wrongful acts, or omissions and violating "federal laws" while acting within the scope of their office or employment by the FBI, VSP, DOJ or the IRS/CI pursuant to 28 U.S.C §2671 *et seq.* The United States is to be served at the Office of Inspector General, Daniel W. Lucas, at 717 14th St., 5th Floor, Washington DC 20005 and at Office of Attorney General, Jeff Sessions at US Department of Justice, 950 Pennsylvania Ave, NW, Washington DC 20530-0001

12. Crystal VL Rivers, "Rivers" is a resident and citizen of Bedford County, Virginia, Rivers is the owner of rights, and the owner & possessor of certain rights pursuant to assignment of rights from CVLR Performance Horses Inc, "CVLR Inc." (terminated December 2015) and Serene Creek Holding Co Inc. (terminated business) and CVLR Performance Horses d.b.a., "CVLR d/b/a" which is currently registered in Bedford County with offices located in Lynchburg, Virginia.

13. The Federal Bureau of Investigation, "FBI" is an agency statutorily empowered by the United States Congress, of the U.S. Government, to enforce and investigate certain alleged violations of the United States Criminal Code. The FBI is part of the U.S.

5

Department of Justice headquartered at 935 Pennsylvania Avenue, NW, Washington DC 20535 and is to be served at the Office of the Attorney General, Jeff Sessions at US Department of Justice, 950 Pennsylvania Ave, NW, Washington DC 20530-0001

14. VIRGINIA STATE POLICE, "VSP" is a State Police organization located in the State of Virginia with offices located throughout the State of Virginia. Virginia State Police is to be served at the Offices of the Executive Officer and Superintendant, Coloniel Gary T Settle at 7700 Middlothian Turnpike, N. Chesterfield, VA 23235

15. Bill Talbott, "Talbott" is a Special Agent with the Virginia State Police located in Virginia with offices located in Salem and Campbell County. During all times alleged in this complaint, was acting within the scope of Special Agent and is being sued individually and in his official capacity. Talbott is to be served at the Office of the Attorney General, Jeff Sessions at the US Department of Justice, 950 Pennsylvania Ave, NW, Washington DC 20530-0001

16. Karen Deer, "Deer", is a Special Agent with the Department of Justice located in Roanoke Virginia with offices located at 310 1st St. SW, Room 906, Roanoke VA 24011. During all times alleged in this complaint. Deer was acting within the scope of Special Agent and is being sued individually and in her official capacity. Deer is to be served at the Office of the Attorney General, Jeff Sessions at the US Department of Justice, 950 Pennsylvania Ave, NW, Washington DC 20530-0001

17. MaryLou Prilliman, "Prilliman", is a Special Agent with the Criminal Division of the IRS/CI-DOJ located in Roanoke Virginia with offices located at 310 1st St. SW, Room 906, Roanoke VA 24011. During all times alleged in this complaint, was acting within the scope of Special Agent and is being sued individually and in her official capacity. Deer is to be served at the Office of the Attorney General, Jeff Sessions at the US Department of Justice, 950 Pennsylvania Ave, NW, Washington DC 20530-0001

6

18. The Virginia Bankers Association "VBA" was the economic base through which the illegal banking enterprise, "RBC and Rivermont Consultants Inc and its employees Wynne and Twery" was advertised and insured as a Virginia State bank and bank employee, in the official publication "*Virginia Banking*" from April 2006 to 2010.

19. The Virginia State Corporation Commission "SCC" is located at offices at 1300 E. Main St, Richmond, VA 23219 and is to be served at the Office of the Attorney General Mark Herring at 202 N. 9th St, Richmond VA 23219. The SCC was the economic base through which the illegal banking enterprise, "RBC and Rivermont Consultants Inc was registered and advertised as a Virginia State bank from April 2006 to July 2014.

20. E. Joseph Face, Jr., "Face" is a resident and citizen of Richmond, Virginia with primary offices at 1300 E. Main St, Richmond, VA 23219, and Commissioner of Financial Institutions-SCC at all relevant times. During all times alleged in this complaint, was acting within the scope of Commissioner of the Bureau of Financial Institutions-SCC as the economic base through which the illegal banking enterprise, "RBC and Rivermont Consultants Inc was overseen as a illegal Virginia State bank and investigated from April 2006 to July 2014. Face is being sued individually and in his official capacity, Face is to be served at the Office of General Counsel for the State Corporation Commission at 1300 E. Main St, Richmond VA 23219 and at the Office of the Attorney General, Mark Herring at 202 N. 9th St, Richmond VA 23219

21. Bedford County Virginia is located in the County Administration Building at 122 E Main St, Bedford Virginia and is to be served at the Office of the Attorney General, Mark Herring at 202 N. 9th St, Richmond VA 23219. Bedford County is the economic base through which the illegal banking enterprises "RBC, Rivermont Consultants Inc" were able to operate and through which the enterprises, S&R, SAF, BBoyz, Northcreek, ATC, and Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant.

7

22. The City of Lynchburg Virginia is located in Lynchburg Virginia and is to be served at the Office of the Attorney General Mark Herring at 202 N. 9th St. Richmond VA 23219. The City of Lynchburg is the economic base through which the illegal banking enterprises, "RBC, Rivermont Banking Company Inc. and 1650" were able to operate during all times relevant.

23. American National Bankshares Inc. (NASDAQ: "AMNB"), is a multi-state bank operating in the State of Virginia with registered agent Jeffrey Haley located at 628 Main St, Danville VA 24541. AMNB is the trustee on Lot 16 and other lots located within the Serene Creek Run and Serenity Acres Subdivisions, owned by Matthew and Sarah Krycinski, and currently under contract with Rivers' CVLR d/b/a at all times relevant

24. American National Bank and Trust Company."ANB" is a banking subsidiary of American National is a multi-state bank and trust company operating in the State of Virginia with registered agent Jeffrey Haley located at 628 Main St, Danville VA 24541. At all times relevant, ANB was named and is being sued in their capacity as trustee on Lot 16 and other lots located within the Serene Creek Run and Serenity Acres Subdivisions, owned by Matthew and Sarah Krycinski and currently under contract with Rivers' CVLR d/b/a at all times relevant

25. Clement & Wheatley A Professional Corporation, "CWPC" is a business operating in the State of Virginia with registered agent Harry Sakellaris located at 549 Main St, Danville VA 24541

26. Shana Beck Lester, "Lester" is a resident of 2069 Everett Rd, Forest VA, Bedford County. Lester was managing member of S&R Farm LLC, is a trustee in liquidation of S&R, and member of Serenity Acres Farm LLC and B&B Ice Cream LLC. Lester was granted full use of certain property owned by S&R, at all relevant times and at the time of S&R dissolution, and negotiated the contracts between Rivers' CVLR d/b/a and S&R, for the sale of remaining S&R property and certain lots located in the Serene Creek Run

8

and Serenity Acres subdivisions. During all times alleged in this complaint, was acting within the scope of member of S&R, B&B and SAF, trustee and investor, operating the enterprise(s) through a pattern of racketeering activity. Lester is sued individually and in her official capacity.

27. S&R Farm LLC, "S&R", formerly a limited liability company organized and registered with the State of Virginia #S1064460, since purged, last known address 5040 Cottontown Rd, Forest, VA 24551, Bedford County. S&R has caused Rivers' CVLR d/b/a the loss of the benefit and right to own the remaining S&R property currently under contract. Presently and at all times relevant S&R was acting within the scope of an enterprise and an economic base through which Lester, Beck, SAF, and BBoyz operated a pattern of racketeering activity. S&R will be served at 5040 Cottontown Rd, Forest VA 24551 and 2069 Everett Rd, Forest VA 24551.

28. Serenity Acres Farm LLC, "SAF", is a limited liability company organized and registered with the State of Virginia, 2009 with a registered agent located at 1 Cedar Hill Court, #C, Bedford VA 24523. SAF acquired and sold property located within the Serene Creek Run and Serenity Acres Subdivisions currently under contract with Rivers' CVLR d/b/a. Presently and at all times relevant SAF was acting within the scope of an enterprise and an economic base through which Lester, Beck, S&R, and BBoyz operated a pattern of racketeering activity.

29. BBoyz Inc, "BBoyz", is a limited liability company registered with the State of Virginia with registered agent located at 1045 Cottontown Rd, Lynchburg VA 24503. BBoyz acquired and sold property located within the Serene Creek Run and Serenity Acres Subdivisions currently under contract with Rivers' CVLR d/b/a. Presently and at all times relevant BBoyz was acting within the scope of an enterprise and an economic base through which Lester, Beck, SAF, and S&R operated a pattern of racketeering activity. BBoyz will be served at 5040 Cottontown Rd, Forest VA 24551

30. Ralph Beck "Beck" is a resident of 5040 Cottontown Rd, Forest VA, 24551 Bedford County, and was a member of S&R Farms and by Order of the City of Lynchburg was granted full use of the raw land at all relevant times and at the time of S&R dissolution, and negotiated the contracts between Rivers' CVLR d/b/a and S&R, for the sale of the remaining S&R land located in the Serene Creek Run and Serenity Acres subdivisions. During all times alleged in this complaint, was acting within the scope of member and trustee in liquidation of S&R, B&B and BBoyz. Presently and at all times relevant Beck was acting within the scope of an enterprise operating a pattern of racketeering activity. Beck is sued individually and in his official capacity

31. Serene Creek Run Association, *formerly Serene Creek Run HOA, "HOA"* is a registered home owners association located within the Serene Creek Run subdivision with offices and registered agent Chad Mooney located at 725 Church St, 12th Floor, Lynchburg VA 24504. The HOA is a party to the Serene Creek Run HOA lease with use of the riding center for a fee since December 2006. The HOA acquired and was gifted land located within the Serene Creek Run and Serenity Acres Subdivisions currently under contract with Rivers' CVLR d/b/a at all times relevant

32. Seth Twery "Twery" is a resident of Lynchburg VA and a attorney licensed in the State of Virginia with offices located at 715 Court St, Lynchburg VA 24504. At all times relevant Twery was acting within the scope of an enterprise conducting the affairs of Beck, SAF, Northcreek, Edmondson, Lester, "Wynne, RBC, 1650," Mason, Thomas, Beach, ODNB, and BBoyz, in a pattern of racketeering activity. Twery is sued individually and in his official capacity

33. Sherwood Day "Day" is a resident of Lynchburg VA and an attorney licensed in the State of VA with offices at 1047 Vista Park #D, Forest VA 24551. At all times relevant Day was acting within the scope of an enterprise conducting the affairs of Beck, SAF, Northcreek, Edmondson, Lester, "Wynne, RBC, 1650," Mason, Thomas, Beach, ODNB,

ATC Richardson and BBoyz, in a pattern of racketeering activity. Day is being sued individually and in his official capacity.

34. ⌈FAC Acquisition Corporation "FAC", a/k/a FAC Inc, a/k/a FAC, is a textile manufacturing company operating from the same location as NMG, with the same employees as NMG, with primarily the same customers. FAC has not been registered to do business in the State of Virginia for over 10 years, and operates a factory with offices located at 1065 Confederate Blvd, Appomattox VA 24522. FAC was not registered as a licensed, registered or d/b/a company anywhere in the State of Virginia during all times relevant. Serve also upon last known registered agent, President, and owner of interest Wallis.

35. William L Wallis, Jr. "Wallis" is a resident of the State of Virginia with offices in Appomattox Virginia. Wallis is to be served at 1202 Greenway Ct, Lynchburg VA 24502, and at 1065 Confederate Blvd, Appomattox VA 24502. During all times alleged in this complaint, was acting within the scope of owner, officer of NMG, Northwood and FAC. Wallis is sued individually and in his official capacity

36. Sheila Wallis "Mrs. Wallis" is a resident of the State of Virginia. Mrs. Wallis is to be served at her residence at 1202 Greenway Ct, Lynchburg VA 24502. Mrs. Wallis is sued individually and in her capacity as owner of interest

37. Michael E Wallis is a resident of Abu Dhabi, the Capital of the United Arab Emirates and is sued individually and in his capacity as owner of interest

38. Eileen M Wallis is a resident of Abu Dhabi, the Capital of the United Arab Emirates and is sued individually and in her capacity as owner of interest

39. Robert Nitti "Nitti" is a resident of 8037 Red House Rd, Appomattox VA 24522. During all times alleged in this complaint, was acting within the scope of owner, officer of FAC. Nitti is sued individually and in his official capacity as officer, owner and owner of interest

40. Julie G Nitti, "Mrs. Nitti" is a resident of 8037 Red House Rd, Appomattox VA 24522. Mrs. Nitti is sued individually and in her official capacity as owner of interest

41. Northwood NMG Group Inc, Northwood. "NMG", is a textile manufacturing company operating from the same location as FAC, with the same employees as FAC, with primarily the same customers and located at 1065 Confederate Blvd, Appomattox VA 24522. NMG is to be served at last known registered agent Gary M Bowman located at 1065 Confederate Blvd, Appomattox VA 24522 and 2725 Colonial Ave, Suite 100, Roanoke VA 24015 and 1065 Confederate Blvd, Appomattox VA 24502

42. Northwood Group a/k/a Northwood, "Northwood" is an un-licensed company or d/b/a operating in the State of Virginia whose owners of interest include Sheila Wallis, Julie G Nitti, William L Wallis Jr and Robert Nitti. Northwood is to be served at the last known address' provided to the Bedford County Treasurer of 1065 Confederate Blvd, Appomattox VA 24502 and 1202 Greenway Ct, Lynchburg VA 24502

43. Old Dominion National Bank, "ODNB" is a national bank located 4916 Plank Rd, North Garden Virginia, 22959 and registered with the Office of the Comptroller of Currency. ODNB is the economic base through which the illegal banking enterprises "RBC, Wynne and 1650," and the enterprises Select, Mason, Thomas, Garrett, SBFC, S&R, SAF, BBoyz, Lester, Beck, ATC, and Richardson " were able to operate and through which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant.

44. Mark Merrill, "Merrill", is a resident of the State of Virginia and the President of ODNB with offices located at 4916 Plank Rd, North Garden Virginia, 22959 and registered with the Office of the Comptroller of Currency. Merrill manages and operates the economic base through which the illegal banking enterprises "RBC, Wynne and 1650," and the enterprises, Select, Mason, Thomas, Garrett, SBFC, S&R, SAF, BBoyz, Lester, Beck,

ATC, and Richardson " operated and, through which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant.

45. Charles Darnell, "Darnell", is a resident and citizen of Albemarle County, Virginia and the President and CEO of Old Dominion National Bank, (ODNB), with offices at 4916 Plank Rd, Building D4, North Garden VA 22959, . At all relevant times and negotiated the commitment letter, the loans and credit line deed of trust for the sale of the riding center property located in Bedford County Virginia. Darnell managed and operated the economic base through which the illegal banking enterprises "RBC, Wynne and 1650," and the enterprises, Select, Mason, Thomas, Garrett, SBFC, S&R, SAF, BBoyz, Lester, Beck, ATC, and Richardson " operated and through which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant.. Darnell is sued individually and in his official capacity

46. David Franzen "Franzen" is a resident and citizen of Albemarle County, Virginia with offices at 4916 Plank Rd, Building D4, North Garden VA 22959. During all times alleged in this complaint, was acting within the scope of trustee. Franzen managed and operated the economic base through which the illegal banking enterprises "RBC, Wynne and 1650," and the enterprises, Select, Mason, Thomas, Garrett, SBFC, S&R, SAF, BBoyz, Lester, Beck, ATC, and Richardson " operated and through which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant.

47. Mary Lou Hopkins, "Hopkins" is a resident and citizen of Albemarle County, Virginia and an officer and shareholder of ODNB with offices at 4916 Plank Rd, Building D4, North Garden VA 22959, and at all relevant times negotiated the commitment letter, loans and credit line deed of trust for the sale of the riding center property located in Bedford County Virginia. Hopkins managed and operated the economic base through which the illegal banking enterprises "RBC, Wynne and 1650," and the enterprises, Select, Mason, Thomas, Garrett, SBFC, S&R, SAF, BBoyz, Lester, Beck, ATC, and Richardson "

13

operated and through which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant.. Hopkins is sued individually and in her official capacity

48. Kelly Potter, "Potter" is a resident and citizen of Albemarle County Virginia and a officer and shareholder of ODNB with offices at 4916 Plank Rd, Building D4, North Garden VA 22959. Potter managed and operated the economic base through which the illegal banking enterprises "RBC, Wynne and 1650," and the enterprises, Select, Mason, Thomas, Garrett, SBFC, S&R, SAF, BBoyz, Lester, Beck, ATC, and Richardson " operated and through which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant.. Potter is sued individually and in her official capacity

49. Ted Counts Realty & Auction Co. Inc. *formerly* Counts Realty Group (Lynchburg CI), and Auction Co, Inc, "Counts" is a business located at 828 Main St, 15th Floor, Lynchburg VA, registered with the State of Virginia #02150522 and negotiated the sale and closing of the S&R property. Counts is the economic base through which the illegal banking enterprises "Wynne, RBC, and 1650," and the enterprises, Mason, Thomas, S&R, Lester, Beck, ODNB, ATC, and Richardson " operated and through which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant..

50. Advantage Title & Closing Company, LLC, "ATCC" is a Virginia Limited Liability company with its principal place of business at 828 Main St, 15th Floor, Lynchburg, VA 24504. ATC is operated and owned by Richardson and Fariss. ATC is the economic base through which the illegal banking enterprises "Wynne, RBC, and 1650," and the enterprises, Mason, Thomas, S&R, BBoyz, SAF, Lester, Beck, Northcreek, Edmondson, Twery, Day, Schenkel, Union, ODNB, Fariss and Richardson " operated and through

14

which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant..

51. Matt Fariss, "Fariss" is a resident of Campbell County Virginia with offices at 828 Main St, 15th Floor, Lynchburg VA 24504 and member of ATCC. Fariss managed and operated the economic base through which the illegal banking enterprises "Wynne, RBC, and 1650," and the enterprises, Mason, Thomas, S&R, BBoyz, SAF, Lester, Beck, Northcreek, Edmondson, Twery, Day, Schenkel, Union, ATC, ODNB, and Richardson " operated and through which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant. Fariss is sued individually and in his official capacity

52. Jennifer Richardson, "Richardson" is a resident and citizen of the City of Lynchburg, Virginia with primary offices at 828 Main St, 15th Floor, Lynchburg, VA, member of ATCC, and CTI, a licensed notary, insurance and title agent licensed in the State of Virginia. Richardson managed and operated the economic base through which the illegal banking enterprises "Wynne, RBC, and 1650," and the enterprises, Mason, Thomas, S&R, BBoyz, SAF, Lester, Beck, Northcreek, Edmondson, Twery, Day, Schenkel, Union, ODNB, Fariss, ATC and Fariss" operated. Richardson negotiated, forged and recorded deeds, credit line deeds of trust and land records, at all times relevant..

53. Robert Thomas Beach, "Beach", is a resident located at 2710 Goode Station Rd, Goode VA, 24523 Bedford County with an investment interest in 1650 Partners LLC, RBC (beneficiary 2006-2014). During all times alleged in this complaint, Beach invested in and had an economic interest in the economic base through which the illegal banking enterprise of "Wynne and RBC," and the enterprises, Mason, Thomas, S&R, BBoyz, Lester, Beck, Twery, Day, Schenkel, Davis, Garrett, Union, ODNB, Counts, ATC, Fariss and Richardson " operated and through which Richardson forged and recorded deeds,

credit line deeds of trust and land records, at all times relevant. Beach is sued individually and in his official capacity

54. Walter G Mason, "Mason", is a resident of the State of Virginia and was a manager and member of 1650 Partners LLC and is an officer/ shareholder of SBFC and Select Bank with offices located at 211 Gristmill Dr, Forest VA 24551. Mason managed and operated the economic base(s) through which the illegal banking enterprise of "Wynne and RBC," and the enterprises, Beach, Thomas, S&R, Davis, Garrett, BBoyz, Lester, Beck, Twery, Day, Schenkel, Union, ODNB, Counts, ATC, Fariss and Richardson ", operated and through which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant. Mason is sued individually and in his official capacity

55. James Michael Thomas, "Thomas", is a resident of the State of Virginia with a member interest in 1650 Partners LLC and officer/shareholder of Select Bank Financial Corp and Select Bank with offices 211 Gristmill Dr, Forest VA 24551. Thomas manages, operates, or has a financial interest in the economic base(s) through which the illegal banking enterprise of "Wynne and RBC," and the enterprises, Beach, Mason, S&R, BBoyz, Lester, Beck, Twery, Day, Garrett, Schenkel, Davis, Union, ODNB, Counts, ATC, Fariss and Richardson ", operated and through which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant. Thomas is sued individually and in his official capacity

56. T. Clay Davis "Davis" is a resident of the State of Virginia and officer/shareholder of Select Bank Financial Corp and Select Bank with offices 211 Gristmill Dr, Forest VA 24551. Davis manages and operates the economic base through which the illegal banking enterprise of "Wynne and RBC," and the enterprises, Beach, Thomas, Mason, S&R, BBoyz, Lester, Beck, Twery, Day, Garrett, Schenkel, Union, ODNB, Counts, ATC, Fariss and Richardson ", operated and through which Richardson forged and recorded

deeds, credit line deeds of trust and land records, at all times relevant. Davis is sued individually and in his official capacity

57. T. Scott Garrett, "Garrett" is a resident of the State of Virginia and member of board of directors and share holder of Select Bank Financial Corp and Select Bank with offices 211 Gristmill Dr, Forest VA 24551. Garrett was a director/shareholder Community First Financial Corp a/k/a Community First Bank and has been sat on Finance Sub-Committees in the Virginia General Assembly. During all times alleged in this complaint, Garrett was director and had a financial interest in the economic base through which the illegal banking enterprise of "Wynne and RBC," and the enterprises, Davis, Beach, Thomas, Mason, S&R, BBoyz, Lester, Beck, Twery, Day, Schenkel, Union, ODNB, Counts, ATC, Fariss and Richardson ", operated and through which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant. Garrett is sued individually and in his official capacity.

58. Margie Callahan, "Callahan", is a resident and citizen of Lynchburg, Virginia with offices located at 18396C Forest Rd, Forest VA  24551. During all times alleged in this complaint, Calahan was acting within the scope of agent of State Farm Mutual Automobile Insurance Company. Callahan is sued individually and in her official capacity.

**59.** Eustice-Merchant Ford, Inc a/k/a/ Battlefield Ford, "Battlefield", is a Virginia company with its place of business in Manassas, Virginia with its registered agent located at 8980 Mathis Ave, Manassas VA 20110, and negotiated the sale of F650 truck to Rivers. Battlefield is the economic base through which the illegal banking enterprise of "Wynne and RBC," and Twery' enterprise operated at all times relevant.

60. Lisa Schenkel, "Schenkel" is a resident and citizen of the City of Lynchburg, Virginia with offices located at 1602 Graves Mill Rd, Lynchburg VA 24502. Schenkel is former counsel for Ralph Beck, licensed to practice law in the State of Virginia during at all

17

relevant times relevant with Schenkel and Donaldson, PC. Schenkel negotiated and conducted the illegal affairs, the enterprises, S&R, BBoyz, Lester, Beck, operated and through which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant. Schenkel is sued individually

61. Frank Morrison, "Morrison", is a resident and citizen of the City of Lynchburg, Virginia, with offices located at 828 Main St, Suite 1403, Lynchburg VA 24504. Morrison was counsel for Shana Lester and licensed to practice law in the State of Virginia. Morrison negotiated and conducted the illegal affairs, the enterprises, S&R, Lester, Beck, operated and through which Richardson forged and recorded deeds, credit line deeds of trust and land records, at all times relevant. Morrison is sued individually

62. Steve Grant, "Grant", is a resident of the State of Virginia with offices located at 1 Cedar Hill Ct, Bedford VA 24523 and licensed to practice law in the State of Virginia at all relevant times. Grant negotiated and conducted the illegal affairs of the enterprises, S&R, Lester, BBoyz, SAF and Beck, operated and continue to operate at all times relevant. Grant is sued individually

63. James Dimitri, "Commissioner Dimitri", former Commissioner of the Virginia State Corporation Commission in Richmond, Virginia for all times relevant to this action and is to be served at the offices of General Counsel for the SCC located at 1300 E. Main St, Richmond VA 23219 and the Office of the Attorney General, Mark Herring at 202 N. 9th St, Richmond VA 23219. During all times alleged in this complaint, was acting within the scope of Commissioner of the SCC as the economic base through which the illegal banking enterprise, "RBC and Rivermont Consultants Inc was registered and advertised as a Virginia State bank from April 2006 to July 2014. and is being sued individually and in his official capacity

64. Judith Williams Jagdmann, " Commissioner Jagdmann", is a Commissioner of the Virginia State Corporation Commission in Richmond Virginia for all times relevant to this

18

action and is to be served at the offices of General Counsel for the SCC located at 1300 E. Main St, Richmond VA 23219, and the Office of the Attorney General, Mark Herring at 202 N. 9th St, Richmond VA 23219. During all times alleged in this complaint, was acting within the scope of Commissioner of the SCC as the economic base through which the illegal banking enterprise, "RBC and Rivermont Consultants Inc was registered and advertised as a Virginia State bank from April 2006 to July 2014. Jagdmann is being sued individually and in her official capacity

65. Mark C Christie, "Commissioner Christie", is a Commissioner of the Virginia State Corporation Commission in Richmond Virginia for all times relevant to this action and is to be served at the offices of General Counsel for the SCC located at 1300 E. Main St, Richmond VA 23219, and the Office of the Attorney General, Mark Herring at 202 N. 9th St, Richmond VA 23219. During all times alleged in this complaint, was acting within the scope of Commissioner of the SCC as the economic base through which the illegal banking enterprise, "RBC and Rivermont Consultants Inc was registered and advertised as a Virginia State bank from April 2006 to July 2014. Christie is being sued individually and in his official capacity

66. Liberty University Inc, "LU", is a Christian University registered with the State of Virginia with offices and registered agent located at 1971 University Blvd, Lynchburg VA, 24515 at all times relevant

67. North Creek Inc. *North Creek Construction,* "Northcreek", is a Virginia corporation with offices and registered agent located at 104 Paddock Lane, Forest VA 24551, Bedford County and at 595 Legacy Lakes Way, Aberdeen NC, 28315. Northcreek was the economic base through which the enterprises, S&R, SAF, Union, Twery, ATC, Richardson, Fariss, Beck, Lester, BBoyz, Edmundson and Mrs. Edmundson, operated.

68. David E. Edmundson, "Edmundson", is a resident of the State of North Carolina and was a resident of Bedford County Virginia, and Northcreek's registered agent. Edmundson is

19

a class A licensed contractor. Edmundson managed and operated the economic base through which the enterprises, S&R, SAF, Union, Twery, ATC, Richardson, Fariss, Beck, Lester, BBoyz, Northcreek and Mrs. Edmundson, operated and is to be served at his residence at 595 Legacy Lakes Way, Aberdeen NC 28315 and at the last known office of Northcreek Inc. at 104 Paddock Lane, Forest VA 24551.

69. Mrs. Edmundson, "Mrs. Edmundson", is a resident of the State of North Carolina and was a resident of Bedford County Virginia, Mrs. Edmundson managed and operated the economic base through which the enterprises, S&R, SAF, Union, Twery, ATC, Richardson, Fariss, Beck, Lester, BBoyz, Northcreek and Edmundson, operated and is to be served at her residence at 595 Legacy Lakes Way, Aberdeen NC 28315 and at the last known office of Northcreek Inc. at 104 Paddock Lane, Forest VA 24551.

70. Gary M Bowman is a resident of Roanoke Virginia and attorney licensed in the State of Virginia, counsel for Rivers, Wallis, Nitti and Registered Agent for NMG with offices located at 2725 Colonial Ave, Suite 100, Roanoke VA 24015 at all times relevant. Bowman is to be served at his residence at 3580 Wright Rd, SW, Roanoke, VA 24015

71. Serene Creek Run Association "HOA", is a company registered with the State of Virginia with registered agent offices located at 725 Church St, 12th Floor, Lynchburg VA 24504. HOA has had a recorded lease with the riding center at all times relevant

72. Laura J Wallace, "Wallace", is a resident of the State of Virginia and Executive Vice President of HR at Liberty University with offices located at 1971 University Blvd, Lynchburg VA 24502 at all times relevant. During all times alleged in this complaint, was acting within the scope of officer and is being sued individually and in her official capacity

73. Travis Baker, "Baker" is a resident of 1299 Riley Run Rd, Forest VA 24551, Bedford County and recorded owner of Lot 3 located within the Serene Creek Run subdivision.

20

Baker negotiated the closing/sale of the S&R property currently under contract with Rivers' CVLR d/b/a at all times relevant

74. Michael Friedman,"Friedman" is a resident of 1409 Riley Run Rd, Forest VA, 24551, Bedford County and recorded owner of Lot 6 located within the Serene Creek Run subdivision. Friedman negotiated the closing/sale of the S&R property currently under contract with Rivers' CVLR d/b/a at all times relevant

75. Richard Rogers, "Rodgers" is a resident of 1475 Riley Run Rd, Forest VA 24551, Bedford County and recorded owner of Lot 8 located within the Serene Creek Run subdivision. Rogers negotiated the closing/sale of the S&R property currently under contract with Rivers' CVLR d/b/a at all times relevant

76. Matthew Krycinski , "Krycinski",  is a resident of 1652 Riley Run Rd, Forest VA, 24551, Bedford County, owning Lots 16 located within the Serene Creek Run subdivision, and Lots H & I located in the Serenity Acres Farm subdivision, Krycinski negotiated the closing/sale of the S&R property currently under contract with Rivers' CVLR d/b/a at all times relevant

77. Sarah Krycinski  is a resident of 1652 Riley Run Rd, Forest VA  24551, Bedford County and recorded owner of Lot 16 located within the Serene Creek Run subdivision and Lot H&I located in the Serenity Acres Farm subdivision.  Krycinski negotiated the closing/sale of the S&R property currently under contract with Rivers' CVLR d/b/a at all times relevant

78. Michael Bradbury, "Bradbury" is a resident of 1648 Riley Run Rd, Forest VA  24551, Bedford County and recorded owner of Lot 18 located within the Serene Creek Run subdivision. Bradbury negotiated the closing/sale of the S&R property currently under contract with Rivers' CVLR d/b/a at all times relevant

79. Howard Frear, "Frear" is  a resident of 1234 Riley Run Rd, Forest VA  24551, Bedford County and recorded owner of Lot 33 located within the Serene Creek Run subdivision.

Frear negotiated the closing/sale of the S&R property currently under contract with Rivers' CVLR d/b/a at all times relevant

80. William Fluker, "Fluker" is a resident of 1140 Riley Run Rd, Forest VA 24551 and recorded owner of Lot 34 located within the Serene Creek Run subdivision. Fluker negotiated the closing/sale of the S&R property currently under contract with Rivers' CVLR d/b/a at all times relevant

81. Bank of the James Financial Group Inc a/k/a Bank of the James, "BOJ" is a bank doing business in the State of Virginia with registered agent offices located at 828 Main St, 19th Floor, Lynchburg VA 24504.

82. Robert R Chapman III, "Chapman" is a resident of Lynchburg Virginia and President of BOJ with offices located at 828 Main St, Lynchburg VA 24504 Bank of the James Building. Chapman. During all times alleged in this complaint, was acting within the scope of officer and is being sued individually and in his official capacity

83. Select Bank Financial Corporation, "SBFC" is a corporation doing business in the State of Virginia with offices located at 211 Gristmill Dr, Forest VA 24551 Bedford County. Select Bank Articles of Restatement were executed with the SCC on March 22, 2007. Select Bank Articles were been restated on July 6, 2006

84. Select Bank "Select" is a bank doing business in the State of Virginia with offices located at 211 Gristmill Dr, Forest VA 24551 Bedford County.

85. Union Bankshares Corporation "UBC", formerly StellarOne, formerly Planters Bank and Trust, is a corporation doing business in the State of Virginia with registered agent offices located at 1051 E. Cary St, Suite 1200, Richmond VA 23219

86. Union Bank & Trust, "Union", formerly StellarOne, formerly Planters Bank and Trust, is a bank doing business in the State of Virginia with offices located at 1051 E. Cary St, Suite 1200, Richmond VA 23219

87. Stephen J Eager, "Eager" is a resident of the State of Virginia and President of Union Bank with offices located at 1051 E. Cary Street, Suite 1200 Richmond VA 23219. During all times alleged in this complaint, was acting within the scope of officer and is being sued individually and in his official capacity. Eager knew or should have known of the illegal banking activity

88. Sanzone and Baker, "SAB" is a law-firm located in the City of Lynchburg Virginia, is to be served at its offices at 1106 Commerce St, Lynchburg, VA 24504 at all times relevant.

89. Joseph Sanzone, "Sanzone" is resident of the State of Virginia, a licensed attorney practicing in the City of Lynchburg Virginia, and is to be served at his offices at 1106 Commerce St, Lynchburg, VA 24504 at all times relevant.

90. Mark Donevant, "Donevant", is resident of the State of Virginia, a licensed attorney practicing in the City of Lynchburg Virginia, and is to be served at his offices at 1106 Commerce St, Lynchburg, VA 24504 at all times relevant

### III. NOTICES OF LEGAL ACTION

91. On June 16, 2017, October 18, 2017 and January 8, 2018, Rivers duly presented Petition and Reports, Notice of Claims and Final Notices of Tort Claims, pursuant to the Federal Tort Claims Act, 28 U.S.C § 2671, *et seq.,* and 28 C.F.R. §14.1, *et seq.,* giving notice of among other things, criminal matters complained of, reported, investigated, proved but intentionally not charged, concerning torts, parties to the crime, money laundering, forgery/altering documents, conspiracy, fraudulent conveyance, gross negligence of employees and agents, using Rivers and other victims documents and evidence not for what they intended, but for embezzlement, pain and suffering, and letters acknowledging the receipt of the notices; which were caused by the negligent and wrongful acts or omissions of certain employees of the United States Government while

acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to Rivers in accordance with the federal laws and the laws of the Commonwealth of Virginia.

92. Although the claims referenced in the previous paragraphs have not been denied, the United States Government has failed to act on the claims within six months from the date the claims were presented. Therefore Rivers elects to treat these claims as having been denied.

### IV. LEGAL OVERVIEW / HISTORY

93. A federal investigation of Wynne was ongoing at all times relevant no later than 2007.

94. Between 2007 and present, the FBI failed to conduct, with flexibility, under appropriate standards and procedures, investigations to detect, obtain information about, interrupt, and prevent, and protect Rivers, her business' and other known victims and unknown victims, against federal crimes being committed and those crimes to be committed in the future, by John L "Wynne", Rivermont Banking Company Inc. "RBC", Rivermont Consultants Inc, 1650 Partners LLC "1650", Southgate Leigh Wynne Testamentary Trust "SGLWT", and the federal crimes committed by the Defendants named in this complaint

95. October 1, 2007 was the offense date for Case No 10-86-02-1050 against Wynne for Obtaining Money Under False Pretense. It is alleged that there were over 12 victims injured by Wynne at all times relevant to this matter

96. On December 28, 2010; Rivers and Special Agent Vaughn met with Bedford County Commonwealth Attorney Mark Robinette to discuss matters relating to the acts against Rivers by Wynne and reviewed Rivers documents and research evidence she had uncovered. Bedford County Commonwealth Attorney Mark Robinette reported that the charges against Wynne were either Federal or civil in nature and he could not pursue the charges in criminal court. The report of this interview was transcribed on 2/3/11 (the

24

day before grand jury) as file #10-86-02-1050-13; indicating 13 files of case no 10-86-02-1050 since offense date against Wynne as subject on October 1, 2007

97. Between December 18, 2010 and January 7, 2011; Rivers and a associate met with the City of Lynchburg Investigator Eugene Wingfield (now Clerk of the Court for City of Lynchburg) and reported her concerns she had about Wynne,RBC and 1650. Rivers was told that;

> "That Wynne was a "washer" and they have been trying to get him for a while but 'they" can't catch him because he stays right under the radar. There wasn't a Judge or Attorney in the State that would take her case. The only way to get Wynne would be to file a case in Federal Court."

98. Rivers provided Wingfield with her documents for review at the meeting and he changed his mind about her case. Wingfield sent Rivers to the office of the FBI agent Christine PettyJohn in the City of Lynchburg. Agent PettyJohn provided Rivers with a business card for Special Agent MaryLou Prilliman of the Department of Justice IRS Division. Rivers and victim Karen Foster made arrangements and met with Special Agent , Defendant Prilliman and provided the Department of Justice IRS Division with the same box of evidence Rivers provided to Bedford County Commonwealth Attorney Mark Robinette and Wingfield to be used to indict Wynne and those involved in obtaining their money under false pretense, the insurance fraud and illegal banking activity. Both women signed papers agreeing that they left their documents and evidence with Prilliman to copy and review. At all times relevant to this matter, Rivers and other victims were told Wynne was being indicted

99. On January 7, 2011; Rivers and Foster obtained their original evidence and documents from Prilliman and each continued to have an ongoing relationship with Prilliman and the Department providing new evidence and facts in real time as they received and lived it

100.        On February 1, 2011; Rivers was interviewed by Virginia State Police Special Agent James Vaughn regarding her reports to the City of Lynchburg Commonwealth Attorney's investigator Eugene Wingfield, the FBI, and the Bedford County

Commonwealth Attorney Mark Robinette about mortgage and insurance fraud and acts committed against her and others by Wynne. Rivers continued to have a relationship with those agencies and agents named defendant in this matter providing new evidence to them and reviewing evidence brought to her by VSP Special Agent James Vaughn

101. On February 4, 2011; Multi-Jurisdictional Grand Jury was empanelled in Bedford County Circuit Court to hear matters pertaining to Wynne pursuant to obtaining money under false pretense in Case No 10-86-02-1050

102. On September 8, 2011; CVLR Performance Horses Inc filed its RICO/Racketeering case no 6:11-cv-00035, as *CVLR Performance Horses Inc v John L Wynne, Rivermont Banking Company Inc., Rivermont Consultants Inc, 1650 Partners LLC, et al.* in this Court, the parties to that case, hereinafter, will be referred to as "CVLR Inc., RBC, Rivermont Consultants, and 1650. The Court remanded the state claims "dismissing without prejudice" to state Court (Albemarle and Bedford County), removing them from the CVLR Inc. RICO case. The RICO case was noticed for appeal on **June 22, 2012**. Rivers was not a party to the case(s).

103. On April 2, 2013; Bowman wrote to Timothy Heaphy, U.S. Attorney on behalf of NMG, acknowledging that Patrick Hogeboom, U.S. Assistant Attorney (deceased Oct. 2017) had threatened Wallis with subpoena to appear before "the grand jury" to testify about the contracts NMG had with Rivers and victim Vicki Marsh. Bowman agreed in the letter that he would be happy to terminate his representation of Rivers and Marsh and he thought NMG would be happy to terminate its contracts with Rivers and Marsh (without notification to Rivers). Bowman, in the fall of 2011, had allowed an investigator from the US Attorney's Office (without permission from Rivers or notification), to come to his office and review his case files for a week. She was given free access to all of his case files which included Rivers files. An adverse interest between Bowman, Wallis, NMG, victims Vicki Marsh and Rivers existed at all times relevant in this matter.

26

Bowman met with the U.S. Assistant Attorney Patrick Hogeboom and Karen Deer in May 2013 on behalf of NMG

104.     On April 23, 2013; CVLR Inc., in Bedford Circuit Court, filed case no CL13-183, against S&R,  Beck and Lester for breach of contract.  Rivers was not a party to the action.

105.     On April 25, 2013 Beck, sued Lester and Rivers in Bedford County Virginia, case no CL13-188 in a "Quiet Title" action against Lester. Beck's x-wife,  Lester hadn't "undone the S&R to CVLR d/b/a option lien contract" as she agreed to in a 2007 Lynchburg City 5th Partial Settlement divorce agreement.  Beck filed cross-claims against Rivers and Lester in the CVLR Inc. case no CL13-183 because Rivers and Lester signed the Option contract. CVLR Inc.was not a party to the Option contract

106.     On May 29, 2013; the United States Court of Appeals No 12-1591 (L) (6:11-cv-00035-NKM) reversed in part and dismissed in part.  The case was remanded to this Court for further proceedings.  The CVLR Inc. RICO case was based on open-ended continuity. Trial was set for July 28, 2014.

107.     On January 16, 2014; Wallis was sued by the United States of America in this Court Case No 6:14-cv-00005, $415,000 Tax Liability. The United States was represented by attorneys with the U.S. Department of Justice and the U.S. Department of Justice IRS Tax Division.  Bowman was Wallis' Power of Attorney at all times relevant in this matter unbeknownst to Rivers until after February 24, 2014

108.     On March 12, 2014; Wallis, represented by Bowman, filed his answer to Case No 6:14-cv-00005.  The case was referred to Honorable Magistrate Judge Robert Ballou for any mediation.

109.     On March 27, 2014 (date of Order); CVLR Inc settled the RICO matter at a February 24, 2014 mediation held in Western District of the United States/Roanoke Division, Honorable Mediation Judge Robert Ballou presiding.

110.       No later than April 4, 2014; the IRS Criminal Investigation Division opened a

criminal investigation of Wallis. The criminal investigation continued until on or about

September 15, 2014. Rivers was not interviewed by the IRS or the DOJ regarding

contracts or claims against Wallis or his entities

111.       On August 4, 2014; Rivers and CVLR Inc were sued by NMG, for breach of

contract asking for Rivers and CVLR Inc claims as relief, in Case No CL14-1454, filed in

the City of Roanoke . Rivers and CVLR Inc answered NMG's complaint and filed

Counter-Claims against them. Rivers and CVLR Inc were represented by James Gilbert

IV until July 22, 2015. Rivers is representing herself pro se and CVLR Inc is un-

represented.

112.       On July 8, 2015: Rivers filed Case No CL15-0525 in the City of Lynchburg

naming 24 Defendants. The Complaint was void of any Causes of Action or Claims. It

alleged a time-line of facts, quoted acts committed and tactics used in Conspiracy,

Legal Malice, Conflict of Interest; and acts alleged under Federal jurisdiction; Aiding and

Abetting, Obtaining Money/Signature Under False Pretense. Rivers failed to state any

claims. The Defendants were not served until after July 8, 2016. The state claims

against them would be lost due to lack of prosecution. However, new claims are filed in

this matter that could not have been known to Rivers at the time.

113.       On August 28, 2015; Rivers and CVLR Inc. added Bowman to Case No CL14-

1454 as a third-party Defendant. Bowman was removed as Defendant on January 3,

2018. The Court's decision has been appealed to the Supreme Court of Virginia

114.     On December 3, 2015; The CVLR Inc v S&R, Beck and Lester case was dismissed due

to CVLR Inc. "lack of standing." The Bedford County Circuit Court validated that (a) <u>CVLR</u>

<u>Inc was not</u> a party of interest to the S&R to CVLR d/b/a Option lien contract, (b) <u>CVLR d/b/a</u>

<u>was the party of interest</u>, (c) <u>Rivers was the owner of interest of CVLR</u> <u>d/b/a</u>, and (d) the

Option had never been assigned. The transcript of the hearing on November 12, 2015 was

incorporated by reference to the Order.    Beck non-suited his claims against Lester and Rivers

115.    On January 20, 2016; Beck filed a new "*de novo*" case in Bedford County Circuit Court, CL16-000031 against Rivers and Lester this time for Lester's 2007 breach of the Fifth Partial Settlement Divorce Agreement. Rivers was not a party to the divorce action

116.    On February 16, 2016; Rivers filed her answer to Beck's complaint and her Counter-Claim against Beck and Cross-Claimed Lester and exercised her April 24, 2007 Option to Purchase and First Right of Refusal Agreement, "Option contract" between S&R and CVLR d/b/a to purchase the property the remaining S&R Farm LLC property on April 24, 2007, including but not limited to, the improvements and lots located within the Serene Creek Run and Serenity Acres subdivisions. Rivers filed Memorandum of Lis Pendens against the property in case no CL16-031.

117.    On February 17, 2016; Rivers served her claim against Lester on Lester in case CL16-031 including a copy of the Notice to Exercise the Option contract filed with the Clerk's office.

118.    On February 23, 2016; Rivers served her answer to Beck's complaint and her Counter-Claim against Beck and Lester on Beck, including a copy of the Notice to Exercise the Option contract filed with Clerks office

119.    On July 8, 2016; in the City of Lynchburg, Case No CL15-0525; Rivers filed her Amended Complaint and added additional defendants without leave of the Court . The original Defendants were never served with the original complaint.  The original and incorrectly added Defendants were not served with the Amended Complaint until after July 8, 2016.

120.    On July 27, 2016; Rivers filed Notice of Removal for Case No CL6:16-cv-00043 in this Court to remove Circuit Court Case CL15-0525 based on diversity of citizenship

121.     On July 28, 2016; this Court <u>Remanded</u> Case No 6:16-cv-00043 back to the Circuit Court for the City of Lynchburg; concluding that the Court lacked jurisdiction and removal was improper; only "the defendant or defendants" may remove a case from state court to federal court. 28 U.S.C. §1441(a); 28 U.S.C. §1446(a)

122.     On August 2, 2016; the City of Lynchburg Circuit Court dismissed Rivers Case No CL15-0525. Although the case was dismissed, only the original complaint was affected. <u>The Court did not have jurisdiction over the subject matter of the Amended Complaint and did not have personal jurisdiction over the additional defendants added to the amended complaint</u>, because; (a) the Court did not grant leave to Rivers to add defendants, (b) the Court did not grant leave to Rivers to Amend the Complaint, and (c) the Defendants were not served or served timely with either the complaint or the amended complaint; at all times relevant.

123.     On October 19, 2016; Rivers appealed the City of Lynchburg Circuit Court's decision due to the Judge's conflict of interest and error in dismissing the case on a motion not filed by Rivers but rather filed by attorney Mark Donevant, a named defendant representing a additional named defendant, attorney Joseph Sanzone. The Court concluded for the record that it (a) had a conflict of interest with attorneys named defendants, and (b) the Court had ex parte communications with the attorneys named defendants without Rivers present or knowledge, and (c) could not hear the substantive matters of the case "on the merits."

124.     On December 6, 2016; in the Bedford County Circuit Court Rivers filed Case No CL17-710 against Lester for "new breach" of contract and fraud based on a new breach occurring on or about September 2016 and new discovery evidence.

125.     On June 16, 2017; the Supreme Court of Virginia refused Rivers Petition for Appeal in Record No 161486 / Case No CL15-0525 and on October 6, 2017, denied her Petition for Rehearing

126.     On December 20, 2017; Rivers petitioned Record No 161486 / Case No CL15-0525 to the Supreme Court of the United States for Writ of Certiorari. The matter was distributed for conference on March 16, 2018. The Petition was Denied on March 19, 2018 and petitioned for Rehearing on April 13, 2018. Rivers Petition for Rehearing was Denied on May 29, 2018. A motion to extend mandate was never filed.

127.     On January 3, 2018; Bowman, a third-party defendant, was removed from Case No CL14-1454 by Order of the Court. The Court granted Rivers motion to add Wallis, Nitti, and FAC to the case as Third-Party Defendants.

128.     On February 2, 2018; Rivers appealed the Courts decision to remove Bowman from Case No CL14-1454 to the Supreme Court of Virginia. Record No 180449. The appeal is pending, oral argument has not been heard.

129.     On February 23, 2018; Rivers filed Motion to proceed *in forma pauperis* and Notice of Removal Case No CL7:18-cv-82 in this Court to remove Circuit Court Case CL14-1454 based on the federal claims II-IV filed incorrectly in the City of Roanoke

130.     On March 1, 2018; this Court <u>Granted</u> Rivers *in forma pauperis* motion and <u>Remanded</u> Case No 4:18-cv-82 to the Circuit Court for the City of Roanoke; the Court concluded that it lacked jurisdiction; the Plaintiff in the matter, Northwood NMG Group Inc.'s complaint in case no CL14-1454 did not assert a federal claim and could not have been filed in federal court.

131.     On May 10, 2018; the City of Roanoke Circuit Court <u>Granted</u> Rivers motion to dismiss without prejudice, her Counts II-V against Wallis, FAC and Nitti because they were Federal in nature; the Circuit Court for the City of Roanoke lacked jurisdiction to hear federal claims.

132.     On May 25, 2018; Rivers non-suited her state claims against Beck and Lester and filed Lis-Pendens on the property she currently has under contract to purchase and mailed a copy to all homeowners and parties of interest

133.    On May 29, 2018; The Writ and Petition for rehearing to the U.S. Supreme Court were denied for Rivers Lynchburg case CL15-0525.

134.    Because the City of Lynchburg Circuit Court did not have subject matter jurisdiction over the amended complaint or personal jurisdiction over the added defendants, res-judicata does not apply to the Lynchburg case.

135.    Since June 2016; Rivers has gathered evidence that she could not have received before this date and that is not recorded, through discovery, pertaining to the Defendants and their acts in this matter from the cases filed against her by Beck, CL16-031 in January 2016 and NMG , CL14-1454 in August 2016 and her case, CL16-710, filed against Lester in December 2016.

136.    The evidence falls under the "new discovery rule." This newly discovered evidence ties the State claims into Federal claims because of new breach's and acts that (a) were committed after August 2, 2016, (b) not known to Rivers before August 2, 2016, (c) and/or are federal and criminal in nature, and (d) one could not have been done without the other.   The Discovery Rule applies in situations where and/if Rivers (a) actually discovered or learned of or could have discovered/learned of the evidence or facts, and /or (b) Rivers did not know and could not have known about the evidence (the truth and facts) until she received that which was intentionally kept from her, for whatever reason; meaning after the statute of limitations would normally start running.

## V. FACTS
## THE UNITED STATES, FEDERAL AND STATE AGENCIES, EMPLOYEES AND CITY AND COUNTY DEFENDANST

137.    Between 2007 and present; The investigation of John L. Wynne "Wynne", Rivermont Banking Company Inc. "RBC", and Richardson has yielded no indictments or charges

32

138.    On February 24, 2014; Rivers and CVLR Performance Horses Inc settled their

claims against Wynne, Rivermont Banking Co Inc, Rivermont Consultants Inc, 1650

Partners LLC and Southgate Leigh Wynne Testamentary Trust

139.    On or before October 1, 2007; an investigation was open naming John Leigh

Wynne the suspect. In Case No 10-86-02-1050.  Wynne and Defendant, Twery held

themselves out as President of Rivermont Banking Company Inc, operating a legitimate

banking business.

140.    In October 2006, Rivers, a horse trainer, had answered an ad that Wynne ran in

the News and Advance, the local paper in Lynchburg Virginia advertising pasture for

rent.  Rivers met Wynne at his RBC's office in Lynchburg Virginia. Rivers agreed to rent

the pastures and signed a lease agreement at the office of RBC. On May 22, 2007;

Rivers signed a loan agreement with RBC agreeing to pay 8.5% plus 1% premium on all

money borrowed and loans received from RBC

141.    December 7, 2010; Bedford County Commonwealth Attorney Mark Robinette

issued subpoenas for documents for the February 4, 2011 Multi Jurisdictional Grand

Jury empanelled at the Circuit Court of the County of Bedford Virginia to Old Dominion

National Bank. Honorable James W Updike Jr. presided. The multi-jurisdictional grand

juries had been empanelled since first ordered by the Supreme Court of Virginia on June

8, 2006. Honorable Chief Judge Mosby Perrow presided.

142.    On January 18, 2011; Bedford County Commonwealth Attorney Mark Robinette

issued subpoenas for documents for the Mulit-Jurisdictional Grand Jury

143.    On January 20, 2011; "ODNB", responded to the subpoena issued by Robinette

and  presented documents to Special Agent James Vaughan at their bank business

located in North Garden Virginia.

144.    On February 1, 2011; Rivers was interviewed by Special Agent James Vaughan

regarding her complaints with the Bedford County Commonwealth Attorney office

regarding mortgage fraud by what she thought was a mortgage banker identified as John Leigh Wynne,. Wynne and Twery operated RBC as an illegal bank in Lynchburg Virginia. Rivers had borrowed large sums of money from RBC and RBC had agreed to finance a F650 valued at over $100,000.00, purchased by Rivers from Battlefield and insured with State Farm, John Deere equipment, valued at over $43,000.00, and her riding center for $500,000.00, and mortgaged through ODNB. When Rivers first met with Talbott and James Vaughn of the Virginia State Police in 2010, she was informed that there were many victims of Wynne and RBC in several states. Rivers had provided what documents she had to demonstrate insurance fraud charges against Wynne. Indicated below (The documents obtained from Rivers were appended for inclusion into the case file #10-86-02-1050-11). Talbott convinced Rivers that she must have assigned her contracts to Wynne.

A. Insurance claim document dated 2.24.08 listing charges submitted to repair buildings damaged on Rivers farm. Adjuster Jane G Harold, AIC, Robinson & Assoc. Inc, Lynchburg Virginia, found replacement costs to total $34,143.11. Depreciation reduced costs to an Actual Cash Value of $24,265.38

B. Document dated 9/8/08 from American Bankers Insurance Company of Florida signed by Patrick Rose, Property Claims Supervisor added $8881.35 to the claim for a total of $33,146.73

C. Document dated 1/13/09 from Joseph Sanzone, former attorney for Rivers and CVLR Inc, indicating how the $8881.35 from the insurance company check was to be allocated

145.    On February 4, 2011; a Multi-Jurisdictional Grand Jury was empanelled in Bedford County Virginia to hear the Case No 10-86-02-1050 matter.

146.    On March 8, 2011: Virginia Department of State Police prepared an evidence list of property acquired from Case No 10-86-02-1050. The Title was Rivers, the victim and Wynne, the suspect. The character was OBTAIN MONEY BY FALSE PRETENSE.

34

Special Agent James Vaughan was the case agent, Jurisdiction was Bedford. Items

placed into evidence were one box containing miscellaneous financial documents

acquired on 2/4/11 (10:00 am) from ODNB by Vaughan. The evidence was moved into

storage on 3/8/11 at (15:29) in evidence room shelf 4 received by Dennis F Parries

147.    On April 5, 2011; Special Agent James Vaughn of the VSB Division VI

Headquarters, Salem VA (assigned to the ODNB investigation) received a letter from

former Bedford County Assistant Commonwealth Attorney, Mark Robinette stating:

"Dear Agent Vaughn, Pursuant to our previous discussions, it appears that any potential
criminal fraud that may have occurred regarding the disbursement of insurance proceeds,
took place at the Old Dominion National Bank, North Garden Virginia, which is located in
Albemarle County. You may want to contact the authorities in Albemarle County regarding
the criminal investigation in this matter."


148.    On August 2, 2011; The SCC's Commissioner Face received a hand written

email correspondence transmission from Wynne stating:


"Commissioner Face: attached is the documentation to support the change of the name of
the above captioned Virginia Corporation. Per you earlier correspondence the term
"banking" has been eliminated and now chartered "Rivermont Consultants Inc". My
apologies for any inconvenience I may have caused the Bureau. It was never my intention
to be a Bank or operate as one. If you have any further questions, do not hesitate to contact
me" Sincerely John L Wynne


149.    On August 3, 2011; SCC's John C Crockett received an email including a hand

written note from Wynne referring to the name change they discussed about two weeks

prior to the email. Wynne trusted this resolved any issues they discussed.

150.    The SCC allowed Wynne to continue to operate and advertise Rivermont

Consultants Inc. as a bank in the banking industry as per the original Rivermont Banking

Company Inc Articles of Incorporation and did not amend them as per the letter he

received from Face and the Va Code 6.2-§ 939.


35

151.     On October 18, 2013; Bowman wrote a letter to Bedford Commonwealth Attorney, Randy Krantz, informing him of Wynne operating RBC illegally. Violating Va. Code §6.2-939 asking him to bring the case before a grand jury:

152.     On February 21, 2014; Rivers received a response from Mark Robinette, Assistant Commonwealth Attorney, at the Bedford Commonwealth Attorney's office regarding documents Rivers had provided to them in January 2014. Robinette was referring to a copy of RBC articles of incorporation she had uncovered from her attorneys office, indicating the purpose of the business was to be a bank in the banking industry. Rivers had also pointed out, that Wynne was not in compliance of the letter she had received from the SCC because Wynne changed his name to Rivermont Consultants Inc but did not amend the RBC Articles of Incorporation.  Meaning that Rivermont Consultants Inc. was now operating as a illegal bank without being certified or authorized under Va. Code §6.2-938.  The response from Robinette only paid significant attention to a  October 3, 2013 letter they had discussed over the phone from the SCC

153.     On August 10, 2014; Rivers reached out again to the SCC General Counsel, DeMarian Johnston, to inquire what they were going to do about Wynne, (who was continuing to operate his illegal banking enterprise) and why they allowed him to be registered with the SCC as a illegal bank not in compliance with Va. Code §6.2-938. Rivers also wrote another letter to the Bedford County Commonwealth Attorney, Mark Robinette, asking him to mail her a copy of the letter Robinette told Rivers he had received from the SCC leading him to believe that Wynne and RBC had complied with the SCC and they were satisfied.

154.     On August 25, 2014: Mr. Robinette responded back to Rivers,

"Per your request, I have enclosed a copy of a letter sent by the State Corporation Commission (SCC) dated October 3, 2013, which was addressed to you.  Please note that I have never received a letter from SCC pertaining to you or Mr. Wynn."

155.     On April 6, 2015: Mr. Robinette responded to Rivers FOIA request by stating,

"In response to your FOIA request enclosed are copies of the only documents or correspondence either to or from my office regarding you or Mr. Wynne."

156.     Sometime in June, 2015 Rivers learned "new discovery evidence" on May 1, 2015 for documents relating to the S&R property.   Rivers former attorney, James Gilbert IV viewed the documents that Rivers had never seen before.  ATC, Richardson and Fariss had been withholding evidence from Rivers and the federal agencies since 2007. In the response of more than 500 pages, Rivers found her notarized Credit Line Deed as it was prepared originally with the spot for Rivers name blank and also a altered/forged copy of the Credit Line (Mortgage) dated November 20, 2007 that Richardson altered while at the Bedford County Courthouse, adding John L Wynne name in addition to 1650 Partners LLC, instead of Crystal VL Rivers and/or CVLR Performance Horses.

157.     Between 2015 and 2018; The City of Lynchburg, Campbell County and Bedford County all refused to file reports, investigate, charge and/or report the felonious and fraudulent and criminal acts to the Federal agencies, committed by Richardson of ATC and reported to them by Rivers.  Bedford County Commonwealth attorneys refused to charge Richardson for the felony she admitted she committed against Rivers.

158.     Richardson altered Rivers' $500,000.00 Credit Line Deed of Trust (ODNB Mortgage), Inst No 070017320, on November 21, 2007 at the Bedford County Courthouse after realizing that the names on the two Deeds being put up for collateral were incorrect and recorded the fraudulent Deed to the riding center .

159.     The aforementioned CLDOT was notarized by Richardson of ATC, on November 20, 2007, the day before she altered and recorded it.

160.     Another document Rivers found was Richardson's prepared HUD statement, that Richardson forged on November 21, 2007 to reflect the November 21, 2007 changes in the cost to record the incorrect, fraudulent Deed to the riding center and the forged CLDOT.  The forged HUD statement was dated November 20, 2007, was not signed by

37

Rivers personally or for CVLR or Lester of S&R and signed in hand by Richardson (not with a stamp like the original November 20, 2007 HUD statement.)

161.     On January 14, 2016; Rivers reported her new evidence regarding her forged ODNB CLDOT to the Campbell County Sheriff office. Investigator JB Epperson was assigned to the case. Campbell County contacted Federal agencies and were instructed not to investigate. Rivers spoke with the U.S. Attorney Patrick Hogeboom (deceased Oct 2017) at length on a taped phone line and Mr. Hogeboom agreed to allow investigator Epperson investigate the matter.

162.     On September 29, 2016; Rivers contacted the Bedford County Commonwealth Attorney's office to report her new evidence regarding her forged ODNB CLDOT. Rivers was directed to the Bedford County Sheriff office.

163.     On or about September 23, 2016; Rivers contacted the Bedford Commonwealth Attorney's Office and was referred to the Bedford County Sheriff Office and reported that she was (a) a victim of fraud; (b) Richardson had forged a CLDOT; (c) the DOJ, VSP and Campbell County had investigated; (d) and investigator Epperson had advised the he found the document to be forged in Bedford not Campbell.

164.     On October 3, 2016; Investigator JW Dooley was assigned to the matter and met with Rivers at the police department to review a collection of documents. Dooley spoke with Richardson on several occasions. Richardson admitted to ATC changing the CLDOT when the error was caught

165.     Dooley's report indicates he spoke with representatives at ODNB and was advised that they are familiar with the case. ODNB representative advised that under the circumstances the documents are prepared by the bank and if changes are required to be made the entire document is corrected

166.     Dooley's report indicates that he spoke with and reviewed opinions of attorneys that deal in real estate law and was advised that a title agent can make corrections to a

38

deed of trust. The examples given were misspellings or other inaccuracies but nothing as in-depth as what occurred in this incident with Rivers CLDOT.

167.     Bedford County Commonwealth Attorney Wheelock decided not to prosecute the Richardson matter as a criminal matter. Dooley received more documents and information from Rivers including additional code sections. Wheelock has refused to meet with Rivers

**168.**     On February 18, 2017; Rivers sent a Request to Re-Open Fraud/Forgery Case/Investigation into the forgery and altering of documents investigation regarding Jennifer Richardson and Mat Fariss of Advantage Title and Closing LLC, to Bedford County Commonwealth Attorneys; Stephanie Ayers, Stacey Gardner, Wes Nance, John Wheelock after speaking, at length to John Wheelock and Assistant Commonwealth Attorney, Tim Griffin

169.     On June 16, 2017: Rivers sent her final Report and Notice to Bedford County Commonwealth Attorneys that she intends to file suit against the Bedford County Commonwealth Attorney's Office and Bedford County, Virginia. Rivers reported to Bedford Commonwealth Attorney's Office among other things, that in the last six months, she received and learned new facts, new subject matter and discovery evidence that she could not ever have known before.

**170.**     On November 9, 2017; Bedford County Wesley Nance responded to Rivers November 3, 2017 FOIA request. The Response included information about Rivers specific request about training, conferences, etc for the Commonwealth Attorneys in Bedford County

**171.**     On January 8, 2018; Rivers sent Bedford County Commonwealth Attorney's Office a Notice of Claim, RE: Criminal Matter Complained of, Reported, Investigated, Among Other Things, Proved by Intentionally Not Charged. 1) Concerning Civil/Tort §18.2-7, 2) Parties to a Crime, 3) Forgery/Altering Documents §18.2-168, 172, 172.2,

178, 186, 197, 4) Conspiracy §18.2-22, 5) Fraudulent Conveyance, 6) Negligence, 7) Using My and Other Victims Documents and Evidence Not for What We Intended, 8) Embezzlement §18.2-111, §18.2-115 and 9) Pain and suffering   Including §6.2-938 and §6.2-939

### COUNT ONE: AIDING AND ABETTING 18 U.S.C. 2

**172.**     Rivers incorporates the facts alleged in the above paragraphs and repeats and recites all previous allegations as if fully set forth herein

**173.**     The Defendants; while acting within the course and scope of their agency, commission, office or employment by the State of Virginia, and/or Federal and State Agencies of the Defendant United States: (a) knew or should have known that prior to the Rivers complaints and the complaints of other victims, the Defendants continued to commit criminal acts against her and others; (b)knew or should have known they had a duty to  investigate Wynne's illegal banking enterprise, prosecute and indict Wynne, his illegal banking entities and the Defendants and Co-Defendants who conspired, organized and profited from the organized enterprise and the illegal acts and omissions; and other Defendants they investigated and allowed to continue to commit criminal acts; (c) knew or should have known they had a duty to disclose the Defendants criminal activities to law enforcement agencies with jurisdiction over their crimes and/or report these activities; (d) knew or should have known they had a duty to follow and enforce the Attorney General Guidelines regarding the investigation into the illegal banking, money laundering, forgery, insurance and land fraud crimes and (e) knew or should have known that their failure to comply with their duties alleged herein would result in Rivers and her businesses suffering irreparable harm

40

**174.** The Agencies, Departments and Employees of those Agencies and Departments named Defendant ordered, causes, aided, abetted, counseled, commanded, induced or assisted in the commission of a federal crime resulting from 18 U.S.C 2. Section 2(a) demands that a Defendant embrace a crime of another and consciously do something to contribute to its success. *See Rosemond v United States,* 134 S.Ct. 1240, 1245 (2014) quoting , *Central Bank of Denver, NA v First Interstate Bank of Denver, NA 511 U.S. 164, 181 (1994)* "Those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime."

**175.** As a result of these wrongful acts by agents named Defendant, Talbott, Harth, Deer, Prilliman, and employees of the Defendant United States, FBI, City of Lynchburg, Bedford County and DOJ; events occurred that a reasonable, prudent person would have foreseen in light of the circumstances set forth herein, including money laundering, illegal banking, forgery, insurance and land fraud. The tortuous and negligent conduct of such employees was a violation of federal laws and a material element and proximate cause of bringing about Rivers suffering and the suffering of her businesses.

**176.** The actions of the Federal agencies and their agents and Defendants named above, are grossly negligent and an extreme deviation from reasonable standards of conduct, undertaken intentionally with actual malice, and/or with a reckless disregard for their likely consequences which tied them to Wynne's illegal banking activity, Richardson, ATC and Fariss forged documents and criminal activity of other defendants as pled herein in this complaint.

**177.** By reason of the negligence of the above named Defendants, United States, Federal and State Agencies and agents tying them to the money laundering scheme including but not limited to (a) ODNB, Hopkins, Potter, Merrill, Select, SBFC, Mason, Thomas, Garrett, Eager, BOJ, Chapman, Twery and Wynne's illegal banking activity, (b) Hopkins, Potter, Richardson, ATC, and Fariss forgery, and (c) State Farm and Callahan

41

insurance fraud; Rivers and her businesses have been deprived of compensation for the loss of reasonably expected net income, services, protection, care, assistance, society, comfort, guidance, counsel, and advice as well as other damages and is entitled to an award of punitive damages.

178.     Pursuant to 12 U.S. Code § 1829, it was a criminal act, not a "civil matter" that ODNB, BOJ, Select, SBFC, Union, Eager, FNB, SBFC, Mason, Twery, Thomas, Beach, Northcreek, Edmundson, Mrs. Edmundson, Richardson, Fariss, ATC, Beck, Lester, BBoyz, SAF, S&R, Callahan, Battlefield, and other named Defendants operated in commerce with each other and Wynne, RBC, and 1650, knowing of Wynne's, inability, to be involved in the "banking" industry at any level. In all Consumer Financial Transactions Rivers entered into contracts that the Defendants used to their own benefit, or which her Personally Identifiable "Information" was used to procure Instruments of Commerce for others to financially benefit from.

179.     Between April 2006 and July 2015, the SCC and Virginia SCC's Bureau of Financial Institutions and the Commissioners named defendants and T. Rann Paynter of VBA violated federal laws by aiding and abetting, advertising for and allowing Wynne and Twery to operate RBC and 1650 as an illegal banking enterprise throughout the state of Virginia.

180.     Since April 2006; An undetermined amount of victims were and are being victimized by the SCC, Commissioners Dimitri, Face, Jagdmann, Christie and VBA, failure to issue cease and desist to Wynne, RBC and/or remove RBC and Rivermont Consultants Inc. from the online business entity look up sights and VBA monthly *Virginia Banker* publications issued and circulating even after July 2014.

181.     Although RBC was terminated from the SCC and not registered with the State of Virginia, they can still be found online advertised as a financial institution, financial planner, bank. Federal Home Loan Bank, Lynchburg Chamber of Commerce leading

42

unsuspecting victims to Wynne's contact; address 1688 Holcomb Rock Rd, Lynchburg

VA, directions and 434-455-4900 phone number. The data is still being circulated.

There is no record of any cease and desist, sanctions, penalties issued by the SCC, no

fines paid and no indictments by the Federal and Government agencies

182.     The complaint alleges that the Defendant, United States, continued to utilize

Rivers, her businesses and other victims evidence and their circumstances, to bolster,

"use as their own", not for what Rivers, her businesses and the victims intended, and

continue their investigations of the multijurisdictional, statewide, criminal acts

perpetrated by the Defendants knowingly, intentionally, directly or indirectly as co-

conspirators, cooperating with the subjects Wynne, RBC, 1650, and SGLWT.

183.     The Defendant, United States, the FBI, DOJ intentionally blocked, "flagged" other

local law enforcement from charging and the City of Lynchburg and Bedford County from

prosecuting Wynne, RBC, 1650, SGLWT and the Defendants named in this case, for

crimes and illegal acts being committed between 2006 to the present, allowing Rivers,

her businesses, the state of Virginia and other victims to be injured. They presented the

keys to the Cities and Counties of the Commonwealth of Virginia to the subjects of their

investigation allowing them to continue to operate the illegal banking enterprise and

fraudulent conveyance business out of several State banks in Virginia.

184.     Defendants engaged in such violations directly and as co-conspirators. The

federal law claims arise out of the same transaction or occurrence or series of

transactions or occurrences that are the basis of the negligence, torts, fraud, fraudulent

conveyances and RICO causes of action. This case summarizes the correlation between

the Defendants and their activity which projected into the future with a threat of repetition

and was not limited to only the Rivers or her businesses

**185.**     Rivers, her businesses and other victims have suffered as a result of the

Defendants named above, neglecting their duties, and aiding and abetting the criminal

activity of the RICO enterprises and barring local law enforcement from investigating and

prosecuting Wynne, his entities and the Defendants named further in this complaint

because decided Rivers, her businesses and other victims were expendable

### COUNT TWO: GROSS NEGLIGENCE/MISCONDUCT

186.      Rivers incorporates the facts alleged in the above paragraphs and repeats and

recites all previous allegations as if fully set forth herein

187.      Among the offenses that the FBI is empowered to investigate are crimes

involving racketeering, 18 U.S.C §1962, et seq., money laundering 18 U.S.C §1956-

1957; obstruction of justice, 18 U.S.C §1501 et seq., aiding and abetting, 2471 18 U.S.C

2; wire and mail fraud 18 U.S.C. §1343; and tampering with a witness, victim or

informant, 18 U.S.C §1512

188.      The FBI has established certain core values that it claims "need to be preserved

and defended by the FBI in performing its statutory missions.  Those values are;

rigorous obedience to the Constitution of the United States; respect for the dignity of all

those we protect; compassion; fairness; and uncompromising personal and institutional

integrity

189.      The FBI mission further states; "Respect for the dignity of all whom we protect

reminds us to wield law enforcement powers with restraint and to recognize the natural

human tendency to be corrupted by power and to become callous in its exercise.

Fairness and compassion insure that we treat everyone with the highest regard for the

constitution, civil and human rights.  Personal and institutional integrity reinforce each

other and are owed to the Nation in exchange for the sacred trust and great authority

conferred upon us."

Case 6:18-cv-00061-EKD   Document 4   Filed 06/15/18   Page 44 of 166   Pageid#: 219

190.    The FBI and the DOJ are statutorily empowered to protect people and victims like Rivers, her businesses and other victims from being victimized by clandestine criminal organizations, and to investigate those responsible for her loss and suffering.

191.    The FBI is an agency within the meaning of 28 U.S.C §2671 et seq.  On September 20, 2015 Rivers received a letter from Investigator JB Epperson of the Campbell County Sheriff Office informing her that he had spoken with Det. Dempsey of the Lynchburg Police Department regarding her complaint of Richardson's forgery of a Credit Line Deed of Trust and HUD statement.  He informed her that both he and Detective Dempsey consulted with the appropriate federal investigating agency and the United States Attorney Office for the Western District of Virginia.  It had been brought to their attention that Rivers' matter had been thoroughly investigated by federal authorities.  After discussions with Epperson, Rivers contacted the U.S. Attorney, Pat Hogeboom (deceased Oct 2017), whom she had met with several times and literally begged him to allow the investigators to do their job and investigate the forgery she had found and was able to prove now with new evidence.  Campbell County was given permission to investigate the matter.  28 U.S.C. §2671 defines the term "Federal agency" as including the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, .... "Employee of the government includes officers or employees of any federal agency which would include Talbott who was assigned to the investigation.

192.    Talbott, Harth, Deer, and Prilliman were special agents at all times material to this complaint,

193.    Sometime in 2016, Rivers learned from a conversation with Lynchburg Commonwealth Attorney Michael Doucette, that Eugene Wingfield never filed a report of her 2010 meeting with him as alleged by Rivers in this complaint.  Rivers reached out to

45

Wingfield, who is now the Clerk of the Lynchburg City Court, and he did remember the meeting and the conversation but affirmed he did not file a report.

194.     Talbott worked closely with Special Agent James Vaughan in 2010 and 2011 and was assigned by deceased U.S. Attorney Patrick Hogeboom to work with Campbell County Investigator JB Epperson in 2016 to interview Rivers again, and to interview Richardson about Rivers alleged complaint of forgery and the altering of the $500,000.00 credit line deed of trust and the altered incomplete HUD statement Rivers had recently learned of. Talbott was not asked to investigate the matter of the Deed or any Wynne matter.

195.     Richardson of ATC admitted to Invesitgator Dooley that she altered the documents as alleged above in this complaint.

196.     In April 2018 Rivers had learned that the forged CLDOT and the HUD statement prepared by Richardson of ATC on November 21, 2007 were documents used intentionally in a fraudulent conveyance and racketeering scheme.

197.     Although Rivers notified and reported to the VBA that RBC was not a real bank and was not certified or authorized to be a bank in the State of Virginia, Code of Va §6.2-938, the VBA failed to issue or request the SCC-Bureau of Financial Institutions to issue a Cease and Desist. The VBA verified Rivers claims with Commissioner Face

198.     The VBA continued to insure and advertise the illegal bank.  The VBA did not rescind or recall its publications of "*Virginia Banking*" advertising the illegal bank or issue a disclaimer to its members or to the public that RBC was, in fact, not a financial institution. Between 2006 and 2011 or until 2014

199.     "*Virginia Banker*" is published bi-monthly and is circulated to almost 10,500 recipients, including CEO's, presidents, directors and other senior managers of banks and is devoted to legal, legislative and informational articles related to the state-banking industry, technology issues, and bank profiles.

200.     The VBA is a massive organization teaching and promoting banking throughout
with its members, associates, online training, conferences, conventions,
seminars/schools, sponsorships, internships, communications, compliance resources,
advocacy, education foundation, and products and services.

201.     The VBA Seminars/Schools include a Anti-Money Laundering & Bank Secrecy
Act School

202.     The VBA Regulatory Compliance Resource Center includes resources for
Commonwealth of Virginia Laws, Regulations and Bank Regulators, United States Laws,
Regulations and Bank Regulators.

203.     The VBA Boards and Committees purpose is to provide input to the VBA on
matters affecting the banking industry and the committee's functional area of banking,
provide input to VBA's professional development division on training needs of their
functional area, often resulting in VBA workshops, seminars, etc., to provide a forum for
exchange of ideas and for networking that will benefit each committee member and
his/her bank, and identify possible legislative and/or regulatory issues on which the VBA
should focus as the banking industry's advocate.

204.     The VBA has also made campaign contributions to Virginia Delegates,
Defendants T. Scott Garrett and Mat Fariss since 2011

205.     During all times relevant to this case, in order to protect (Wynne, RBC and
1650) and the Defendants named in this cause of action, from prosecution and to further
expand the enterprises, the agents, the Commonwealth Attorney's of the City of
Lynchburg, Bedford County and Albemarle County , the investigators, the Virginia State
Police, the VBA , failed to report the ongoing criminal activities, including money
laundering and forgery reported to them by Rivers again in 2016-2018.

206.     Beginning in 2006, the SCC acts and omissions, permitted RBC to operate two
separate illegal bank businesses using the same Articles of Incorporation, creating a

systemic pattern. The SCC permitted Wynne to operate RBC within the banking business as a "consultant". The RBC Articles of Incorporation gave the appearance to the public, and unsuspecting customers of the company, that RBC was a registered company which purpose was to be a bank in the banking business.

207.  The SCC allowed the ongoing pattern of RICO/Racketeering and illegal banking activity to be committed against the residents of the State of Virginia, Rivers, her businesses and other victims, using the state banks named Defendants in this cause of action since 2007, and the criminal behavior of other Defendants named in this complaint as "enterprises" who are recorded land owners, settlement agents, real-estate agents, insurance agents and bank officers managing and conducting affairs of the enterprises

208.  The SCC was in possession of, but did not provide or disclose to Rivers, documents and investigative reports that contained damaging evidence and information that would lead to the prosecution and indictments resulting from the illegal banking enterprise, but failed to submit a favorable report to the federal agencies to prosecute or indict because it could endanger the safety and soundness of the state banks, and financial institutions doing business legally or illegally in the State and Commonwealth of Virginia.

209.  On April 29, 2011: The SCC continued to take in evidence, claims, documentation and complaints from Rivers, Foster and Marsh including on the day after Rivers lost her home and her horsefarm, and her business, in a relief of stay motion filed by Wynne. SCC's general counsel Maureen Stinger and Demarian Johnston were Rivers contacts at the SCC.

210.  Maureen Stinger provided Rivers with her fax number to forward more documentation. Rivers notified Stinger that she would be homeless on May 9, 2011.

Rivers had to relocate herself, her business, her children and her entire farm including heavy machinery, livestock, etc. in 72 hours.

211.     The SCC intentionally neglected Rivers to protect their agency, the commissioners, the state banks, the Virginia Bankers Association and the Virginia General Assembly members, Garrett and Fariss. Rivers, her businesses, and the other victims were expendable and were let to suffer and "bleed out'. The net effect of the evidence withheld by the SCC and kept secret from the public in this case raises a reasonable probability that its disclosure would have produced a different result, and Rivers, her businesses and the other victims would not have lost their worldly possessions, reputations, property and money and there would have been indictments.

212.     Bedford County has collected taxes on the subject properties since April 24, 2007, approved the S&R /120 Family Subdivision. The family subdivision includes those portions of land named and described in Rivers exercised Option to Purchase Contract and belonging to S&R in 2007 that were also named within the original Deed of Trust with Union, and used as collateral and cross collateralized for other loans. The application for family subdivision remains sealed.

213.     Between 2004 and 2009; there was no relief granted by the director of community development in the form of an instrument, recorded against the parcel (named in the sealed family subdivision application) in the land records of the Bedford County Circuit Court. Union documents recently received by Rivers indicate and document the existence of a #120 Family Subdivision for the property liened by Union as described within. As found in the Bedford County Subdivision Ordinance, Division 2, 3.6 (a) 1-13.

214.     Bedford County continues to allow the illegal use of a commercial motor cross track on that portion of the subject property, located at 5040 Cottontown Rd, Forest VA. The motor cross track is (a) uninsured and a liability to the property, (b) any owner of

49

interest in the subject property in the event of death, maiming or catastrophic event from the use of the motor cross track; and (c) a reported nuisance to the surrounding neighborhood

215.     The employees of the City of Lynchburg, Clerk of the Court Eugene Wingfield former investigator, Commonwealth Attorney Michael Doucette, and the Police Department have failed to file reports and report the criminal acts regarding the illegal banking, forgery, insurance fraud and fraudulent conveyance reported to them by Rivers and the complaints they received from other victims since 2006, to the federal agencies

## Defendants United States Federal Investigations Yield No Indictments

216.     Furthermore, the complaint alleges that the federal agencies and the federal Defendants failed to control the criminal activities of the subjects and the co-conspirators the Defendants whose acts were motivated for an economic purpose. The Defendants allowed the activity illegal banking and money laundering activity to continue within the state banks; they failed to enforce the Attorney General Guidelines for FBI Operations and those guidelines on General Crimes and Racketeering , the Virginia Crime Codes that fall under the category of among others, fraud, including altering or falsifying documents, forgery, identity fraud, obtaining money under false pretense, fraudulent conveyance, illegal banking activity, and identity theft; violated the Attorney General Guidelines, Regulations and Policies by failing to inform and appropriate law enforcement and officials of the criminal activities of their subjects and co-conspirators even when Rivers and other victims complained and reported the crimes since 2006; failed to properly supervise the subjects of the investigation allowing them to continue to commit their criminal acts; failed to investigate and allow law enforcement and officials investigate for purposes of prosecution and indictment; failed to serve the warrants issued for arrest; and failure to present the new matters to a Grand Jury; failed to protect

50

the federal investigation from Bowman and Wallis impeding on the investigation which caused the close of the case within 21 days after the CVLR Inc case was settled; and therefore failed to prosecute the subjects.

217.    For over eight years, Rivers, her businesses, and other victims have been ignored by the FBI, DOJ, Commonwealth Attorneys of Lynchburg, Bedford, and Albemarle, State Corporation Commission, Bureau of Financial Institutions, Bureau of Insurance, Attorney General Office, Criminal Division of the IRS, Virginia State Bar, except for the brief time when each agency takes in Rivers and other victims evidence, complaints and reports; the subjects were still at large and Rivers claims fell on deaf ears.

218.    Rivers seeks redress for her hardship and loss. As a proximate cause of the federal Defendants' acts and/or omissions, violating the very oaths that they have sworn and Rivers' rights as guaranteed by the Amendments to the United States Constitution and the Constitution of Virginia. The Virginia Codes were violated, as were Rivers and her businesses rights to own land and prosper

219.    Rivers alleges that the Federal Defendants and the local agencies conspired to protect and shield from prosecution the subjects (and their co-conspirators) of their Federal investigation. The purpose of the conspiracy for the Federal Defendants to protect the subjects and the co-conspirators of their investigation from arrest and prosecution in order to maintain the "ruse" of a possible indictment and obtain more evidence from Rivers and the other victims meanwhile allowing Rivers, her businesses and other victims to lose everything. The end result would be that the Federal statute of limitations ran out and they couldn't do anything; "They couldn't find it!"

220.    Rivers alleges that the United States and the Federal Defendants knew or should have known that the subjects of their investigation and the co-conspirators of the

51

subject, the Defendants in this matter, were involved in criminal activity, including among others, fraud, including altering or falsifying documents, forgery, identity fraud, obtaining money under false pretense, fraudulent conveyance, illegal banking activity, possibly embezzlement and extortion and identity theft; but despite this knowledge failed or refused to investigate or allow the local agencies to investigate the criminal activity for purposes of prosecution because, if prosecuted, the Federal Defendants would lose their subjects service and information. They would be prosecuting Virginia State Banks, Commissioners and Delegates of the State of Virginia, local attorneys, settlement agents, bankers, accountants, "pillars of the community"; and they also knew Rivers, her businesses and the other victims had claims against them for protecting their subjects.

221. Rivers alleges that the Federal Defendants, Deer and Prilliman, entered the law offices to obtain documents without Rivers knowledge or notice and investigated Rivers attorney, Bowman and her third-party payee , Wallis and threatened them with Grand Jury to keep her from moving forward with her RICO/Racketeering claims against Wynne, Rivermont, SGLWT and 1650, the subjects of their investigation in Order to keep the truth from the public of the on-going criminal activity.

222. Rivers alleges that Bowman, NMG, FAC, Nitti and Wallis were impeding on the Federal investigation of Wynne's illegal banking enterprise. The agencies also knew or should have known that Bowman had aN adverse interest with Wallis and therefore, was not supposed to be representing Rivers or Vicki Marsh, and Wallis, who had no income and whose assets were federally liened and recorded in the County Circuit Court records. The U.S. Attorneys and the agents kept the information they had about Bowman and Wallis secret from Rivers but made it very well understood to Bowman and Wallis that Bowman had to withdraw from Rivers RICO case and Wallis could not pay legal fees and Rivers, Foster and Marsh were witnesses in their Federal investigation..

52

223.  The Federal and State Agencies named Defendant in this matter, assigned the Special Agents named Defendants in this matter, to work together to investigation, compile information and collect evidence and information from Rivers and other victims. The Defendants knew or should have known of the facts alleged in this complaint.

224.  Rivers does not have the wherewithal, the software capability, the man power or even the clearance to gather what the agencies have at their finger tips. This complaint closely follows the findings and rulings of the United States District Court for the District of Massachusetts. *See United States v Salemme,* 91 F. Supp. 2d 141 (D.Mass 1999). The complaint incorporates by reference and includes herein the findings and rulings contained in that case as well as the pattern, facts and circumstances set forth in *Classicstar Mare Lease Litigation and West Hills Farms LLC, et al v ClassicStar LLC, et al (D. Kentucky 2016); Luanne Litif & Lee Litif v Unites States et al (D.Mass 2010); and the Estate of John McIntyre v United States of America, James Buler et al (D.Mass 2012).*

## COUNT THREE:  CONSPIRACY TO DEPRIVE RIVERS RIGHTS GUARANTEED BY THE FIRST AND FIFTH AMENDMENTS
## FEDERAL AND STATE  AGENCY DEFENDANTS

225.  Rivers incorporates the facts alleged in the paragraphs above and repeats and recites all previous allegations as if fully set forth herein

226.  From 2010, the agencies named Defendants and the Agents employed by them, acting under color of law of the United States, and State and Commonwealth of Virginia combined, conspired and confederated together to deny Rivers and her businesses and other victims their clearly established rights and/or the right not to be deprived of property without the due process of law as secured by the Fifty Amendment to the United States Constitution.

53

227.     By the time Rivers and her businesses, Serene Creek Run Riding Center, Serene Creek Run Holding Co., CVLR Performance Horses Inc, and other victims in more than one state, including Karen Foster and Vicki Marsh, had lost their property, the Defendants knew or should have known that there was a pattern of RICO/Racketeering still being perpetrated on Rivers and the other victims and continued to operating from the state banks named Defendant and by the Co-Conspirators

228.     In part, the FBI, SCC, DOJ, the United States and the agents, Deer, Talbott, and Prilliman named Defendant benefited from the pattern of RICO alleged herein for, among other ways: (a) increased prestige and promotions for the individual agents named in this Complaint and the Salem field offices, arising from the successful investigation into Wynne, his illegal banking enterprise and ODNB; (b) concealing from the public and courts that the Attorney General Guidelines had been systematically ignored by the Federal agencies, thus saving the Federal agencies, and the State agencies and the VBA from extreme embarrassment associated with its handling of the investigation of Wynne and his illegal banking investigation; (c) concealing from the public and courts that Wynne and Twery were operating their illegal banking enterprise from Wynne's jail cell and throughout the Cities and Counties of Virginia violating the laws of the United States of America and the Commonwealth of Virginia, thus saving the Federal and State agencies and the United States from adverse publicity associated with the indictment of pillars of the community and endangering the safety and soundness of the State banks or the public revelation of the conduct alleged within this complaint; or (d) concealing from the public, courts, and litigants the conduct alleged in this complaint in order to prevent persons from challenging the legality of their convictions; (e) concealing from the public, courts and litigants the conduct alleged in this complaint, thus precluding persons/victims who had been unlawfully harmed, including the Rivers, from making claims against the Defendant United States

54

229.   In furtherance, the Federal agencies and agents named Defendant; (a) failed to interview potential witnesses who had information concerning Wynne and Twery's illegal banking enterprise; (b) failed to follow up on leads and evidence provided to them regarding the illegal enterprise and the suffering of Rivers; (c) otherwise failed to issue warrants for arrest and (d) failed to prosecute

230.   As a direct, proximate, foreseeable and intended result of the acts and omissions alleged in this complaint, the Federal and State agencies and their agents and employees named Defendant prevented Rivers from (a) learning the truth they had uncovered in their investigations of Wynne, the pattern of RICO activity being perpetrated by the named Defendants in this complaint, the illegal banking activity of Select, SBFC, Mason, Davis,Thomas, Garrett, BOJ, Chadwell, Eager, ODNB, Darnell, Merrill, Hopkins, Potter and Union, the relationship between Wynne as trustee on Defendants Schenkel, Mason, Thomas, Twery, Beach and his businesses, and Sanzone and his businesses,  and thus allow Rivers, her businesses, Serene Creek Run Holding Company, CVLR Performance Horses Inc."CVLR Inc.,  and CVLR d/b/a, and the victims to continue to be victimized and suffer as a result of not allowing for criminal charges and/or prosecution, (b) precluding Rivers from seeking civil judgment against those responsible for her suffering, and (c) denying Rivers from her clearly established constitutional rights as guaranteed by the First Amendment to the United States Constitution in that Rivers was deprived her right to seek a civil remedy since 2009 when Rivers provided SCC, FBI, VSP, Talbott, Prilliman, DOJ, Deer, and the local Bedford and Lynchburg sheriff departments with her documents and evidence for review and/or to be copied and used to prosecute, to the present because the illegal activity is still on-going resulting in lost damages.

231.   Rivers, her businesses and other victims have suffered as a result of the Defendants named above, neglecting their duties, and aiding and abetting the criminal

activity of the RICO enterprises and barring local law enforcement from investigating and prosecuting Wynne, his entities and the Defendants named further in this complaint because decided Rivers, her businesses and other victims were expendable

## COUNT FOUR:   RICO 18 U.S.C §1961 §1962 (b)(c)(d) §1964 (c)

232.      Rivers restates, re alleges and re pleads the allegations contained in paragraphs above in this complaint.

233.      At all times relevant to the Complaint, the Defendants, named in this Count, who are or have been corporations, subsidiaries, officers, directors, recorded owners and agents; aligned with and continue to do and have done business with each other, operated and/or managed  "enterprise" scenarios in a "pattern of racketeering activity" committing related acts within a ten year period of time and were each an enterprise as that term is defined in RICO Racketeering 18 U.S.C §1961 (5) and used in 18 U.S.C §1962(b)(c)(d)

### THE BANKS, BANK EMPLOYEES AND INVESTORS

### PREDICATE ACT 1: MONEY LAUNDERING: 18 U.S.C. §1956

234.      On May 11, 2018; John Deere Credit provided Rivers with "new discovery evidence";  showing that on February 19, 2009 Potter received, endorsed and exchanged Rivers $8881.35, insurance check # 2687309, payable to  Rivers business CVLR Inc. and ODNB for policy #FSL4151961 01 dated 7/8/08 for a cashier's check without Rivers knowledge after Rivers attorney had the check hand delivered to ODNB along with a letter and instructions to: (a) pay CVLR invoices for work that was completed on the property, namely clean-up, equipment rental and well permit (paid for by Rivers), (b) pay for well installation, (c) lights installation, and the remainder of the check should be deposited into the 1650 Partners LLC account (used by Rivers for

56

expenses on the property).  The money was deposited into the Catherine R Wynne DDA #xxxxxx6856

## PREDICATE ACT 2: MONEY LAUNDERING: 18 U.S.C. §1956 AND §1957

235.     On or about May 25, 2016; ODNB provided "new discovery evidence" to Rivers showing that ODNB, Merrill, Potter, Hopkins, and Darnell intentionally (a) deposited Rivers insurance funds into accounts unrelated to Rivers, account DDA #xxxxxx6856 Catherine R Wynne Estate, (b) transferred Rivers insurance funds into a Select Bank #xxx4439 Catherine R Wynne by John L Wynne; $85,000.00 Credit Line, (c) allowed for check #1015 RE: Select Bank note 2204 to be written by John L Wynne on April 20, 2009 from account DDA #xxxxxx6856 to Select Bank for $10,315.90 funds cleared on April 27, 2009, without Rivers permission or notice to Rivers.

## PREDICATE ACT 3: MONEY LAUNDERING: 18 U.S.C. §1956 AND §1957

236.     On or about October 16, 2016 ;Select provided Rivers with "new discovery evidence"  showing the Select Bank Interest Only Credit Line #xxx4439, note 2204, was opened on or about July 1, 2008, by bank officer, Walter "Chip" Mason, for Catherine R Wynne Estate, John L Wynne POA using Catherine R Wynne social security number xxx-xx-9197 and backed by securities, 1160 shares of EXXON Mobile Corporation stock to launder, receive and deposit Rivers insurance money without Rivers permission or notice to Rivers.

## PREDICATE ACT 4 - 8: OBTAINING MONEY UNDER FALSE PRETENSE: 18 U.S.C. §1341   AND   §18.2-178

237.     Rivers learned in October 2016 through "new discovery" evidence that had been intentionally withheld from her, that ODNB, Merrill, Potter, Hopkins, and Darnell intentionally (a) obtained Rivers insurance funds under false pretense, (b) laundered Rivers money into the BOJ by intentionally; (c) paying Terrance White $10,315.35 from a forged invoice he submitted for work he had not done on Rivers property, by (d) paying a

57

check to Terrance White on July 29, 2008; check #1438 RE:1650 Partners LLC for $10,315.35 from Rivers insurance funds payable to Terrance White, endorsed for deposit to Rivermont Banking #xxx1620 checking account.

### PREDICATE ACT 9 – 10: MONEY LAUNDERING 18 U.S.C. §1956 AND §1957

238.     The money from the check described above was laundered and flowed from BOJ into the Select Bank account DDA Catherine R Wynne Estate by John L Wynne account #xxx4439, Note 2204, without Rivers permission or notice to Rivers. The amount of money paid to Select Bank by ODNB $10,315.90 and paid to Terrance White $10,315.35 is the same amount of money within cents paid to 1650 by ATC $10,514.20 on a check dated November 20, 2007 and deposited into the same BOJ account.

239.     Select, ODNB and SBFC laundered money for John L Wynne as POA of Catherine R Wynne estate during all times relevant to this matter.

240.     Select and SBFC allowed Wynne to open credit lines backed by Exxon stock in the name of deceased individuals, for whom Wynne was a POA, using their social security numbers. Select and SBFC allowed for Rivers closing proceeds and insurance money to flow through to these accounts from ODNB and BOJ.

241.     Mason was in charge of and named as officer on the Wynne account forms. Select and SBFC did not have Rivers permission and did not notify Rivers of the transfers and deposits of her closing and insurance funds from ODNB and BOJ to the Catherine R Wynne account and credit line at Select Bank

242.     BOJ allowed laundered money to be deposited and transferred in and out of Rivermont Banking Co Inc. and various BOJ accounts operated by John L Wynne as President of Rivermont Banking Co Inc. POA of Southgate Leigh Wynne Testamentary Trust during all times relevant to this matter.

### PREDICATE ACT 11 AND 12: MONEY LAUNDERING 18 U.S.C. §1956 AND §1957

243.     On October 13, 2017; BOJ provided Rivers with "new discovery evidence" verifying the documents received from Select bank and also verified the history of other laundered payments made to other parties to illegally foreclose on other victims property including a April 26, 2007, $465,000.00 wire transfer from Robert Gwin III, to BOJ, aba # 051409016 to beneficiary Southgate Leigh Wynne Trust Account U/A DTD #xxx0246. The money was wired from victim, Pawleys Island native and artist, Vicki Marsh, who suffers from a disease known as "Aspergers Syndrome", (considered a high-functioning autism,) under the promise from Wynne, her friend, that he would make her Wachovia mortgage payments with the money and operate the account for her.

244.     The BOJ documents show the money credited to the SGLWT account #xxx0246 on April 27, 2007 and paid out $468,330.36 on the same day as a Loan Payment. Wynne did not pay the Wachovia mortgage with the money and the money has never been paid back to Marsh.  Marsh had been one of several victims complaining and reporting the illegal activity to the local, state and federal agencies since 2006.

245.     The VSP, the City of Lynchburg, Agencies and Special Agents named Defendants intentionally neglected to indict or prosecute after a intensive investigation regarding Rivers funds and the illegal banking activity of Wynne and RBC §6.2-938

HISTORY

246.     Sometime in March 2007; Beach, posing as a investor, met Rivers personally to discuss investing $500,000.00 in her commercial equestrian subdivision project. Soon after that Beach, Mason and Thomas agreed to allow Wynne the use of 1650 after he paid the claims they had against him. The Defendants together, while Mason, Davis and Thomas were under a non-compete agreement with American National Bank, intentionally strategized, reinstated Select and laid plans to open Select, SBFC, in March 2007.

247.    Beach, Mason, Thomas, Select, SBFC provided documentation to ODNB and
Twery between April 2007 and November 2007, for their part in the fraudulent
conveyance to be used to complete the scam closing of the riding center, and also were
familiar with Darnell and had an interest in ODNB since 2006. ODNB would open its
doors in July 2007.

248.    Between 2007 and 2014; ODNB, Select, SBFC and BOJ opened accounts for
Wynne, RBC even though it was not a certified or authorized bank in the state of
Virginia. The Defendants provided their banks as a conduits for RBC, 1650 and Wynne
personally (Wynne was ousted from the banking business completely in 2006) and as
POA for dead family members and trusts

249.    The Defendants systematically (a) reinstated (July 2006) Select bank on March
22, 2007, (b) assigned their 66.01% interest in 1650 Partners LLC (bank holding
company) membership to Wynne between April 30 and May 2, 2007, ( c) entered into a
separate deal with ODNB to agree to lend $500,000 to 1650 with Mason and Wynne as
managers and Rivers would pay what she thought was a mortgage payment every
month to ODNB, (d) had ODNB agree to transfer all Rivers funds into Select Bank
accounts.

250.    Garrett is also being sued for negligence, non reporting crimes in the his 23rd
district of Lynchburg and for intentionally lying to Rivers and other victims about his
relationship with Wynne, Mason, Thomas, Beach, and the banking industry

251.    "The object of civil RICO is thus not merely to compensate victims but to turn
them into prosecutors, "private AG's" dedicated to eliminating racketeering activity." *See*
*Rotella v Wood* 528 US 549, 557 (2000)

252.    Rivers alleges the Defendants criminal acts were motivated by an economic
purpose

253. The Defendants participated in the operation or management of an enterprise through a pattern of racketeering activity. *H.J. Inc. v N.W. Bell Tel. Co.* 492 US 229, 239 (1989)

254. Rivers asks the Court to award her equitable relief pursuant to 18 U.S.C. §1964(c); RICO also provides for equitable relief, including divestiture of defendant's interest in the enterprise, restrictions on future activities, reorganization, or dissolution. *See The Proper Point of Accrual of a Private Civil RICO Action,* 65, *NYUL Rev 172, 180* (1990)

## COUNT FIVE: OBTAINING MONEY AND SIGNATURE UNDER FALSE PRETENSES
## 18 U.S. Code §1341 and §18.2-178 of the Code of Virginia

255. Rivers restates, re alleges and re pleads the allegations contained in paragraphs above in this complaint.

256. On April 7, 2008; ODNB received Rivers insurance proceeds under false pretense and did not do with the proceeds what Rivers had intended and instructed them to do with it.

257. CVLR Inc was the owner of the insurance checks submitted to ODNB who claimed to be the mortgagee. Rivers dissolved CVLR Inc on or about, November 16, 2015. Rivers is now the owner of all CVLR Inc. award, claims and equity

258. On May 11, 2018; Rivers learned that on February 20, 2009; ODNB's Senior Vice President, Potter, accepted Rivers business insurance check #2687309 for $8881.35 payable to CVLR Inc and ODNB and exchanged it for a cashier's check and presented it to a party unknown to Rivers.

259. Documents obtained by VSP, Special Agent James Vaughn on January 20, 2011; indicate that on February 19, 2009; ODNB, Darnell, Hopkins, and Potter submitted

61

their accounting entries for 1650 Insurance Proceeds and Disbursements, even though 1650 did not have a insurance policy and did not own the insurance proceeds referred to, indicating that check #2687309 for $8881.35 had been received on 2/19/09 payable to CVLR Inc/ODNB and that a check #1658 was paid to Terrance White for $6837.49 and the balance of the proceeds $2043.86 was deposited to DDA #1010006856 (Catherine R Wynne Estate).

260.    The Defendants hold funds that in equity and good conscience belong to Rivers, which Rivers is in equity and law entitled to recover

### COUNT SIX: OBTAINING MONEY AND SIGNATURE UNDER FALSE PRETENSE. 18 U.S. Code §1341 and §18.2-178 of the Code of Virginia

261.    Rivers restates, re alleges and re pleads the allegations contained in paragraphs above in this complaint.

262.    Sometime in November 2007; Sanzone and SAB reviewed the November 2007 scam closing documents, including the forged Deed and CLDOT, for the riding center property currently under contract with S&R and Rivers (CVLR d/b/a)

263.    Between 2007 and January 2011; Rivers paid Sanzone and SAB, legal fees and retainers for their legal services.  Rivers trusted Sanzone and SAB to protect and advocate for their best interest.

264.    On October 14 and 15, 2008; Rivers contacted BB&T Equipment Finance to inquire for the pay out on a truck she purchased from Battlefield in May 2007 for $60,000.00 with a $16,000.00 deposit she borrowed from RBC. Rivers learned her pay off amount was $96,000.00 and the loan payments she had made for $1976.00 each month were paying interest only because the loan was interest only.

265.    Rivers contacted Sanzone immediately upon learning she had been duped. Sanzone instructed Rivers to come to his office the next day and not to contact the VSP Special Agent and Talbott she had been speaking with. Sanzone had BB&T fax a copy of the loan that Rivers had never seen, to his office. The document was dated September 27, 2007 and revealed that (a) Rivers name was not on her loan, (b) the borrower name on the loan was RBC. (c) Rivers insurance policy information was on the loan, (d) the amount of the loan was $104,000.00, (e) the monthly payments were $1976.00.

266.    On October 15, 2008; Sanzone warned Twery that because Rivers found out about the illegal loan for her F650, that she asked him for her closing documents and she intended to call Battlefield, John Deere Credit and ODNB and ask for all pay off amounts and documents regarding her truck loans, equipment loans, start up and mortgage loans. Sanzone warned Twery that Rivers was asking for the closing documents for the scam closing of the riding center and she intended to have Sanzone go after Wynne criminally.

267.    On October 15, 2008; Twery warned ODNB that Rivers would be calling and asking for the pay off on her start up loan and mortgage. ODNB received a written instruction from Wynne to remove Rivers from all 1650 accounts and not give her anything CVLR and 1650 related. Darnell sent out a memo to Hopkins and Potter with Wynne's instructions.

268.    On October 15, 2007; Hopkins and Potter spoke with Rivers and both refused to give her or send her any pay off information or documents relating to her, CVLR or 1650.

269.    Sanzone told Rivers in 2007 upon reviewing her Memorandum of Understanding that he didn't know Wynne but he had clients that had dealings with Wynne. (The clients were other victims of Wynne.)

270.    Sanzone and SAB had a adverse interest with Wynne and Wynne was the named trustee on Sanzone's personal and "Riverfront" business loans and credit lines recorded in the City of Lynchburg and Franklin County since 2003

271.    Since 2007; the funds paid to Sanzone, Donevant and SAB were extorted intentionally to keep Rivers from going after Wynne criminally. Sanzone intentionally did not report Wynne's criminal activity to the FBI and intentionally continued to lie to Rivers about what he knew about the scam closing and Wynne. Sanzone lied to Rivers and promised he would go after Wynne criminally if she, (a) kept "clean hands" and continued per the terms of her (i) loan contracts with Wynne and RBC, and ODNB, (ii) memorandum of understanding with Wynne, (iii) mortgage with ODNB, and (b) pay $15,000.00 deposit and enter into a separate agreement to acquire the riding center, again, and agree to give up her interest in 1650.

272.    ODNB was paid between $1800 and $3000 monthly between December 2007 and December 2011. .

273.    Between June 2009 and January 2011; Sanzone, Donevant and SAB were negotiating a SBA loan with Wachovia Bank and JGA Associates for $1.3 Million and $750,000.00 to be used by Rivers to refinance her loans with RBC, ODNB, John Deere Credit and her mortgage and perform on her memorandum of understanding and buy out 1650 for $50,000.00. Rivers paid for loan applications and other processing fees, over $5000.00. The loan process was completed and accepted but halted because the bank couldn't commit to the loan due to Rivers not being able to obtain the necessary historical documents she needed and had been paying on, from ODNB, Twery, Richardson, S&R, Beck and Lester, Sanzone, Donevant, SAB, and Battlefield.

274.    In February 2011; Because Sanzone, SAB, continued to extort money from Rivers for legal fees and retainers, after Sanzone had reviewed the scam closing documents and not disclosed the truth to Rivers, and because Sanzone, SAB, and

Donevant, continued to obtain money from Rivers for legal fees and retainers, after Sanzone learned of the criminal acts that injured Rivers, and after he warned Twery of Rivers knowledge of the criminal acts; Rivers was Court Ordered to leave the riding center property because she didn't own the property and her company was unable to obtain the financing to purchase the property.

275.　　The Defendants hold funds that in equity and good conscience belong to Rivers, which Rivers is in equity and law entitled to recover

## COUNT SEVEN:　RICO 18 U.S.C §1961 §1962 (b)(c)(d) §1964 (c)

276.　　Rivers restates, re alleges and re pleads the allegations contained in paragraphs above in this complaint.

277.　　At all times relevant to the Complaint, the Defendants, named in this Count, who are or have been corporations, subsidiaries, officers, directors, recorded owners and agents; aligned with and continue to do and have done business with each other, operated and/or managed "enterprise" scenarios in a "pattern of racketeering activity" committing related acts within a ten year period of time and were each an enterprise as that term is defined in RICO Racketeering 18 U.S.C §1961 (5) and used in 18 U.S.C §1962(b)(c)(d)

278.　　The Defendants hold funds that in equity and good conscience belong to Rivers, which Rivers is in equity and law entitled to recover

## COMMON RELATIONSHIP - THE SELLERS, CONTRACTORS AND BUYERS

279.　　S&R applied with Bedford County to build a Subdivision in Forest Virginia and to also be classified as a Family Subdivision. That portion of the property that was to be a subdivision included amenities and Lots 1-35 and A-K. The raw land and riding center portions of the remaining S&R property were included in the family subdivision and could not be sold or conveyed to any party other than a family member or member of S&R for

65

five years. According to the Serene Creek Run Covenants and Declarations, the "raw-land" was to be subdivided and annexed at a later date.

280.    On April 24, 2007; S&R negotiated and signed and on February 16, 2016; agreed to (a) the Noticed Exercised Option contract between Rivers (CVLR d/b/a) and S&R, (b) the consideration both parties agreed to and that had been paid out and received, (c) the terms of the Option contract, (d) the addendum to the purchase contract for the riding center, and (e) the contract included the raw land and certain lots located in the Serene Creek Run and Serenity Acres subdivisions

**PREDICATE ACT 1: OBTAINING MONEY UNDER FALSE PRETENSE**

**18 U.S.C. 1341 AND §18.2-178**

281.    On or about August 21, 2009, SAF was intentionally organized and registered as a Limited Liability Company to do business in the State of Virginia, by Lester and/or Lester and Beck as the member(s) and trustee(s) in liquidation of S&R under the advice of her attorneys Defendant Day and Grant, to hide assets derived from the illegal acts and omissions of Lester, Beck and S&R since 2007 and plead in this complaint

282.    On or about September 3, 2009, BBoyz was intentionally organized and registered as a limited liability company to do business in the State of Virginia, by Beck and/or Lester and Beck as the member(s) and trustee(s) in liquidation of S&R under the advice of his attorney, to hide assets derived from the illegal acts and omissions of Beck, Lester and S&R plead in this complaint

283.    Beck, Lester and S&R agreed to, negotiated, and received consideration for the Noticed Exercised Option and First Right of Refusal contract between CVLR d/b/a and S&R that includes terms, a lease with the Serene Creek Run HOA/Assoc, and the 2007 addendum pertaining to the riding center, the HOA membership for Rivers and named CVLR d/b/a as the purchaser of the riding center. (a) $20,000.00 deposit on or about April 20, 2007, (b)$1 on April 24, 2007, (c) $500.00 per month between July 2007 and

66

December 2007, (d) $5000.00 deposit in July 2007, (e) $475,000.00 on November 20, 2007, and (f) $500 and $700 per month for S&R property taxes between 2008 and 2014

284.    On February 23, 2016; Beck was served with the February 16, 2016 Notice to Exercise the Option and First Right of Refusal contract by Bedford County Sheriff Deputy. Lester was served with the Notice to Exercise the April 24, 2007 Option contract on February 17, 2016 by Bedford County Sheriff Deputy

**PREDICATE ACT 2: CONSPIRACY TO COMMIT §18.2-22**

285.    The HOA, agreed to, negotiated, and paid consideration to Rivers for mowing the addendum as per the terms within the November 5, 2011 Addendum to the Contract of Purchase between S&R and CVLR which survived the closing and is now part of the February 16, 2016 Notice to Exercise the Option (Purchase contract) As per the addendum, (a) Rivers is the HOA member, (b) the HOA paid $75 per month to Rivers (CVLR d/b/a) to maintain the mowing of the grass in the common areas around the clubhouse, pool and playground, between 2007 and 2011, (c) Rivers (CVLR d/b/a) is the purchaser, (d) the $5,000.00 deposit, escrowed by Counts Realty Group (Counts) will be refunded to Rivers (CVLR d/b/a), (e) the $20,000.00 deposit to S&R is non-refundable upon acceptable binding contract between the parties and (f) S&R will pay up to $1200.00 to CVLR d/b/a towards the connection to a new well.

286.    In 2011; The HOA refused taking membership money from Rivers and Rivers has not had full use of the amenities as defined in the recorded Serene Creek Run Covenants and Declarations dated December 2006 since 2011.

287.    Rivers has provided the HOA with all notices sent to homeowners and all pleadings filed against the Serene Creek Run subdivision property and recorded with the Bedford County Clerk's Office

288.    Grant on behalf of S&R, SAF, and Lester, knowing and intentionally mislead real estate agents, closing agents, buyers, and insurance agents that the Option and First

67

Right of Refusal contract between S&R and Rivers (CVLR d//b/a) wasn't valid and if it was valid, had ran out after two years to protect the Defendants and help them profit and dupe Rivers

289.     Beck, BBoyz, S&R, SAF and Lester are attempting to sell the S&R property while encumbered in this litigation, by Lis Pendens filed in the Bedford County Clerk's office Instrument No #180004869 and by Rivers Noticed Exercised Option and First Right of Refusal contract also recorded in the Clerk's office as Instrument No 160003231,

290.     Beck and Bboyz are currently using the property as collateral for the benefit of Beck, BBoyz, Lester, their entities and assigns, and are currently attempting to sell portions of the property for subdivision; although Rivers has offered to negotiate and requests they set up a time for closing.  The Defendants refuse to perform on the contract with Rivers

**291.**     Based on the Defendants' fraudulent misrepresentations and other illegal actions in connection with the fraudulent conveyances, Rivers bring this action against the Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C §1961 (5) §1962 (b)(c)(d) §1964(c) *et. seq.,* and other federal and state laws. Defendants engaged in such violations directly and as co-conspirators.  The state law claims arise out of the same transaction or occurrence or series of transactions or occurrences that form the basis of RICO cause of action.


### PREDICATE ACT 4 – 21: CONSPIRACY TO COMMITT §18.2-22

292.     The Defendants actions in the over 75 transactions--- the cross-collateralized loans, purchase of investment property, the sale of investment properties, fraudulent conveyances and closings of 17 lots and the riding center, the resell of at least 7 lots, the conveyance of the amenities property, ODNB's theft of Rivers insurance funds, the

68

laundering of the insurance funds from ODNB to BOJ and Select with each transaction being a separate transaction, and the ongoing investment and use of Rivers original equity, insurance policies and signature on contracts---establish an ongoing, "open-ended" pattern of racketeering activity.

293.     The Defendants actions, individually and together, demonstrate a pattern of fraudulent activity with the following common elements: (a) contacting and negotiating with victims and businesses interested in purchasing property, (b) offering to option and/or sell and/or finance the purchase of the property, (c) enter into contracts promising to sell and/or finance the loans to purchase the property upon payment of a deposit and/or agreement to guarantee after receiving business records, tax records, identification records and personal information is obtained by the Defendants, (d) failing to provide documents for review, (e) forging bank commitment letters, deeds of trust, deeds, project parameters, HUD statements and, (f) using Rivers consideration paid not for what she intended or what was agreed to under contract terms, (g) forging documents required to close on transactions, laundering the deposits and consideration paid, mortgage and loan money paid out by Rivers, (h) obtaining Rivers insurance proceeds, equity and interest, the Defendants derived from the schemes. Pursuant to that defined in RICO Racketeering 18 U.S.C §1961 (5) and used in 18 U.S.C §1962(b)(c)(d) §1964(c)

294.     The result of the Defendants activity was to cause the unsuspecting victim, Rivers, to rely upon their promises to sell and/or finance, and perform on their contracts, delay in closing and performance on the contracts allowing for the scheme to fund itself and earn income, equity, credit and interest to in-rich each other and finalize bigger deals, investments and divorces.

295.     The delay in performance and Rivers loss of business caused the business and Rivers to incur additional expenses but personally enriched the Defendants, who,

69

contrary to the representations made to Rivers and other victims, prior to signing contracts and obtaining deposits and funds for consideration, loan and insurance payments, marketing, etc, had no intention actually sell and/or purchase the property and/or provide loans to Rivers for the property, but used Rivers and her businesses as the debt service and Rivers contracts as assets to earn a substantial profit, equity, credit, interest and income.

296.    Each of the Defendants described above identified in this Count did intentionally commit and conspired to and did, as part of the acts and omissions, conduct or participate in the conduct of the affairs of the illegal banking enterprise of Union, BOJ, Select, SBFC, and the enterprises owned, managed and operated by the Defendants through engaging in a pattern of racketeering activity. Pursuant to that defined in RICO Racketeering 18 U.S.C §1961 (5) and used in 18 U.S.C §1962(b)(c)(d) and §1964(c)

297.    Through their conduct, the Defendants identified in this Count have made or caused to be made or distributed communications by United States mail which included misrepresentations of material fact regarding Rivers commercial contracts, equity, business, proceeds, chattel, and insurance policies and have made or caused to be made interstate wire transfers as a result of such misrepresentations. Examples of such communications and transfers in furtherance of the fraudulent schemes are described in throughout this complaint

298.    By virtue of these and similar communications occurring within a ten year period, the Defendants identified in this Count have engaged in and are continuing to engage in an uninterrupted series of predicate acts of mail and wire fraud, money laundering and fraudulent conveyance that are related to one another in furtherance of the fraudulent schemes

299.    As a direct and proximate result of the conduct of the Defendants identified in this Count as set forth herein, including their ownership, conduct and NMG of the affairs of

70

and investments made in the cross-collateralizing loans, sale of the commercial property and fraudulent conveyances, use of Rivers commercial contracts, equity, insurance policies and identity, Rivers has been injured in her businesses and property and continues to suffer injuries, including the amount of her equity, lost profit, investment and legal expenses.

300.    At all times relevant to the Complaint, the Defendants, (other than the Federal and State Defendants) who are or have been corporations, subsidiaries, officers, directors, recorded owners and agents; aligned with and continue to do and have done business with each other, operated and/or managed "enterprise" scenarios in a "pattern of racketeering activity" committing related acts within a ten year period of time and were each an enterprise as that term is defined in RICO Racketeering 18 U.S.C §1961 (5) and used in 18 U.S.C §1962(b)(c)(d) and §1964(c)

**301.**    Between October 25, 2017 and May 31, 2018, Union has provided "new discovery evidence" to Rivers showing the RICO activity of the enterprise(s) including but not limited to the purchase contracts and; (a) the profit earned, (b) the loans and equity acquired, (c) the building of new infrastructure, (d) the payoff of business and mortgage loans, (e) and cross-collateralizing the property and loans, (f) selling lots, (g) orchestrating a scam sale of the riding center, (h) and not releasing the riding center to allow Beck and Lester, BBoyz, S&R and SAF to pay off business and mortgage loans and notes.


**PREDICATE ACT 22: MONEY LAUNDERING 18 U.S.C. §1956 AND §1957**

**302.**    The money earned from the sale of the lots, the deposits and closing pay outs, the commissions, proceeds checks, and sale and deposits of the newly built homes was laundering into accounts owned by Beck and Lester, SAF, BBoyz, North Creek, Mrs. Edmundson and Edmundson (and Wynne) and held at Union. The money was then

71

used to pay for business expenses, payroll, other investments, loans, purchases of other investment property in the area and to pay Co-Conspirator Defendants named in this complaint.

303.     Union provided Rivers with "new discovery evidence" indicating that on August 30, 2007 Lester and Beck's divorce attorney(s) validated the value of the Purchase and Sale contracts between S&R and Rivers. The estimated value of the CVLR d/b/a Purchase and sale contracts for the riding center; $550,000.00 and the 17 remaining S&R lots at $1,417,166.00 and the raw land was $1,700,000.00.

304.     Union bank provided yet more "new discovery evidence" indicating that on September 5, 2007 the first deed of trust Loan #XXXXX6765 was cross-collateralized with Loan #XXXXX6770. The first Deed of Trust was collateralized by "raw land" TM#99-3-1 and the amenities property TM#99-A-28 and the riding center TM#99-3-3 and the entire parcel(s) were part of a "family subdivision (development).

305.     Pursuant to Bedford County Zoning Ordinances, land designated as "family subdivision (development) can not be sold to any party other than a family member or member of the owner trust or limited liability company until five years after the "family subdivision (development) application is approved and recorded.

306.     Between April 17, 2007 and August 7, 2007; S&R, Beck and Lester entered into and agreed to the November 5, 2007 Addendum to Purchase and sale contracts which survives the contracts. The addendum is made part of the February 16, 2016 Notice to Exercise the April 24, 2007 Option and First Right of Refusal Agreement between S&R and Rivers (CVLR d/b/a)

**PREDICATE ACT 23: OBTAINING MONEY UNDER FALSE PRETENSE §18.2-178**

307.     Between 2007 and 2014 Richardson, Fariss, and ATC have been paid to notarize and prepared closing documents, insurance and title policies, HUD statements, proceeds checks and other closing documents, for property sold in the Serene Creek

72

Run and Serenity Acres subdivisions currently under contract between S&R (Beck and Lester) and Rivers (CVLR d/b/a).

308.      ATC, Fariss and Richardson of ATC were paid no less than $ 700.00 because they agreed to perform a sham closing on November 20, 2007 and forge the CLDOT and HUD documents.

**309.**      ATC paid Teresa Polinek a amount equal to 5% commission on the un settled contracts for the purchase of the riding center and Counts $23,750.00 on November 20, 2007 and $5000.00 on August 8, 2008 for their part in the scheme to dupe Rivers

310.      Twery was paid $1200.00 by ATC from the November 20, 2007 HUD statement forged by Richardson, for his part in negotiating and coordinating the scam closing to dupe Rivers. (an amount equal to Rivers (CVLR d/b/a well allowance promised in the Addendum to the Purchase contract).

311.      Schenkel, Twery, Day and Morrison were paid for coordinating, negotiating and orchestrated the fraudulent scheme and the scam closing between the Defendants. to dupe Rivers and to benefit their clients to (a) refinance and pay off S&R mortgage loans, $174,000.00 - $1,700,000.00 (b) obtain a new construction loan $110,000.00 to build the Serene Creek Run clubhouse and pool, (c) to pay off existing mortgages on the B&B Ice Cream Store for up to $66,000.00 and therefore earn a profit and income from the existing business, (c) to invest, purchase, and build on other property and businesses, and (d) to earn a profit and income from those businesses and property they had invested in and purchased from the equity, credit, and funds obtained under false pretense.

312.      The Union documents received by Rivers in 2018; show that Lester had no income in 2005, 2006, or 2007 and show the motive for the pattern of RICO activity and ongoing activity of the enterprise(s), because; (b) Lester and Beck were in a heated divorce, (c) S&R mortgage loans were coming due in March 2007, (d) the original 2003

73

guarantor, Tessy Plastics, refused to guarantee new loans or a increase or extension for the credit limit for S&R, Lester or Beck, (e) the family subdivision (development) could not be sold to any outside party other than a family or LLC member of S&R, Beck or Lester until 2009, (f) S&R owed the Serene Creek Run Subdivision a club house and pool for the amenities and had not gifted the land to the HOA and could not due to Rivers Option, (g) Planters Bank (Union) was the senior lien holder on the property, Beck and Lester owed Henry and Helga Beck $1 Million Dollars interest only on a promissory note coming due in December 2019 , and (h) S&R could not have a new appraisal done on the property to acquire new loans due to the title search that would uncover Rivers (CVLR d/b/a) Option Lien Contract with the first right of refusal; the Defendants, hired by S&R, Lester and Beck and Union, Grant, Schenkel, Morrison, Day, Counts, Teresa Polinek, ATC, Richardson and Fariss, with the use of ODNB, BOJ, Mason, Thomas and Beach (RBC, 1650 and Wynne); coordinated, organized and perfected the scheme  to  intentionally use Rivers and CVLR d/b/a debt service, commercial contracts, equity, signature, insurance policies, property appraisals, marketing, commercial business plans, project parameters, friendship and trust in them.

313.    On October 23, 2017; Union provided Rivers with "new discovery evidence" related to three S&R loans on the S&R property, the sales, partial satisfactions and releases, all documents Rivers could not have known or reviewed until that day.  The documents revealed that:

A. On August 10, 2009; Richardson of ATC faxed 12 pages to  Union successor of StellarOne Corp, with a cover page informing "Beth" that she was closing on **Lot 33** Riley Run in the Serene Creek Run subdivision and the S& R property lien for S&R loan #xxxx16765, $1,700,000.00, describing the property as Tax Map #99-A-28, 99-3-1, 3, 3A, 3B, that being the same property conveyed to S&R by V.Howard Belcher and Margaret T Belcher, by deed dated November 19, 2003 of record in the aforementioned

74

Clerk's Office as Inst #030024202. The property had not been paid off and there had been no release of the riding center property after the November 20, 2007 closing.

B. Union successor of StallarOne Corp sent the Certificate and Affidavit of Satisfaction certifying that the full amount of $1,700,000.00 had been paid in full, to Richardson of ATC to record on August 12, 2009. Rivers was not notified on or before August 10, 2009 by Union successor of StellarOne or Richardson of ATC, or Beck and Lester of S&R, that Lot 33 had been sold and was closed by Richardson of ATC and that the remaining S&R property including the riding center property had not been released on August 12, 2009.

314.    Union successor of StellarOne's, S&R Deed of Trust terms included that the bank be paid a percentage equal to 80% of lots sales as per the S&R/Deed of Trust. Union successor of StallarOne formerly Planters Bank and Trust. Planters Bank received $44,171.14 on November 21, 2007 deposited to Acct #xxxx74006, and $176,571.92 on November 26, 2007 deposited to Acct #xxxx16765 and $111,177.06 deposited to Acct #xxxx16770, paid from the "sham" closing of the riding center that was set up to dupe Rivers. Planters Bank did not obtain a release from Rivers. S&R never obtained a release from CVLR to BBoyz or SAF or S&R or the new recorded owners of the property.

315.    Union earned a substantial profit from the money it received from the sham sale of the riding center, the new loans acquired by collateralization, the continued use of the property as collateral which allowed for other loans, accounts, interest, credit lines and investments for the Defendants, the fraudulent conveyance of the other Serene Creek Run Subdivision lot sales, the bank products it provided to the Defendants from the sale of the lots and the sale of other properties acquired from the profit the Defendants earned.

316.     Since 2007; Union has managed and operated its bank as a enterprise allowing the Defendants to obtain loans and checking accounts, collateralize for the loans, and deposit the illegally obtained funds earned from the enterprises obtained from the illegal activity into Union.  Union therefore; earns a profit from: S&R, BBoyz, SAF, Lester and Beck from the sale of the S&R property, the loans acquired from collateralizing and not releasing the title to the property and the investments purchased from the sale of the property, and from Northcreek, Mrs. Edmundson and Edmundson's; (1) purchase of S&R property lots (valued at $65,000.00 per acre) #3, 2.2 acres, #6, 2 acres, #18, 4.16 acres, #34, 2.2 acres, and #J, 4.9 acres, at discounted rates, (2) obtaining substantial lot loans for the lots through First National Bank, (3) entering into sale contracts to sell the lots to buyers whose loans were inflated and large enough to pay Edmundson of Northcreek to build a home on the lots, ($250,000 - $400,000) (4) falsified applications for construction loans from First National Bank, using the property as collateral, and (5) Richardson and Fariss of ATC incomplete title searches and closings on the property and lots sold without releases or first right of refusal from Rivers. (Title examiners gave instructions to the agents that it was required that Rivers sign a release)

317.     Union successor of StellarOne knew of or should have known, that the lots, sold by BBoyz and SAF to Northcreek, Mrs. Edmundson and Edmundson purchased at an amount equal to or less than Rivers discounted rate (to avoid paying Rivers), were sold without a releases from Rivers and Northcreek, Mrs. Edmundson and Edmundson borrowed between $375,000 and $450,000 for each lot as a construction loan putting the property and the new constructed home up as collateral. The funds received by Edmundson, Mrs. Edmundson and Northcreek for the sale and building of the homes on the lots were used to purchase other property and lots and Edmundson, Mrs. Edmundson and Northcreek received large draws from the money.  Northcreek paid

76

Edmundson, Mrs. Edmundson and his family large profits from each loan derived from the sale of the lots without a release from Rivers.

318.    Each of the Defendants agreed to and acted in concert with the others carrying out the fraudulent scheme described above

319.    Each of the Defendants in this complaint performed acts in furtherance of the common fraudulent scheme which was part of the overall RICO activity.

320.    Rivers has suffered damages as a result of the Defendants' concerted activities as described above, for which the Defendants are jointly and severally liable.

321.    Edmundson, Mrs. Edmundson and Northcreek, S&R, Lester and Beck, BBoyz and SAF, Union, Select, and ODNB, hold funds that in equity and good conscience belong to Rivers, which Rivers is in equity and law entitled to recover.

322.    Each of the 17 lots and property described within Rivers Notice to Exercise the Option and First Right of Refusal contract and located in the Serene Creek Run and Serenity Acres Farm subdivisions, were sold without a release from Rivers and was fraudulently conveyed and obtained under false pretense with certain property being sold and obtained by the illegal use of Rivers signature and insurance policies under false pretense

## COMMON RELATIONSHIP -NORTHCREEK, MRS. EDMUNDSON, EDMUNDSON

**323.**    Northcreek was and is operated by Mrs. Edmundson, and Edmundson as a mere instrumentality, without observing corporate formalities, without sufficient capital to transact the business it transacted and as a fraud on creditors of those companies

324.    The Defendants used the property lots, Optioned by Rivers and now under contract by Rivers to purchase, located in the Serene Creek Run subdivision, to(a) hold closings with Poplar Forest and ATC who paid individuals and businesses named on the HUD statements, (b) obtain loans from Union and FNB of over $250,000 – $400,000 each to build homes and then, (c)sell the homes for a personal and commercial profit.

77

The money obtained from the sale of the homes was then used to (a) purchase other investment property to be used as collateral to (b) obtain larger loans to (c) build yet more homes to (d) sell for a larger profit.

325. On August 9, 2011; SAF Deeded Lot 3 to Northcreek. $40,000.00 Consideration Instrument No 110007858. The Deed was prepared by Twery. The assessed value was $80,000.00. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

326. On or about November 29, 2011; Bboyz and SAF Deeded Lot 6 to Northcreek. $48,000.00 Consideration Instrument No 110011438. The Deed was prepared by Twery. The assessed value was $72,000.00. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

327. On January 24, 2008; SAR Deeded Lot 16 to Lester and HOA, Instrument No 120011178. . The Deed was prepared by Day. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

328. On October 12, 2012; Lester Deeded Lot 16 to SAF. $40,000.00 Consideration Instrument No 110007858. The Deed was prepared by Grant. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

329. On March 7, 2014; SAF sold Lot 16 to Mr and Mrs Krycinski. $95,000.00.00 Consideration Instrument No 140001823. The assessed value was $125,000.00. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

330. On October 7, 2011; Bboyz and SAF sold Lot 18 to Northcreek. $55,000.00 Consideration Instrument No 100006927. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

331.   On October 7, 2011; Northcreek used Lot 18 as collateral and cross-collateralized the loan to acquire a $267,200.00 CLDOT Instrument No 110009570 with First National Bank (acquired by Union). The title company required a release from Rivers but Northcreek, Twery was named trustee. Twery and FNB went around it and decided to write the loan as a Lot loan. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

332.   On July 13, 2007; S&R Deeded Lot 21 to Lester. $500,000.00 Consideration, Day was the closing agent and prepared the Deed. $364,000.00 was used to pay off a Union (Planter Bank) note. The note was used to refinance an existing debt recorded as Instrument No #070010954. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

333.   On August 27, 2007; Lester paid off the Union (Planters Bank) $364,000.00 loan. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

334.   On November 25, 2008; Lester Deeded Lot 21 to Beck. $500,000.00 Consideration, Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

335.   On November 4, 2008; (Lester sold Lot 28 to Beck on May 22, 2008)  Lester Deeded Lot 28 to Beck. Instrument No 080013853 Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

336.   On August 18, 2009; S&R Deeded Lot 33 to Beck, Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

337.   On August 18, 2009; Beck Deeded Lot 33 to Mr and Mrs Frear, $75,000.00 Consideration. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

79

338.     On July 26, 2010; S&R Deeded Lot 34 to Bboyz and SAF. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

339.     On May 14, 2012; Bboyz and SAF Deeded Lot 34 to Mr and Mrs Fluker, $41,000.00 Consideration. Twery prepared the Deed. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

340.     The actions of the Defendants were an extreme deviation from reasonable standards of conduct, undertaken intentionally with actual malice, intent to defraud and/or with a reckless disregard for their likely consequences.  As a result, Rivers is entitled to an award of damages.

## COUNT EIGHT: MAIL AND WIRE FRAUD
## DEFENDANTS ODNB, ATC, FARISS, RICHARDSON, DARNELL, HOPKINS, BOJ, POTTER, CHAPMAN, MERRILL
## 18 U.S.C §1341 or §1343 AND 18 U.S.C §1341 and/or §1343

341.     Rivers restates, re alleges and re pleads the allegations contained in the paragraphs above, as set forth against ODNB, ATC, Fariss, Richardson, Darnell, Hopkins, Potter, BOJ, Chapman, Merrill,  the Defendants

342.     **PREDICATE ACT 1:** On or about November 20, 2007; ODNB, Darnell, Hopkins, Potter, transferred $500,000.00 and BOJ, Chapman accepted the wire transfer in to ATC, Fariss, Richardson bank account, as consideration for Rivers purchase of the riding center, into ATC's BOJ account. The title to the property was not released to ODNB or Rivers

343.     **PREDICATE ACT 2 – 9:** Richardson emailed and/or faxed the sham closing and forged unsigned documents  the Defendants Counts, ODNB, Hopkins, Darnell, Twery, Schenkel, Day, Morrison, Lester, Beck, S&R and Teresa Polinek between November 13, 2007 and November 26, 2007.

344.     **PREDICATE ACT 10 – 13:** On or about November 26, 2007; Richardson used the United States Postal Service, to mail the sham closing documents including unsigned documents and the forged documents to ODNB. The documents acts are separate from the mailing act.

345.     The actions of each of the Defendants identified in this Count, through a pattern of racketeering activity, took place within a ten year period and included multiple acts of mail and wire fraud and money laundering

346.     Defendants identified in this Count have continuously engaged in criminal activities, including, but not limited to, mail and wire fraud, money laundering, RICO and forgery, as described in this complaint, as part of their overall scheme, within a ten year period and will continue indefinitely unless prevented.

347.     The Defendants, *infra, did* conspire to and did engage in mail and wire fraud in violation of 18 U.S.C §1341 or §1343 by using or causing to be used, the United States mail or interstate wire communications in furtherance of and for the purposes of executing schemes to defraud and to obtain and maintain money by false pretenses. Each use of the mails or interstate wire communications in furtherance of and for the purposes of executing the schemes constitutes a separate and distinct violation of 18 U.S.C §1341 and/or §1343. Some of the relevant uses are described in Exhibits attached and incorporated by reference herein.

348.     The Defendants used mail and wire communications to collect and launder the proceeds of the fraudulent scheme, to induce Rivers to forward or cause payments to be forwarded to them, to forestall Rivers inquiry into the scheme, and to induce Rivers participation in paying the debt service.

349.     The misrepresentations of the Defendants using the United States mail and for the purpose of causing the use of the United States mail and interstate wire communications by others were made with the intent to defraud Rivers, and her businesses and Rivers in fact

reasonably relied upon such misrepresentations, including those relating to the nature of Rivers contracts to purchase the commercial property, and contracts to purchase, to perform on the contracts "keeping clean hands" and insure vehicles and trailers for her equine business, to her detriment.

## COUNT NINE: AIDING AND ABETTING 18 U.S.C. 2 (a)

**350.**    Rivers restates, re alleges and re pleads the allegations contained in the paragraphs above, as set forth

351.    Bowman, Nitti, NMG, Northwood, FAC and Wallis, together sought Rivers and her business out for her claims after learning of her bankruptcy case and the federal investigation of Wynne, et. al.

352.    Sometime beginning in February 2006; FAC and Wallis, had a hidden agenda against Twery and his law partner Schneider who represented *Advisco Capital Corp. v FAC Corp.* in 2007. Twery had been hired by a Wisconsin law-firm to record and collect a $196,635.37 judgment against Wallis, Nitti and FAC in 2006; Case No 05CV30 *Ellen Chelstrom v FAC Acquisition Corp Inc, FAC Inc, Boss NMG Group Inc, William Wallis, Robert Nitti.* . (Twery had represented Wynne in Rivers bankruptcy case filed in 2011.)

353.    Sometime between June and July 16, 2011; Bowman, FAC, NMG, Nitti and Wallis strategized how to meet and be-friend Rivers, represent and acquire an interest in her claims and the claims of others.

354.    Sometime between July 20, 2011 and April 2, 2013; the U.S. Attorney's office, and the DOJ learned that Wallis and NMG were third-party payees for the Wynne victims and Wallis's attorney and that Bowman was representing them with a "adverse interest".

355.    The federal agencies and the federal investigation got in the way of the Defendants scheme forcing them to re-strategize and work with the federal agencies without Rivers or the other victims' knowledge, thereby forcing Wallis and NMG not to

82

pay legal fees for Rivers and Marsh and Bowman to withdraw from Rivers cases or get her to dismiss or settle the cases against Wynne or suffer the consequences.

356.      On or about April 2, 2013; The US Attorney's office had asked Wallis to testify at a grand jury.  Bowman and Wallis set up the RICO mediation quickly so as to dismiss the case before Bowman had to file a response in Wallis' *United States of America/IRS v William L Wallis Jr.* case, without Rivers knowledge and in such a way that Rivers would never be able to testify against Wynne and Bowman agreed that Wallis would not testify against Wynne. However, greed got the best of Wallis and he bragged to Judge Ballou how he and NMG would go to any length and pay large amounts of money to beat Wynne in court.  Judge Ballou and Bowman knew that wasn't what Wallis, Bowman and the US Attorney's office had agreed to.  Rivers has rights to fair and honest due process and remedy at law.  The settlement agreement is *void ab initio*

**357.**      The Defendants above, through the activities alleged and re plead, participated in and aided and abetted in commission of the fraudulent schemes by which Rivers was deprived of her property and income

### COUNT TEN:  MONEY LAUNDERING 18 U.S.C §1956 and 1957

358.      Rivers restates, re alleges and re pleads the allegations contained in paragraphs above in this complaint

359.      On April 7, 2008 ODNB received two insurance checks from Rivers who hand delivered them to Hopkins at the bank located in North Garden.  Hopkins instructed Rivers to endorse the checks and refused to cash the smaller Check #2683641, $2043.86. The larger Check #2683642 was for $24,265.38. Both checks were made payable to CVLR Performance Horses Inc. and ODNB. CVLR Inc assigned the proceeds to Rivers in 2015 before being terminated with  Virginia State Corporation Commission

**360.**      On January 20, 2011; ODNB presented documents to the VSP, Special Agent James Vaughn for John and James Wynne.  ODNB's document listing the accounts for

John and James Wynne indicated that several accounts had been closed and/or purged on that same day. Also one account listed Revolving/ Commercial R/E LN account #xxxx1000, $491,520.44. ODNB had been issued subpoena for a Multi-Jurisdictional Grand Jury empanelled for February 4, 2011 in Bedford County, Virginia. One of the accounts listed on the document was in the name of Catherine R Wynne account DDA #xxxxxx6856. Rivers was not named on the account and did not have access to the account.

361.    On the same day as above VSP, Special Agent Vaughn was presented with a list of insurance proceeds and disbursements. The document listed:

A. The checks delivered to ODNB by Rivers on April 7, 2008. One of the entries on the document lists the third check received from Rivers attorney's office, check #2687309, $8881.35 on February 19, 2009 with a comment section indicating the money had been deposited into DDA #xxxxxx6856

B. The disbursements of the check proceeds had been paid to Terrance White between May 28, 2008 and February 19, 2009 with Check #1379, $5309.54, Check #1404, $4339.84, Check #1438, $9000.00, and Check #1658, $6837.49

362.    In October 2016; Rivers received documents from Select that included document reflecting loan statements with figures and check amounts matching closely to the $10,514.20 check ATC paid to 1650 on November 20, 2007, and the $10,351.35 check ODNB paid to Terrance White on July 23, 2008 and deposited for Rivermont Banking Company into John Wynne's, BOJ account #xxx1620 on July 28, 2008, and matched identically to the $10,315.90 check #1015 that Catherine R Wynne Estate paid Select on April 27, 2009. $10,000.00 of the April 27, 2009 payment was applied as a principal payment of the Select account note #xxx4439, Catherine R Wynne Credit Line Account. That account #xxx4439 also described in the documents as port #2204 being the same

number found on several check payments made to Select from John Wynne's BOJ account #xxxx1620.

363.     The checks paid to Select were drawn from the same account that ODNB deposited Rivers insurance proceeds into; account DDA #xxxx6856 Catherine R Wynne Estate. The Select Credit Line account for Catherine R Wynne /John L Wynne POA was opened on July 1, 2008 (statement date) with an application dated in the back, September 3, 2004 (before Select was open for business) by John Wynne as POA for Catherine R Wynne and collateral backed by 1160 shares of Exxon Mobile stock valued at $77,488.00. The loan officer named on the July 1, 2008 application was Walter Mason. The front page of the application indicated a BB&T money market account owned by self/Wynne for $40,000.00. The account was paid off on November 30, 2010 for $84,314.69

364.     Sometime after May 10, 2018; Rivers received subpoenaed documents from ODNB. The documents included the account records of the Catherine R Wynne DDA #xxxxxx6856 verifying the documents received from Select and described above and was that same account that had been purged the day Special Agent James Vaughn attempted to retrieve subpoenaed documents for the Multi Jurisdictional Grand Jury to avoid indictment and possible closing of the bank and fines

**365.**     Rivers has suffered damages as a result of the Defendants activities in concert with each other as described in this Count for which the Defendants are jointly and severally liable

## COUNT ELEVEN: FRAUDULENT CONVEYANCE

366.     Rivers restates, realleges and repleads the allegations contained in the foregoing paragraphs as though fully set forth

367.     On October 23, 2017; Union provided Rivers with "new discovery evidence" related to three S&R loans on the S&R property, the sales, partial satisfactions and releases, all documents Rivers could not have known or reviewed until that day. The documents revealed that:

A. On August 10, 2009; Richardson of ATC faxed 12 pages to Union successor of StellarOne Corp, with a cover page informing "Beth" that she was closing on **Lot 33** Riley Run in the Serene Creek Run subdivision and the S& R property lien for S&R loan #xxxx16765, $1,700,000.00, describing the property as Tax Map #99-A-28, 99-3-1, 3, 3A, 3B, that being the same property conveyed to S&R by V.Howard Belcher and Margaret T Belcher, by deed dated November 19, 2003 of record in the aforementioned Clerk's Office as Inst #030024202. The property had not been paid off and there had been no release of the riding center property after the November 20, 2007 closing.

B. Union successor of StallarOne Corp sent the Certificate and Affidavit of Satisfaction certifying that the full amount of $1,700,000.00 had been paid in full, to Richardson of ATC to record on August 12, 2009. Rivers was not notified on or before August 10, 2009 by Union successor of StellarOne or Richardson of ATC, or Beck and Lester of S&R, that Lot 33 had been sold and was closed by Richardson of ATC and that the remaining S&R property including the riding center property had not been released on August 12, 2009.

368.     Union successor of StellarOne's, S&R Deed of Trust terms included that the bank be paid a percentage equal to 80% of lots sales as per the S&R/Deed of Trust. Union successor of StellarOne formerly Planters Bank and Trust. Planters Bank received $44,171.14 on November 21, 2007 deposited to Acct #xxxx74006, and $176,571.92 on November 26, 2007 deposited to Acct #xxxx16765 and $111,177.06 deposited to Acct #xxxx16770, paid from the "sham" closing of the riding center that was set up to dupe Rivers. Planters Bank did not obtain a release from Rivers. S&R never

86

obtained a release from CVLR to BBoyz or SAF or S&R or the new recorded owners of the property.

369.     Union earned a substantial profit from the money it received from the sham sale of the riding center, the new loans acquired by collateralization, the continued use of the property as collateral which allowed for other loans, accounts, interest, credit lines and investments for the Defendants, the fraudulent conveyance of the other Serene Creek Run Subdivision lot sales, the bank products it provided to the Defendants from the sale of the lots and the sale of other properties acquired from the profit the Defendants earned.

370.     Each of the Defendants named in this Count agreed to and acted in concert with the others carrying out the fraudulent scheme described above

371.     Each of the Defendants in this complaint performed acts in furtherance of the common fraudulent scheme which was part of the overall RICO activity.

372.     Rivers has suffered damages as a result of the Defendants' concerted activities as described above, for which the Defendants are jointly and severally liable.

373.     Edmundson, Mrs. Edmundson, Northcreek, S&R, Lester and Beck, BBoyz and SAF, and Union, hold funds that in equity and good conscience belong to Rivers, which Rivers is in equity and law entitled to recover.

374.     Each of the 17 lots and property described within Rivers Notice to Exercise the Option and First Right of Refusal contract and located in the Serene Creek Run and Serenity Acres Farm subdivisions, were sold without a release from Rivers and was fraudulently conveyed and obtained under false pretense with certain property being sold and obtained by the illegal use of Rivers signature and insurance policies under false pretense

375.     Since 2007; Union has managed and operated its bank as a enterprise allowing the Defendants to obtain loans and checking accounts, collateralize for the loans, and

deposit the illegally obtained funds earned from the enterprises obtained from the illegal activity into Union. Union therefore; earns a profit from: S&R, BBoyz, SAF, Lester and Beck from the sale of the S&R property, the loans acquired from collateralizing and not releasing the title to the property and the investments purchased from the sale of the property, and from Northcreek, Mrs. Edmundson and Edmundson's; (1) purchase of S&R property lots (valued at $65,000.00 per acre) #3, 2.2 acres, #6, 2 acres, #18, 4.16 acres, #34, 2.2 acres, and #J, 4.9 acres, at discounted rates, (2) obtaining substantial lot loans for the lots through First National Bank, (3) entering into sale contracts to sell the lots to buyers whose loans were inflated and large enough to pay Edmundson of Northcreek to build a home on the lots, ($250,000 - $400,000) (4) falsified applications for construction loans from First National Bank, using the property as collateral, and (5) Richardson and Fariss of ATC incomplete title searches and closings on the property and lots sold without releases or first right of refusal from Rivers. (Title examiners gave instructions to the agents that it was required that Rivers sign a release)

376.     Union successor of StellarOne knew of or should have known, that the lots, sold by BBoyz and SAF to Northcreek, Mrs. Edmundson and Edmundson purchased at an amount equal to or less than Rivers discounted rate (to avoid paying Rivers), were sold without a releases from Rivers and Northcreek, Mrs. Edmundson and Edmundson borrowed between $375,000 and $450,000 for each lot as a construction loan putting the property and the new constructed home up as collateral. The funds received by Edmundson, Mrs. Edmundson and Northcreek for the sale and building of the homes on the lots were used to purchase other property and lots and Edmundson, Mrs. Edmundson and Northcreek received large draws from the money. Northcreek paid Edmundson, Mrs. Edmundson and his family large profits from each loan derived from the sale of the lots without a release from Rivers.

377.    Rivers has suffered damages as a result of the Defendants' concerted activities as described above, for which the Defendants are jointly and severally liable.

## COUNT TWELVE: MAKING FALSE STATEMENTS/FORGURY
## 18 U.S.C. §1001 AND §1010

378.    Rivers restates, re alleges and re pleads the allegations contained in paragraphs above in this complaint

379.    On November 30, 2016; Rivers received a copy of the entire incident report from the Bedford Police Department concerning the investigation of settlement and closing agent, Jennifer Richardson. Rivers learned that Richardson of ATC had admitted to altering the Credit Line Deed of Trust (which in Virginia is the mortgage) the day after the November 20, 2007 closing and before it was recorded in the Bedford County Clerk's office on November 21, 2007. Richardson omitted the name of Rivers, who had agreed to put up the riding center as collateral and instead, added a third party not named in any contracts relating to the Option or sale of the riding center. The altering and forging of the $500,000.00 mortgage makes the mortgage NULLAND VOID and the money retained by the Defendants is obtained under false pretense.

380.    The new information led Rivers to the facts that Richardson, on November 21, 2007, had to write a check for the difference owed at the courthouse when recording the altered Credit Line Deed of Trust and adjusted the accounting and prepared a NEW final HUD statement and issued new proceeds checks based on the difference in the accounting. The original November 20, 2007, HUD statement is also NULL AND VOID due to the changed accounting and the NEW final HUD being drafted and signed by Richardson, Beck and John Wynne the next day. However, the final HUD is incomplete and the settlement closing for the riding center has not been finalized because the NEW final HUD was not signed by the parties to the Option or the contract; Rivers, the

89

purchaser, and Lester, the other 50% member Seller; the parties to the contract between CVLR Performance Horses and S&R Farm LLC

381.        Richardson altered/forged the Credit Line Deed of Trust (the mortgage) and HUD statement and made false statements relating to the sale of the S&R property.

**382.**        Rivers has suffered damages as a result of the Defendants activities in concert with each other as described in this Count for which the Defendants are jointly and severally liable

**COUNT THIRTEEN: MAKING FALSE STATEMENTS/FORGURY**
**18 U.S.C. §1001 AND §1010**

383.        Rivers restates, re alleges and re pleads the allegations contained in paragraphs above in this complaint

384.        On February 6, 2014; Bowman filed Motion to Refer the RICO Case to Magistrate Judge for Mediation, signing the Motion for his client CVLR Inc and Rivers. The Motion filed was a false statement because Rivers of CVLR Inc did not give Bowman permission to prepare, file or ask for mediation. Bowman did not notify or ask Rivers to file the Motion.   When Bowman received the scheduling order on February 11, 2014 (he did not provide Rivers with a copy or tell her about the mediation) and a date for mediation set for March 24, 2014.

385.        In July 2014; Rivers learned from a letter she retrieved from her former attorney, Bowman, dated April 2, 2013 addressed to U.S. Attorney Timothy Heaphy that he, representing NMG in the subject matter RE: of the letter, (a) acknowledged Wallis receiving a phone call being asked to testify at a Grand Jury, (b) had allowed Special Agents (Deer) to come to his office and peruse files, (c)  thought he mentioned to U.S. Attorney office that he represented Rivers and another Wynne victim, Vicki Marsh, (d) agreed to not continue to represent Rivers and Marsh, (e) NMG would agree not to pay legal fees, and (f) asked how they U.S. Attorney would like him to proceed.

386.     On or about April 2, 2013; Bowman made false statements to the Virginia State Bar Ethics Hotline in email correspondences regarding his representation of Rivers, the time of signing the contracts between them and Wallis and NMG's third-party agreement with Rivers and brokering legal fees.

387.     On February 24, 2014; Bowman intentionally made false statements to Magistrate Judge Robert Ballou to allow the CVLR Inc.RICO settlement to proceed. Bowman misled Magistrate Judge Ballou about what the U.S. Attorney had warned him of in April 2013 and agreed to; regarding his representation of Rivers and Wallis and NMG as Rivers third-party payee, among other things.

**388.**     Rivers has suffered damages as a result of the Defendants activities in concert with each other as described in this Count for which the Defendants are jointly and severally liable

### COUNT FOURTEEN:  BREACH OF CONTRACT
### S&R Beck/Lester trustees in liquidation

389.     Rivers restates, re alleges and re pleads the allegations contained in paragraphs above in this complaint

**390.**     On February 16, 2016; Rivers gave Notice to Exercise her S&R to CVLR Performance Horses  Option to Purchase and First Right of Refusal Agreement dated April 24, 2007, recorded it with the Bedford County Clerk's Office and served it upon the Defendants Beck and Lester, in liquidation of S&R.  Rivers also filed a Memorandum of Lis Pendens in Bedford County along with the Notice. The contract is now a Purchase Contract and includes the original addendum to the riding center contract (addendum survives the contract S&R did not perform on) and the 30 year lease with a 10 year roll over, with the Defendants Serene Creek Run Assoc. The Notice to Exercise is valid and automatically converts back to the date of signing the contract (April 24, 2007) and is good for ten years.

91

**391.** A "cloud" lien contract has been on the property since the Defendants Lynchburg 2008 divorce action regarding Rivers "Option Lien Contract". The Defendants swept the issue of the Option under the rug and never addressed in a court of law so to avoid paying Rivers and to avoid releasing the title to the property. Beck's filing of his first Bedford Circuit Court action in 2013 has "tolled" the statute of limitations (non-suit December 3, 2015). Beck's de-novo action in Bedford County Circuit Court in January 2016 extends the tolling period and his contract issue with Lester had not been ruled on by the Court. The cloud remains to this day with two Lis Pendens recorded in the Bedford County Clerk's Office and now Rivers federal action in this case.

392. On May 21, 2018 Breach; Rivers learned that Beck had listed the property located at 4988 Cottontown Rd, Forest VA 24551 on the market for sale again for $249,000.00 committing a "new breach" of the February 16, 2016 Notice to Exercise the Option (Purchase contract).

393. On August 1, 2017 Breach, Lester, allowed Beck to intentionally put the property as described as a portion of TM#99-3-1 and situated at 4988 Cottontown Rd, Forest VA back on the market for sale, online and by signage along Cottontown Rd; as 2.0 acres for $269,000.00. Lester knew the property was encumbered and also knew, because she was present at the hearing held on December 7, 2016 between the parties to the Ralph Beck v Shana Lester and Crystal Rivers matter, CL16000031,

394. December 7, 2016 Breach: Lester confirmed to the Court on December 7, 2016 that she had prepared Deeds for the sale of the property that had not yet been recorded. Lester's, confirmation of Deeds prepared but not yet recorded i.e. the September 19, 2016, conveyance of the property to Beck was one of three new breach of contract actions that prompted Rivers to file motion to amend the complaint in this case. Lester admitted on September 19, 2016, to conveying the property to Beck, knowing the property has been encumbered by divorce and civil legal actions since 2006; and by the

92

Lis Pendens since 2016; and by the February 16, 2016, Notice to Exercise served upon Lester and recorded in the Bedford County Clerks' office. Rivers' cloud on the title to all the property still remains active, Rivers has not agreed to release the lien and this Court has not issued an Order granting Lester leave to sell or convey the property.

395.    On December 5, 2016; Rivers learned that on or about <u>September 19, 2016</u>, that Lester recorded her September 19, 2016, answer to Becks' January 20, 2016 complaint against Lester, admitting to the @September 19, 2016, and fraudulent conveyance of the property to Beck, circumventing Rivers, and establishing a new cause of breach. The new breach, from facts and new discovery, is a new breach of the Notice to Exercise the Option contract to purchase the land between S&R and CVLR, because Lester on September 19, 2016, recorded by answer under oath, the conveyance of the property to Beck, described in the Notice to Exercise the Option , after Beck. agreed to allow Lester to file her answer 9 months late

396.    On or about May 25, 2018; S&R, Beck, and Lester as former members of S&R and trustees in liquidation breached the February 16, 2016 Notice to Exercise the Option and First Right of Refusal contract, and listed the home located on TM#99-3-1 on the market with realtor Frank Londeree to sell the home and 2.0 acres of the property online and by signage along Cottontown Rd, Forest VA.  The property is being offered for sale at $269,000.00.  Rivers has offered to purchase the property under the terms of her purchase contract and has attempted to negotiate with S&R, Beck and Lester through their counsel for a closing on all the property. Rivers has filed a Lis Pendens in this matter.

397.    Because Beck, Lester and S&R agreed to and Lester of S&R signed the April 24, 2007 Option to Purchase and First Right of Refusal Agreement with Rivers (CVLR d/b/a), they have also signed and agreed to the February 16, 2016, Notice to Exercise the Option contract. .

93

398.    The title will not relate back to the date the option was granted until Rivers obtains title to the property. As a result, any third party interests', whatsoever, in the property that arose between the date of the option and the transfer of title to the optionee are extinguishable if the owner of interest had notice of the option. In this matter, the Option was recorded and according to Virginia law, the property owners and parties of interest to the property, are noticed by the recording of the option; including any obtained title to the property that is the subject of the option, and Rivers of CVLR d/b/a (the optionee) by way of compelling specific performance has the benefit of the "claw back or relation back" rule.

399.    Rivers' Exercising the Option extinguished any third party interest in the property and (when executed) the Deed is prior to and superior to any third party interest in the property and will have no interest in any adverse to Rivers interest in the property.

400.    Neither Rivers, of CVLR d/b/a, as buyer; or Lester of S&R Farm LLC, as director/member or trustee in liquidation of S&R Farm LLC, the seller, have ever assigned their rights under the Notice to Exercise the Option or the former Option

401.    In May of 2008; S&R Deeded the "raw land" portion of the property TM #99-3-1, 99-A-28 to Beck, without first obtaining a release from Rivers or permission from the Bedford County Zoning Commissioner, and did not record the property as removed from the family subdivision-development and recorded the Deed in January 2010; using the property to collateralize a $100,000,000 promissory note between Beck, Lester and Mr and Mrs Henry Beck due and payable in December 2019.

402.    Lester did not own the property that is the subject of the Notice to Exercise the Option in her individual capacity on April 24, 2007, nor could she have owned the property in her individual capacity on April 2008 upon agreeing, personally, to deed the property to Beck in their 5th Partial (Divorce) Settlement Agreement. The property, legally, could only be transferred from S&R to Lester, as trustee in liquidation of S&R

94

Farm LLC, upon the cancellation of S&R on or about, December 31, 2008, and only after NOTICE to Rivers, of CVLR. Any contract, agreement, or promise would be a back up contract at best!

403.　　　S&R was cancelled as a limited liability company on December 31, 2008. The members immediately took full ownership of interest in the S&R assets including the Option, assignments, trust agreements, subordinates and all contracts relating to the Option and the property described in the Notice to Exercise owned by Rivers

404.　　　On August 1, 2017; Beck and Lester individually and as trustees in liquidation of S&A breached the Notice to Exercise the Option contract by allowing with permission, Beck to sell and market the home and land located at 4988 Cottontown Rd, Forest VA 24551, better described in the Bedford County Records and within the Notice to Exercise as TM#99-3-1. The property is being offered for sale as a 3 bedroom, 2.5 bath, home on a 2.0 acre lot for $269,000.00

405.　　　On August 31, 2017; Rivers received an official notification received by her real estate agent, from Beck, attesting, that;

"The property located at 4988 Cottontown Rd, Forest Va 24551, is owned by himself, free and clear of any type of lien. Once the property is under contract, two acres will be zoned off along with the house. This will be completed prior to closing"

406.　　　Lester, S&R and Beck are aware that Rivers has a binding contract and is ready and willing to proceed to closing as per her letters to Steve Grant and Mark Loftis, the listing agent, Frank Londeree, Londeree's Real Estate and Property NMG, and to Lester regarding; 1. Setting up a closing date, agreeable between all parties, after and within 90 days, but not before, the owner of the title of the property obtains a settlement from Rivers or an Order from this Court ordering the sale of the property to Rivers, and; 2. Subdividing the 2 acres with the home and recording the plat in the County records, as promised by Beck,

95

407.    Lester, S&R and Beck intentionally, did not give Notice to Rivers of the conveyance to Beck of property, did not pay Rivers to withdraw, or agree to release the cloud from the Court and county records, while knowing a contract to purchase existed between the parties to purchase the home and the property

408.    Lester has not recorded the Deed of any conveyance of the property from her to Beck

409.    Lester admitted in her September 19, 2016, recorded answer, that each party, Lester and Beck, were aware of the status of the Option to Purchase and that the Option was supported by consideration. Lester had merely agreed,(in her individual capacity) to deed the property (described in the Notice to Exercise the Option) to Beck as described in detail in their "5th Partial Property Settlement Agreement and Separation Agreement and Modification Agreement", (signed by Lester on April 16, 2008 and by Beck on April 23, 2008), and filed in their divorce case, City of Lynchburg Circuit Court Case No CL06-448. At the time of signing the agreement, the property was encumbered by legal proceedings and the recorded Option on the property. The Option was referred to by both Lester and Beck as a "Lien Contract" within the divorce agreement their divorce lawyers prepared and advised them to sign.

**410.**    Lester also admitted that if the Court finds the Option Agreement did attach, to the property, then the (5th Partial Settlement) Agreement would have been the result of the mutual mistake of both parties. That mistake has caused Rivers to suffer severe irreparable damage.

411.    In Lester's answer of record in CL16-031; Lester stated that she sold the property to Beck and in doing so, "UNDID" the Option. The sale would have been between September 15, 2016 (prepared) and September 19, 2016(recorded) and would have been the remaining land (+/- 216 acres), better known as the "farm parcel" and "raw

land", the property described in the Notice to Exercise the Option. No such document has been recorded in the Bedford County Clerk's office

412.    Previous Lis Pendens were filed on February 10, 2016, and Amended on August 23, 2017 and recorded against the property.

413.    Upon the title being transferred to Rivers on the day of a closing of the property; will revert the "claw back" of the property and improvements back to April 24, 2007, including any/all investments, subordinates, purchases, assignments, equity transfers, interest and premium payments earned, profit earned, and any future interest regarding the property; immediately upon transfer of the title to Rivers and not before the transfer.

414.    Both Beck and Lester, and S&R agreed and allowed, without Rivers knowledge, that Union Bank and Trust, formerly StellarOne, formerly Planters Bank & Trust Company of Virginia would not release the title to the S&R Property described within the Option contract until August 10, 2009 and that it instead, be used to collateralize other accounts, investments and transactions

415.    The "raw-land" portion of the S&R property and described within the Notice to Exercise the Option contract continues to be used to collateralize other accounts, investments and transactions for entities the Defendants have a interest in

## VI. HISTORY/THE PROPERTY AT ISSUE – VALUED AT OVER $13 MILLION

416.    The property at issue is located in Forest Virginia, County of Bedford.  It is identified on the Bedford County Tax Maps as numbers TM#99-10-A,3,6,8,16,18,21,33,34,35 andTM#99-3-1, 99-A-28 and 99-3-3 and is more particularly in a Deed dated November 19, 2003, of record in the Clerk's Office of the Bedford County Circuit Court as Instrument No 030024202, in the Option and First Right of Refusal Agreement as Instrument No 070006380, the General Affidavit attaching the Notice to

Exercise the Option as Instrument No 160003231, and in the Amended Lis Pendens filed August 23, 2017 and the Lis Pendens filed on May 25, 2018..

417.     The property is also the same described property as described in the <u>UNSIGNED</u> fraud induced, March 21, 2012, Deed Releasing Option to Purchase and Right of First Refusal, prepared by Frank, Spicer & Cox of Blacksburg VA for and by instruction of and payment by Lester, without Rivers knowledge or consent.

418.     On July 14, 2006; by Order of the City of Lynchburg; Lester was given the exclusive use and possession of the riding center and adjacent pastures and the personal barn; and Beck was given the exclusive use of the marital residence and adjoining acreage

419.      The S&R property and  improvements have been encumbered by divorce and civil legal proceedings and liened since April 24, 2007

420.     On July 28, 2007; Lester and Beck's divorce, CL06000448, was final in the City of Lynchburg and pursuant to the provisions of Virginia Code §20-121.03; the April 16 and 18 signed, 5th Partial Settlement, Separation and Modification Agreement between Lester and Beck, and the transcripts of the May 21, 2008 depositions were attached to and made part of the FINAL DECREE OF DIVORCE issued by Pro Judge ProTempre, Richard Cunningham

421.     On November 15, 2007, Lester formed the Magidson Trust with her father, Stanford Magidson, as trustee of the Magidson Trust; for the use of bargaining, selling, borrowing against, refinancing, purchasing and conveying property to such person(s), and for such sum or sums of money or other consider

422.     On May 20, 2013; in the Ralph Beck v. Shana Lester and Crystal Rivers matter, CL13000188, Lester, represented by counsel,  answered the complaint and admitted in #7 that she lacked the legal ability to remove the option, and that the provision in the

settlement agreement ((5th partial settlement agreement)) presented an impossibility and therefore was void

423.     Lester also admitted in #8 of the answer referenced above, that she has made no efforts to remove the option but lacks the legal ability to do so; and in #19 she affirmatively alleged that the agreement ((5th partial settlement agreement)) called for impossibility on behalf of the Lester and that provision was void upon its execution. Lester affirmatively alleged defense was relative to defense of laches, impossibility and statute of limitations of actions

424.     Rivers had at all times performed all of her obligations under the contracts or been ready, willing, and able to perform all of her obligations under the contracts.

425.     February 10, 2016, Rivers filed the first Lis Pendens on all the property named within the Exercised Option to Purchase and First Right of Refusal Agreement

426.     On February 16, 2016; Rivers Exercised and Noticed; the April 24, 2007, S&R to CVLR  Option to Purchase and First Right of Refusal Agreement that S&R promised to give CVLR the Option to Purchase for $15,000.00 per acre and the First Right of Refusal on the real property described as, "any/all remaining property of S&R Farm LLC, specifically INST #03002420 TM#99-3-1 +/- 55 acres and 99-A-28 +/- 74.4 acres, which is situated either in part or whole, next to, around, and beyond, the residence of Ralph Beck TM#99-3-3 +/- 18.35 acres".

427.     On April 20, 2016; Rivers mailed to Lester and Beck a copy of the texted Notice to Cease and Desist selling, conveying any portion of the S&R property without proper notification and release from CVLR.  Rivers asked to have the realtor set up a walk through for her to view the home and land.  Rivers got no response and none of what she asked has been done.

428.     On September 5, 2016, before Rivers learned of Lester's conveyance to Beck; Rivers submitted a DEMAND NOTICE to both Lester and Beck, demanding to be

99

provided with the, among other things, a complete accounting of the sales, profits earned, liens, closing documents, HUD statements, notices to all SCR homeowners, contract agreements, etc. no later than September 24, 2016 so that we can proceed with a complete walk through and set up the closing of the property within 90 days after the accounting and legalize are complete.

429.    On January 16, 2017; Rivers hired and paid for the appraisal of the raw land and home situated on the property known as 4988 Cottontown Rd as vacant and as improved. The market value of the property was valued at $5,800,000.00 proposed. Rivers project estimated 1, 1-3 and 3-5 acre lots ranging in value from $58,000.00 per acre for 82 acres to $115,000.00 per acre for 5 lots.

430.    On January 28, 2017; Rivers sent another Notice to Cease and Desist to both Lester and Beck. Rivers asked them to;

"Please cease and desist conveying and/or collateralizing any portion of the land so named in the Option Agreement until we resolve the issue and to stop illegally dumping materials and toxic waste on the property Optioned, building any structure or pools without the necessary applications and zoning permits, moving large amounts of dirt without same as per Bedford County ordinances and stop operating and collecting money for the use of the two Commercial Motocross tracks. Removal of the trees and dirt is affecting the land value. The tracks are a complained nuisance to the residential homeowners."

431.    On September 5, 2017; Lester was mailed a copy of the Letter and Notice emailed and mailed to the listing realtor, Frank Londeree of Londerees Real Estate and Property NMG, regarding the property listing for 4988 Cottontown Rd, Forest Va 24551. In the letter Rivers asks Londeree to please set up a closing date, agreeable between all parties, after and within 90 days, but not before, the owner of the title of the property obtains a settlement from me or a Order from the Bedford Circuit Court ordering them to sell the property to me, subdivide the 2.0 acre property and records the new plat to include the home on 2.0 acres as you have advertised and marketed for sale.

432.     On March 8, 2018 Lester admits in Paragraph #15 of Rivers request for admissions to Lester, that she accepted the $20,000.00 consideration on April 20,2007, and in paragraph #17, she admits that $5000.00 was collected from Rivers on August 7, 2007 and also admits that an additional $20,000.00 was paid to Lester and Beck later for the July 15, 2007 Commercial Purchase Agreement between S&R and CVLR d/b/a.

433.     The additional $20,000.00 Lester referred to in her response to paragraph #17 is a bribe for $20,000.00 paid to Lester and Beck on October 24, 2007 (deposited into Suntrust account and cleared on November 6, 2007) to continue to stall the closing of the July 15, 2007 contract until Rivers $1 Million life insurance policy was approved and Wynne made Beck and Lester believe Rivers had assigned the Option to him in a Memorandum of Understanding.  Rivers policy was approved on October 31, 2007 and included the riding center property and RBC/ODNB loan, her show truck and trailer loans and other loans RBC had financed for her.  Wynne was the beneficiary on the policy until Rivers was advised to remove him.

434.     Lester and Beck took $20,000.00 the bribe and set up a scam closing to dupe Rivers.

435.     On or about August 12 or 13, 2013, Wynne testified at trial in Bedford County Circuit Court, that he had not paid $20,000.00 Lester and Beck  and Beck testified that he had not received the money from Wynne.  Special Agent James Vaughn of the Virginia State Police testified as to the existence of the check, the amount and where it was deposited and drawn from.


## VII. CONSIDERTION AND INTENT

436.     Between April 17, 2007 and April 24, 2007; Lester, Beck, S&R, and Rivers agreed that for and in consideration of the Option and Right of First Refusal, the

purchase of the riding center property contained within the Option, promises and agreements between them, Rivers agreed and would pay as consideration; $550,000.00 (later negotiated to $475,000.00) for the purchase of the riding center, the Serene Creek Run Logo, and the Option to cut and maintain the hay and pay the S&R taxes on Beck's interest in the adjoining land @144 acres; and $500.00 per month for Lester's interest in the riding center and adjacent pastures and the remaining 17 lots until closing of the riding center. Rivers agreed to allow Lester to keep her horses on the property FREE for 6 months after closing and her children would receive FREE riding lessons for 6 months, 2 per month, and the Serene Creek Run homeowners would be allowed FREE entrance to events and receive 20% off boarding and lessons.

437.    Lester, as Manager/Director for/by S&R Farms LLC, and Rivers, as Owner for/by, paid Lester, an additional Dollar ($1) at the time the Option was executed on April 24, 2007 at the First National Bank of Altavista.

438.    April 20, 2007; Rivers paid $20,000.00 as refundable deposit toward the purchase price of the riding center portion of the Option at settlement. The riding center transaction has never been settled because Rivers and Lester did not sign the final HUD statement, S&R did not refund Rivers $20,000.00 deposit and S&R did not pay Rivers the $1200.00 well allowance as it promised to do

439.    On November 20, 2007; S&R was paid $475,000.00 for sale of the riding center; resulting from the consideration paid and agreed to for the Option to Purchase and the Commercial Purchase contract between S&R and CVLR d/b/a, Lester and Rivers have not signed the final 11/21/07 HUD statement. Planters Bank was paid $111,177.09, and $176,571.92 to payoff 1st and 2nd mortgages, S&R received 420,000.00, Lester received $44,020.19 after deductions from the mistake made by Jennifer Richardson in the accounting and changed on November 21, 2007, Beck received $65,820.18 after the November 21, 2007 changes, Frank Morrison received $20,000.00, Counts Realty

Group received $23,750.00 commission and deducted the $5000.00 deposit from that. Lester has not refunded the $20,000.00 deposit or any consideration paid by Rivers, and has not paid Rivers the $1200.00 well allowance as promised. Lester has never given Rivers notice of default of the Notice to Exercise or any contract, agreement or promise between them

440.    Between November 20, 2007 and September 2011, Lester asked and Rivers maintained and cut the grass in the common areas around the clubhouse and pool as agreed in the addendum of the riding center contract; and

441.    Between January 2008 and December 2010; Rivers paid Beck, $500.00 per month between July 2008 and 2014 as agreed in the contract addendum regarding the Option, for the taxes on @144 acres of land that Lester and Beck of S&R agreed to allow Rivers to cut for hay until the property was sold or developed.

442.    Between January 2012 and May 2014, paid $700.00 every year for the taxes until Beck, in violation of Bedford County Zoning Ordinances, built a commercial size motocross tracks throughout over 30 acres of the hay crop land; Lester, of S&R and Rivers agreed to the terms of the agreements, covenants of the Serene Creek Run Declarations and promises

443.    Consideration paid would also now include any/all interest and premium paid to or by Lester, her successors, assigns, trustees, or agents, for any contracts, subordinates or assignments of, and profit or equitable interest earned from same

444.    Lester met Rivers in February 2007 and knew that Rivers was in the market for a equestrian facility with more than 86 acres and had acquired the promise of financing

445.    Between May 2007 and August 2007; Lester used the value of the Option Contract at $15,000.00 per acre for all the remaining S&R land, the value of the April 17, 2007 riding center contract $550,000.00 and the value of the backup July 15, 2007 riding

103

center contract $475,000.00 to extend her maturity dates for three Union (Planters Bank and Trust) loans to December 2007.

446. S&R used the collateral to borrow $110,000.00 to build the amenities for the HOA

**447.** Upon exercising the Option, the Option was transformed into a bilateral contract of purchase and sale, Lester and Beck as trustees in liquidation of S&R Farm LLC, became the seller and Rivers of CVLR d/b/a, the Optionee, the buyer. As in *Claremont Terrace, supra 146 Cal. App 3d at pp 406, 407, 194 Cal ; Anthony v Enzler (1976); and Miller and Starr; Seeburg v El Royale Corp*

**448.** The February 16, 2016, Notice to Exercise the Option describes the Optioned remaining property, TM#99-3-1, 99-A-28, and 99-3-3. The farm parcel portion of the property, TM#99-3-1 and 99-A-28, currently has a appraised value of +/- $25,000.00 per acre and a "proposed value" of $62,000.00-65,000.00 subdivided per acre. TM#99-3-3 was appraised in 2009 for $988,000.00

**449.** The August 2017 and May 25, 2018 Lis Pendens describes the property as; (1) Common Area; (2)The Riding Center; (3) Lot 3; (4) Lot 6; (5) Lot 8; (6) Lot 16; (7) Lot 18; (8) Lot 21; (9) Lot 33; (10) Lot 34; (11) Lot 35; (12) the farm parcel, TM#99-A-28; (13) the farm parcel, 4988 Cottontown Rd and remaining residual of the S&R Farm land (6 acres was added to TM#99-3-1); Total Acres 184.77

**450.** The economic injury of the loss of the benefit to purchase the property to Rivers and her businesses occurred on February 16, 2016 when Rivers exercised her option to purchase the property which reverts back, claws back, to the day of signing on April 24, 2007 once the Deed to the property is titled to Rivers.

**451.** Rivers has paid more than ample consideration for the property and expenses and costs of over $750,000.00 since 2007 regarding the S&R property; (1) consideration, (2) property appraisals, (3) application fees, (4) brokerage fees, (5) traffic

104

studies, (6) engineering cost, (7) research, (8) investigations, (9) attorneys fees, (10) project managers fees, (11) title searches, (12) deposits, (13) taxes, (14) utilities, and other expenses relating to the project

452.   Beck, Lester, S&R, HOA, SAF, Bboyz, Northcreek, Mrs. Edmundson, Edmundson, ODNB, Union, Mr. and Mrs Travis Baker, Mr. and Mrs Michael Friedman, Mrs and Mr. Rodgers, Mr and Mrs Matthew Krycinski, American National Bank and Trust Co, .Clement A Wheatley ( A professional Corporation), Michael Bradbury, Mr. and Mrs Howard Frear, Mr and Mrs William Fluker, and Darnell are responsible to pay any cost to co Rivers has suffered damages as a result of the Defendants activities in concert with each other as described in this Count for which the Defendants are jointly and severally liable

453.   As a direct the deeds, setting aside deeds, removal of illegal documents, the cost of abating and redacting and negotiate the performance of the contracts valued at over $13,395,720.00

454.   Rivers has suffered damages as a result of the Defendants activities in concert with each other as described in this Count for which the Defendants are jointly and severally liable

## COUNT FIFTEEN:  SPECIFIC PERFORMANCE/ENFORCEMENT OF THE S&R TO CVLR CONTRACT AND ADDENDUM

455.   Rivers restates, realleges and repleads the allegations contained in the foregoing paragraphs as though fully set forth

456.   Rivers asks the Court to order or compel the performance of the contracts between CVLR and S&R and/or Rivers and the trustees in liquidation for the sale of real property.  The real property is to include any/all invested, collateralized, purchased and/or assigned attached certain other contracts, improvements, and order claw back provisions on the property or interest thereof, pursuant to the principles of equity

105

**457.** Rivers asks the Court to prohibit Lester against any action without permission from this Court or by Court Order, without notice to Rivers, specifically, any action which legally binds and/or liables, the property, including but not limited to, deed transfers, recordings, subordinates, assignments, lending and collateralizing, investing, leasing, covenants, building or tearing down buildings, optioning, or destruction of the property

**458.** Rivers asks the Court to Order the Defendant(s) to cooperate and work with the purchaser and her attorney(s), agents, engineers, accountants, to effectuate the sale of the property described within, as the remaining S&R Farm LLC property, as it was and has been described and recorded since April 24, 2007, or:

**459.** Rivers asks that the Court Order the Defendant(s), if the Defendant(s) do not comply with the Court Order to completely satisfy Rivers lien on the property and pay Rivers the appraised value of the property as a proposed annexed subdivision to the Serene Creek Run subdivision; according to the Amended Serene Creek Run Association Declaration of Covenants, Conditions and Restriction recorded with the Bedford County Clerk's Office as Instrument No 050000909; and Order the owners of the title to the property to pay Rivers based on the value of the property as it was appraised in 2017 or as it appraises 60 days from the issuance of the Order, which ever amount is greater minus all consideration paid for the contracts and minus the $15,000.00 per acre agreed price for the property for each and every remaining S&R lot owned by S&R on April 24, 2007 and the cost to Rivers for attorneys fees and cost and expenses

**460.** Reach the conclusion that each parcel of remaining S&R Farm land is unique and that a monetary award would be inadequate, and Order the seller to convey the property and all that is attached to it, to the purchaser according to the terms of the Notice to Exercise and the Option to Purchase and First Right of Refusal and the Addendum to the November 5, 2011 contract to purchase the riding center property

106

## COUNT SIXTEEN:   INSURANCE FRAUD

## Code of Virginia §52-40 §18.2-178

**461.**     Rivers incorporates the facts alleged in the paragraphs above and repeats and recites all previous allegations as if fully set forth herein

**462.**      On May 2, 2018; Rivers received "new discovery evidence" from John Deere in response to her *subpoena duces tecum* served in Case No CL14-1454 that she could not have known until that day.

**463.**     Callahan prepared and negotiated the insurance policies in Rivers name for RBC illegal use. Callahan caused Rivers loss of the benefit and right to own the John Deere equipment purchased in May 2007 – October 2007

**464.**     Rivers reviewed her John Deere equipment loan documents for the first time. Rivers payments were $2845.90 every six months beginning on December 2007 until June 2013 for the JD 525 tractor and front end loader.  Rivers payments were $4182.82 every six months during the same timeframe for the baler and Mo-Co Cutter.  The new evidence revealed that among other things that Callahan used Rivers identity to get prepare a fake policy for Rivermont Banking Company Inc in the name of  Rivers as the client.  The insurance policy covered two separate loans for John Deere Equipment financed for $40,820.80 on June 18, 2007 and $54,102.92 on May 29, 2007.  One of the loan terms was #7 Insurance which required evidence of insurance coverage.  Callahan knew that Wynne could not get a automobile policy with his criminal and DUI/Hit and Run record;

465.     The evidence also revealed that on May 23, 2007 Wynne of RBC submitted information on a Customer Responsibility For Physical Damage Insurance form, application #10492625:  a) the Customer was RBC, EIN #54-1853778 who claimed they had been in the agricultural business for over 13 years, b) the co-borrower was Wynne,

c) date of the loan was June 18, 2007, d) Wynne used the same State Farm Automobile Insurance policy #0778584D1646 e) Margie Callahan was the Agent's name.

466.     Rivers signed and entered into a Loan Contract Agreement with RBC, Wynne and CVLR on May 22, 2007 because RBC had financed loans for her for various monies to purchase certain equipment. Rivers provided a copy of her Virginia drivers license, her Texas ID cards, her birth date, and her mother's maiden name to Wynne. The interest rate was 8.5% and 1% perdium on any money loaned.

467.     Callahan conducted illegal affairs for RBC and Wynne which allowed RBC to use Rivers insurance policy to obtain the loan on the John Deer Equipment which required the owner/borrower to provide and prove insurance to obtain financing approval through John Deere Credit. Callahan did not disclose this information to Rivers and Rivers did not learn it until May 2018.

468.      On May 2, 2018 Rivers called several representatives with State Farm and Callahan to discuss and try to figure out what policy had covered the John Deere equipment, John Deere Credit loans. Callahan confirmed that the policy number was the same used for Wynne's Chevy Tahoe #0778584D1646 in Rivers name. Callahan refused to send me a copy of the policy

469.     By reason of the fraud perpetrated on Rivers, by Callahan and taking away Rivers benefit to purchase the John Deere Equipment in her name, Callahan is liable to Rivers for the loss and replacement value of the John Deere tractor and loader equipment, bailer and Mo-Co Cutter worth over $62,000.00

470.      By reason of the fraud perpetrated on Rivers, by the Defendants laundering Rivers insurance proceeds into bank account held with ODNB, Select, SBFC, BOJ, ; ODNB, Champan, Mason, Thomas, Garrett, Darnell, Hopkins, Potter, Merrill, Davis, Franzen, Select and SBFC took away Rivers benefit of her insurance proceeds. The

Defendants are liable to Rivers for the loss of the insurance proceeds entirely plus interest.

471.    "New discovery evidence" proves the Defendants, Callahan, conspired with Wynne since agreeing to change, alter and forge Rivers commercial business and/or automobile policies without Rivers knowledge, notice, or permission

472.    The economic injury of the loss of Rivers insurance funds occurred on or about October 16, 2016 when Rivers first learned that the funds were laundered from ODNB into Select and BOJ and from BOJ to Select which reverts back, claws back, to the day of the insurance checks were deposited on April 7, 2008

473.    Rivers has suffered damages as a result of the Defendants activities in concert with each other as described in this Count for which the Defendants are jointly and severally liable

## COUNT SEVENTEEN – FORGERY §18.2-168 , § 59.1-200(A)(13)

474.    Rivers restates, re alleges and re pleads the allegations contained in paragraphs above in this complaint

475.    Defendants ATC, CTI, Richardson and Fariss facilitated the transfer of funds $475,000.00 from ODNB to S & R, Union (then Planters Bank), Beck and Lester for the benefit of the Defendants paid from the forged HUD statement.

476.    As a result of Defendants proximate acts and omissions, Rivers purchased a $1,000,000.00 Life Insurance Policy to insure her estate, paid for an appraisal for the S &R to CVLRd/b/a purchase contract and ODNB accepted monthly consideration payments each month between December 2007 and February 2011 as a mortgage payment - "malicious interference with the use of property falls into category of Injury to the Person."

109

477.     The Defendants ATC, Richardson, Fariss, engaged in Prohibited practices as set

forth in Virginia Codes§18.2-169 and § 59.1-200(A)(13) by intentionally filing false

documents in the public record and operating in commerce in a biased manner

inconsistent with Virginia law ."The key component is the 3rd parties' Intent" *Chaves v.*

*Johnson,* 335 SE 2d 97 - Va: Supreme Court 1985.

478.     As a direct, proximate, foreseeable and intended result of the acts alleged in this

complaint, the Defendants intentionally caused Rivers to attend a scam closing, sign

loan documents that didn't pay for her property, and pay considerable amounts of money

toward forged mortgages that her name was omitted from by Richardson

479.     In furtherance of the intentional forgery, Defendants ATC, and Fariss altered the

final HUD statement and the pay-out amounts of $496,150.00 paid to the Defendants

named on the HUD statement for the sale of the riding center property under contract to

the purchaser Rivers (CVLR d/b/a)  and named in this complaint.

480.     Richardson, Fariss and ATC continued to make a profit, defraud buyers, close

and settle S&R property, and issue insurance policies and certificates for the property,

intentionally without obtaining releases from Rivers

481.     The actions of the Defendants Richardson, Fariss and ATC, alleged above, were

an extreme deviation from reasonable standards of conduct, undertaken intentionally

with actual malice, and/or with a reckless disregard for their likely consequences.  As a

result, the Rivers is entitled to an award of punitive damages.

<br>

**COUNT EIGHTEEN:**
**TORTIOUS BUSINESS INTERFERENCE WITH RIVERS CONTRACT**
**TORTIOUS BUSINESS INTERFERENCE**
**§§ 8.5A-109, 8.9A-102(13)(B), 6.2-411,6.2-887, 18.2-499 and -500**

110

482.     Rivers restates, realleges and repleads the allegations in the aforementioned paragraphs of this Complaint as though fully set forth

483.     Rivers alleges that Bowman, Wallis, NMG, Nitti and FAC sought her out between June and July 2011 after Bowman returned from his stent in the Army. The Defendants planned and strategized how to protect Wallis, Nitti and their entities from the IRS and devise a way to repay the tax money owed to the IRS within the 10 year statute of limitations coming to rest in 2013 or February 2014 at the latest.

484.     The Defendants named in this cause of action systematically planned to intentionally rack up an unrealistic accounting of legal fees to be paid to Bowman by Rivers' third-party legal fee payee NMG. After the U.S. Attorney's Office learned that Wallis' and NMG was a third-party payee paying legal fees for CVLR Inc. RICO case against Wynne, they would have reminded Bowman and Wallis in April of 2013, that both men could not proceed in the case against Wynne with Bowman as counsel for CVLR Inc, Rivers and Marsh and Wallis and NMG as third-party payee to Bowman for Rivers and Marsh.

485.     Rivers alleges that Bowman was told he could only continue to represent Rivers and CVLR Inc if he could prove to the US Attorney's Office that CVLR Inc agreed to allow him to dismiss the case or to settle it before the IRS tax division filed its claim against Wallis sometime between December 2013 and January 2014,

486.     The Defendants in this cause of action had their own hidden agenda, they did not want Rivers to pay Bowman or hire different counsel and they did not want any other party or agency to litigate the open-ended RICO case against Wynne. Wallis needed cash to pay Bowman to represent him in the United States' case against him and his entities. The only way he could obtain cash for Bowman for legal fees would be to have CVLR Inc settle for inflated legal fees. If he could obtain cash to pay Bowman any other way, he would have to surrender it to the IRS or prove where it came from.    If CVLR

111

Inc'., settlement included what is customary in mediation, it would have settled for what Rivers told Bowman they would settle for; equity or property and money owed to them at a reduced amount. Wallis would not be able to do anything with that type of award payment to him because he would have to surrender it to the IRS immediately.

487.    Bowman purposely stalled the RICO case (a) not depose her defendants, (b) would not hire expert witnesses and pay them to testify, (c) would not send out subpoenas and discovery to not allow Rivers access to her invoices and present the doctored, unproven invoices to Rivers after Bowman would force the RICO settlement with Wynne and RAC and after the *United States/IRS v Wallis, Nitti Family Enterprises* was filed would claim he had been paid and NMG become Rivers creditor and steal or take over her claims against the other Defendants named in this complaint, and Wynne and RAC, injuring Rivers and her business CVLR Inc. beginning on or about the same time period the *United States of America v William Wallis, Nitti Family Enterprises, et al* Case No 6:14-cv-00005 statute of limitations ran out. February 24, 2014 pursuant to the United States Court of Appeals in Re: *James M Dunlap v Cottman Transmission Systems, et.al (February 27, 2014)*

488.    On October 7, 2013 and October 8, 2013 Bowman received emails from Wallis and Nitti; of High importance, to Bowman and cc'd to Wallis and Nitti; accounting dept, a complete accounting including check numbers, amounts paid and dates paid for legal fees and expenses for Rivers case. The email was prepared and emailed on FAC letterhead and electronically signed Bill and Robert; the FAC logo was omitted intentionally.

489.    Because Bowman withdrew from the ODNB case and there was never a result of award from the "Option Agreement" case; Wallis or FAC on behalf of NMG or Rivers should not have paid Bowman for the ODNB case

490. Wallis instructed Bowman to prepare new contracts between the parties on September 9, 2013; The contract agreement superseded any all agreements between the parties and changed the terms writing Wallis and NMG out of paying legal fees until or unless a separate agreement was entered into first and it wrote out any award payable to Wallis or NMG. Rivers alleges the new agreement was prepared and presented to the U.S Attorney's Office for approval based on what the US Attorney Patrick Hogeboom told them they could do and not do for CVLR Inc, Rivers, Foster and Marsh

491. On February 4, 2014, Bowman received emails from Wallis and Nitti of the full accounting including check numbers, amounts paid and dates paid for legal fees and expenses for Rivers case. The email was prepared and emailed on FAC letterhead and signed above the FAC logo

492. Both accountings emailed to Bowman were based on a fraudulent set of books, legal fees and services provided to Rivers for work done on her case.

493. Each check received is its own act of obtaining money under false pretenses

494. On July 21, 2011 Because Bowman emailed a Representation Agreement to Rivers; Bowman acknowledged, within the contract, that Rivers had entered the agreement, NMG was a third party payee under which NMG had agreed to pay a $5000.00 retainer to him, and Bowman agreed to draw his fees from that retainer. Bowman's records indicate that he received the $5000.00 on July 26, 2011.

495. On April 2, 2013; Bowman offered, on behalf of NMG and Wallis, to the US Attorney's office that Wallis and NMG would not pay legal fees for Rivers, CVLR Inc, and Vicki Marsh and Bowman agreed he would not represent them. The U.S. Attorney, Parick Hogeboom had threatened Wallis with grand jury.

496. On February 21, 2014 at 11:07 AM; Bowman received a email from opposing counsel Chad Mooney that included a Mutual Release and Settlement Agreement:

113

"Gary, Attached you will find a proposed Mutual Release and Settlement Agreement. As you will see, I tried to include as many parties as possible and cover as many suits as possible. It was my intent to make this a global settlement, which, of course will benefit both parties and provide finality. Also, you indicated that William Wallace, Rivers'advisor or consultant, will attend mediation. We have no objection to his attendance provided that you stipulate that he will not be a witness in the CVLR v Wynne federal suit."

Bowman never mentioned to Rivers, the email, the agreement he received or the fact that he told Mooney that Wallis was her consultant or advisor.

Bowman responded back to Mooney without consulting Rivers:

"Mr. Mooney, I stipulate that William Wallis will not be a witness in the CVLR v Wynne federal suit."

497.    On February 21, 2014; Rivers met with Bowman at his office that afternoon. The conversation was taped. Bowman reminded Rivers that she owed him nothing and Wallis and NMG were out of the RICO action as third-party. A conference call was to be held between Honorable Judge Robert Ballou, Bowman and Rivers. Before the conference call Bowman was to contact Judge Ballou to set up the conference call and Rivers was not supposed to hear the conversation between Judge Ballou and Bowman. During the call, Bowman mentioned to Judge Ballou that Wallis would be attending the mediation as Rivers advisor. Bowman was aware that Rivers furious and she did not agree to Wallis being present at the mediation. Bowman warned Rivers if she didn't settle tomorrow he would withdraw as counsel for CVLR from all her cases. Bowman did not discuss or give Rivers a copy of the Mutual Settlement Agreement to review. Rivers has never seen the original copy.

498.    On February 23, 2014 7:23 AM; Rivers emailed Bowman reminding him that she had not received anything from him regarding the settlement.

499.    On the evening of February 23, 2014; Bowman emailed Rivers reminding her he was "serious about moving to withdraw' as counsel for CVLR. He wrote that he was considering returning money that Wallis paid him to pursue the ODNB and the Option

cases and withdraw from all representation of her and CVLR Inc. Also, Wallis called Rivers' while she was as work but never mentioned that he would be at the mediation;

> "Wallis grilled Rivers about settling the Option case and whether she was going to settle tomorrow or not. Wallis informed Rivers that he and Nitti were out of all her cases as third-party payee and would be getting their checks back from Bowman for the ODNB and Option case."

500.    Wallis, NMG, CVLR Inc and Rivers never entered into a separate agreement as per the specific terms in the September 9, 2013 agreement regarding retainer payments for the ODNB or the Option case legal fees. The Option case had not been settled.

501.    On February 24, 2014; the mediation hearing was held in *CVLR Performance Horses Inc v John L Wynne, Rivermont Banking Company Inc, et al.* Bowman and Wallis were meeting in a conference room when Rivers arrived at the Courthouse. Rivers was not invited in the meeting between the men and was motioned to stay out. The men met for over twenty minutes. Wallis slipped and bragged to Magistrate Judge Robert Ballou that; "He would continue paying large amounts of legal fees to stop Wynne at any cost," which caused Judge Ballou to stop the settlement proceeding. Judge Ballou was aware of the issue between the US Attorney's office, Bowman and Wallis. Bowman lied to Judge Ballou to cause the proceeding to continue.

502.    On March 7, 2014; Rivers emailed Bowman and Wallis asking them to provide the complete accounting of the expenses, legal fees billed and paid out to Bowman, including proof of payment

503.    On March 20, 2014 at 7:44 AM; Rivers terminated the Partnership Agreement between her and NMG and demanded billing statements, invoices paid, itemized per case, and proof of payment and any title work and appraisals done on the optioned S&R farm land

504.    At 9:34 AM; Bowman responded to Rivers March 20, 2014 email he received earlier that morning. Bowman wrote, among other things;

115

"It is my understanding that Wallis' bookkeeper is preparing for you a list of all the bills and a copy of all the payments that Northwood Management Group has made on your behalf."

505.     Between February and March 26, 2014; Bowman received CVLR's award check for One Hundred Thousand Dollars ($100,000.00) as a direct result of intentionally; misleading and threatening Rivers and misleading and lying to Magistrate Judge Robert Ballou.

506.     On March 26, 2014; Rivers emailed Bowman reminding him that she had not received any evidence whatsoever of any legal fees billed to CVLR or invoiced to Wallis and NMG for payment as per the contract between them. Rivers stated;

    "DO NOT DEPOSIT THE CHECK UNTIL AFTER WE HAVE THE CVLR/CRYSTAL RIVERS LEGAL BILLS FROM THE START OF OUR CONTRACT AGREEMENT WITH YOU TO PROVIDE LEGAL SERVICES. WE WOULD PREFER TO DEPOSIT IT IN OUR MONEY OUR MONEY MARKET ACCOUNT UNTIL YOU CAN FIND OUR BILLS"

507.     On March 27, 2014; Bowman emailed Chad Mooney asking if it was possible if the settlement proceeds would not be cashed during March because Ms. Rivers wants all the proceeds paid to her directly.

508.     Bowman took ownership of the $100,000.00 CVLR Inc. RICO Case award check on between February 24, 2014 even though he had been advised by the Virginia State Bar Ethics Line that the award belonged to Rivers and he had to give the check to Rivers and sue the third party for legal fees.

    B. Bowman conspired with Wallis, Nitti, NMG, and FAC to negotiate, author, prepare, the "scheme" that required the Representation Agreements, Partnership Agreements and Fee Dispute Agreements even though he knew he had a major conflict of interest

509.     Bowman conspired with Wallis, Nitti, NMG, and FAC and authored, prepared, the Representation Agreements, Partnership Agreements and Fee Dispute Agreements even though he knew Wallis and NMG had no income and didn't have the ability to pay

116

legal fees as per the contracts he had advised Rivers to sign and remain in if he were to represent her.

510.       Bowman conspired with Wallis, Nitti, NMG, and FAC and authored, prepared, the Representation Agreements, Partnership Agreements and Fee Dispute Agreements even though he knew Rivers and CVLR Inc. had claims against him, Wallis, Nitti, FAC and NMG

511.       Bowman conspired with Wallis, Nitti, FAC and NMG and authored, prepared, the May 5, 2014 Fee Dispute Agreements even though he knew NMG wasn't in good standing with the Virginia State Corporation Commission and Wallis was the owner of NMG's assets and Rivers had terminated the NMG contracts beforehand.

512.       Bowman, who was hired by Wallis, FAC, Nitti and NMG to represent them personally and as Registered Agents, had a personal relationship with and conspired with them as a licensed attorney, in his legal capacity with almost twenty nine years experience as an attorney in both the Federal and State Courts of Virginia in the Commonwealth of Virginia.

513.       The basic elements of Tortuous Business Interference With Existing Contract are as follows:

514.       Existence of a valid contractual relationship or business expectancy.

515.       Knowledge of the contractual relationship or expectancy by the defendant

516.       Intentional interference inducing or causing a breach or termination of the contraction relationship or expectancy

517.       Resultant damage to the party whose contractual relationship or expectancy has been disrupted.

518.       The contract has a present and future business expectancy upon consummation of the contracts, the contract was intentionally breached (interfered with) by the third parties with willful intent. It was public knowledge of the following:

117

519.     The Defendants in this Count engaged in a conspiracy with each other with the unlawful purpose of willfully and maliciously injuring Rivers equestrian business and her property interest in the 1650 Partners LLC property, contracts, equity and Income in violation of Va. Code §18.2-500

520.     The business which the Defendants conspired to injure was Rivers equestrian subdivision project including the 99 year lease contract with her employer CVLR Inc, the 40 year lease contract with the HOA , and any future contracts

521.     Rivers had a right to conduct her equestrian subdivision project business without being injured by the Defendants conspiracy to injure her and her business; (a) Wallis and Bowman sought Rivers out for her claims, (b) Wallis approached Rivers after befriending her and hiring her for her services as a horse instructor for riding lessons for his son, (c) Wallis offered to pay Rivers and her company, CVLR Inc, legal fees for a percentage of an award, (d) Wallis introduced Bowman to Rivers, (e) Rivers entered into a representation agreement with Bowman for legal services to represent her and her company, (f) Rivers  entered into a separate Partnership Agreement with NMG, Wallis company, (g) at that time, Rivers had a right to conduct her business without being the target of a conspiracy to mislead her into signing contracts with the Defendants who knowingly had adverse interests and knowledge of Wallis and NMG not having resources "income" to pay for legal fees which ultimately caused the forcing of the improper settlement and dismissal of the CVLR Inc. RICO case that caused her to lose her business and contract with 1650 Partners LLC., (h) the Defendants violated Rivers rights, and (i) Rivers was the party to the Memorandum of Understanding with owner of interest in CVLR d/b/a.

522.     The Defendants assumed legal duties to Rivers as a means of advancing their conspiracy, and they violated the legal duties that they assumed as a means of advancing their conspiracy; (a) Wallis could simply have not approached Rivers and

118

offer to pay legal fees and Bowman could have simply told/disclosed to Rivers that he had a adverse interest with Wallis and NMG and that he did not wish to represent her, but they did not --- they instead embarked on an elaborate conspiracy to harm her equestrian subdivision project and business and seek out her claims for themselves, which was a violation of Rivers rights to not be the target of a business conspiracy,

523.    <u>LEGAL NOTICE:</u> The Defendants in this Count acted with legal malice and acted willfully, intentionally, purposefully, without legal justification, and with legal malice because they agreed to injure Rivers equestrian subdivision project and business and to deprive Rivers of her property interest in 1650 Partners LLC. The Defendants repeatedly employed tactics of fraud, forgery, false pretenses, breach of contract, and sharp practice to injure Rivers equestrian subdivision project and business, and to deprive her of her property interest in 1650 Partners LLC.

524.    The Defendants acted, knowingly, wantonly, oppressively, and with such malice as to evince a spirit of malice or criminal indifference to their civil obligations to Rivers because they knew that she was operating her equestrian and subdivision project business, that she would lose if they 'duped" and "tricked" her to enter into contracts with them. They continually cut her out of all communication between them, the meetings they had with the U.S. Attorney's Office and deny her attorney work-product, invoices, billing, and accounting information regarding her legal fees. They were not justified in relying upon the contracts between them as giving each other the authority to deny Rivers her rights to full disclosure, her case and accounting files.

525.    Both Defendants knew that the contracts between them were fraud induced and Rivers depended on their promises to agree to the terms of the contracts and would not have agreed to the terms if she knew the truth about the two men and their adverse interests.

119

526.     Both Defendants agreed with each other that Rivers would sign and agree to the contracts between them, but that she would be misled into believing Bowman could represent her effectively with an adverse interest with/to Wallis and NMG, and NMG would pay legal fees for her and her company with an adverse interest with Bowman and that NMG had income and resources to pay the legal fees.

527.     Both Defendants had caused Rives to sigh the contracts between them knowing the contracts were fraud induced from inception and they knew the purpose of the contracts, from the outset, was to misdirect Rivers into thinking NMG could pay legal fees and would pay legal fees and Bowman could and would represent her effectively without a adverse interest with/to Wallis and NMG

528.     Rivers was first injured as a result of the conspiracy on or about July 20, 2014, when Rivers read the April 2, 2013 letter Bowman had written to U.S. Attorney Timothy Heaphy and April and May 2013 email correspondence between Bowman and U.S. Attorney Patrick Hogeboom (deceased). If Wallis had not instructed Bowman to write the letter and Bowman had not written the letter agreeing to not represent Rivers, she would not have continued to remain in contract with either Defendant, she would have continued to operate her business and exercised her rights under the 1650 Contract and would have suffered no injury. Rivers had investors, a profitable business and equity in the 1650 Partners LLC contract and would have been able to buy-out Wynne's interest in 1650 Partners LLC if the Defendants had not, (1) mislead Rivers about their relationship at the settlement table (because Rivers refused to settle unless Bowman agreed not to quit and Wallis agreed to pay legal fees), again tricking her into entering into another contract agreeing that Wallis and NMG will continue to pay legal fees and Bowman would continue to represent Rivers and her company , (2) mislead "lied" to Honorable Magistrate Judge Ballou after he halted the mediation, (3) causing the

120

improper mediation to continue, (4) which caused Rivers into settling with Wynne and the loss of her contract with 1650 Partners LLC

529.     As a direct and proximate result of the Defendants acts on February 24, 2014, Rivers was not able to buy out Wynne, Wynne retained control of 1650 Partners LLC and the value or the property, interests and equity 1650 Partners LLC owned

530.     As a direct and proximate result of Rivers signing away her interest in 1650 Partners LLC on March 27, 2014 (date of the order) and not being able to buy out Wynne, Wynne retained control of 1650 Partners LLC and the value or the property, interests and equity 1650 Partners LLC owned

531.     The Defendants acts were essential to Rivers injury when they knew they had caused Rivers contractual rights to purchase Wynne's interest in 1650 Partners LLC to be signed away at the settlement, when they both knew they weren't supposed to represent her and had an adverse interest with each other, when they both knew they caused her to settle so Bowman could represent Wallis in the <u>United States of America/IRS v William L Wallis Jr.</u> and when they both knew Bowman lied to Honorable Judge Robert Ballou about the relationship between them and the instructions given to them by the U.S. Attorney's Office and they were both in violation, and knowing all this—in agreement and acting in concert---denied Rivers the rights to the 1650 Partners LLC contract.

532.     Rivers alleges that she would have been able to buy-out Wynne and obtain ownership of the entity that owns the property and she would not have been kicked off the property.

533.     Rivers business had increased the riding center property value from $618,500.00 in 2007 $966,500.00 in 2009.  1650 Partners LLC was a bank holding company that owns financial interest in ODNB and Select and SBFC since 2006.

121

534.    As of August 2009 when Rivers learned that her riding center Deed was in the name of 1650 Partners LLC and not her own, as per the 2007 commercial purchase contract, Rivers business averaged profits of $13,116.50 per month.  Rivers currently has February 16, 2016 Exercised Option Purchase Contract, contract addendum and a 30 year lease with the HOA.  Rivers CVLR d/b/a is the owner of the interest to the contracts including the Memorandum of Understanding between Rivers and 1650 Partners LLC and has suffered a steady decline in profits since the mediation order was filed.  The thirty-year lease with a ten year rollover term with the HOA would have allowed Rivers to operate the riding center for forty-years at the Forest Virginia location. Rivers company remains and is the Serene Creek Run Riding Center and has been marketed and operated since 2007 in that name.

535.    As a result of the Defendants conspiracy with each other to prevent Rivers from buying out Wynne and purchasing the interest owned by 1650 Partners LLC, Rivers has lost net profits in the amount of over $8,316,347.50 calculated as the sum of the lost profits since 2009 plus lost equity in the riding center of $466,500.00

536.    Rivers has also lost equity and profits in an amount to be determined at trial of the value of 1650 Partners LLC on March 2014 and the current value of the bank holding company.  The estimated value is over $10,000,000.00

537.    Rivers prays that this Court will award judgment in her favor in the amount equal to compensatory damages in the amount of no less than $18,316,347.50, trebled in the amount of $54,949,042.50, plus interest, plus punitive damages, and attorney's fees and cost, as allowed by Va. Code §18.2-500

538.    FAC and NMG were and are operated by Wallis and Nitti, as a mere instrumentality, without observing corporate formalities, without sufficient capital to transact the business it transacted and as a fraud on creditors of those companies.

539.    The companies both formerly have registered agent Bowman with offices located

in Roanoke VA

## COUNT NINETEEN: ALTER EGO/INSTRUMENTALITY

540.    Rivers learned in July 2014 that Wallis, FAC, Nitti (and a multitude of other

entities) had been involved in a "pattern" of multiple bankruptcy and judgment litigation

schemes throughout the United States with Bowman as counsel and that FAC and NMG

with Bowman as Registered Agent, were not in good standing with the State of Virginia

and not registered to do business in the state, therefore Wallis and Nitti operate FAC

and NMG as an alter-ego, and an entity to defraud parties in and sue for their claims.

541.    The controlling Defendants exercised control over these entities in such a way as

to defraud or harm Rivers, her businesses and other victims

542.    Refusal to disregard the corporate entities in this instance would subject Rivers

to unjust loss or otherwise sanction a fraud.

543.    In July 2014, Rivers learned, by reviewing exhibits filed in the United States of

America/IRS case against Wallis that Bowman was Power of Attorney for Wallis since

before 2011 and that Wallis had no income since before 2011

544.    Nitti, and his counsel, Matthew Huebschman, admitted on May 10, 2018 that

FAC Acquisition Corporation had not been in "good standing" or registered with the

Virginia State Corporation Commission to do business as a company in the State of

Virginia for over 10 years

545.    As a result of the foregoing the Defendants, are each jointly and severally liable

for all the liabilities of FAC and NMG

**546.    Rivers alleges the Mutual Release and Settlement Agreement is Void Ab**

**Initio because the contract was entered prepared and entered into by fraud**

**inducement, the Honorable Judge Robert Ballou stopped the settlement**

**proceeding because Wallis could not be a third-party payee for Rivers legal fees in**

the matter and if he was the third-party payee, there could be no settlement proceeding and the same is true if Bowman represented Rivers while Wallis was her third-party payee.  If the court determines the contract is null and void or Void Ab Initio, then it never existed and therefore had no binding power over any parties to the contract.

547.     The Defendants named in this cause of action, through fraud, caused Rivers to sign the Mutual Release and Settlement Agreement, violating her due process rights, while being misled about the facts,

548.     The Defendants have (a) Caused Rivers the loss and benefit to purchase and own 1650 Partners LLC, (b)  have violated Rivers due process rights in her claims against Wynne, RAC, Rivermont Consultants Inc, 1650, SGLWT and caused her to defend in this action against

549.     The Defendants had a contractual duty of right and interest to represent Rivers to the best of their ability, fairly, honestly and without Malice or intent to defraud.

550.     The Defendants, instructed Bowman,to negotiate, author and prepare the contracts between them. Bowman is the Power of Attorney for Wallis and Nitti who own FAC assets.

551.     Wallis' owns the former NMG assets, and Bowman is the Registered Agent for NMG. NMG has once again been terminated with the Virginia State Corporation Commission.

552.     Rivers has requested and the Defendants have failed to provide Rivers with agreements they made with Bowman, the Criminal Division of the IRS, The Justice Department, Karen Deer, the Assistant US State Attorney, Patrick Hogeboom III, the US State Attorney, or Timothy Heaphy; regarding their (a) relationship with Bowman, (b) the reason Judge Ballou stopped the proceeding after Wallis told him he would continue to pay legal fees, (c) the reason Wallis was threatened to testify at Grand Jury, (d) what

124

was the outcome of the May 2013 meeting with Patrick Hogeboom or (e) credit or money they earned from Bowman's legal fees.

553.     The Defendants have not provided the signed checks and bank accounts statements from which the checks were drawn to pay Bowman on her behalf, or the correspondence between themselves and Bowman regarding the CVLR Inc settlement

554.     The actions of the Defendants were an extreme deviation from reasonable standards of conduct, undertaken intentionally with actual malice, and/or with a reckless disregard for their likely consequences.  As a result, the Rivers is entitled to an award of punitive damages.

555.     As a result of the foregoing the Defendants, are each jointly and severally liable for all the liabilities of FAC and NMG

## COUNT TWENTY: OBTAINING MONEY AND SIGNATURE UNDER FALSE PRETENSE §18.2-178

556.     Rivers restates, realleges and repleads the allegations in the paragraphs above of this Complaint as though fully set forth

557.     Each check received by Bowman from NMG, FAC, Northwood, Wallis, Mrs. Wallis or Nitti the "Defendants" as legal fees paid for Rivers or her businesses is its own act of obtaining money under false pretense and fraud,

558.     Each payment claimed by the "Defendants" to have been paid to Bowman as legal fees for Rivers or her businesses, is its own act of obtaining money under false pretense and fraud

559.     From July 26, 2011 and March 6, 2014 Wallis, Nitti and Bowman were aware that Bowman's fee was $200.00, the FAC records indicate that FAC paid and Bowman received $76,164.90 for work done on Rivers cases

560.     In March of 2014; Bowman received CVLR Inc's award check for One Hundred

Thousand Dollars ($100,000.00) as a direct result of intentionally (a) stipulating to Chad

Mooney, that Wallis would not testify in the CVLR Inc. v Wynne, et al federal case ; (b)

misleading and threatening Rivers to settle, and (c) misleading and lying to Magistrate

Judge Robert Ballou to (i) allow the mediation to continue and settle, (ii) not sanction or

report Bowman for disbarment, and (iii) not reinstate the matter. .

561.     On April 23, 2014 at 9:21 A.M., Bowman emailed the Virginia State Bar Ethics

Hotline stating,

"I have in my trust account settlement funds from a lawsuit. I told the client at the time she
signed the settlement check that I would disburse the funds to anyone until we had an
agreement or an order from a court as to how the funds should be distributed. The client is
disputing my fee entirely, claiming that I am not entitled to a fee because there is no fee
agreement, even though I have a representation agreement signed by the client which
clearly states the hourly rate and that I would be entitled to my hourly fees from any
settlement proceeds received in the case. The client agreed to mediate the fee dispute, but
she has not agreed to a mediator from the list of mediators that the mediation coordinator
sent her. Today, I received an email from her that states she wants me to distribute to her
the portion of the settlement proceeds that I do not claim as attorneys fees. I don't mind
disbursing the funds to her, but I am concerned that she will never agree to the
disbursement of my attorney fees once I disburse money to her. She will view the funds in
trust as her savings account, which will sit there until she decides she wants more money.
May I disburse the funds to her? If I pay the client her portion of the funds, may I pay my
attorney fees because her dispute of the fees is frivolous, she agreed to mediate her fee
dispute, but has refused to follow through by agreeing to a mediator?"

562.     Bowman received a response at 12:10 PM,

"You have to disburse to her promptly the funds to which she is entitled. Rule 1:15(b). You
cannot withhold undisputed funds from disbursement on account of a fee dispute. Disburse
to her the funds she is entitled to. If this is a matter in which a court is required to order
distribution of the settlement proceeds, you can present your claim for fees and let the court
determine that amount. If that is not the case, you should terminate the relationship as soon
as possible and sue the former client to collect your fees."

563.     NMG, in 2018 admitted in Case No CL14-1454 in Requests for admissions,

that NMG and Bowman met with Shenandoah Legal Group "SLG" on or before May 5,

126

2014. Bowman begged Rivers to settle and hired "SLG" to mediate the fee dispute between Rivers and Bowman. The "Defendants" conspired with Bowman to add paragraphs in the May 5, 2014 Fee Dispute Agreement between Bowman and Rivers that implied that NMG was a third-party payee and the contract reverted back to September 9, 2013 and have Rivers sign it. Rivers had Bowman change the wording of "has a third party agreement with NMG to had a third party agreement with NMG" when she read it and before she signed the agreement.

564.     The "Defendants", were aware that; (a) Rivers had terminated the NMG contract for "breach" failure to pay legal fees, (b) NMG had no award coming, (c) Bowman had told Rivers, in the taped conversation, she owed nothing to him for legal fees, (d) they had intentionally kept the bills from her, (e) if Bowman went after Rivers for any legal fees then Rivers would have claims against Wallis, FAC, Nitti and NMG, and among other things, (f) Bowman misled Rivers, the Virginia State Bar, and the Magistrate Judge Ballou to protect the "Defendants"

565.     The Defendants had each hired Bowman to represent them personally and as Registered Agents, had a personal relationship with and conspired with Bowman as a licensed attorney, (Bowman has more or less than twenty nine years experience as an attorney in both the Federal and State Courts of Virginia in the Commonwealth of Virginia.

566.     The Defendants made false statements to Rivers, upon which she relied on that would cause Rivers to agree to pay $200.00 - $300.00 per hr and allow Bowman to represent her and CVLR Inc. to obtain the over $10 Million Dollars in claim rewards demanded for in Rivers businesses cases.

567.     The "Defendants" actions and omissions prejudiced Rivers rights and the benefit of her businesses right to move forward with the CVLR Inc. RICO case and the claims against the parties, a fair settlement and her 99 year lease contract with CVLR Inc. and

127

the contract to purchase 1650 for $50,000.00, and were essential to pay Bowman legal fees and allow Bowman to represent Wallis and essential to harm Rivers

568.     Between June and July 1, 2011; Wallis approached Rivers as a horse trainer to give his son riding lessons. Wallis inquired why Rivers had moved her business from the riding center that he and Michael Wallis, his brother had once rented from her for a birthday party. Wallis offered to pay legal fees to a attorney he once used for a percentage of any award if she would hold off on hiring anyone for her bankruptcy.

569.     Rivers alleges the "Defendants" intentionally sought her and her businesses out and planned to have Bowman represent her and overcharge legal fees and set it up for the Defendants to become creditors to collect on her claims

570.     On or about July 16, 2011; Wallis and Nitti attended a land foreclosure auction held at the Bedford YMCA and purchased two lots #43 and #59 for $249,600.00 for Northwood. Northwood later assigned the lots to Mrs. Wallis, Julie Nitti, Michael Wallis and Eileen Wallis.

571.     Between July 1, 2011 and July 20, 2011; Wallis met with Rivers several times at his home and retrieved Rivers documents and evidence to take to Bowman to review. Wallis refused to divulge the name of the attorney to Rivers.

572.     Rivers entered into a contract with Bowman on July 21, 2011 to represent her in her bankruptcy to get a stay on her property that had been fraudulently conveyed to 1650 Partners LLC

573.     Rivers and her company, CVLR Inc entered into a contract with NMG on July 26, 2011 agreeing that NMG will pay legal fees, only Bowman would represent the two and to pay 25% of whatever award was received and pay nothing if they lost.

574.     The CVLR Inc RICO case was dismissed on April 2, 2012, and appealed and reversed on March 29, 2013.

575.    August 2013 Rivers learned that Bowman had been sued in the Western District Bankruptcy Court by US Trustee Byrnes and Byrnes was asking that Bowman be disbarred from practicing law. Rivers inquired with the U.S Attorney Patrick Hogeboom and the trustee Byrnes who both agreed that Rivers would get a do-over if Bowman was disbarred and Ordered to withdraw from her case. Bowman was furious with the Bankruptcy Trustee for informing Rivers .

576.    On or about September 6, 2013 Bowman contacted Rivers to inform her that Wallis and Nitti had worked something out and asked her to meet him at the Owen's market in Goode on September 9, 2013 to sign contracts that he had prepared for Rivers, CVLR Inc, NMG and himself.  Bowman met Rivers to sign and initial all three sets of two copies each for less than ten minutes.

577.    In February 2014; Rivers learned that Bowman had set up a March 24, 2014 mediation for the CVLR Inc. case.  Rivers had not been able to reach Bowman for several weeks. The RICO case was in the middle of the discovery phase, interrogatories were due and Bowman was not available.

578.    In July 2014; Bowman provided Rivers, for the first time, with copies of emailed communication with opposing counsel, Chad Mooney revealing that Bowman between October and December 2013 was negotiating dismissing the case or try mediation because he didn't want to go through discovery process. The emails reflect that Bowman had expedited the date and moved it up to February 24, 2014 and informed opposing counsel that Wallis would be at the CVLR Inc. settlement and Bowman agreed that Wallis would not be called to testify in the CVLR Inc. v Wynne matter.

579.    Bowman set up the settlement date for February 24, 2014 without asking Rivers. The trail date had been set for July 28, 2014.  Bowman had failed to follow the scheduling order and file his expert witness late and added Karen Foster and Vicki Marsh as intervener plaintiffs without Rivers permission or notice.

580. Between July 20, 2011 and May 5, 2014; The "Defendants" conspired with Bowman to author and prepare, the Representation Agreements, Partnership Agreements and Fee Dispute Agreements

581. Rivers learned also that (a) Wallis had no income, (b) that his Mrs. Wallis pays his expenses, (c) that Bowman had been Wallis POA since before 2002, and (d) NMG did not have funds enough to make payroll. Bowman withheld these facts and the facts that Liens were filed and recorded against Wallis income and assets and Wallis owed back withholding taxes of over $417,000.00 to the IRS.

582. The Defendants conduct constitutes activity of conspiracy in that (a) FAC is a unregistered enterprise with the State of Virginia for more than 10 years and which affects interstate commerce when it falsely advertises and operates as a Corporation with factories in the State of Virginia, China and Sir Lanka; (b) NMG is a enterprise that affects interstate commerce when it falsely claims that it paid legal fees for Rivers and her businesses to Bowman for legal services (c) Wallis and Nitti are employed by FAC as officers, owners, and owners of interest; and use operate the company as alter-egos; (d) Wallis is employed by NMG; advertises that he is the 100% owner of NMG. Wallis operates the company as his alter-ego; (e) Northwood pay taxes for land it purchased on or about July 16, 2011 in Bedford County, from the same bank account used to dupe Rivers into believing NMG paid her and her companies legal fees to Bowman,(f) Northwood purchased the two lots 43 and 59 for $249,600.00, and (g) it is documented for the record in this Court that Wallis has no income and his wife, Mrs. Wallis, pays his expenses, (h) Northwood assigned lot 43 to Wallis' brother Michael E Wallis and his wife Eileen M Wallis, Instrument No 110008309 and Lot 59 to Mrs. Wallis and Mrs. Nitti on August 30, 2011, Instrument No 110008310

583. Because (a) Northwood is not a real company and unregistered with the State of Virginia and (b) NMG claims to use the same checking account owned by Northwood to

130

pay Bowman; the Defendants have defrauded Rivers since July 26, 2011 when it agreed to and claims to have paid legal fees for her and CVLR Inc. cases. Northwood defrauded Rivers when it paid Bowman money with the appearance that NMG paid legal fees to Bowman.

584.     The Defendants conducted and participated in the fraud and conspiracy to give the appearance that both FAC, Wallis, Nitti and NMG paid legal fees to Bowman for Rivers and CVLR Inc. cases of over $50,000.00;

585.     The Defendants fraudulent activity affects interstate commerce because they (a) made promises to Rivers to represent her and her businesses, or (b) promised to pay for legal services, or (c) paid for other than legal services but claim the payments are for legal services, and (d) received money through interstate commerce when Wallis and NMG did not have the ability to pay,

586.     On May 5, 2014; Bowman obtained $66,000.00 in a fee dispute agreement, under false pretense from Rivers and her businesses. Bowman did not divulging and not disclosing the truth about Wallis and NMG not having the ability to pay since the day they entered into contracts with Rivers and CVLR Inc. Bowman also by not divulging and disclosing the truth to Rivers or Judge Robert Ballou about the adverse interest and the relationship between Bowman and Wallis which would have caused the CVLR Inc. case to be reinstated.

587.     Bowman fraudulently obtaining CVLR Inc.'s award money and had failed to return the money; and (d) Bowman has cashed the CVLR Inc. $100,000.00 award check he obtained under false pretenses, (b) has paid $34,000.00 consideration to Rivers to represent her and CVLR Inc., (c) and continues to use the money for his benefit and not the benefit of Rivers

131

588.     As a direct result, Rivers was damaged by the value of 100% of any award prayed for in her cases in an amount to be proved at trial but no less than Nine Million Four Hundred Thirty Thousand Dollars ($9,430,000.00) trebled

### COUNT TWENTY ONE:   FRAUD, WIRE AND MAIL FRAUD
### 941.  18 U.S.C. 1341-1343
### DEFENDANTS BOWMAN, WALLIS, FAC, NMG, NITTI

589.     Rivers restates, re alleges and re pleads the allegations contained in the paragraphs above, as set forth. Wallis, Nitti, NMG, FAC, Northwood, and Bowman, the Defendants named in this predicate act committed the following fraudulent acts which constitute wire and/or mail fraud.

590.     Bowman used the internet to defraud and mislead Rivers.  On July 21, 2011 Bowman emailed a Representation Agreement to Rivers.  Bowman acknowledged, in the contract, that Rivers had entered into an agreement with NMG as a third party payee under which NMG had agreed to pay a $5000.00 retainer to him, and Bowman agreed to draw his fees from that retainer.  Although Wallis and Nitti were aware that NMG had no income and its assets were federally liened by the United States of America, Treasury Department/IRS, that Wallis, owner of NMG, had no income and that Bowman was Wallis's Power of Attorney, and Rivers had not signed a third party Agreement with NMG at that time.  See *United States v Briscoe, 65 F. 3d 576, 583, (7th Cir. 1995) (citing United states v Ames Sintering Co, 927 F ed 232, 234 (6th Cir. 1990);  United States v Frey 42 F 3d 795,797, (3d Cir 1994)  see also United States v Profit 49 F 3d 404, 406 n. 1 (8th Cir)*

591.     The Defendants intended to defraud Rivers by means of false pretenses in the "scheme" with Bowman each with the intent to defraud Rivers. Each Defendant used the

interstate wire communication "email" and "phone" in furtherance of the scheme. *See United States v Maxwell 920 F 2d 1028, 1035 (DC Cir 1990)*

592.   **PREDICATE ACT 1:** In October 2013 and on February 4, 2014; The Defendants intentionally emailed a false statement of accounting to Bowman

593.   On or about March 20, 2014; Bowman was asked to provide Rivers with the accounting of legal fees owed. Bowman claimed in an email to Rivers that Wallis bookkeeper was putting the invoices together and continued to put Rivers off from receiving the accounting for legal fees.

594.   **PREDICATE ACT 2:** In April 2014, Bowman mailed Rivers fraudulent accounting claiming that NMG and Wallis had paid the accounting for the legal bills.

595.   **PREDICATE ACT 3:** On March 26, 2014, Bowman mailed Rivers a letter stating among other things;

" Here is a copy of the check I received from Chad Mooney, John Wynne's lawyer. The check is made payable to both me and CVLR Performance Horses inc. in accordance with the settlement Agreement. Both you and I will have to endorse the check and it must be deposited in my trust account until it clears.

You have requested copies of all of the bills for work done on the RICO case and all of the money paid on the RICO case. Attached at Exhibit 1 is a copy of all the billing statements for work done on the RICO case, and copies of checks that were applied as payment of the bills. I requested periodic payments from NMG during the period from July 26, 2011 through May 2, 2012 for work done in the RICO case prior to the filing of the appeal from the district court to the Fourth Circuit on May 2, 2012. I allowed NMG to make periodic partial payments because we expected that the case would be resolved in early 2012, and I expected to be paid in full when the case settled. NMG paid $25,769.60 during that period, which I applied to the billed total of $40,668.60. I pursued the appeal and performed all of the work done after May 2, 2012, without being paid. Attached at Exhibit 2 is a copy of all the bills for that work, which comes to a total of $66,527.30 (less $1500.00 which NMG paid on the expenses of the Fourth Circuit appeal and oral argument). Therefore, the total legal fees and expenses incurred in the RICO case was $107,195.90. NMG paid $25,769.60, leaving a remaining balance due of $81,426.30.

Moreover, both you and NMG agreed to not pursue the RICO case, and you granted me the discretion to dismiss the case at my sole discretion.

Pursuant to the September9, 2013 agreement between us, I am entitled to payment of my attorney fees in the RICO case from the settlement proceeds.

I suggest that you come to my office on your next day off and endorse the settlement check so I can deposit it into my trust account. If you don't endorse it, nothing will happen to the check and I will seek guidance from a court as to the disposition of the settlement proceeds. If you endorse it, I will not distribute the proceeds, even to myself as payment of my fees, until either we reach an agreement or I obtain guidance from a court as to the disposition of the settlement proceeds.

NMG has paid me the agreed upon retainer on CVLR's behalf in the Option case, and has paid a retainer on your behalf in the ODNB case. If I cooperated with you in cutting out NMG, I would be guilty of the same type of business conspiracy and interference with contract as the Defendants in your cases.

If you desire for me to continue to represent you in the option case, the purchase agreement case, and the ODNB case, that is fine with me, so long as my representation of you continues under the terms of the September 9 agreement between you and NMG.

If you do not wish to work out an agreement going forward, than we will all be bound by the terms of our agreements.

582. Each and every bill/invoice emailed to and from the Defendants, is to be considered a separate act of wire fraud and each list of accounting was emailed to Bowman from Wallis and Nitti of FAC. Each bill/invoice/payment was intentionally, emailed without consent or knowledge of Rivers and withheld from Rivers until after April 2014.. Each bill, individually, prepared by Bowman, was intentionally, different than the bills/invoices/payments provided to Wallis and then to Rivers after April 2, 2014. The actual and partial differences were; (1) $100-$150 per hr; (2) actual dates and hours worked; (3) description of the legal services provided; (4) and the additional legal services provided to/for Wallis, Nitti, Foster and Marsh billed, on behalf of Rivers, and sent to Wallis, intentionally and knowingly submitted by Bowman in an attempt to defraud Rivers and use the interstate wire communication "email" to further the scheme.

596.     The Defendants named in this Count provided and instructed the providing of false written promises, including documents mailed to Rivers and documents mailed from Bowman to the Defendants and other parties on Rivers or the Defendants behalf, over-billing and invoicing Rivers and her company for legal fees. Rivers relied on the Defendants false statements regarding the hours billed, the correct accounting and what

134

they were billed for and to her detriment because the Defendants had defrauded her, resulting in Rivers being required to pay for the inflated hours for legal fees and be coerced into dismissing the RICO case because Wallis and NMG hadn't paid Bowman.

597.     Each invoice Bowman mailed to Rivers, was different and more inflated than the bills/invoices he provided to Wallis and Nitti. The actual and partial differences in fees were $100-$150 per hr, the actual dates and hours worked were different, the description of the legal services provided was difference, and additional legal services were provided to Rivers but provided to/for Wallis, Nitti, Foster and Marsh and billed, on behalf of Rivers, to Wallis and Nitti of FAC.

598.     **PREDICATE ACT 4 AND 5:**  On April 2, 2014, Bowman <u>mailed</u> to Rivers, via U.S. Postal Service, fraud induced invoices for Legal Work done in Rivers v ODNB Albemarle County Circuit Court Case No 13-598 crediting NMG $8,134.55 and invoicing a outstanding balance of $11,670.59.  A copy of a 10/07/13 NMG check for $5502.70 and a copy of a 11/04/13 NMG check for $2500.00 was attached.  The Defendants were attempting to complete the scheme whereby NMG and/or a assignee would attempt to collect unpaid legal fees from Rivers and CVLR Inc. <u>PREDICATE ACTS-</u>

599.     **PREDICATE ACTS 6 – 37:** The fraud induced, <u>mailed</u>, ODNB invoice itself is an act of mail fraud.  The invoice includes no less than 31 counts of mail fraud. A letter accompanied the invoice stating that;

"I have enclosed a copy of an email he received from Bill Wallis stating how he was going to pay the agreed upon $7500.00 retainer, and a statement for NMG showing what they have paid on the ODNB case. There is a outstanding balance of $11,670.59. I have already told you that I have no intention of seeking collection of this money from you because you have no ability to pay my fees and it would be a waste of my time to pursue collection from you. However I am not waiving the fees."

600.     **PREDICATE ACT 38:** Bowman also provided false written promises in his July 20, 2011 representation agreement, by email to Rivers to sign and agree to, promising Rivers he would represent her and her company in her bankruptcy and other claims

601.     **PREDICATE ACT 39:** On April 23, 2104, Bowman mailed via U.S. Postal Service fraud induced invoices for legal work done in the CVLR Performance Horses Inc v S&R Farm LLC, et al, Case No CL12000867-00, Bedford County Circuit Court. Bowman attached a letter to the invoice stating that, "the total amount due was $54,222.28. I applied as credit $16,918.81 that was paid by NMG on the time and expenses in the bill. This leaves an outstanding balance of $37,303.47.

602.     **PREDICATE ACTS 40- 116-** The fraud induced, S&R Farm LLC Invoice, Bowman mailed to Rivers, is itself an act of mail fraud. The invoice within has no less than 75 counts of mail fraud asking for money including Bowman misrepresenting the NMG payments paid as credits which in themselves constitute separate acts of Conspiring with Bowman to Obtaining Money Under False Pretenses and is incorporated in this Complaint

603.     The Defendants did, with intent to defraud, injured Rivers. Rivers paid Bowman $66,000.00 on May 5, 2014. As a direct result, Rivers was damaged by the value of 100% of the $100,000.00 award assigned to her by CVLR Inc..

### COUNT TWENTY TWO: NEGLIGENT MISREPRESENTATION
### GARY BOWMAN

604.     Rivers restates, re alleges and re pleads the allegations contained in the paragraphs above, as set forth.

605.     In his role as Rivers attorney, Bowman, prepared contracts for Rivers and NMG that vouched for the soundness of NMG

136

606.    On July 21, 2011; Rivers entered into a Representation Agreement with Bowman

607.    On July 26, 2011; Rivers entered into a Partnership Agreement with NMG

608.    In addition, in his role as Rivers attorney, Bowman prepared dummy statements which grossly overstated the expenses and legal fees paid to Bowman on behalf of Rivers and her business.  Bowman knew or should have known that the accounting, bank accounts, and Bowman's escrow accounts would prove to be false once Rivers was able to review and prove up the separate three set of books

609.    By virtue of the contracts prepared by Bowman at the instruction of Wallis and the accounting submitted to Rivers in 2014, Bowman was representing to Rivers that the contracts, business relationship and accounting were sound and viable from a business standpoint

610.    Based on information learned by Bowman in the course of meeting with Rivers and strategizing with Wallis and Nitti, and based on information known by the US Attorneys Office; through his role as counsel for Wallis, Nitti and their entities, Bowman should have known that, in order to avoid making the contents of those documents misleading to Rivers, he needed to further disclose, *inter alia,* that (a) neither Wallis or NMG were solvent and could not afford to pay her legal fees, (b) that Wallis and NMG had no income, (c) that he was Wallis's POA and (d) he had a adverse interest with Wallis and Nitti, (e) could not enter a contract with Rivers or her business with NMG, Wallis or FAC as a third-party payee for her legal claims, (f) Wallis was under investigation with the federal agencies and (g) Wynne was the former trustee on the mortgage for his residence, (h) that Twery, Wynne's attorney and former owner of RBC, had been hired to collect over $290,000 judgment against Wallis and FAC that Twery had recorded in the Appomattox Circuit Court Clerk's office in 2006 and (g) he or Wallis being involved in her claims against Wynne would be unfair to her and CVLR Inc and a violation of their due process rights.

137

611.    The Defendants did not make the necessary disclosures to Rivers

612.    Each of the representations was false when it was made and each of the omitted facts was one which Bowman had a duty to disclose

613.    As a result of Bowman's negligence and the scheme between he, NMG and Wallis, NMG is now attempting to complete the scheme and profit from the misrepresentations and omissions complained of in this Count

614.    Bowman should have known that each representation was false and that it needed to make additional disclosures in order to prevent what it had represented to Rivers from being materially misleading

615.    Rivers reasonably and justifiably relied on the representations to her detriment by, *inter alia,* her agreements with Bowman to represent her and CVLR Inc to the best of his ability

616.    Rivers and her business have suffered damages as a direct and proximate result of their reasonable reliance on Bowman's representations, for which she is entitled to recover

617.    Bowman made the representations complained of in this Count in the course of his legal practice and for the avowed reason of guiding CVLR Inc. to an improper and unfair settlement.

618.    The contracts prepared by Bowman based on instructions from Wallis and NMG provided legitimacy for the overall scheme.  Without the overlay of Wallis, Nitti, FAC, Bowman and NMG adding legitimacy to the scheme; Bowman with the help of the Defendants, would not have been unable to induce Rivers, CVLR Inc. and other victims to enter into contract agreements.  The role of Wallis, Nitti, FAC and NMG in Bowman's scheme gave the impression of viability and lawfulness of the contract agreements and substantially furthered and assisted Bowman's efforts in moving the litigation forward; moreover, the participation, opinions, agreements, correspondence, and discussions of

138

and with Bowman, were instrumental in the decision of Rivers, CVLR Inc. and other victims to enter contract agreements and continue participation in the agreements in the scheme to drive CVLR Inc and Rivers claims to settle only for attorneys fees and then drive the claims into the pockets of the new made creditors Wallis, Nitti, FAC and/or NMG by collection or assignment. The conduct of Bowman in doing the acts and omissions herein alleged directly resulted in damages and harm to Rivers as set out herein.

619.     Bowman's representation of Rivers at $200.00 per hour was outlined in the July 21, 2011 representation agreement. Rivers hired Bowman for the reasons that he told her he had considerable experience in matters of bankruptcy and federal law, and she believed him to be well-qualified to represent her and her business and to do what he promised he would do.

620.     Bowman acknowledged that the representation covered by the July 21, 2011 agreement existed solely for the Client. Bowman's charge for legal services was $200.00 per hour.

621.     Bowman emailed Herbert Beskin on July 21, 2011 informing him that he had been retained by Rivers, the pro se debtor in Case No 11-60706. Bowman outlined the case and acknowledged that Beskin had filed a Motion to Dismiss for July 28, 2011. Bowman informed Beskin that Rivers has a valuable litigation claim and I represent her in that litigation. He went on to inform Beskin that he wanted to file a plan for Rivers, have a creditors meeting and proceed on toward confirmation of a Chapter 13 plan and he also wanted to pursue the litigation claim in bankruptcy court but there may be an issue of whether the debtor or the trustee has standing to pursue the claim.

622.     Although Rivers estate, contracts, equity and investors would certainly support a Chapter 7 converted to Chapter 13 plan, Bowman deliberately, failed to move forward by filing for a extension to continue the hearing on the Motion to Dismiss or to hold another

139

creditors meeting or to assure that he laid a sufficient foundation to support Rivers' fraudulent conveyance arguments to support a Chapter 13 plan or to move ahead with having Rivers submit a declaration or the testimony of Special Agent James Vaughan to support the fact that her d/b/a, Rivers owned the contracts and a memorandum of understanding , and lending agreements, were, in fact, in place and viable. After the bankruptcy case was dismissed on January 29, 2011, without prejudice, Bowman told Rivers he would file her bankruptcy again timely but failed to file another bankruptcy case in 180 days (January 29, 2012)

623.        Because Rivers and Wallis of NMG had entered into a legal fees arrangement agreeing to only hire Bowman and Bowman represented Wallis and NMG, Bowman was very much aware of the conflict of interest and professional negligence he had in representing Rivers and Wallis and the automatic claims Rivers had against him, Wallis and NMG. Bowman knew, but did not divulge to Rivers, that he had an interest adverse to Rivers and to her estate, (her business and her interests), and his representation was not in the best interest of her or her estate.   Bowman deliberately did not argue Rivers Ch 13 bankruptcy matters to her advantage or file a new bankruptcy case and chose to ONLY file the RICO claims to Federal Court for Rivers business.  Bowman still had a conflict of interest with Rivers and her estate, Wallis, NMG, Nitti, and now witnesses Karen Foster, hereinafter "Foster" and Vicki Marsh, hereinafter "Marsh".

624.        Based upon the information provided to Rivers, by Bowman, Rivers believed that Bowman was telling her the truth, was representing her faithfully and  would file her bankruptcy after 180 days.  When Bowman threatened Rivers and convinced Rivers he had no time to continue her case and that he would withdraw the day of settlement if she did not settle, Rivers accepted what Bowman told her to be the truth and Bowman took no additional steps to convince or attempt to persuade Rivers that her claims were too

valuable to forego or that he could not represent her in her case against John Wynne because he had a conflict of interest.

625.     Bowman's failure to fully disclose his relationship with Wallis, Nitti, FAC and NMG and his failure to adequately and fully advise Rivers to pursue the extremely beneficial claims fell below the standard of care. Bowman should have fully disclosed his relationship with Wallis, Nitti, FAC and NMG and explained to Rivers how and why she needed to pursue her claims rather than engage in a full blown settlement (which Bowman knew, and had been warned, that he could not continue to represent Rivers because of his conflict of interest) and Bowman's additional inflated legal fees exceeding $100,000.00 to negligently litigate Rivers claims

626.     In doing the things herein alleged, Bowman intentionally put his own financial interests and the gain realized by a full blown litigation of Rivers bankruptcy case and RICO claims, ahead of the interests of Rivers, his client, in avoiding the correct litigation and process of full disclosure and a do over by order of the court and the inflated legal fees by obtaining a mediation hearing for a settlement and forcing the date moved up for a beneficial period for Bowman and his clients, Wallis and Nitti, thereby potentially avoiding disbarment, sanctions, criminal arrest, fines, fees, and/or court arbitration. As a direst and proximate result of Bowman's actions, as alleged herein, Rivers incurred substantial unnecessary fees and costs, in an amount subject to proof

627.     Because Rivers and CVLR Inc and other victims of Wynne were represented by Bowman; Magistrate Judge Robert Ballou, Assistant U.S. State Attorney, Patrick Hogeboom, U.S. State Attorney Timothy Heaphy could not divulge the truth to Rivers about (a) Bowman being warned that he had to withdraw from the CVLR Inc. cases, (b) Wallis and NMG could not be third-party payees for the cases, and/or (c) his relationship with his clients Wallis, NMG, FAC and Nitti and the circumstances that affected Rivers.

141

628. Because Rivers hadn't been told the truth; Rivers trusted Bowman and took his threat to withdraw from all her cases as powerful truth and didn't know to tell the Magistrate Judge Robert Ballou to not proceed with the CVLR Inc settlement after he allowed it to continue. If Rivers had known the truth on February 24, 2014, Bowman knew she wouldn't settle and would have fired him at the settlement table, and sought new counsel.

629. Bowman was dealing with conflict of interest issues with the 2011 Providence Hall Associates case no. 11-11656-BFK and 11-01508-BFK as discovered by the bankruptcy court during the time he represented Rivers, her estate, and CVLR Inc. On October 14, 2011, Bowman filed his application to be employed as counsel for the Debtor in Possession in the case under 11 U.S.C. §327. On November 23, 2011 Judge Brian f Kenney, of the U.S. Bankruptcy Court, Eastern District of Virginia, DENIED Debtor, Providence Hall Associates United Partnership application to employ Bowman finding among other things, (2) that owing to Bowman's representation of the Dixon Properties LLC, Bowman was not disinterested under 11 U.S.C. §327(a) and 101(14) as he had declared.

630. As in the Providence Hall case, Bowman did not disclose or give full disclosure to Rivers and her estate, that he was has adverse interest in her RICO case and he could not file her bankruptcy case as he promised. Knowing that, Bowman also failed to add Rivers to the CVLR Inc. RICO case as a Plaintiff as he promised; and knowing that, Bowman also failed to file separate RICO claims for Foster and Marsh as he had promised them. Because he knew Foster, Marsh and Rivers had automatic claims against him; he added them, without notice or permission from Rivers, as Plaintiffs in the CVLR Inc. RICO case knowing their claims were moot due to Rivers AGREEING ON 9/9/13, THAT BOWMAN COULD DISMISS THE CASE AT HIS OWN DISCRETION.

142

631.     Bowman also, during the time he represented Rivers and CVLR Inc., had a conflict of interest and filed false statements as he did in the CVLR Inc case, that was also discovered with Mr. and Mrs. Christopher Jaggars in the June 14, 2012 Chapter 11 converted to Chapter 13 bankruptcy Case no 6:12-BK-61438; and in the January 13, 2012 Karen Foster Chapter 13 converted to Chapter 11 bankruptcy case no 12-60080 closed in July 3, 2012; and in the March 29, 2012 Victoria Marsh v. Wells Fargo Bank NA, et. al Injunction case no CL12000624 Non Suited March 2, 2013; and in the March 16, 2013, Victoria Marsh v Wells Fargo NA case no CL13001145, closed under the 3 year rule on September 29, 2016; due to being duped by Rivermont Banking Co.

632.     Because Bowman's conflict of interest was not waivable and it had not been waived, and because of his current situation, at the time, being sued again by US Trustee, John R Byrnes, on July 12, 2012; Case no 12-00701, re-opening the US Bankruptcy Court, (Western District of Virginia (Roanoke), August 2007- June 2010 case.  The original case was a miscellaneous proceeding, show cause, case no 07-00701 for Bowman's failure to comply with certain bankruptcy requirements and among other things, deceptive and misleading filings, and sanctioned repeatedly; and because Bowman violated Rule 1.7(a) Conflict of Interest, he erred by not adding Rivers to the CVLR Inc.case and failed to file Rivers new bankruptcy case.  Case no 12-00701 was Dismissed without prejudice on October 4, 2012

633.     Bowman conflict of interest is not waivable because Bowman, knowing, in an attempt to dupe Rivers; prepared each and every contract Rivers entered into with Bowman, Wallis and NMG.  The contracts were fraud induced and meant to harm Rivers and help Bowman and Wallis.  Bowman failed to divulge and be transparent as to his history and current complaints against him that could result in the prejudice of her case, financial ruin and having to seek new counsel.

143

634.     Bowman's conduct in Rivers July 2011 Chapter 13 bankruptcy matters and in the September 8, 2011, CVLR Inc. RICO case constituted a conflict of interest that could not be waived.  Just as Bowman had done in the Providence Hall Assoc case and the CVLR Inc. RICO case; he deliberately continued to file frivolous pleadings, at the expense of his client.  Knowing, in the Providence Hall Assoc case, that the court had denied his application for employment on November 23, 2100 and had also appointed a trustee and the debtor in possession was not entitled to employ counsel under 11 U.S.C. §327 after the appointment of a trustee; and knowing, in the CVLR Inc. RICO case that Rivers was the manager of CVLR Inc. and the owner of the contracts and rights under dispute; the estate.

635.     Bowman's handling of Rivers case fell below the applicable standard of care in many respects.  From July 21, 2011 to May 5, 2014, Bowman inflated legal fees, never provided any billing or invoices to Rivers, whatsoever until over 22 days after the settlement, and billed her $300 per hour which was $100 more an hour than originally quoted in the July 21, 2011 representation agreement.   Rivers alleges that this staggering amount of legal fees, over $100,000.00, is an example of unconscionable, abusive, and unfettered expenditure of attorney's fees.

636.     Rivers bankruptcy case was never refiled and her RICO case was mishandled from the start of Bowman's representation and the mishandling by Bowman began almost immediately after Bowman was hired when he failed to handle the case as he assured Rivers that he would as alleged hereinafter.  Not only did Bowman fail to handle the matter correctly,  he intentionally billed Rivers for legal work done on a case that the Plaintiff of the case, CVLR Inc, was the incorrect party to several of the contract and he failed to add Rivers (who is the actual party of interest to all the contracts) as a Plaintiff to the case and, without notifying Rivers that he had added Foster and Marsh as

144

Plaintiffs and set up a mediation and settlement hearing after Rivers had been specifically assured by Bowman that he would not do

637.     Even a cursory review of Bowman's billing records evidence the fact that this was a "legal fees, brokering scheme, and running of multiple sets of books", between Bowman and Wallis, Nitti, FAC and NMG which led to grossly excessive, wasteful, unnecessary, and often repetitive work and work done on other clients that even Bowman cannot identify.

638.     Bowman ignored the advice of the Virginia State Bar and failed to pursue the courses of action and strategies which would have offered Rivers a valid defense and bolstered Rivers bankruptcy and RICO case.

639.     Bowman was counsel for Rivers and Wallis when he filed the CVLR Inc. RICO case. Bowman had interviewed the Virginia State Police Special Agent, James Vaughan, and both Foster and Marsh, (agreeing to represent them and they had agreed to testify) in July 2011 before the CVLR Inc RICO case was filed.

640.     Bowman violated Rule 3.3; because each and every pleading filed and signed on behalf of Rivers and CVLR Inc., by Bowman was done so, knowingly, under oath and is a separate act of fraud upon the court and to Rivers and CVLR Inc. and to Rivers and CVLR Inc.; and Foster and Marsh; professional negligence. Bowman did not reveal the fraud to Rivers, the court or self report it.

641.     Bowman knew of and had an adverse interest with Wallis, who was one of the owners of NMG, and FAC. Wallis had offered to pay legal fees for Rivers, Marsh, and CVLR Inc.'s. cases' against Wynne, RBC, 1650, Beck, Lester, and S&R .

642.     On July 19 or 20, 2011; Bowman advised Rivers to enter into a contract with him as bankruptcy counsel and NMG as third-party payee for legal fees

643.     On July 26, 2011; Rivers entered into a Partnership Agreement with NMG

145

644.     Bowman did not provide Rivers with invoices, escrow statements or bills paid or owed. Bowman made false assurances to Rivers. Based upon the representation by Bowman, Rivers agreed to hire him.

645.     Bowman had a duty to use such skill, prudence, and diligence as members of the legal profession commonly possess and exercise, in providing legal services to Rivers, herein.

646.     On September 8, 2011 Bowman filed Case no 6:11-cv-00035, CVLR Performance Horses, Inc. v et.al; the RICO Racketeering action demanding $9,430,000.00

647.     During the course of Bowman's representation of Rivers and CVLR Inc., there were several instances wherein the conduct of Bowman fell below the applicable standard of care, as set forth herein. Bowman did not conduct proper discovery and the depositions and discovery, that he did do; and some that he did not do but billed for, was extremely costly, was not used in the case, and were all a ruse for Bowman's benefit in his legal fees brokering scheme with Wallis, Nitti, FAC and NMG

648.     Bowman also failed to take depositions of Foster and Marsh who were named in the RICO case as victims and could be crucial witnesses. Bowman instead chose to represent them knowing he wouldn't be able to call them as witnesses in the RICO case and that the US Attorneys Office, and the Federal Agencies would want to call them as witnesses in their federal case against Wynne. After the US Attorneys Office threatened Wallis with grand jury testimony, Bowman knew he couldn't represent Rivers, CVLR Inc., Foster and Marsh in the cases against Wynne and would have to withdraw from their cases.

649.     Because Rivers is unable to obtain evidence and discovery from Federal Judges, Federal agencies and agents named defendants in this matter, without Order of the Court; the fraud and impropriety of Bowman and Wallis, alleged in this matter, will be

146

proven by clear and convincing evidence propounded from the Honorable Mediation Judge Robert Ballou, the federal agencies that investigated Wynne and the U.S. Attorney's Office upon discovery.

650.    Gary M Bowman, the Defendant, had a contractual duty of right and interest to represent, Rivers, and her estate, to the best of his ability, fairly, honestly and without Malice or intent to defraud

651.    Find that, as a direct and proximate result of the Defendants acts, Rivers lost the benefit of her due process rights to proceed to a fair trial, loss of business and the loss of the legal fees she paid to the Defendant; Rivers asks to be paid damages trebled, plus interest since February 24, 2014

652.    Find the Rivers was damaged in the amount of no less than the value of her estate at the time of the settlement, trebled, plus interest since February 24, 2014.

653.    Find that the Defendant, Gary M Bowman; violated Rule 4.1 of the American Bar Association, adopted by the State of Virginia as rules of the court; and the Defendant; (1) lied to the Virginia State Bar Ethics Hotline and (2) did not do what the hotline advised him to do; and give Rivers her check for $100,000.00; and (4) lied to the Virginia State Bar, and (5) lied to the Department of Justice; and (6) lied to the Criminal Division of the IRS; and (7) lied to the Honorable Magistrate Judge Robert Ballou, in order for Judge Ballou to allow the settlement to continue after stopping the proceeding due to the Defendants conflict of interest and relationship with William Wallis.

654.    Award damages in favor of the Rivers and against the Defendant in the amount to be proved at trial; from the date of the settlement, with 100% of the loss due to the Defendants in this Count, intentionally, unethically prejudicing Rivers and CVLR Inc, by allowing the settlement of the CVLR Inc RICO case to go forward with Bowman representing Rivers and CVLR Inc. and Wallis present at the settlement as a third-party; because the Honorable Magistrate Judge Robert Ballou correctly stopped the

proceeding due to the facts pled herein but allowed the proceeding to improperly resume due to the acts of Bowman and Wallis.

655.     Reach the conclusion that Rivers federal RICO settlement was rendered improper to proceed with Bowman as counsel and Wallis as third-party payee and the Defendant, Gary M Bowman, mislead "lied" to Magistrate Judge Robert Ballou about the facts pertaining to William L Wallis Jr. as a third-party payee and client of Bowman with an adverse interest in the parties represented; and for additional reasons regarding the U.S. Attorney's office, not yet known to Rivers; which also caused the Federal case against Wynne and his entities to be closed; and with that caused the suffering of countless victims and the ongoing pattern of the illegal banking enterprise pled as allegations and facts in this matter

<u>MOTIVE</u>

656.     Rivers alleges Bowman had a hidden agenda.    Bowman has a history of sanctions and harbored resentment and grudges against the Bankruptcy Court Judges and Trustees after being sued by bankruptcy trustee, John Byrnes in 2011.(Bowman did not divulge that fact to Rivers and agreed with the bankruptcy court not to continue to practice bankruptcy law.)    Bowman had also warned his client, Wallis with grand jury testimony and they both had been warned by the US Attorneys Timothy Heaphy and Patrick Hogeboom in 2012 and 2013 about the relationship they had with Rivers, CVLR Inc and Marsh regarding legal fees and representation. His office was searched by Special Agents Deer and others of DOJ and the Criminal Division of the IRS in 2011, appealed and denied in 2013. (Bowman did not disclose the facts to Rivers).    Bowman's biggest fear was that near January 2014 he would have to represent his main client, Wallis in the *IRS v Wallis* matter in the United States District Court for the Western District of Virginia.    Wallis and Bowman sought Rivers and CVLR Inc out for their claims in federal court.

148

657.     Wallis, who claims to have no income, would need money to pay legal fees to Bowman and to pay the IRS the over $417,000.00 he owed them in back withholding taxes since 2002. Bowman was Wallis' POA and was very aware of the ten year statute of limitations running out. Therefore, Bowman had a short window of time and opportunity to threaten CVLR Inc and Rivers into settling, obtain money from a settlement in the RICO case, and withdraw from all Rivers, CVLR Inc., and avoid grand jury or the Virginia State Bar, and set up NMG as a "creditor" to collect from CVLR Inc. and Rivers when CVLR Inc and Rivers couldn't pay the inflated, brokered legal fees they had never received and Bowman withheld from them.

658.     The Pre Trial Order was entered on July 31, 2013. Plaintiff, CVLR initial expert disclosure was due 75 days from the order. Bowman failed to timely file the expert disclosure for CVLR's experts. The case was set for jury trial

659.     On November 8, 2013, Bowman filed, on behalf of CVLR, to intervene Karen Foster and Vicki Marsh as Plaintiffs in CVLR's case without notice to or permission from Rivers.

660.     Because Bowman, in the September 9, 2013 agreement, had included that he could dismiss Rivers and CVLR's case at his own discretion, and because Bowman could not call Foster and Marsh as witnesses in CVLR's case, if he represented them, their claims would be moot, and he had to file their RICO claims separately.

661.     In doing all of the acts and omissions alleged in this complaint, Bowman, repeatedly, and intentionally put his own financial interests ahead of the interests of his client, Rivers.

662.     As a direct and proximate result of the aforesaid negligence and/or intentional failures of Bowman, Rivers was required to retain new attorneys to represent her in this case.

149

663.    As a further direct and proximate result of the negligence of Bowman, Rivers sustained damages, including, but not limited to, legal fees paid to Bowman in the amount of over $100,000.00, and payment of legal fees to new attorneys to represent Rivers in this case. Rivers has sustained, and will continue to sustain, further and additional damages as a direct result of Bowman's negligence, all in an amount according to proof

664.    Bowman violated Rule 1.9 (a), Conflict of Interest: Former Client; because Bowman knew Foster and Marsh were victims of the same and substantially related matters and their interests were materially adverse to Rivers as a former bankruptcy client and Rivers' business after CVLR's case was dismissed, and: because Marsh's interest was materially adverse to Rivers and CVLR's fee agreement with Wallis who had agreed to pay Marsh and Rivers legal fees to Bowman.

665.    Wallis was served with the USA/IRS complaint on January 16, 2014 and had 21 days to respond. Bowman was his attorney

666.    Because Bowman had a gross conflict of interest representing both Rivers and Wallis (who had no income), and knew when Rivers hired him that there was a ten year statute of limitations issue closing in around him moving the IRS case against Wallis to January 2014; he prepared the fee agreements and now needed to collect money for Wallis in CVLR's RICO case to pay him, Bowman, legal fees for the upcoming US America/IRS v Wallis case $415,000.00.

667.    On February 6, 2014 Bowman, filed a Motion to refer the CVLR RICO case to Magistrate Judge for Mediation, moving the plaintiff, CVLR had agreed to the motion and desire to mediate the case with the assistance of the Magistrate Judge without notice to or permission from Rivers or CVLR. The Order granting Plaintiff's motion was entered on the 7th day of February, 2014

150

668.     On February 11, 2014, the Settlement Conference Order was entered signed by the Honorable Robert S Ballou, US Magistrate Judge and set for March 24, 2014. The parties were to schedule a conference call with the court approximately 14 days in advance of the settlement conference (3/10/14) and submit brief statements as to their factual and legal positions on or before February 17, 2014

669.     A notice to reschedule the 3/34/14 hearing was filed with the Federal Court changing the date to 2/24/14 at 10:00AM with no notice or permission from Rivers or CVLR. Upon investigation, Rivers can find no record of a written request for the change from the magistrate Judge and the Clerk has nothing in the files.

670.     Bowman deliberately failed to re file Rivers bankruptcy case and coordinated the settlement with Wallis, Wynne's attorney and Judge Ballou unbeknownst to Rivers to hurry the process up and get CVLR's RICO case off the books so he could collect Rivers settlement check and represent Wallis.

671.     Bowman had also prepared a fee agreement between Wallis and Marsh similar to the agreement between Wallis and Rivers and CVLR whereby Wallis agreed to pay Marsh's legal fees and Bowman would represent.

672.     Bowman in a rush and under stress of the bankruptcy court, Virginia State Bar, U.S. State Attorney, Timothy Heaphy, Asst. U.S. State Attorney, Pat Hogeboom, Army, Department of Justice, Wallis, and the USA/IRS v Wallis case, failed to timely file Foster and Marsh RICO claims as promised, add Rivers to the RICO case and timely file witness and expert witness disclosures

673.     Because, although Bowman filed the expert witness disclosure, he failed to file expert disclosures timely and only filed one expert witness; and decided to join Foster and Marsh in the CVLR case because he knew he could get John Wynne to settle for $100,000.00 in legal fees because Rivers had agreed on 9/9/13, that Bowman could dismiss the CVLR RICO case at his discretion. Bowman would have known that if

151

Rivers settled with John Wynne and the CVLR RICO case was dismissed with Foster and Marsh named in it, that the Federal case/investigation on John Wynne would implode and have to be closed because Rivers couldn't testify against Wynne.

674.    Bowman, after giving access to the Criminal Division of the IRS, Department of Justice, Agent Karen Deer, to files; agreed, with the U.S. State Attorney Timothy Heaphy, (after Wallis was threatened with Grand Jury) in April 2013 not to represent Marsh and Rivers and Wallis would probably agree not to pay legal fees. Rivers received no notice

675.    Bowman was impeding on the Department of Justice, Criminal Division of the IRS, U.S. State Attorney Office's, Federal investigation of John Wynne and they could report him to the Virginia State Bar and to the United States Army, Jag Dept. if Bowman continued to represent Rivers, CVLR Inc and Marsh and Foster and Wallis continued to pay legal fees for Rivers, CVLR Inc. and Marsh.

676.    Because Bowman was aware that Rivers, Foster and Marsh would be called as a witness in the Federal case investigation against John Wynne; he agreed for $100,000.00 in legal fees, with Wynne's attorney, to have Rivers agree, the day of settlement, to never testify against Wynne or help anyone or any agency indict Wynne.

677.    Rivers was named as a debtor in the Ch 13 bankruptcy case No. 11-60706 in the United States Bankruptcy Court for the Western District of Virginia.

**678.**    On July 21, 2011 Bowman emailed Rivers a copy of the Attorney Client Privilege Representation Agreement he had negotiated with Wallis and Nitti.  Rivers signed the Agreement agreeing to, among other things; to pay Bowman $200.00 per hr.

679.    Bowman agreed to (1) represent Rivers in her Chapter 13 Bankruptcy Case; (2) to obtain compensation for injury suffered by her as a result of the sale of real property to 1650 Partners LLC; (3) to obtain any injunctive or equitable relief to which the Client may be entitled as a consequence of the sale of the real property to 1650; (4) to obtain

152

any legal money damages and injunctive or equitable relief to which she may be entitled under the Memorandum of Understanding; (5) if practicable and pursuant to the consent of the Chapter 13 trustee, will file a plan of reorganization in the Chapter 13 case and seek to have the plan confirmed in Federal and State Court.

680.     Bowman on behalf of Wallis and Nitti, contacted the Assistant US Attorney Patrick Heaphy and made arrangements for an Investigator of the Department of Justice, Karen Deer to come to Bowman's office for over a week, to go through and collect files belonging to Rivers. Bowman did not notify Rivers of any subpoenas or requests to review, remove or collect her files

681.     The CVLR Inc. v Wynne et al RICO case was dismissed on April 2, 2012 and was reversed in March 2013 from the Supreme Court of Virginia to be presented for trial

682.     On April 2, 2013, Bowman emailed the Virginia State Bar, Assistant Ethics Counsel, Barbara Balogh Saunders, regarding brokering legal fees and third party payees. Bowman was advised to advise Rivers, the client, regarding the impropriety of the contract and whether there is any way out of it, again to the extent that this is "unconscionable."

683.     On April 2, 2013 Bowman wrote a letter, on behalf of NMG, to US State Attorney, Timothy Heaphy agreeing to terminate his representation of Rivers and Marsh and he thought NMG would be happy to terminate its contracts with them and he wanted to know why Heaphy wanted Wallis to attend a Grand Jury hearing.

684.     On April 17, 2013, Bowman agreed to meet with Assistant US Attorney, Patrick Hogeboom on May 5, 2013 10:30 on behalf of NMG, without notifying Rivers or CVLR Inc.

685.     On September 5, 2013, Rivers received a letter from Bowman indicating that Wallis/NMG owed him $25,000.00 and he wasn't getting paid and he could not proceed and would withdraw or dismiss the RICO case; if he wasn't getting paid. Rivers emailed

153

Bowman to remind him that CVLR was not aware that the legal fees of over $25,000 were owed and CVLR has never had privy to any billing or statements whatsoever.

686.     Rivers also stated, "CVLR remains under contract with Bill Wallis and will honor the contract until such time as they choose to vacate or resend the contract. They will have to choose which case to pursue next."

687.     On September 9, 2013, Bowman, with less than a days notice to Rivers, prepared a new set of agreements (as per NMG instructions) between Bowman, NMG, Rivers and CVLR Inc. and instructed Rivers to meet him at a gas station on Hwy 460 in Bedford County to sign them. The two met for less than 10 minutes

688.     As a direct and proximate result of the conduct of the Defendant Gary M Bowman, including his unethical, negligent conduct of the affairs and investment in Rivers cases, Rivers was injured in her business and property and continues to suffer injuries, including the amount of her investment and legal expenses to defend this action.

689.     On November 3, 2014; Bowman contended in his Answer to the Riv*Virginia State Bar complaint, In Re: *Before the Disciplinary Board of the Virginia State Bar in the matter of Gary Michael Bowman* Case No: CL-15002307, (VSB Docket No 12-080-092249), that the conflict of interest had been waived in writing by the necessary parties.

690.     Rivers alleges that any waiver in writing between Bowman and Rivers is null and void because the writing "contract" was fraud induced by the author of the contract "Bowman" and intentionally added in the contract to protect Bowman from claims Rivers would have after learning the facts and truth that both Bowman, Wallis and NMG kept from her

691.     Rivers was not aligned with NMG or Wallis on May 5, 2014.

692.     The conflict of interest between the parties is not waivable in this matter before the court.

154

693.    Bowman at all times relevant, was licensed to practice law in the Commonwealth of Virginia since October 14, 1988

694.    On June 5, 2012, the United States Bankruptcy Court for the Eastern District of Virginia entered an order imposing sanctions against Bowman. The order was entered as a result of Bowman's involvement in two cases, In Re: _Dickson Properties, LLC, Case,_ No 11-18617-BFK_and In Re: _Providence Hall Associates, LLC,_ Case No 11-11656-BFK

695.    Among its findings, the US Bankruptcy Court found that Bowman (a) disobeyed orders of the Court by continuing to file pleadings and make appearance after his application to be counsel for Providence Hall, (b) disobeyed standing rules of the Rules of Bankruptcy Procedure, (c) Filed pleadings with the Court that did not have proper evidentiary support for them, (d) filed pleadings for an improper purpose, (e) engaged in conduct that created a concurrent conflict of interest; or alternatively his employment had been terminated when the Court denied his application for reemployment created a conflict of interest with a former client; (f) filed pleadings with the Court that did not have proper evidentiary support for them, and (g) failed to make adequate disclosures to the Court by failing to file applications and verified statements as required by the Rules of Bankruptcy

696.    Rivers alleges there is clear and convincing evidence that Bowman's professional independence was compromised.

697.    Rivers asks the Court to reach the conclusion that the CVLR Inc. RICO Racketeering Case was winnable and legally justifiable, and the case proceeded in settlement through fraud on the this Court, because Wallis was present and Bowman lied to Honorable Magistrate Judge Robert Ballou, and because Bowman and Wallis defrauded this Court the correct outcome would have been that the case remained

stopped and improper to proceed by Order of the Court and Rivers would have had legal remedy without Bowman as counsel and Wynne would have been indicted.

698.     On May 20, 2015, In the _Disciplinary Board of the Virginia State Bar, matter of Gary Michael Bowman,_ Case No CL-15002307, (VSB Docket No. 12-080-092249); The Three-Judge Circuit Court, consisting of the Honorable Colin R Gibb, Judge of the Twenty-seven Judicial Circuit, and the Honorable Charles J Strauss, Retired Judge of the Twenty-second Judicial Circuit Ordered that Bowman receive a Public Admonition. The Agreed Disposition Memorandum Order stated in paragraph #21 "

> "The issue in this matter is the unique legal issue of whether the conflict of interest was waivable under these circumstances. Neither counsel for the Bar nor the Respondent is aware of any controlling case law that bears on this question. The Respondent recognized that, if the court rules that the conflict was not waivable, then the Bar has sufficient evidence to meet its burden of proving the Misconduct alleged as set forth in this Agreed Disposition by clear and convincing evidence if this case were to go to trial."

699.     Bowman did not appeal the Three-Judge Circuit Court decision

700.     Rives asks the Court to reach the conclusion that such conduct as described above and in this Complaint by Bowman constitutes misconduct in violation of the following provisions of the Rules of Professional Conduct: A. Rule 1.1, Rule 1.7 (a)(b), Rule 1.9 (a), Rule 1.16 (a) (1), Rule 3.1, Rule 8.4 (a) and;

701.     Find that the conflict between the parties was not waivable.

702.     Rivers asks the Court to reach the conclusion that the CVLR Inc. RICO Racketeering Case was winnable and legally justifiable, and the case proceeded in settlement through fraud on the this Court, because Wallis was present and Bowman lied to Honorable Magistrate Judge Robert Ballou, and because Bowman and Wallis defrauded this Court the correct outcome would have been that the case remained stopped and improper to proceed by Order of the Court and Rivers would have had legal remedy without Bowman as counsel and Wynne would have been indicted.

703.    Award damages in favor of the Rivers and against Bowman in the amount to be

proved at trial but no less than compensatory damages for the loss of the value of the

Rivers contractual rights in the case

## COUNT TWENTY THREE – DEFAMATION OF CHARACTER §18.2-417

704.    Rivers restates, re alleges and re pleads the allegations contained in the above

paragraphs in this Complaint

**705.**    On May 5, 2018; Rivers discovered, through "new discovery evidence", an

egregious, demoralizing, defaming email circulated from Wallace to her associates at LU

defaming Rivers character in 2009 at the start of school term.

706.    Rivers alleges the defamation of character and slander acts committed by

Wallace caused the "domino effect", essentially the collapse of Rivers equestrian

subdivision project and business, coaching career, and caused the emotional suffering

that Rivers has endured since the loss of her equestrian center.  If Wallace had not

defamed Rivers and begun a campaign to replace Rivers as the equestrian coach for LU

and keep LU at Rivers and continue to use the riding center, (1) Rivers name and

contact information attached to her farm name, would not have been removed from the

LU website, causing Rivers loss of income and future income, since 2009  (2) LU would

not have began interviewing other coaches i.e. Matt Arrigon, to replace Rivers (3)

Arrigon and his girlfriend, Ashley Lovegrove would not have formed Ashmont Stables

LLC to own and operate Rivers riding center, (4) Wynne would not have began

searching for another victim to purchase Rivers' riding center, livestock, show horses,

tack, farm equipment, show horse  trailers, show truck, outdoor arena panels, judges

stands, etc. to Ashmont Stables. And (5) LU would not have negotiated with Wynne to

remove Rivers  and market Rivers riding center using Rivers insurance policy coverage,

show horses, tack, outdoor arena panels, judges stands, farm equipment, show horse

Case 6:18-cv-00061-EKD   Document 4   Filed 06/15/18   Page 157 of 166   Pageid#: 332

trailers, etc, and among other things. And (6) Rivers would not have lost her boarding

contracts, (7) Rivers would not have had to form the Serene Creek Run Travel Team for

the LU team riders to continue to show until they graduated, (8) LU would not have

ousted Rivers and the equestrian club sport, (7) Rivers and her businesses would not

have filed for bankruptcy to put a stay on the riding center property, (8) LU would not

have refused Rivers her employment and coaching file, and (9) Rivers would not have

lost her Small Business Loan to refinance her loans to payoff the riding center.

707.     Rivers alleges that the email and the defamatory statements made in writing and

any furtherance of the defamation by Wallace; systematically caused injury to Rivers and

her business.  As a result of Wallace's acts; (a) LU breached Rivers and her businesses

contract as the LU equestrian coach for three years with perks, (b) and cancelled the

equestrian club sport "the equestrian team", (c) and LU has not paid Rivers stipend, as

promised, as per the LU standard for coaching staff,  (d) caused LU to block Rivers from

acquiring her emails from the LU email account she had been assigned and used in her

normal course of business on the website to recruit students and market Rivers

equestrian subdivision project and business, (d) caused LU employees not to provide

Rivers with her file when she asked for it over the years, and (e) caused LU make false

statements about and falsely advertise a LU equestrian club sport and Rivers facility,

Rivers horses, Rivers as a coach, and all that Rivers offered to students and the public.

By using Rivers assigned email account and her information; LU made a substantial

profit from recruited students that specifically requested and desired and had interest in

the LU equestrian club sport,  Rivers, and/or her facility and all that Rivers offered to

them and the public.

708.     LU is responsible to pay Rivers an amount equal to no less than profit earned

from each LU student that registered and paid a fee to attend LU because, among other

things; (1) LU offered a equestrian club sport and/or, (2) because LU had access to

158

Rivers facility, horses and Rivers as a instructor, between April 2010 and December 2015, more or less

**709.** Between May 1 and July 7, 2009, Rivers spoke with Jerry Falwell Jr. and began negotiating an agreement whereby LU would provide for the donation of her time and the 18.35 acre equestrian facility, located at 1024 Riley Run Rd, Forest Virginia. Rivers agreed to a) coach the LU equestrian team if the riders paid the necessary expenses and LU paid a reduced rate of $2000.00 in expenses instead of $8000.00 – 10,000.00 monthly for a. the use of the house barn and arena, b) professional instructor to host travel team, c) professionally trained show horses, d) NMG and instruction for travel team, e. student living quarters for travel team and visiting parents. Rivers explained to Falwell that after 2009 no more colleges would be accepted in their local IHSA region and they would have to host a show in their second year.

710. On June 22, 2009; Rivers contacted Lee Beaumont, head of LU Auxiliary Services, agreeing to volunteer her time and facility if the team riders paid the required expenses because he could not get LU to agree to the $2000.00 per month rental. Each student would get a $650.00 package deal (worth over $1250.00) for lessons on Wednesday nights, unlimited practice during the weekdays, coaching at competitions May – November, their horses boarded or leasing a horse from Serene Creek and travel expenses not including mileage.

711. On June 25, 2009; Beaumont emailed Rivers attorney, Mark Donevant and negotiated with him that if they (LU) could get something crafted that reflected Rivers offer, LU would make Serene Creek the official LU Equestrian facility and make it an official club sport.

712. On June 26, 2009; Rivers attorney, Donevant emailed Beaumont and negotiated with him that:

159

"Serene Creek Run Holding Company Inc was prepared to engage in an agreement with Liberty that would provide for the donation of Ms. River's time and facility to Liberty if the girls are paying the necessary expenses. The previous proposal holds firm, with exception to the monthly expenses paid by the school. Liberty would have NO obligation to contribute any money. We would ask in return that the club be marketed to your student body as are other clubs and organizations. You are free to publicize Serene Creek as the exclusive equestrian facility for LU. I am happy to draft a written agreement, memorandum of understanding, or any other formal document to memorialize the deal."

**713.**     On July 7, 2009; Rivers and LU entered into a Memorandum of Understanding

for three years attached in this complaint as

714.     On July 21, 2009; Rivers provided LU with Serene Creek Run Riding Center

logos and materials to be used for marketing on LU's website and signage as agreed to

between the parties. Rivers was offered the standard coach's stipend of $1000 per year

and signed the Club Sports Handbook Agreement, Background and Reference

Investigation authorization and release for employment purposes form *HRO 02/02/07,*

Club Sport Coaching Agreement. Rivers also agreed to abide by the *LU Employee*

*Handbook* and the policies set forth by LU. Rivers added LU to CVLR Inc. equestrian

insurance policy as an additional insured at no charge to LU. Rivers abided by and

operated by the terms of the contract and her agreement with LU until LU breached the

contract and terms.

715.     On July 27, 2009; Lee Beaumont emailed a copy of Rivers and Serene Creek

Run Holding Company Inc. FINAL contract with LU to Laura Wallace for review.

716.     On July 28, 2009; LU was added as an additional insured on CVLR Inc.

$1,000,000.00 certificate of liability insurance policy with Travelers

717.     On August 3, 2009 at 11:22 AM; Laura Wallace emailed Grace Renee Bailey

including attachments; court.docx to intentionally launch a smear campaign against

Rivers defaming her character personally and professionally as successful business

owner, horse trainer, riding instructor and LU's equestrian coach. Laura's defamatory

email stated, among other things:

"I wrote several days ago to voice my concern about Liberty's Equestrian Team...I now saw that it is confirmed on your website. I cannot believe you would have hired someone without a background check. Ms. Rivers has a long history of legal problems. She almost always wears sunglasses in any photo posted of her..I've noticed this for quite awhile. I've been told there are outstanding warrants on her from other states but I do not personally know it this is true. Attached is a screenshot from Virginia's Court case website—she is currently facing eviction for non-payment of rent on Serene Creek Run. The guy who owns it takes her to court constantly. Look it up for yourself...it's all available to the public. Check Bedford County, Lynchburg City, Campbell County, Rockbridge...active and inactive records..you will see what has been going on with her in the court system the last several years in this area. I cannot believe Liberty would hire someone with this sort of reputation. Please please please do yourself a favor in check into her background, and start asking the other equine professionals about Crystal Rivers. You are setting yourself up for a major embarrassment and you will most definitely remember this letter. Crystal is a major con artist and will say anything about herself. She does NOT have the qualifications to teach riding on a college level. I might be willing to talk to you about it in person if you will answer this letter. Crystal Rivers has done nothing to me personally, but I have observed a lot of what she has one to others.

A very concerned person who loves horses and wants Liberty to NOT get off on the wrong foot with their first equestrian team."

718.     On August 13, 2009; Rivers background and reference investigation was

approved and initialed by "han", I, C, B, "nsopr", and per Todd

719.     On September 8-9, 2009; Rivers began negotiating with Liberty Christian

Academy Superintendant, Todd Campo, LCA's proposed IEA team for middle and high

school students'. Rivers provided SCRHC mission statement and objectives.

720.     On September 10, 2009; Campo's email suggested:

"They (LCA) use similar thoughts as expressed in paragraph 1 in your contract with LU, that is, *Liberty (LCA) agrees to market, publicize, support (though not financially) and use Serene Creek Run Riding Center as their exclusive equestrian facility.* We can promote your services immediately, but you would have to facilitate any financial dealings. As I mentioned, if you submit a budget proposal by, let's say, January, it will be considered for 2010-2011. I was thinking that if you made an informational flier, we can send it home, put it on our website and include it in our newsletters, etc."

721.     On May 26, 2010; LU edited their equestrian club sport website, removing Rivers

serenecreekrun@aol.com email changing it to equestrian@liberty.edu. All Serene Creek

Run Riding Center equestrian and travel team ads and phone numbers were removed

from the student activities splash page without Rivers knowledge or notice whatsoever.

161

The marketing was part of the contract agreement and valued an amount equal to or greater than $650 a month per stall for 16 stalls, up to 32 - 50 students lessons at $260 or more per month, up to 12 horses leased at $350 - $500 per month, birthday parties, special events, facility rental at $500 per day, hay sales at $7 per bale, horse sales of $5000 - $25,000 per horse, cliniques, hauling, etc which could generate income through Rivers lifetime and the lifetime of her children or estate..

722.     LU continued, until June 16, 2010 to advertise Serene Creek Run Riding Center, its logo, hours of operation, Facebook page, historical and area information and the riding center program information on the new website (lessons, boarding, practice, indoor arena, riding instructions, etc) without Rivers permission, intentionally to generate and recruit new students all the while knowing they had breached the contract with Rivers and did not have a facility or a equestrian team to offer as they were advertising.

723.     On April 7, 2010; LU wrote a letter to Rivers terminating her coaching services and the Memorandum of Understanding between them, thanking her for her efforts and informing her that LU no longer wanted to have a equestrian club sports team. The team riders and other students were already under contract with Rivers and CVLR Inc. for the upcoming IHSA season.

724.     On June 16, 2010; Rivers learned of LU's false advertising and contacted her attorney, Donevant to notify him of LU's recruiting, marketing and false advertising fraud campaign. LU removed Serene Creek Run Riding Center and Rivers bio and riding program information from the equestrian@liberty.edu website and replaced the Serene Creek Run logo with a different equestrian style logo.

725.     Between April 7, 2010 and 2012; LU continued to dupe the public and unsuspecting families and students that the university offered and had an equestrian club sport "team".

162

726. Even as late as June 8, 2010 ; LU while continuing to recruit students and advertise that they had an equestrian team; directed offers of .donated horses to Mr. Nelson in the gifts department when people called to inquire about the equestrian team

727. On November 29, 2010; LU advertised in its *libertyCHAMPION,* in an article written by Jonathan Parker published November 17, 2010, *Growing up: university prepares for campus renovations,* that Liberty plans to provide equestrian services on a 67-acre farm it recently purchased, which adjoins Liberty (Candler's) Mountain and the university's 60-mile trail system.

728. As a result of Wallace's August 3, 2009 defamation emailed statement, discovered by Rivers on May 5, 2018, and LU's April 7, 2010 ousting of Rivers, her business and her contract on April 7, 2010 which resulted from the defamation of Wallace.  Rivers and her business have suffered from the loss of income from the three year contract between them trebled.

729. LU has never paid Rivers $1000 per year stipend they promised her for three years beginning July 2009.

730. Rivers has asked LU for her stipend and her HR files since 2010.

731. LU has falsely advertised 2012-2013 as being the first year of the LU equestrian club sports "team"

732. On May 5, 2018; LU provided Rivers with responses to her *subpoena duces tecum* directed to LU. The responses included the email from Laura, defaming Rivers character, dated August 3, 2009 along with other documents that have intentionally, been withheld from Rivers, who has asked for them since 2009 inquiring about her $1000 a year stipend, including a handwritten note and letter Rivers received from Steve Foster, Office of HR Employee Benefits in April 2011, stating:

"Ms. Rivers, I have searched my records and records of LU Human Resources and find nothing to produce in response to your subpoena duces tecum dated 3/30/11."

733.     On April 24, 2018; Lee Baumont emailed a response to a email he received from Laura admitting that Crystal did not get paid by the school despite being our 'coach'. A sticky note accompanied the document stating, "She was our coach, she never got paid."

734.     As a result of Laura Wallace's defamation, LU and Wallace caused Rivers loss of income from advertising on the LU website because they pulled Rivers name, phone and email information from the online website but continued to promote the LU equestrian club sport and Rivers equestrian facility to recruit new students.

735.     LU failed to inform students that LU had done away with the equestrian club sport and continued to take in new students whose sole purpose to come to LU was because they advertised that they offered a equestrian club sport.

736.     Wallace and LU caused Rivers and her businesses no less than 3 years loss of boarding, riding lessons, horse shows, instruction, hay sales, special events, horse training, breeding, facility rental, hauling, commercial mowing, income, and future contracts when they deleted her contact information from their internet website.

737.     Wallace and LU together, by their individual and combined acts caused torts of the distinctive *claims*.

738.     Rivers alleges the defamation of character and slander acts committed by Wallace caused the "domino effect", essentially the collapse of Rivers equestrian business, coaching career, and caused the emotional suffering that Rivers has endured since the loss of her equestrian center. If Wallace had not defamed Rivers and began a campaign to replace Rivers as the equestrian coach for LU and keep LU at Rivers riding center, (1) Rivers name and contact attached to her farm name and contact information, would not have been removed from the LU website, causing Rivers loss of income and future income, (2) LU would not have began interviewing other coaches i.e. Matt

164

Arrigon, to replace Rivers (3) Arrigon and his girlfriend, Ashley Lovegrove would not have formed Ashmont Stables LLC to own and operate Rivers riding center, (4) Wynne would not have began negotiations to sell the Rivers riding center and Rivers livestock, show horses, tack, farm equipment, show horse trailers, show truck, outdoor arena panels, judges stands, etc. to Ashmont Stables, (5) LU would not have negotiated with Wynne to remove Rivers and continue the contract with Wynne/Arrigon/Lovegrove/Ashmont Stables to continue using and marketing Rivers riding center using Rivers insurance policy coverage, show horses, tack, outdoor arena panels, judges stands, farm equipment, show horse trailers, etc, and among other things, (6) Rivers would not have lost her boarding contracts, (7) Rivers would not have had to form the Serene Creek Run Travel Team for the LU team riders to continue to show until they graduated, (8) LU would not have ousted Rivers and the equestrian club sport, (9) Rivers and her businesses would not have filed for bankruptcy to put a stay on the riding center property

739.     As a direct and proximate result of the negligence of LU, by and through Laura Wallace, while acting within the scope or office of their employment alleged in this complaint, Rivers and her business have suffered great pain of body and anguish of mind in that the defamatory statements led to the ousting of her position as LU's equestrian coach, which led to the loss of current and future contracts, and the loss of her stipend for three years.

740.     As a direct result and proximate result of the negligence of LU, by and through Laura Wallace, the 2009-2010 LU Equestrian Club Sports "Team" has not been recognized and honored since 2012-2013 as the "first", LU Equestrian Club Sports "team", and or as the riders of that team, and Rivers as the Coach.

## PUNITIVE DAMAGES

741.     The allegations of the above paragraphs are incorporated by reference as if fully

set forth herein.

742.     The actions of the Defendants described in this complaint were undertaken with

fraud, malice and oppression so as to entitle Rivers to punitive damages under

applicable law.

WHEREFORE, the Plaintiff requests a Three-Judge panel and demands judgment against
Defendants as follows:

A.  Damages in the amount of $**64,949,042.50**;

B.  Compensatory damages; and Punitive damages

C.  Treble damages and attorneys' fees where authorized;

D.  Injunctive relief; and such other further relief as the Court deems just

and proper.

**PLAINTIFF  DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Crystal VL Rivers, Pro Se
3831 Old Forest Rd, Suite 6
Lynchburg, VA  24501
434-818-2921
riversparalegalservices@gmail.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT ON JUNE 15, 2018
A TRUE AND CORRECT COPY OF THE FOREGOING
HAS BEEN FILED IN THE COURT

166

3831 OLD FOREST RD
LYNCHBURG VA 24501