IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE U.S. DIST. COUR
AT LYNCHBURG, VA
FILED

JUL 0 2 2019

JULIA C. DUDLEY, CLERK
BY: ~~Coleman~~
DEPUTY CLERK

CRYSTAL VL RIVERS

    Plaintiff

v.

UNITED STATES OF AMERICA
FEDERAL BUREAU OF INVESTIGATIONS
VIRGINIA STATE POLICE             Civil No **6:18-CV-061**
IRS - CRIMINAL DIVISION
BEDFORD COUNTY VIRGINIA
CITY OF LYNCHBURG VIRGINIA
ALBEMARLE COUNTY
KAREN DEER
MARYLOU PRILLIMAN
BILL TALBOTT
VIRGINIA STATE CORPORATION COMMISSION
STATE CORPORATION COMMISSION
BUREAU OF FINANCIAL INSTITUTIONS
E. JOSEPH FACE, JR, COMMISSIONER
BANK OF THE JAMES FINANCIAL GROUP INC.a/k/a BANK OF THE JAMES
ROBERT R. CHAPMAN III
SELECT BANK FINANCIAL CORP
SELECT BANK
ROBERT BEACH
J. MICHAEL THOMAS
OLD DOMINION NATIONAL BANK
MARK MERRILL
KELLY POTTER
BRANCH BANKING AND TRUST COMPANY OF VIRGINIA
UNION BANKSHARES CORPORATION, now ATLANTIC UNION BANKSHARES
UNION BANK AND TRUST, now ATLANTIC UNION BANK; *successor of and formerly
StellarOne Bank; formerly Planters Bank& Trust Company of Virginia*
ADVANTAGE TITLE AND CLOSING LLC
JENNIFER RICHARDSON
MATT FARISS
SHANA BECK LESTER
RALPH H BECK
S & R FARM LLC
BBOYZ LLC
SERENITY ACRES FARM LLC
LIBERTY UNIVERSITY INC
LAURA J. WALLACE
MARK LOFTIS, VSB #79538
PRESCOTT H. GAY, SR, VSB # 17727
SETH TWERY, VSB # 20031
LISA SCHENKEL, VSB #21521

SAMEER M PATEL, VSB#65811
SHERWOOD DAY, VSB #15128
FRANK W. MORRISON, VSB #07549
STEVEN R. GRANT, VSB #27178
SHERRI SACKETT
PETER C SACKETT
NORTHCREEK INC. NORTH CREEK CONSTRUCTION
DAVID EDMUNDSON
KELLY EDMUNDSON
SERENE CREEK RUN ASSOCIATION
TRAVIS BAKER
JENNIFER BAKER
MICHAEL FRIEDMAN
LOREN FRIEDMAN
RICHARD ROGERS
BETH ROGERS
MATTHEW KRYCINSKI
SARAH KRYCINSKI
MICHAEL BRADBURY
HOWARD FREAR
BARBARA FREAR
WILLIAM FLUKER
MICHELLE FLUKER
MARGIE CALLAHAN
TED COUNTS REALTY GROUP AND AUCTION CO INC

Defendants

## **AMENDED COMPLAINT**

COMES NOW, the Plaintiff, Crystal VL Rivers, Pro Se, "Rivers", and amends her complaint

to adhere to the Federal Rules of procedure and moreover the Courts June 27, 2019

memorandum opinion; [1]adding Defendants and new Counts and causes of action that relate to

---

[1] Rivers files her second amended complaint within ten days after entry of the Court's order and will effect service on the named defendants, paying particular attention to Rule 20(a)(2), which provides that persons may be joined in one action as defendants only if: "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). Thus, her second amended complaint should not name more than one defendant unless one claim against each additional defendant is transactionally related to the claim against the first defendant or seeks joint and several relief, and involves a common question of law or fact. See Keck v. Virginia, No. 3:10cv555, 2011 WL 2708357, at *2 (E.D. Va. July 12, 2011) (imposing same requirement on plaintiff). Additionally, and unlike her amended complaint, each separate count or claim in her second amended complaint shall identify clearly which defendants are being named in that particular count

the original complaint and remove causes of actions under the US Criminal Codes [2], adding

Defendants and removing Defendants pursuant to the Federal Rules of Civil Procedure and the

Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et. seq.,* and pursuant to the Racketeer Influenced

and Corrupt Organizations Act (RICO), 18 U.S.C § 1961 *et. seq.* and other Federal and State

laws, against the Defendants and moves this Court to hear this matter as a Complex Litigation

and enter judgment in her favor against the Defendants for the grounds stated in this complaint.

See *Pennhurst State Sch. V Halderman,* 465 U.S. 89 (1984), *and Great Northern Life Ins. Co v*

*Read,* 322 U.S. 47, 322 U.S. 59 (1944)

## I. JURISDICTION AND VENUE

1. Pursuant to 28 U.S.C. §1331 (federal subject matter jurisdiction), this Court has original

   jurisdiction over the subject matter of this case as all of part of the claims arise from the

   Defendant's violations including, *inter alia,* the Racketeer Influenced Corrupt

   Organizations Act (RICO), 18 U.S.C. §1961, *et. seq., See Poindexter v Greenhow,* 114

   U.S. 270, 290, 291 (1885), *See also Gibbons,* The Eleventh Amendment and State

   Sovereign Immunity: A Reinterpretation, 83 Colum. L. Rev. 1889 (1983)

2. At all times relevant to this complaint, each of the Defendants was and is a "person" as

   that term is defined in 18 U.S.C §1961 and used in 18 U.S.C §1962

3. This Court has supplemental jurisdiction over the subject matter of the claims asserted

   herein that arise under state law pursuant to 28 U.S.C. §1367 (supplemental jurisdiction)

   and the doctrines of pendent and ancillary jurisdiction, as the state law claims arise from

   a common nucleus of operative fact giving rise to the federal claims alleged in this case.

---

[2] The Court's 5/21/19 Order Granting Rivers Motion to Withdraw her Petition to proceed *in forma pauperis,* advised that some of her claims failed to state a claim upon which relief could not be granted. Many of Rivers counts in her amended complaint filed previously were being brought under Federal or State Criminal statutes, which do not generally provide a cause of action. *See Tribble v Reedy,* No 89-6781, 888 F 2d 1387 (4th Cir 1989) )explaining that a plaintiff cannot recover civil damages for an alleged violation of a criminal statute, including 18 USC §1341, absent a clear Congressional intent to provide a civil remedy); Rivers has not claimed an action of 18 USC §1341

4. The jurisdiction of this Court is founded upon 28 U.S.C §1367, as the Complaint states causes of action so related to claims in the action within the original jurisdiction of the Federal investigation and of this Court that they form part of the same case or controversy under Article III of the United States Constitution

5. The jurisdiction of this Court is founded upon 28 U.S.C. § 1346, as the Complaint states causes of action under the Federal Tort Claim Act 28 U.S.C §2671, *et seq.*

6. The amount in dispute exceeds $75,000, exclusive of interest and costs. This Court has subject matter jurisdiction over the case under Title 28 U.S.C §1332

7. Venue is proper in this district pursuant to 18 U.S.C §1965 and 28 U.S.C §1391 as one or more of the Defendants reside, are found, have agents, or transact their affairs within the jury division of this Court and conducted their fraudulent scheme, through use of the United States Mail or interstate wire communications in an illegal manner, from this District.

8. Venue is appropriate in this Court pursuant to § § 18.2-430 and 18.2-517 because all transactions occurred between Rivers, many victims and Defendant(s) in the State of Virginia

9. Venue is proper because a substantial part of the events or omissions giving rise to the claims of Rivers occurred in the Western District of Virginia Lynchburg and Roanoke Division under 28 U.S.C §1391

10. This case is also brought to recover damages under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.,* alleging that Rivers loss and damages were caused by the negligent or wrongful acts or omissions of certain employees and agents of the United States Government for violating "federal laws", while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to Rivers as an aggrieved party. The real party in interest in this case is not the state of Virginia.

11. The United States of America "USA" is a Defendant in this action pursuant the Federal Tort Claims Act, 28 U.S.C §2671 *et seq.* arising from the acts and/or omissions of employees and agents of the defendants, Federal Bureau of Investigation "FBI", United States of America USA., Criminal Division of the Internal Revenue Service "IRS", agencies of the Defendant, and a party Defendant for violating "federal laws" and claims arising from individual agents of the IRS that are named as Defendants for negligent and wrongful acts, or omissions and violating "federal laws" while acting within the scope of their office or employment by the VSP, or the IRS pursuant to 28 U.S.C §2671 *et seq.* The United States is to be served at the <u>Office of Inspector General, Daniel W. Lucas, at 717 14th St., 5th Floor, Washington DC 20005</u> and at the <u>Office of the US Attorney's office located at 310 First St, SW, Room 906, Roanoke VA 24011</u>

12. Crystal VL Rivers, "Rivers" is a resident and citizen of Bedford County, Virginia, Rivers is the owner of rights, and the owner & possessor of certain rights pursuant to assignment of rights from CVLR Performance Horses Inc, "CVLR Inc." (terminated December 2015) and Serene Creek Holding Co Inc. (terminated business) and CVLR Performance Horses d.b.a., "CVLR d/b/a" which is currently registered in Bedford County with offices located in Lynchburg, Virginia.

13. The Federal Bureau of Investigation, "FBI" is an agency statutorily empowered by the United States Congress, of the U.S. Government, to enforce and investigate certain alleged violations of the United States Criminal Code. The FBI is part of the U.S. Department of Justice headquartered at 935 Pennsylvania Avenue, NW, Washington DC 20535 and is to be served at the <u>Office of the Attorney General, Jeff Sessions at US Department of Justice, 950 Pennsylvania Ave, NW, Washington DC 20530-0001</u>

14. Virginia State Police, "VSP" is a State Police organization located in the State of Virginia with offices located throughout the State of Virginia. Virginia State Police is to

be served at the Offices of the Executive Officer and Superintendent, Gary T Settle, at 7700 Midlothian Turnpike, N. Chesterfield, VA 23235

15. Bill Talbott, "Talbott" is a Special Agent with the Virginia State Police located in Virginia with offices located in Salem and Campbell County. During all times alleged in this complaint, was acting within the scope of Special Agent and is being sued individually and in his official capacity. Talbott is to be served at the Virginia State Police- BCI Division Seven Headquarters, 4977 Alliance Dr, Fairfax VA 22030

16. Karen Deer, "Deer", is a Special Agent with the Criminal Division of the IRS located in Roanoke Virginia with offices located at 210 First St, #100, Roanoke VA 24011. During all times alleged in this complaint. Deer was acting within the scope of Special Agent and is being sued individually and in her official capacity. Deer is to be served at the Criminal Division of the IRS, 210 First St, #100, Roanoke VA 24011

17. MaryLou Prilliman, "Prilliman", is a Special Agent with the Criminal Division of the IRS located in Roanoke Virginia with offices located at Roanoke Virginia with offices located at 210 First St, Room 100, Roanoke VA 24011. During all times alleged in this complaint. Prilliman was acting within the scope of Special Agent and is being sued individually and in her official capacity. Prilliman is to be served at the Criminal Division of the IRS, 210 First St, Room 100, Roanoke VA 24011

18. The Virginia State Corporation Commission "SCC" is located at offices at 1300 E. Main St, Richmond, VA 23219 and is to be served at the Office of the Attorney General Mark Herring at 202 N. 9th St, Richmond VA 23219. The SCC was the economic base through which the illegal banking enterprise, "RBC and Rivermont Consultants Inc was registered and advertised as a Virginia State bank from April 2006 to July 2014.

19. E. Joseph Face, Jr., "Face" is a resident and citizen of Richmond, Virginia with primary offices at 1300 E. Main St, Richmond, VA 23219, and Commissioner of Financial Institutions-SCC at all relevant times. During all times alleged in this complaint, was

6

acting within the scope of Commissioner with the SCC as the economic base through
which Wynne's illegal banking enterprise, "RBC" was able to operate from April 2006 to
July 2014. Face negotiated the 2005-2006 agreement barring Wynne from the banking
industry and allowing Wynne to do 3 loans a year. Face is being sued individually and in
his official capacity, Face is to be served at the Office of General Counsel for the State
Corporation Commission at 1300 E. Main St, Richmond VA 23219 and at the Office of
the Attorney General, Mark Herring at 202 N. 9th St, Richmond VA 23219

20. Bedford County Virginia is located in the County Administration Building at 122 E Main
St, Bedford Virginia and is to be served at the Office of the Attorney General, Mark
Herring at 202 N. 9th St, Richmond VA 23219. Bedford County is the economic base
through which the illegal activity described in this complaint in depth has been able to
operate during all times relevant. The Counties Commonwealth Attorneys failed to
charge, indict or prosecute Wynne and the subjects of their investigation for criminal acts
against the State of Virginia, Rivers and her companies.

21. The City of Lynchburg Virginia is located in Lynchburg Virginia and is to be served at the
Office of the Attorney General Mark Herring at 202 N. 9th St. Richmond VA 23219. The
City of Lynchburg is the economic base through which the illegal activity described in
this complaint in depth has been able to operate during all times relevant. The City's
Commonwealth Attorneys failed to charge, indict or prosecute Wynne and the subjects
of their investigation for criminal acts against the State of Virginia, Rivers and her
companies.

22. Albemarle County is located in Charlottesville Virginia and is to be served at the Office
of the Attorney General Mark Herring at 202 N. 9th St. Richmond VA 23219. The
County of Albemarle is the economic base through which the illegal activity described in
this complaint in depth has been able to operate during all times relevant. The Counties
Commonwealth Attorneys failed to charge, indict or prosecute Wynne and the subjects

of their investigation for criminal acts against the State of Virginia, Rivers and her companies.

23. Shana Beck Lester, "Lester" is a resident of 2069 Everett Rd, Forest VA, Bedford County. Lester was managing member of S&R Farm LLC, is a trustee in liquidation of S&R, and member of Serenity Acres Farm LLC and B&B Ice Cream LLC. During all times alleged in this complaint, was acting within the scope of member of S&R, B&B and SAF, trustee and investor, operating the enterprise(s) through a pattern of racketeering activity. Lester is sued individually and in her official capacity as trustee in liquidation of S&R.

24. Lester was granted full use of certain property owned by S&R, at all relevant times and at the time of S&R dissolution and negotiated the contracts between Rivers' CVLR d/b/a and S&R, for the sale of remaining S&R property and certain lots located in the Serene Creek Run and Serenity Acres subdivisions.

25. S&R Farm LLC, "S&R", formerly a limited liability company organized and registered with the State of Virginia #S1064460, purged since December 31, 2008, last known address 5040 Cottontown Rd, Forest, VA 24551, Bedford County. At all times relevant S&R was acting within the scope of an enterprise and an economic base through which Lester, Beck, SAF, and BBoyz operated a pattern of racketeering activity. S&R will be served at 5040 Cottontown Rd, Forest VA·24551.

26. Serenity Acres Farm LLC, "SAF", is a limited liability company organized and registered with the State of Virginia, 2009 with a registered agent located at 1 Cedar Hill Court, #C, Bedford VA 24523. SAF acquired and sold property located within the Serene Creek Run and Serenity Acres Subdivisions currently under contract with Rivers' CVLR d/b/a. Presently and at all times relevant SAF was acting within the scope of an enterprise and an economic base through which Lester, Beck, S&R, and BBoyz operated a pattern of racketeering activity.

27. BBoyz Inc, "BBoyz", is a limited liability company registered with the State of Virginia with registered agent located at 1045 Cottontown Rd, Lynchburg VA 24503. BBoyz acquired and sold property located within the Serene Creek Run and Serenity Acres Subdivisions currently under contract with Rivers' CVLR d/b/a. Presently and at all times relevant BBoyz was acting within the scope of an enterprise and an economic base through which Lester, Beck, SAF, and S&R operated a pattern of racketeering activity. BBoyz will be served at 5040 Cottontown Rd, Forest VA 24551

28. Ralph Beck "Beck" is a resident of 5040 Cottontown Rd, Forest VA, 24551 Bedford County, and was a member of S&R Farms and by Order of the City of Lynchburg was granted full use of the raw land at all relevant times and at the time of S&R dissolution. Beck is sued individually and in his official capacity as trustee in liquidation of S&R

29. Beck negotiated the contracts between Rivers' CVLR d/b/a and S&R, for the sale of the remaining S&R land located in the Serene Creek Run and Serenity Acres subdivisions. During all times alleged in this complaint, was acting within the scope of member and trustee in liquidation of S&R, B&B and BBoyz. Presently and at all times relevant Beck was acting within the scope of an enterprise operating a pattern of racketeering activity.

30. Serene Creek Run Association "HOA" is a HOA with their registered agent located at 925 Main St., Lynchburg VA 24504 was gifted 7.75 acres with pond, club house and swimming pool located within the Serene Creek Run and Serenity Acres Subdivisions currently under contract with Rivers' CVLR d/b/a

31. Peter C Sackett, "Sackett" is a residence of Lynchburg Virginia. Sackett will be served at his residence located at 5058 Boonsboro Rd, Lynchburg VA 24503

32. Sherri A Sackett is a residence of Lynchburg Virginia. She will be served at her residence located at 5058 Boonsboro Rd, Lynchburg VA 24503

33. Seth Twery "Twery" is a resident of Lynchburg VA and a attorney licensed in the State of Virginia with offices located at 715 Court St, Lynchburg VA 24504. Twery is sued

9

individually and in his official capacity. Twery was acting within the scope of an enterprise conspiring with the Defendants, in a pattern of racketeering activity intentionally to get paid for his services as a closing attorney, registered agent and owner of interest.

34. Sherwood Day "Day" is a resident of Lynchburg VA and an attorney licensed in the State of VA with offices at 1047 Vista Park #D, Forest VA 24551.

35. Old Dominion National Bank, "ODNB" is a national bank located 4916 Plank Rd, North Garden Virginia, 22959.

36. Mark Merrill, "Merrill", is a resident of the State of Virginia and the President of ODNB with offices located at 4916 Plank Rd, North Garden Virginia, 22959 and registered with the Office of the Comptroller of Currency.

37. Kelly Potter, "Potter" is a resident and citizen of Albemarle County Virginia and an officer and shareholder of ODNB with offices at 4916 Plank Rd, Building D4, North Garden VA 22959. Potter is sued individually and in her official capacity

38. Ted Counts Realty & Auction Co. Inc. *formerly* Counts Realty Group (Lynchburg Cl), and Auction Co, Inc, "Counts" is a business located at 828 Main St, 15th Floor, Lynchburg VA, registered with the State of Virginia #02150522

39. Advantage Title & Closing Company, LLC, "ATC" is a Virginia Limited Liability company with its principal place of business at 828 Main St, 15th Floor, Lynchburg, VA 24504. ATC is operated and owned by Richardson and Fariss.

40. Matt Fariss, "Fariss" is a resident of Campbell County Virginia with offices at 828 Main St, 15th Floor, Lynchburg VA 24504 and member of ATCC. Fariss is sued individually and in his official capacity

41. Jennifer Richardson, "Richardson" is a resident and citizen of the City of Lynchburg, Virginia with primary offices at 828 Main St, 15th Floor, Lynchburg, VA, member of

ATCC, and CTI, a licensed notary, insurance and title agent licensed in the State of Virginia. Richardson is being sued individually and in her official capacity.

42. Ronald Thomas Beach, "Beach", is a resident located at 2710 Goode Station Rd, Goode VA 24523 Bedford County with an investment interest in Select, SBFC and BMTW Holdings LLC, #S0449712 (since 12/30/99 and now known as Winton Investments, LLC, a/k/a Winton Group). The LLC was formed for Beach and his family member and trust in 1999 to acquire voting shares of Community First Bank. The members of the LLC were Beach, Mason, Thomas and Wynne.

43. Walter G Mason, "Mason", is a resident of the State of Virginia and was a manager and member of 1650 Partners LLC and is an officer/ shareholder of SBFC and Select Bank with offices located at 211 Gristmill Dr, Forest VA 24551. Mason is sued individually and in his official capacity

44. James Michael Thomas, "Thomas", is a resident of the State of Virginia with a member interest in 1650 Partners LLC and officer/shareholder of Select Bank Financial Corp and Select Bank with offices 211 Gristmill Dr, Forest VA 24551. Thomas is sued individually and in his official capacity

45. Margie Callahan, "Callahan", is a resident and citizen of Lynchburg, Virginia with offices located at 18396C Forest Rd, Forest VA 24551. During all times alleged in this complaint, Callahan was acting within the scope of agent of State Farm Mutual Automobile Insurance Company. Callahan is sued individually and in her official capacity.

46. Lisa Schenkel, "Schenkel" is a resident and citizen of the City of Lynchburg, Virginia with offices located at 1602 Graves Mill Rd, Lynchburg VA 24502. Schenkel is former counsel for Ralph Beck, licensed to practice law in the State of Virginia during at all relevant times relevant with Schenkel and Donaldson, PC.

47. Frank Morrison, "Morrison", is a resident and citizen of the City of Lynchburg, Virginia, with offices located at 828 Main St, Suite 1403, Lynchburg VA 24504. Morrison was counsel for Lester and licensed to practice law in the State of Virginia.

**48.** Steve Grant, "Grant", is a resident of the State of Virginia with offices located at 1 Cedar Hill Ct, Bedford VA 24523 and licensed to practice law in the State of Virginia at all relevant times.

49. Mark Loftis, "Loftis", is a resident of the State of Virginia with offices located at 1 Cedar Hill Ct, Bedford VA 24523 and licensed to practice law in the State of Virginia at all relevant times.

50. Prescott H Gay, "Gay", is a resident of the State of Virginia with offices located at 1045 Cottontown Rd, Lynchburg VA 24503 and licensed to practice law in the State of Virginia at all relevant times.

51. Liberty University Inc, "LU", is a Christian University registered Sameer M Patel, "Patel", is a resident of the State of Virginia with offices located at 5200 Fort Avenue, Lynchburg VA 24502 and licensed to practice law in the State of Virginia at all relevant times.

52. Liberty University Inc, "LU", is a Christian University registered with the State of Virginia with offices and registered agent, David M Corry, located at 1971 University Blvd, Lynchburg VA, 24515, Lynchburg City.

**53.** North Creek Inc., *aka North Creek Construction,* "Northcreek", is a Virginia corporation, terminated with the State Corporation in 2014 with offices and registered agent, David Edmundson, formerly located at 104 Paddock Lane, Forest VA 24551, Bedford County. Northcreek is to be served at 595 Legacy Lakes Way, Aberdeen NC, 28315.

54. David E. Edmundson, "Edmundson", is a resident of the State of North Carolina and was a resident of Bedford County Virgini595 Legacy Lakes Way, Aberdeen NC 28315 and is being served personally and in his official capacity as officer of Northcreek

55. Kelly Edmundson, "Mrs. Edmundson", is a resident of the State of North Carolina and was a resident of Bedford County Virginia and is being served personally and in her official capacity as officer of Northcreek

56. Laura J Wallace, "Wallace", is a resident of the State of Virginia and Executive Vice President of HR at Liberty University with offices located at 1971 University Blvd, Lynchburg VA 24502. During all times alleged in this complaint, was acting within the scope of head of human resources for LU and is being sued individually and in her official capacity

57. Travis Baker, "Baker" is a resident of 1299 Riley Run Rd, Forest VA 24551, Bedford County and recorded owner and negotiated the sale of Lot 3 located within the Serene Creek Run subdivision

58. Michael Friedman, "Friedman" is a resident of 1409 Riley Run Rd, Forest VA, 24551, Bedford County and recorded owner and negotiated the sale of Lot 6 located within the Serene Creek Run subdivision

59. Richard Rogers, "Rodgers" is a resident of 1475 Riley Run Rd, Forest VA 24551, Bedford County and recorded owner and negotiated the sale of Lot 8 located within the Serene Creek Run subdivision.

60. Matthew Krycinski , "Krycinski",  is a resident of 1652 Riley Run Rd, Forest VA, 24551, Bedford County, and recorded owner and negotiated the sale of Lots 16 located within the Serene Creek Run subdivision, and Lots H & I located in the Serenity Acres Farm subdivision

61. Sarah Krycinski is a resident of 1652 Riley Run Rd, Forest VA 24551, Bedford County and recorded owner and negotiated the sale of Lot 16 located within the Serene Creek Run subdivision and Lot H&I located in the Serenity Acres Farm subdivision.

62. Michael Bradbury, "Bradbury" is a resident of 1648 Riley Run Rd, Forest VA 24551, Bedford County and recorded owner and negotiated the sale of Lot 18 located within the Serene Creek Run subdivision.

63. Howard Frear, "Frear" is a resident of 1234 Riley Run Rd, Forest VA 24551, Bedford County and recorded owner and negotiated the sale of Lot 33 located within the Serene Creek Run subdivision.

64. William Fluker, "Fluker" is a resident of 1140 Riley Run Rd, Forest VA 24551 and recorded owner and negotiated the sale of Lot 34 located within the Serene Creek Run subdivision.

65. Bank of the James Financial Group Inc a/k/a Bank of the James, "BOJ" is a bank doing business in the State of Virginia with registered agent offices located at 828 Main St, 19th Floor, Lynchburg VA 24504.

66. Robert R Chapman III, "Chapman" is a resident of Lynchburg Virginia and President of BOJ with offices located at 828 Main St, Lynchburg VA 24504 Bank of the James Building. Chapman. During all times alleged in this complaint, was acting within the scope of officer and is being sued individually and in his official capacity

67. Select Bank Financial Corporation, "SBFC" is a corporation doing business in the State of Virginia with offices located at 211 Gristmill Dr, Forest VA 24551 Bedford County. Select Bank Articles of Restatement were executed with the SCC on March 22, 2007. Select Bank Articles were restated on July 6, 2006

68. Select Bank "Select" is a bank doing business in the State of Virginia with offices located at 211 Gristmill Dr, Forest VA 24551 Bedford County.

69. Union Bankshares Corporation "UBC", now Atlantic Union Bank; formerly StellarOne, formerly Planters Bank and Trust, is a corporation doing business in the State of Virginia with registered agent offices located at 1051 E. Cary St, Suite 1200, Richmond VA 23219 and registered agent, Rachel Lape, located at the same address

70. Union Bank & Trust, "Union", now Atlantic Union Bank; formerly StellarOne, formerly Planters Bank and Trust, is a bank doing business in the State of Virginia with offices located at 1051 E. Cary St, Suite 1200, Richmond VA 23219 and registered agent, Janis Orfe, located at the same address

### III. NOTICES OF LEGAL ACTION

71. On June 16, 2017, October 18, 2017 and January 8, 2018, Rivers duly presented Petition and Reports, Notice of Claims and Final Notices of Tort Claims, pursuant to the Federal Tort Claims Act, 28 U.S.C § 2671, _et seq.,_ and 28 C.F.R. §14.1, _et seq.,_ giving notice of among other things, criminal matters complained of, reported, investigated, proved but intentionally not charged, concerning torts, parties to the crime, obtaining money by fraud, forgery/altering documents, conspiracy, fraudulent conveyance, gross negligence of employees and agents, using Rivers and other victims documents and evidence not for what they intended, but for embezzlement, pain and suffering, and letters acknowledging the receipt of the notices; which were caused by the negligent and wrongful acts or omissions of certain employees of the United States Government while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to Rivers in accordance with the federal laws and the laws of the Commonwealth of Virginia.

72. On February 8, 2016; duly presented her complaint and prayers for relief to the Virginia General Assembly Members and Speaker of the House and copies to the Richmond – FBI, Face and SCC, to consider the complaint and the Resolutions requesting the resignation of former Delegate Scott Garrett, and Commissioner Face, as true and proper for the residents of the State of Virginia and the victims of the financial crimes and asked that they commence an investigation on Commissioner Face and Executive VBA/VP T. Rann Payanter and any agency or party's actions and activities, adjudicate

any violations of ethics rules or laws, and render any other such relief that the Virginia General Assembly Members or the Speaker of the House deemed just and equitable. The complaint was forwarded to the House Ethics Advisory Panel by Christopher Piper, Executive Director of Virginia Conflict of Interest and Ethics Advisory Council

73. Rivers notified and reported her findings as she learned them to the FBI, the US Attorney Office, Advocate Mr. Smith, Senator Tim Kaine and the Department of Justice.

74. Rivers has notified all parties of interest and counsel if represented at the time, of any Demand Notices, Lis Pendens and Notices relating to the property described in this action.

## IV. LEGAL OVERVIEW / HISTORY

75. A federal investigation of Wynne was ongoing beginning so later than December 2010 and March 2014.

76. Between 2007 and present, the FBI failed to conduct, with flexibility, under appropriate standards and procedures, investigations to detect, obtain information about, interrupt, and prevent, and protect Rivers, her business' and other known victims and unknown victims, against federal crimes being committed and those crimes to be committed in the future, by John L "Wynne", Rivermont Banking Company Inc. "RBC", Rivermont Consultants Inc, 1650 Partners LLC "1650", Southgate Leigh Wynne Testamentary Trust "SGLWT", and the federal crimes committed by the Defendants named in this complaint

77. October 1, 2007 was the offense date for Case No 10-86-02-1050 against Wynne for Obtaining Money Under False Pretense. It is alleged that there were over 12 victims injured by Wynne at all times relevant to this matter

78. On December 28, 2010; Rivers and Special Agent Vaughn met with Bedford County Commonwealth Attorney Mark Robinette to discuss matters relating to the acts against Rivers by Wynne and reviewed Rivers documents and research evidence she had

uncovered. Bedford County Commonwealth Attorney Mark Robinette reported that the charges against Wynne were either Federal or civil in nature and he could not pursue the charges in criminal court. The report of this interview was transcribed on 2/3/11 (the day before grand jury) as file #10-86-02-1050-13; indicating 13 files of case no 10-86-02-1050 since offense date against Wynne as subject on October 1, 2007

79. Between December 18, 2010 and January 7, 2011; Rivers and an associate met with the City of Lynchburg Investigator Eugene Wingfield (now Clerk of the Court for City of Lynchburg) and reported her concerns she had about Wynne, RBC and 1650. Rivers was told that;

> "That Wynne was a "washer" and they have been trying to get him for a while but 'they' can't catch him because he stays right under the radar. There wasn't a Judge or Attorney in the State that would take her case. The only way to get Wynne would be to file a case in Federal Court."

80. Rivers provided Wingfield with her documents for review at the meeting and he changed his mind about her case. Wingfield sent Rivers to the office of the FBI agent Christine PettyJohn in the City of Lynchburg. Agent PettyJohn provided Rivers with a business card for Special Agent MaryLou Prilliman of the Department of Justice IRS Division. Rivers and victim Karen Foster made arrangements and met with Special Agent, Defendant Prilliman and provided the Department of Justice IRS Division with the same box of evidence Rivers provided to Bedford County Commonwealth Attorney Mark Robinette and Wingfield to be used to indict Wynne and those involved in obtaining their money under false pretense, the insurance fraud and illegal banking activity. Both women signed papers agreeing that they left their documents and evidence with Prilliman to copy and review. At all times relevant to this matter, Rivers and other victims were told Wynne was being indicted

81. On January 7, 2011; Rivers and Foster obtained their original evidence and documents from Prilliman and each continued to have an ongoing relationship with Prilliman and the Department providing new evidence and facts in real time as they received and lived it

82. On February 1, 2011; Rivers was interviewed by Virginia State Police Special Agent

James Vaughn regarding her reports to the City of Lynchburg Commonwealth Attorney's

investigator Eugene Wingfield, the FBI, and the Bedford County Commonwealth

Attorney Mark Robinette about mortgage and insurance fraud and acts committed

against her and others by Wynne. Rivers continued to have a relationship with those

agencies and agents named defendant in this matter providing new evidence to them

and reviewing evidence brought to her by VSP Special Agent James Vaughn

83. On February 4, 2011; Multi-Jurisdictional Grand Jury was empanelled in Bedford County

Circuit Court to hear matters pertaining to Wynne pursuant to obtaining money under

false pretense in Case No 10-86-02-1050

84. On September 8, 2011; CVLR Performance Horses Inc filed its RICO/Racketeering case

no 6:11-cv-00035, as *CVLR Performance Horses Inc v John L Wynne, Rivermont*

*Banking Company Inc., Rivermont Consultants Inc, 1650 Partners LLC, et al.* in this

Court. Rivers was not a party to the action. The Court remanded the state claims

"dismissing without prejudice" to state Court (Albemarle and Bedford County), removing

them from the CVLR Inc. RICO case. The RICO case was noticed for appeal on **June**

**22, 2012**.

85. On April 2, 2013; Bowman wrote to Timothy Heaphy, U.S. Attorney on behalf of NMG,

acknowledging that Patrick Hogeboom, U.S. Assistant Attorney (deceased Oct. 2017)

had threatened Wallis with subpoena to appear before "the grand jury" to testify about

the contracts NMG had with Rivers and victim Vicki Marsh. Bowman agreed in the letter

that he would be happy to terminate his representation of Rivers and Marsh and he

thought NMG would be happy to terminate its contracts with Rivers and Marsh (without

notification to Rivers). Bowman, in the fall of 2011, had allowed Deer (without

permission from Rivers or notification), to come to his office and review his case files for

a week. She was given free access to all of his case files which included Rivers files.

Bowman met with the U.S. Assistant Attorney Patrick Hogeboom and Karen Deer in May 2013 on behalf of NMG [3]

86.  On April 23, 2013; CVLR Inc., in Bedford Circuit Court, filed case no CL13-183, against S&R, Beck and Lester for breach of contract. Rivers was not a party to the action.

87. On April 25, 2013 Beck, sued Lester and Rivers in Bedford County Virginia, case no CL13-188 in a "Quiet Title" action against Lester. Beck's x-wife, Lester hadn't "undone the S&R to CVLR d/b/a option lien contract" as she agreed to in a 2007 Lynchburg City 5th Partial Settlement divorce agreement. Beck filed cross-claims against Rivers and Lester in the CVLR Inc. case no CL13-183 because Rivers and Lester signed the Option contract. CVLR Inc. was not a party to the Option contract

88. On May 29, 2013; the United States Court of Appeals No 12-1591 (L) (6:11-cv-00035-NKM) reversed in part and dismissed in part. The case was remanded to this Court for further proceedings. The CVLR Inc. RICO case was based on open-ended continuity. Trial was set for July 28, 2014.

89.  On March 27, 2014 (date of Order); CVLR Inc settled the RICO matter at a February 24, 2014 mediation held in Western District of the United States/Roanoke Division, Honorable Mediation Judge Robert Ballou presiding. Rivers was not a party to the action but signed the settlement agreement agreeing not to sue Wynne or the other Defendants.

90. No later than April 4, 2013; the Criminal Division of the IRS opened a criminal investigation of Wallis, CVLR Inc's third-party payee. Rivers was not interviewed by the IRS regarding her contracts with Wallis or Bowman. US Attorney Hogeboom was angry because he learned that Bowman was representing another victim, Victoria Marsh and Wallis was also her third-party payee. Hogeboom had already warned Bowman and

---

[3] An adverse interest between Bowman, Wallis, NMG, victims Vicki Marsh and Rivers existed at all times relevant in this matter.

Wallis in July 2011, that Rivers was a victim in their Federal investigation, and he could not add Rivers or any other victim as a Plaintiff to the CVLR Inc RICO case and Wallis could not be their third-party payee.

91. On August 4, 2014; Rivers was sued by Northwood Management Group for breach of contract asking for Rivers and CVLR Inc claims as relief, in Case No CL14-1454, filed in the City of Roanoke. Rivers filed Counter-Claims against them. The case was tried by jury and decided on December 14, 2015. Rivers and CVLR Inc. claims were not granted to NMG and Rivers is the owner of interest in all her claims and the assigned owner of any claims and award owed to CVLR Inc.

92. On July 8, 2015: Rivers filed Case No CL15-0525 in the City of Lynchburg naming 24 Defendants. The case had sat dormant since 2011. It alleged a time-line of facts, quoted acts committed and tactics used in Conspiracy, Legal Malice, Conflict of Interest; and acts plead under United States Criminal Codes; Aiding and Abetting, Obtaining Money/Signature Under False Pretense. Rivers failed to state any claims. The Defendants were not served with the amended complaint until after July 8, 2016. The original complaint was not served. The state claims against the original Defendants would be lost due to lack of prosecution. Those Defendants are not being sued in this case for the actions plead in the Lynchburg case.

93. On August 28, 2015; Rivers and CVLR Inc. added Gary Bowman to Case No CL14-1454 as a third-party Defendant. Bowman was removed as Defendant on January 3, 2018.

94. On December 3, 2015; The CVLR Inc v S&R, Beck and Lester case was dismissed due to CVLR Inc. "lack of standing." The Bedford County Circuit Court validated that (a) CVLR Inc was not a party of interest to the S&R to CVLR d/b/a Option lien contract, (b) CVLR d/b/a was the party of interest, (c) Rivers was the owner of interest of CVLR d/b/a, and (d) the Option had never been assigned. The transcript of the hearing on November 12, 2015 was

incorporated by reference to the Order.    Beck non-suited his claims against Lester and
Rivers

95. On January 20, 2016; Beck filed a new "*de novo*" case in Bedford County Circuit Court,
    CL16-000031 against Rivers and Lester this time for Lester's 2007 breach of the Fifth
    Partial Settlement Divorce Agreement. Rivers was not a party to the divorce action

96. On February 16, 2016; Rivers filed her answer to Beck's complaint and her Counter-
    Claim against Beck and Cross-Claimed Lester and exercised her April 24, 2007 Option
    to Purchase and First Right of Refusal Agreement, "Option contract" between S&R and
    CVLR d/b/a to purchase the property the remaining S&R Farm LLC property on April 24,
    2007, including but not limited to, the improvements and lots located within the Serene
    Creek Run and Serenity Acres subdivisions. Rivers filed Memorandum of Lis Pendens
    against the property in case no CL16-031.

97. On February 17, 2016; Rivers served her claim against Lester on Lester in case CL16-
    031 including a copy of the Notice to Exercise the Option contract filed with the Clerk's
    office.

98. On February 23, 2016; Rivers served her answer to Beck's complaint and her Counter-
    Claim against Beck and Lester on Beck, including a copy of the Notice to Exercise the
    Option contract filed with Clerks office

99. On July 8, 2016; in the City of Lynchburg, Case No CL15-0525; Rivers filed her
    Amended Complaint and added additional defendants without leave of the Court . The
    original Defendants were never served with the original complaint.  The original and
    incorrectly added Defendants were not served with the Amended Complaint until after
    July 8, 2016. The original Defendants are not being sued by Rivers for the State claims
    known at the time of the filing of the case.

100.        On July 27, 2016; Rivers filed Notice of Removal for Case No CL6:16-cv-00043
    in this Court to remove Circuit Court Case CL15-0525 based on diversity of citizenship

101.    On July 28, 2016; this Court Remanded Case No 6:16-cv-00043 back to the

Circuit Court for the City of Lynchburg; concluding that the Court lacked jurisdiction and

removal was improper; only "the defendant or defendants" may remove a case from

state court to federal court. 28 U.S.C. §1441(a); 28 U.S.C. §1446(a)

102.    On August 2, 2016; the City of Lynchburg Circuit Court dismissed Rivers Case

No CL15-0525. Although the case was dismissed, only the original complaint was

affected. The Court did not have jurisdiction over the subject matter of the Amended

Complaint and did not have personal jurisdiction over the additional defendants added to

the amended complaint, because; (a) the Court did not grant leave to Rivers to add

defendants, (b) the Court did not grant leave to Rivers to Amend the Complaint, and (c)

the Defendants were not served or served timely with either the complaint or the

amended complaint; at all times relevant.

103.    On October 19, 2016; Rivers appealed the City of Lynchburg Circuit Court's

decision due to the Judge's conflict of interest and error in dismissing the case on a

motion not filed by Rivers but rather filed by Joseph Sanzone. The Court concluded for

the record that it (a) had a conflict of interest with attorneys named defendants, and (b)

the Court had ex parte communications with the attorneys named defendants without

Rivers present or knowledge, and (c) could not hear the substantive matters of the case

"on the merits."

104.    On December 6, 2016; in the Bedford County Circuit Court Rivers filed Case No

CL17-710 against Lester for "new breach" of contract and fraud based on a new breach

occurring on or about September 2016 and new discovery evidence.

105.    On June 16, 2017; the Supreme Court of Virginia refused Rivers Petition for

Appeal in Record No 161486 / Case No CL15-0525 and on October 6, 2017, denied her

Petition for Rehearing

106.     On December 20, 2017; Rivers petitioned Record No 161486 / Case No CL15-0525 to the Supreme Court of the United States for Writ of Certiorari. The matter was distributed for conference on March 16, 2018. The Petition was Denied on March 19, 2018 and petitioned for Rehearing on April 13, 2018. Rivers Petition for Rehearing was Denied on May 29, 2018. A motion to extend mandate was never filed.

107.     On January 3, 2018; Bowman, a third-party defendant, was removed from Case No CL14-1454 by Order of the Court.

108.     On February 23, 2018; Rivers filed Motion to proceed *in forma pauperis* and Notice of Removal Case No CL7:18-cv-82 in this Court to remove Circuit Court Case CL14-1454 based on the federal claims II-IV filed incorrectly in the City of Roanoke

109.     On March 1, 2018; this Court Granted Rivers *in forma pauperis* motion and Remanded Case No 4:18-cv-82 to the Circuit Court for the City of Roanoke; the Court concluded that it lacked jurisdiction; the Plaintiff in the matter, Northwood NMG Group Inc.'s complaint in case no CL14-1454 did not assert a federal claim and could not have been filed in federal court.

110.     On May 25, 2018; Rivers non-suited her state claims against Beck and Lester and filed Lis-Pendens on the property she currently has under contract to purchase and mailed a copy to all homeowners and parties of interest. Beck did not object to the non-suit. The case was dismissed. Beck now has no legal remedy to remove the cloud on the property.

111.     On May 29, 2018; The Writ and Petition for rehearing to the U.S. Supreme Court were denied for Rivers Lynchburg case CL15-0525.

112.     Because the City of Lynchburg Circuit Court did not have subject matter jurisdiction over CL15-0525, the amended complaint or personal jurisdiction over the added defendants, res-judicata does not apply to the Lynchburg case.

113.     Since June 2016; Rivers has gathered evidence that she could not have received before this date and that is not recorded, through discovery, pertaining to the Defendants and their acts in this matter from the cases filed against her in Bedford County Circuit Court by Beck, CL16-031 in January 2016 and by NMG in Roanoke City Circuit Court, CL14-1454 in August 2016 and in her Bedford County Circuit case, CL16-710, filed against Lester in December 2016.

114.     Rivers has non-suited her State Court claims against Beck, Lester, S&R. There was not objection to the Non Suit.

115.     On May 7, 2019; Rivers appealed the Courts decision to remove Bowman from Case No CL14-1454 to the Supreme Court of Virginia.  Record No 190762.  The appeal is pending, oral argument has not been heard

116.     The evidence gathered by Rivers falls under the "new discovery rule." This newly discovered evidence ties the State claims into Federal claims because of new breach's and acts that (a) were committed after August 2, 2016, (b) not known to Rivers before August 2, 2016, (c) and/or are federal and criminal in nature, and (d) one could not have been done without the other.  The Discovery Rule applies in situations where and/if Rivers (a) actually discovered or learned of or could have discovered/learned of the evidence or facts, and /or (b) Rivers did not know and could not have known about the evidence (the truth and facts) until she received that which was intentionally kept from her, for whatever reason; meaning after the statute of limitations would normally start running.

## V. FACTS
## THE UNITED STATES, FEDERAL AND STATE AGENCIES, EMPLOYEES AND CITY AND COUNTY DEFENDANTS

117.     Between 2007 and present; The federal investigation of "Wynne", "RBC", and the Investigated Defendants has yielded no indictments or charges

118.    The Defendants were aware of the RICO pattern: White collar crime. BCI-Division 7, Financial Crimes. They investigated and found what Rivers has uncovered. Although John L Wynne is not a Defendant in this case; the RICO activity continues using Rivers funds and property under contract; all of which are related indirectly to the original scheme of Wynne with the assistance of the other named Defendants in this matter. Wynne being banned from banking targeted a female business woman, an entrepreneur, to lend money to under the aspis that he owns a bank, for investment purposes. The women sign loan agreements, MOU's or Demand Notes. Wynne then makes a deal with the seller, trustee or owner of property to lend them money or pay them a kick back to put the property in his name or his assigns name before the property is paid for. A sham closing or foreclosure occurs (or the contract is flipped using the victims signature, insurance policy, etc), the victim is led to believe they own the property, Wynne transfers the agreed loan or kickback money to the seller as a mock payment for the property, documents are altered (Credit Line Deed of Trust, Deeds, Commitment Letters, HUD), the property is deeded or sold to Wynne prematurely, Wynne instructs his banking, title, and attorney associates involved in the transaction not to give the victim anything (documents), the victim insures and pays for the property monthly (interest only), the property is paid for by Wynne or by means about 2 years later and released to Wynne or a assigned, the victim attempts to pay for or refinance the property loans and is refused the payoffs and historical documents, the victim is sued for default or breach of contract and loses all finances and business usually resulting in bankruptcy. The victim reports what she knows of the crimes against her to local law enforcement who gathers evidence and is then told by the Federal agencies they can't investigate because the case is a mere part of the ongoing Federal investigation being prosecuted by the US Attorney's office. More specifically the Criminal Division of the IRS.

119.     On February 24, 2014; Rivers and CVLR Performance Horses Inc settled their claims against Wynne, Rivermont Banking Co Inc, Rivermont Consultants Inc, 1650 Partners LLC and Southgate Leigh Wynne Testamentary Trust. At the settlement Magistrate Judge Robert Ballou stopped the proceeding due to US Attorney Hogeboom's concerns of impropriety and the adverse relationship between her attorney, Gary M Bowman and William Wallis as third-party payee for Rivers and CVLR Inc.

120.     When Judge Ballou stopped the proceeding, he asked Rivers attorney, Bowman about an issue there was with Wallis that Hogeboom had warned Bowman about. Rivers was not privy to the issue. Bowman lied to Judge Ballou concerning he and the third-party payee William Wallis relationship telling Judge Ballou that the former assistant US Attorney Patrick Hogeboom had changed his mind about his warning to the men that it was improper for Bowman to continue to represent Rivers and Wallis and NMG to continue to be a third-party payee for her companies legal fees. [4]Bowman also stipulated to Chad Mooney, counsel for John Wynne, without Rivers knowledge or consent, that Wallis agreed to never testify against Wynne.

121.     Because Judge Ballou was lied to, he allowed the proceeding to continue. Rivers alleges the proceeding and the settlement are null and void. Bowman has testified at trial that the contracts between Wallis, NMG and Rivers were not brought to him before Rivers and Bowman signed a contract for representation. [5]Rivers has "new discovery evidence" that will be presented in this case and will prove her due process rights were violated and the proceeding should have been halted on February 24, 2014 and Rivers notified of the truth about the investigation and her rights and remedy

---

[4] Rivers was not a party to the CVLR RICO case
[5] Bowman lied to the Virginia State Bar telling them that the contracts between the parties were in place before he was hired. The VSB felt that it would be "unconscionable" and considered brokering legal fees. Hogeboom warned the two men of the adverse interest

122.     Rivers has filed a Motion to Validate the settlement agreement.[6]

## VI. THE FEDERAL INVESTIGATION

123.     On or before October 1, 2007; an investigation was open naming John Leigh

Wynne the suspect. In Case No 10-86-02-1050. Wynne of Rivermont Banking Company

Inc, operating a legitimate banking business.

124.     December 7, 2010; Bedford County Commonwealth Attorney Mark Robinette

issued subpoenas for documents for the February 4, 2011 Multi-Jurisdictional Grand

Jury, empaneled at the Circuit Court of the County of Bedford Virginia to Old Dominion

National Bank. Honorable James W Updike Jr. presided. The multi-jurisdictional grand

juries had been empaneled since first ordered by the Supreme Court of Virginia on June

8, 2006. Honorable Chief Judge Mosby Perrow presided.

125.     On January 18, 2011; Bedford County Commonwealth Attorney Mark Robinette

issued subpoenas for documents for the Mulit-Jurisdictional Grand Jury

126.     On January 20, 2011; "ODNB", responded to the subpoena issued by Robinette

and presented documents to Special Agent James Vaughan at their bank business

located in North Garden Virginia.

127.     On February 1, 2011; Rivers was interviewed by VSP, Special Agent James

Vaughan regarding her complaints. The two met with the Bedford County

Commonwealth Attorney office regarding what she thought was a mortgage fraud

committed by a known banker identified as John Wynne and his company Rivermont

Banking Company Inc. Rivers had borrowed large sums of money from RBC and RBC

---

[6] In her motion to amend her complaint, Rivers also includes in the title that it is a "Motion(s) to Validate." (Dkt. No. 14 at 3.) Therein, she requests that the court "Validate her interest in 1650 Partners LLC, and Validate the February 24, 2014 RICO Settlement Agreement." (Id.) The court is unsure of the precise relief she is seeking in requesting "validation," but to the extent she wants relief based on her claims and the allegations in her amended complaint, this motion is premature. She asserts that validation is proper based on facts in witness declarations and testimony, but the court cannot determine the rights and obligations of the parties based on allegations or statements in a filing by Rivers. Instead, any interest Rivers has in those properties will be decided, if it is proper to do so, in the normal course of proceedings in this case.

had agreed to finance, among other things, $76,000.00 for a F650, purchased by Rivers in May 2007 from Battlefield Ford and insured with State Farm, $38,000.00 for a 5 Horse Sundowner Horse Trailer on , over $43,000.00 for John Deere tractor and hay equipment, a $475,000.00 commercial loan, $25,000.00 start-up loan, and $25,000.00 deposits for a commercial contract to purchase a riding center property mortgaged through ODNB by Credit Line Deed of Trust dated November 20, 2007.

128.    When Rivers first met with Talbott and James Vaughn of the Virginia State Police in 2010, she was informed by Talbott that there were many victims of Wynne and RBC in several states. Rivers had provided what documents she had to demonstrate insurance fraud by Wynne and RBC and what she thought was mortgage fraud. Rivers documents and documents subpoenaed by the Virginia State Police were appended for inclusion into the case file #10-86-02-1050-11.

A. Insurance claim document dated 2.24.08 listing charges submitted to repair buildings damaged on Rivers farm. Adjuster Jane G Harold, AIC, Robinson & Assoc. Inc, Lynchburg Virginia, found replacement costs to total $34,143.11. Depreciation reduced costs to an Actual Cash Value of $24,265.38

B. Document dated 9/8/08 from American Bankers Insurance Company of Florida signed by Patrick Rose, Property Claims Supervisor added $8881.35 to the claim for a total of $33,146.73

C. Document dated 1/13/09 from Joseph Sanzone, former attorney for Rivers and CVLR Inc, indicating how the $8881.35 from the insurance company check was to be allocated

129.    On February 4, 2011; a Multi-Jurisdictional Grand Jury was empaneled in Bedford County Virginia to hear the Case No 10-86-02-1050 matter. Rivers was not called to testify or submit documents.

130.    On March 8, 2011: Virginia Department of State Police prepared an evidence list of property acquired from Case No 10-86-02-1050. The Title was Rivers, the victim and

Wynne, the suspect. The character was OBTAIN MONEY BY FALSE PRETENSE. Special Agent James Vaughan was the case agent, Jurisdiction was Bedford. Items placed into evidence were one box containing miscellaneous financial documents acquired on 2/4/11 (10:00 am) from ODNB by Vaughan. The evidence was moved into storage on 3/8/11 at (15:29) in evidence room shelf 4 received by Dennis F Parries

131.    On April 5, 2011; Special Agent James Vaughn of the VSB Division VI Headquarters, Salem VA (assigned to the ODNB investigation) received a letter from former Bedford County Assistant Commonwealth Attorney, Mark Robinette stating:

"Dear Agent Vaughn, Pursuant to our previous discussions, it appears that any potential criminal fraud that may have occurred regarding the disbursement of insurance proceeds, took place at the Old Dominion National Bank, North Garden Virginia, which is located in Albemarle County. You may want to contact the authorities in Albemarle County regarding the criminal investigation in this matter."

132.    On August 2, 2011; The SCC's Commissioner Face received a hand-written email correspondence transmission from Wynne stating:

"Commissioner Face: attached is the documentation to support the change of the name of the above captioned Virginia Corporation. Per you earlier correspondence the term "banking" has been eliminated and now chartered "Rivermont Consultants Inc". My apologies for any inconvenience I may have caused the Bureau. It was never my intention to be a Bank or operate as one. If you have any further questions, do not hesitate to contact me" Sincerely John L Wynne

133.    On August 3, 2011; SCC's John C Crockett received an email including a hand-written note from Wynne referring to the name change they discussed about two weeks prior to the email. Wynne trusted this resolved any issues they discussed.

134.    The SCC allowed Wynne to continue to operate and advertise Rivermont Consultants Inc. as a bank in the banking industry as per the original Rivermont Banking Company Inc Articles of Incorporation and did not amend them as per the letter he received from Face and the Va Code 6.2-§ 939.

135.    On October 18, 2013; Bowman wrote a letter to Bedford Commonwealth

Attorney, Randy Krantz, informing him of Wynne operating RBC illegally. Violating Va.

Code §6.2-939 asking him to bring the case before a grand jury:

136.    On February 21, 2014; Rivers received a response from Mark Robinette,

Assistant Commonwealth Attorney, at the Bedford Commonwealth Attorney's office

regarding documents Rivers had provided to them in January 2014. Robinette was

referring to a copy of RBC articles of incorporation she had uncovered from her

attorney's office, indicating the purpose of the business was to be a bank in the banking

industry. Rivers had also pointed out, that Wynne was not in compliance of the letter she

had received from the SCC because Wynne changed his name to Rivermont

Consultants Inc but did not amend the RBC Articles of Incorporation.  Meaning that

Rivermont Consultants Inc. was now operating as a illegal bank without being certified or

authorized under Va. Code §6.2-938.  The response from Robinette only paid significant

attention to a October 3, 2013 letter they had discussed over the phone from the SCC

137.    On August 10, 2014; Rivers reached out again to the SCC General Counsel,

DeMarian Johnston, to inquire what they were going to do about Wynne, (who was

continuing to operate his illegal banking enterprise) and why they allowed him to be

registered with the SCC as a illegal bank not in compliance with Va. Code §6.2-938.

Rivers also wrote another letter to the Bedford County Commonwealth Attorney, Mark

Robinette, asking him to mail her a copy of the letter Robinette told Rivers he had

received from the SCC leading him to believe that Wynne and RBC had complied with

the SCC and they were satisfied.

138.    On August 25, 2014: Mr. Robinette responded back to Rivers,

"Per your request, I have enclosed a copy of a letter sent by the State Corporation
Commission (SCC) dated October 3, 2013, which was addressed to you.  Please note
that I have never received a letter from SCC pertaining to you or Mr. Wynn."

139.    On April 6, 2015: Mr. Robinette responded to Rivers FOIA request by stating,

"In response to your FOIA request enclosed are copies of the only documents or correspondence either to or from my office regarding you or Mr. Wynne."

140.     Sometime in June, 2015 Rivers learned "new discovery evidence" on May 1, 2015 for documents relating to the S&R property.   Rivers former attorney, James Gilbert IV viewed the documents that Rivers had never seen before.  ATC, Richardson and Fariss had been withholding evidence from Rivers and the federal agencies since 2007. In the response of more than 500 pages, Rivers found her notarized Credit Line Deed as it was prepared originally with the spot for Rivers name blank and also a altered/forged copy of the Credit Line (Mortgage) dated November 20, 2007 that Richardson altered while at the Bedford County Courthouse, adding John L Wynne name in addition to 1650 Partners LLC, instead of Crystal VL Rivers and/or CVLR Performance Horses.

141.     Between 2015 and 2018, The City of Lynchburg, Campbell County and Bedford County all refused to take the charges to the magistrate or indict for the felonious and fraudulent and criminal violations committed by Richardson of ATC. Bedford County Commonwealth attorneys refused to charge Richardson for the felony she admitted she committed.  Bedford County Commonwealth Attorney Tim Griffith told Rivers the crimes were Federal and she should bring him something else.

142.     Richardson admitted to altering Rivers' $500,000.00 Credit Line Deed of Trust (ODNB Mortgage), Inst No 070017320, on November 21, 2007 at the Bedford County Courthouse adding and recorded the fraudulent Deed to the riding center .

143.     The aforementioned CLDOT was notarized by Richardson of ATC, on November 20, 2007, the day before she altered and recorded it.

144.     Another document Rivers found was Richardson's prepared HUD statement, that Richardson forged on November 21, 2007 to reflect the November 21, 2007 changes in the cost to record the incorrect, fraudulent Deed to the riding center and the forged CLDOT.  The forged HUD statement was dated November 20, 2007, was not signed by

Rivers personally or for CVLR or Lester of S&R and signed in hand by Richardson (not with a stamp like the original November 20, 2007 HUD statement.)

145.       On January 14, 2016; Rivers reported her new evidence regarding her forged ODNB CLDOT to the Campbell County Sheriff office. Investigator JB Epperson was assigned to the case. Campbell County contacted Federal agencies and were instructed not to investigate. Rivers spoke with the U.S. Attorney Patrick Hogeboom (deceased Oct 2017) at length on a taped phone line and Mr. Hogeboom agreed to allow investigator Epperson to investigate the matter.

146.       On September 29, 2016; Rivers contacted the Bedford County Commonwealth Attorney's office to report her new evidence regarding her forged ODNB CLDOT. Rivers was directed to the Bedford County Sheriff office.

147.       On or about September 23, 2016; Rivers contacted the Bedford Commonwealth Attorney's Office and was referred to the Bedford County Sheriff Office and reported that she was (a) a victim of fraud; (b) Richardson had forged a CLDOT; (c) the VSP, IRS and Campbell County had investigated; (d) and investigator Epperson had advised the he found the document to be forged in Bedford not Campbell.

148.       On October 3, 2016; Investigator JW Dooley was assigned to the matter and met with Rivers at the police department to review a collection of documents. Dooley spoke with Richardson on several occasions. Richardson admitted to ATC changing the CLDOT when the error was caught

149.       Dooley's report indicates he spoke with representatives at ODNB and was advised that they are familiar with the case. ODNB representative advised that under the circumstances the documents are prepared by the bank and if changes are required to be made the entire document is corrected

150.       Dooley's report indicates that he spoke with and reviewed opinions of attorneys that deal in real estate law and was advised that a title agent can make corrections to a

deed of trust. The examples given were misspellings or other inaccuracies but nothing as in-depth as what occurred in this incident with Rivers CLDOT.

151.    Bedford County Commonwealth Attorney Wheelock decided not to prosecute the Richardson matter as a criminal matter. Dooley received more documents and information from Rivers including additional code sections. Wheelock has refused to meet with Rivers

**152.**    On February 18, 2017; Rivers sent a Request to Re-Open Fraud/Forgery Case/Investigation into the forgery and altering of documents investigation regarding Jennifer Richardson and Mat Fariss of Advantage Title and Closing LLC, to Bedford County Commonwealth Attorneys; Stephanie Ayers, Stacey Gardner, Wes Nance, John Wheelock after speaking, at length to John Wheelock and Assistant Commonwealth Attorney, Tim Griffin

153.    On June 16, 2017: Rivers sent her final Report and Notice to Bedford County Commonwealth Attorneys that she intends to file suit against the Bedford County Commonwealth Attorney's Office and Bedford County, Virginia. Rivers reported to Bedford Commonwealth Attorney's Office among other things, that in the last six months, she received and learned new facts, new subject matter and discovery evidence that she could not ever have known before.

**154.**    On November 9, 2017; Bedford County Wesley Nance responded to Rivers November 3, 2017 FOIA request. The Response included information about Rivers specific request about training, conferences, etc for the Commonwealth Attorneys in Bedford County

**155.**    On January 8, 2018; Rivers sent Bedford County Commonwealth Attorney's Office a Notice of Claim, RE: Criminal Matter Complained of, Reported, Investigated, Among Other Things, Proved by Intentionally Not Charged. 1) Concerning Civil/Tort §18.2-7, 2) Parties to a Crime, 3) Forgery/Altering Documents §18.2-168, 172, 172.2,

178, 186, 197, 4) Conspiracy §18.2-22, 5) Fraudulent Conveyance, 6) Negligence, 7) Using My and Other Victims Documents and Evidence Not for What We Intended, 8) Embezzlement §18.2-111, §18.2-115 and 9) Pain and suffering   Including §6.2-938 and §6.2-939

156.     Rivers is not privy to the Federal investigation relating to this matter or the notes, findings, agreements or status. The Federal Statute of Limitations may have tolled for the Federal investigation. Rivers newly found fraud and conspiracy evidence gives her a 2 year statute of limitations when she obtains it and when the last occurrence happens, however, the IRS, VSP and FBI already had knowledge of the evidence Rivers is obtaining but did not divulge it to Rivers. If the statute of limitations has not ran for the Federal investigation, Rivers asks the Court to order the investigation be reopened and Rivers to be compensated for her losses and paid restitution and her assets "clawed back". If the statute of limitations has ran out for the Federal investigation, Rivers asks the Court to find in favor or Rivers in the Negligence counts against the Defendants. The Defendants actions are reprehensible.

### COUNT ONE: NEGLIGENCE

157.     Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein. Defendants, USA, FBI, IRS, VSP, Bedford County, the City of Lynchburg, Albemarle County, and agents employed by them, Prilliman, Deer, and Talbott.

158.     The Defendants; while acting within the course and scope of their agency, commission, office or employment by the State of Virginia, and/or Federal and State Agencies of the Defendant United States: (a) knew or should have known that prior to the Rivers complaints and the complaints of other victims, the Defendants continued to

commit criminal acts against her and others; (b)knew or should have known they had a

duty to investigate Wynne's illegal banking enterprise, prosecute and indict Wynne, his

illegal banking entities and the Defendants and Co-Defendants who conspired,

organized and profited from the organized enterprise and the illegal acts and omissions;

and other Defendants they investigated and allowed to continue to commit criminal acts;

(c) knew or should have known they had a duty to disclose the Defendants criminal

activities to law enforcement agencies with jurisdiction over their crimes and/or report

these activities; (d) knew or should have known they had a duty to follow and enforce the

Attorney General Guidelines regarding the investigation into the illegal banking, money

laundering, forgery, insurance and land fraud crimes and (e) knew or should have known

that their failure to comply with their duties alleged herein would result in Rivers, her

businesses and other victims (to be intervened) suffering irreparable harm

159.     The Agencies, Departments and Employees of those Agencies and Departments

named Defendant ordered, caused, aided, abetted, counseled, commanded, induced or

assisted in the commission of Federal and criminal violations resulting from 18 U.S.C 2.

Section 2(a) demands that a Defendant embrace a crime of another and consciously do

something to contribute to its success. *See Rosemond v United States,* 134 S.Ct. 1240,

1245 (2014) quoting , *Central Bank of Denver, NA v First Interstate Bank of Denver, NA*

*511 U.S. 164, 181 (1994)* "Those who provide knowing aid to persons committing federal

crimes, with the intent to facilitate the crime, are themselves committing a crime."

160.     As a result of these wrongful acts and events occurred that a reasonable,

prudent person would have foreseen in light of the circumstances set forth herein,

including money laundering, illegal banking, forgery, insurance and land fraud.  The

tortuous and negligent conduct of such Defendant and employee of Defendant was and

continued to be a violation of federal laws and a material element and proximate cause

of bringing about Rivers, her business, and other victims (to be intervened) suffering.

161.　　　The actions of the Federal agencies and their agents and Defendants named
above, are grossly negligent and an extreme deviation from reasonable standards of
conduct, undertaken intentionally with actual malice, and/or with a reckless disregard for
their likely consequences which tied them to Wynne's illegal banking activity,
Richardson, ATC and Fariss forged documents and criminal activity of other defendants
as pled herein in this complaint.

162.　　　By reason of the negligence, the Defendants are directly liable to Rivers for
failing to protect her and prosecute the parties they investigated, some of which are
named Defendants in this matter. The acts of negligence tie them to the money
laundering scheme including forgery, insurance fraud, tax evasion, embezzlement and
mortgage fraud.  Rivers and her businesses have been deprived of compensation for the
loss of reasonably expected net income, services, protection, care, assistance, society,
comfort, guidance, counsel, and advice as well as other damages and is entitled to an
award of punitive damages, times three.

163.　　　The Federal investigation included or should have included the named
Defendants, other than themselves, as subjects operating in commerce with each other.
The Defendants used Rivers signature and equity to their own benefit, or which her
Personally Identifiable "Information" was used to procure Instruments of Commerce for
investment and personal financial benefit.

164.　　　Since April 2006; An undetermined amount of victims have been victimized by
the SCC and the Bureau of Financial Institutions. Wynne, Mason, Beach, Thomas,
Garret and Sacketts bank, Community First Bank, settled a legal matter which ousted
and ordered the bank to cease and desist operating and Wynne to be banned from
banking. *Centra Bank, Inc (WV) v Community First Bank,* City of Lynchburg Circuit Court

Case No CL04-024674.[7] Commissioner Face's failure to issue cease and desist to Wynne, RBC and/or remove RBC and Rivermont Consultants Inc. from the online business entity look up sights and VBA monthly *Virginia Banker* publications issued and circulating even after July 2014.

**165.**     Although RBC was terminated from the SCC and not registered with the State of Virginia, they can still be found online advertised as a financial institution, financial planner, bank. Business including the Federal Home Loan Bank and Lynchburg Chamber of Commerce advertise and lead unsuspecting victims to Wynne's contact; address 1688 Holcomb Rock Rd, Lynchburg VA, directions and 434-455-4900 phone number.  The data is still being circulated. There is no record of any cease and desist, sanctions, penalties issued by the SCC, no fines paid and no indictments by the State, Federal and Government agencies

166.     The complaint alleges that the Defendants utilized Rivers, her businesses and other victims evidence and their circumstances, to bolster, "use as their own", for their Federal investigation, not for what Rivers, her businesses and the victims intended. The Defendants continued their investigations of the multijurisdictional, statewide, criminal acts perpetrated by/with/and for, the other Defendants named in this matter, knowingly, intentionally, directly or indirectly as co-conspirators, who cooperated with their main subjects Wynne, RBC, 1650, and SGLWT.

167.     The Defendants intentionally blocked, "flagged" other local law enforcement from charging and the City of Lynchburg and Albemarle, Bedford and Campbell County from prosecuting Wynne, RBC, 1650, SGLWT, thus allowing the other named Defendants in this case, to continue to commit crimes and illegal acts that injure Rivers, her businesses, other victims and the state of Virginia. They presented the keys to the Cities and Counties of the Commonwealth of Virginia to the subjects of their investigation

---

[7] The Bureau of Financial Institutions regulates and oversees all Virginia State Banks

allowing them to continue to operate the illegal enterprise, fraudulently conveying property and laundering Rivers funds obtained through fraud, in and out of the banks named Defendant in this matter.

168.    Defendants engaged in such violations directly and as co-conspirators. The federal law claims arise out of the same transaction or occurrence or series of transactions or occurrences that are the basis of the negligence, torts, fraud, fraudulent conveyances and RICO causes of action. This case summarizes the correlation between the Defendants and their activity which projected into the future with a threat of repetition and was not limited to only the Rivers or her businesses

**169.**    Rivers, her businesses and other victims have suffered as a result of the Defendants named above, neglecting their duties, and aiding and abetting the criminal activity of the RICO enterprises and barring local law enforcement from investigating and prosecuting Wynne, his entities and the other Defendants named in this matter.

**170.**    Beginning in 2010, on March 2011 and continuing until after 2016; Rivers provided numerous evidence that she obtained as she obtained it to the Defendants, their Commonwealth Attorney's, the Attorney General's Office-Richmond (Ken Cuccinelli and his paralegal Judith Jessee) as requested by former US Attorney Patrick Hogeboom. The Defendants excepted Rivers evidence but they felt that Rivers, her businesses and other victims were expendable[8]

**COUNT TWO: GROSS NEGLIGENCE/MISCONDUCT**
**FEDERAL AND STATE AGENCIES/CITY AND COUNTY DEFENDANTS**

---

[8] The SCC files and documents contain confidential information and are generally protected from disclosure by §6.2-101 of the Code of Virginia provides A. (ii) that any information furnished to or obtained by the Bureau, the disclosure of which, in the opinion of the Commissioner, could endanger the safety and soundness of a bank, savings institution or credit union

**171.** Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein

172. Among the offenses that the FBI is empowered to investigate are crimes involving racketeering, 18 U.S.C §1962, et seq., money laundering 18 U.S.C §1956-1957; obstruction of justice, 18 U.S.C §1501 et seq., aiding and abetting, 2471 18 U.S.C 2; wire and mail fraud 18 U.S.C. §1343; and tampering with a witness, victim or informant, 18 U.S.C §1512

173. The FBI has established certain core values that it claims "need to be preserved and defended by the FBI in performing its statutory missions. Those values are; rigorous obedience to the Constitution of the United States; respect for the dignity of all those we protect; compassion; fairness; and uncompromising personal and institutional integrity

174. The FBI mission further states; "Respect for the dignity of all whom we protect reminds us to wield law enforcement powers with restraint and to recognize the natural human tendency to be corrupted by power and to become callous in its exercise. Fairness and compassion insure that we treat everyone with the highest regard for the constitution, civil and human rights. Personal and institutional integrity reinforce each other and are owed to the Nation in exchange for the sacred trust and great authority conferred upon us."

175. The FBI and the Criminal Division of the IRS are statutorily empowered to protect people and victims like Rivers, her businesses and other victims from being victimized by clandestine criminal organizations, and to investigate those responsible for her loss and suffering.

176. The FBI is an agency within the meaning of 28 U.S.C §2671 et seq. On September 20, 2015 Rivers received a letter from Investigator JB Epperson of the

Campbell County Sheriff Office informing her that he had spoken with Det. Dempsey of the Lynchburg Police Department regarding her complaint of Richardson's forgery of a Credit Line Deed of Trust and HUD statement. He informed her that both he and Detective Dempsey consulted with the appropriate federal investigating agency and the United States Attorney Office for the Western District of Virginia. It had been brought to their attention that Rivers' matter had been thoroughly investigated by federal authorities. After discussions with Epperson, Rivers contacted the U.S. Attorney, Pat Hogeboom (deceased Oct 2017), whom she had met with several times and literally begged him to allow the investigators to do their job and investigate the forgery she had found and was able to prove now with new evidence. Campbell County was given permission to investigate the matter. 28 U.S.C. §2671 defines the term "Federal agency" as including the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, ....

"Employee of the government includes officers or employees of any federal agency which would include Talbott who was assigned to the investigation.

177.     Sometime in 2016, Rivers learned from a conversation with Lynchburg Commonwealth Attorney Michael Doucette, that Eugene Wingfield never filed a report of her 2010 meeting with him as alleged by Rivers in this complaint. Rivers reached out to Wingfield, who is now the Clerk of the Lynchburg City Court, and he did remember the meeting and the conversation but affirmed he did not file a report.

178.     Talbott worked closely with Special Agent James Vaughan in 2010 and 2011 and was assigned by deceased U.S. Attorney Patrick Hogeboom to work with Campbell County Investigator JB Epperson in 2016 to interview Rivers again, and to interview Richardson about Rivers alleged complaint of forgery and the altering of the $500,000.00 credit line deed of trust and the altered incomplete HUD statement Rivers had recently learned of. Talbott was not asked to investigate the matter of the Deed or

40

any Wynne matter. Talbott, Deer, and Prilliman were special agents at all times material to this complaint,

179. Richardson of ATC admitted to Investigator Dooley that she altered the documents as alleged above in this complaint. Richardson, ATC, Counts, Teresa Grant and Fariss managed and operated the economic base through which the illegal banking enterprises operate and operated and through which S&R land was sold, optioned and fraudulent conveyed, $475,000.00 and deposits from Rivers, money paid by the homeowners from their lending institutions and money paid from HUD statements and commissions was transferred and paid to the named Defendants. Documents were forged by Richardson and ATC and recorded in the Bedford County Circuit Court

180. In April 2018 Rivers had learned that the forged CLDOT and the HUD statement prepared by Richardson of ATC on November 21, 2007 were documents used intentionally in a fraudulent conveyance and racketeering scheme.

181. During all times relevant to this case, in order to protect (Wynne, RBC and 1650) and the Defendants named in this cause of action, from prosecution and to further expand the enterprises, the agents, the Commonwealth Attorney's of the City of Lynchburg, Bedford County and Albemarle County, the investigators, and the Virginia State Police, failed to charge, indict or prosecute the criminal activities, including money laundering and forgery reported to them by Rivers again in 2016-2018.

182. Beginning in 2006, the SCC acts and omissions, permitted RBC to operate two separate illegal bank businesses using the same Articles of Incorporation, creating a systemic pattern. The SCC permitted Wynne to operate RBC within the banking business as a "consultant". The RBC Articles of Incorporation gave the appearance to the public, and unsuspecting customers of the company, that RBC was a registered company which purpose was to be a bank in the banking business.

183.	The SCC allowed the ongoing pattern of RICO/Racketeering and illegal banking activity to be committed against the residents of the State of Virginia, Rivers, her businesses and other victims, using the state banks named Defendants in this cause of action since 2007, and the criminal behavior of other Defendants named in this complaint as "enterprises" who are recorded land owners, settlement agents, real-estate agents, insurance agents and bank officers managing and conducting affairs of the enterprises

184.	The SCC was in possession of, but did not provide or disclose to Rivers, documents and investigative reports that contained damaging evidence and information that would lead to the prosecution and indictments resulting from the illegal banking enterprise, but failed to submit a favorable report to the federal agencies to prosecute or indict because it could endanger the safety and soundness of the state banks, and financial institutions doing business legally or illegally in the State and Commonwealth of Virginia.

185.	On April 29, 2011: The SCC continued to take in evidence, claims, documentation and complaints from Rivers, Foster and Marsh including on the day after Rivers lost her home and her horse farm, and her business, in a relief of stay motion filed by Wynne.  SCC's general counsel Maureen Stinger and Demarian Johnston were Rivers contacts at the SCC.

186.	Maureen Stinger provided Rivers with her fax number to forward more documentation.  Rivers notified Stinger that she would be homeless on May 9, 2011. Rivers had to relocate herself, her business, her children and her entire farm including heavy machinery, livestock, etc. in 72 hours.

187.	The SCC intentionally neglected Rivers to protect their agency, the Commissioners, the state banks, the Virginia Bankers Association (insurer and advertiser for Virginia State Banks) and the Virginia General Assembly member Fariss.

188.    The SCC and the Commissioners considered and treated Rivers, her businesses, and the other victims as though they were expendable and were let to suffer and "bleed out'. The net effect of the evidence withheld by the SCC and kept secret from the public in this case raises a reasonable probability that its disclosure would have produced a different result, and Rivers, her businesses and the other victims would not have lost their worldly possessions, reputations, property and money and there would have been indictments.

189.    Bedford County has collected taxes on the subject properties since April 24, 2007, approved the S&R /120 Family Subdivision. The family subdivision includes those portions of land named and described in Rivers exercised Option to Purchase Contract and belonging to S&R in 2007 that were also named within the original Deed of Trust with Union and used as collateral and cross collateralized for other loans. The application for family subdivision remains sealed.

190.    Between 2004 and 2009; there was no relief granted by the director of community development in the form of an instrument, recorded against the parcel (named in the sealed family subdivision application) in the land records of the Bedford County Circuit Court. Union documents recently received by Rivers indicate and document the existence of a #120 Family Subdivision for the property liened by Union as described within. As found in the Bedford County Subdivision Ordinance, Division 2, 3.6 (a) 1-13.

191.    Bedford County continues to allow the illegal use of a commercial motor cross track on that portion of the subject property, located at 5040 Cottontown Rd, Forest VA. The motor cross track is (a) uninsured and a liability to the property, (b) any owner of interest in the subject property in the event of death, maiming or catastrophic event from the use of the motor cross track; and (c) a reported nuisance to the surrounding neighborhood

192.     The employees of the City of Lynchburg, the Commonwealth Attorneys Office,
and the Police Department have failed to charge, indict and prosecute the criminal acts
regarding illegal banking, forgery, insurance fraud and fraudulent conveyance reported
to them by Rivers and other victims

193.     The "specified unlawful activity" is on-going. The case pending in the City of
Lynchburg Circuit Court CL11-05550, relating to the use of Rivers funds and funds
obtained from the use of her signature, her equity, insurance policies and commercial
purchase contracts is the most recent account of illegal activity. Sackett attempted to
conceal the remaining foreclosure funds, the source and what he did with them.

194.     Rivers was informed by Special Agent James Vaughan that there was no
indictment of Wynne because they could not find what he did with her money. Rivers has
learned how and where Wynne disposed of her funds and the funds he obtained from
her by using her signature on file, forgery, equity contracts and her insurance policies.
The evidence is overwhelming and was sufficient to support the Defendants case. *See
United States v Sullivan*, 919 F 2d 1403, 1431 (10th Cir. 1990)

195.     Rivers alleges that the Defendants, the federal agencies, the federal employees,
and the City and State agencies named in this complaint, failed to control the criminal
activities of the subjects and the co-conspirators and the Defendants acts were
motivated for an economic purpose. The Defendants allowed the activity of illegal
banking, forgery, obtaining money and signature under false pretense, insurance fraud,
fraudulent conveyance and money laundering to continue within the City of Lynchburg
County of Bedford and the State of Virginia through the state banks named as
Defendants in this case, as conduits violating Rivers civil rights and after being warned,
and receiving numerous complaints from Rivers and tri-county state and county victims
and investigating the matter with the use of tax paid funds. They failed to enforce the
Attorney General Guidelines for FBI Operations and those guidelines on General Crimes

and Racketeering , the Virginia Crime Codes that fall under the category of among others, fraud, including altering or falsifying documents, forgery, identity fraud, obtaining money under false pretense, fraudulent conveyance, illegal banking activity, and identity theft; violated the Attorney General Guidelines, Regulations and Policies by failing to inform and appropriate law enforcement and officials of the criminal activities of their subjects and co-conspirators even when Rivers and other victims complained and reported the crimes since 2006; failed to properly supervise the subjects of the investigation allowing them to continue to commit their criminal acts; failed to investigate and allow law enforcement and officials investigate for purposes of prosecution and indictment; failed to serve the warrants issued for arrest; and failure to present the new matters to a Grand Jury; failed to protect the federal investigation from Gary Bowman and Wallis impeding on the investigation which caused the close of the case within 21 days after the CVLR Inc case was settled; and therefore failed to prosecute the subjects.

196.     For over eight years, Rivers, her businesses, and other victims have been ignored by the FBI, Commonwealth Attorneys of Lynchburg, Bedford, and Albemarle County, State Corporation Commission, Bureau of Financial Institutions, Bureau of Insurance, Attorney General Office, Criminal Division of the IRS, Virginia State Bar, except for the brief time when each agency takes in Rivers and other victims evidence, complaints and reports; the subjects were still at large and Rivers claims fell on deaf ears.

197.     Rivers seeks redress for her hardship and loss. As a proximate cause of the federal Defendants' acts and/or omissions, violating the very oaths that they have sworn and Rivers' rights as guaranteed by the Amendments to the United States Constitution and the Constitution of Virginia. The Virginia Codes were violated, as were Rivers and her businesses rights to own land and prosper

198.    Rivers alleges that the Federal Defendants and the local agencies conspired to protect and shield from prosecution the subjects (and their co-conspirators) of their Federal investigation. The purpose of the conspiracy for the Federal Defendants to protect the subjects and the co-conspirators of their investigation from arrest and prosecution in order to maintain the "ruse" of a possible indictment and obtain more evidence from Rivers and the other victims meanwhile allowing Rivers, her businesses and other victims to lose everything.  The end result would be that the Federal statute of limitations ran out and they couldn't do anything; "They couldn't find it!"

199.    Rivers alleges that the United States and the Federal Defendants knew or should have known that the subjects of their investigation and the co-conspirators of the subject, the Defendants in this matter, were involved in criminal activity, including among others, fraud, including altering or falsifying documents, forgery, identity fraud, obtaining money under false pretense, fraudulent conveyance, illegal banking activity, possibly embezzlement and extortion and identity theft; but despite this knowledge failed or refused to investigate or allow the local agencies to investigate the criminal activity for purposes of prosecution because, if prosecuted, the Federal Defendants would lose their subjects service and information. They would be prosecuting Virginia State Banks, Commissioners and Delegates of the State of Virginia, local attorneys, settlement agents, bankers, accountants, "pillars of the community"; and they also knew Rivers, her businesses and the other victims had claims against them for protecting their subjects.

200.    Rivers alleges that the Federal Defendants, Deer and Prilliman, entered the law offices to obtain documents without Rivers knowledge or notice and investigated Rivers attorney, Gary Bowman and her third-party payee , Wallis and threatened them with Grand Jury  for their adverse interest in the CVLR Inc case and Rivers claims.

201.    The agencies also knew or should have known that Bowman had an adverse interest with Wallis and therefore, was not supposed to be representing Rivers or Vicki

Marsh, and Wallis, who had no income and whose assets were federally liened and recorded in the County Circuit Court records. The U.S. Attorneys and the agents kept the information they had about Bowman and Wallis secret from Rivers but made it very well understood to Bowman and Wallis that Bowman had to withdraw from the CVLR Inc. case and Wallis could not pay legal fees and Rivers, Foster and Marsh because they were named victims and witnesses in their Federal investigation..

202.        The Federal and State Agencies named Defendant in this matter, assigned the Special Agents named Defendants in this matter, to work together to investigation, compile information and collect evidence and information from Rivers and other victims. The Defendants knew or should have known of the facts alleged in this complaint.

203.        Rivers does not have the wherewithal, the software capability, the man power or even the clearance to gather what the agencies have at their finger-tips. This complaint closely follows the findings and rulings of the United States District Court for the District of Massachusetts. *See United States v Salemme,* 91 F. Supp. 2d 141 (D.Mass 1999). The complaint incorporates by reference and includes herein the findings and rulings contained in that case as well as the pattern, facts and circumstances set forth in *Classicstar Mare Lease Litigation and West Hills Farms LLC, et al v ClassicStar LLC, et al (D. Kentucky 2016); Luanne Litif & Lee Litif v Unites States et al (D.Mass 2010); and the Estate of John McIntyre v United States of America, James Buler et al (D.Mass 2012).*

### COUNT THREE- CIVIL RICO
**18 USC §1962, §1964 (**
**DEFENDANTS - SACKETT, SHERRI SACKETT, SELECT, SBFC, BOJ, ODNB, MASON, THOMAS, PETERS SR, LUCK AND LAURA SACKETT**

**PREDICATE ACT 1:**
**OBTAINING MONEY THROUGH FRAUD**

204.    The allegations of the paragraphs above are adopted herein. Each deposit is equal to one predicate act. Each payment made from the use of Rivers funds is equal to a separate predicate act.

205.    The Defendants masterminded a "peso scheme" which defrauded Rivers and hid money from the Courts, Rivers, the VSP, IRS and the Virginia State Bar. The Federal agents were waiting for Sackett to file his accounting and Peters to approve it. Sackett completed the fraud in September 2018 when he filed his fraudulent accounting of foreclosure with the City of Lynchburg Clerk's office. It is clear and the evidence will overwhelmingly support Rivers claim that the scheme between the Defendants was fraudulent and Sackett did not use the original $114,000.00 to pay for the property; he received it as a "kick-back" and he and his wife spent it for their own personal benefit and for the business.

206.    In January 2018; Rivers learned from evidence she obtained in October 2016 from Select Bank that her insurance funds and funds obtained from her signature and other equity contracts were ultimately transferred from a BOJ bank account held and maintained by John L Wynne into a Select bank account in the name of Catherine R Wynne. Rivers traced those funds to an American National Bank account held by Sackett. $114,000 had been transferred to Sacketts bank account for a foreclosure held in September 2008 on 2232 Ridgewood Dr, Lynchburg VA. Rivers conducted further research and found that the accounting on the foreclosure had not been approved and the case was not matured against Sackett.

207.    On August 20, 2018; a hearing was held by Motion of Rivers and the Court validated the fact that the accounting of foreclosure had not been approved.

208.    In September 2018; Sackett filed his final accounting. The accounting is fraud and incomplete. [9] With the new evidence proving the discrepancies the Court cannot approve the accounting. The matter will revert back to the 2008 foreclosure and cases will be filed against Sackett and his conspirator's for fraud. Rivers claims against Sackett are directly related to the negligence of the Federal agencies and the agents that investigated the matter and the money deposited in ODNB, Select, SBFC and BOJ

209.    On April 11, 2019; the Court determined that Rivers was a "party of interest" and had rights to the foreclosure proceeds if the funds were determined to have originated from her or her signature, insurance policies or equity. A trial date is pending for the determination of the accounting of foreclosure. However, the fraud has already been committed by Sackett who's case against him has not matured. The crimes against Sackett are ripe and Rivers has claims against Sackett and all parties that conspired to help him defraud the Court including Peters, Luck and Laura Sackett, and Sherri Sackett. Sherri Sackett received money from Sackett and deposited over $14,000 into a joint bank account maintained by her and Sackett. Sherri Sackett was aware that the funds were part of the foreclosure proceeds, and as a former employee of Community First Bank, knew that Wynne, who was operating an illegal banking enterprise, and Sackett were under investigation by Federal agencies, the VSP and the Virginia State Bar.

210.    Rivers never assigned her contractual rights under her purchase contracts, her purchase of her truck from Battlefield or her insurance policies.  Rivers was not aware of the Select bank accounts or the fact that her money was ultimately transferred to Sackett in September and October 2008.

---

[9] Rivers objected to the accounting and filed exceptions to the Commissioners report. The scope of the case is currently only "the accounting of foreclosure", however, Sackett has filed his final accounting under oath with the Clerk of the Court.

211.    The acts committed are Federal because they are related the criminal acts investigated by the FBI, VSP, IRS, DEER, PRILLIMAN and TALBOTT

212.    As a direct and proximate result the banks and their bank officers named Defendant, allowing their bank to be used as a conduit to operate an illegal banking enterprise and Sackett and Sherri Sackett's use of Rivers funds and funds obtained from Rivers through the use of her signature, equity and purchase contracts, and insurance policies, Rivers was damaged by the loss of the value of her money obtained illegally from her signature equity and purchase contracts, and insurance policies between 2007 and 2008 in an amount to be proved at trial but no less than $500,000.00

**PREDICATE ACT 2:**
**WIRE FRAUD**

213.    Each transfer described below is equal to one singular predicate act

214.    Sackett received $98, 000 from Wynne by wire transfer on October 15, 2008 and deposited it in his American National Bank account. Sackett spent the funds on himself personally and for his business expenses. Over $12,000.00 was paid to Sherri Sackett personally and for her expenses. The funds written to Sackett, Sherri Sackett and to CASH were deposited into a joint account held and maintained by Sackett and Sherri Sackett.

215.    On November 23, 2009; Sacketts parents transferred $72,000.00 to an additional Select bank account held and maintained by Sackett to cover the shortage of the foreclosure funds he had transferred into his Select joint bank account and spent. Sackett paid over $68,000.00 to Bank of America for the mortgage on the 2008 foreclosed property. The remaining funds were paid to Wynne from Sacketts escrow account. ($74,000.00 was previously transferred from the same Select bank account held and maintained by Catherine R Wynne, Wynne POA and paid for by Rivers funds and funds obtained from the illegal use of her signature, equity and purchase contracts and insurance policies) Mason a former employee of Community First Bank was the

officer named on both the Catherine R Wynne Lines of Credit and the Line of Credit for Luck and Laura Sackett

216.     Wire fraud is a predicate act for a violation of 18 USC §1962

217.     As a direct and proximate result the banks and their bank officers named Defendant, allowing their bank to be used as a conduit to operate an illegal banking enterprise and  Sackett and Sherri Sackett's use of Rivers funds and funds obtained from Rivers through the use of her signature, equity and purchase contracts, and insurance policies, Rivers was damaged by the loss of the value of her money obtained illegally from her signature equity and purchase contracts, and insurance policies in an amount to be proved at trial but no less than $170,000.00

## United States Federal Investigations
## Yield No Charges or Indictments

## COUNT FOUR - CONSPIRACY TO DEPRIVE RIVERS RIGHTS AND REMEDY TO RESTITUTION AND HER ASSETS
## FEDERAL, CITY, COUNTY, STATE AGENCY AND AGENTS DEFENDANTS

**218.**     Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein

**219.**     On May 3, 2019; Rivers obtained "new evidence" from the VSP that proved that her claims investigated and reported to the County, City and State agencies were part of the overall investigation being conducted Federally. More specifically the case investigated by the VSP were being worked Federally by the Internal Revenue Service. More specifically, Special Agent Karen Deer of the IRS Roanoke VA. The Federal prosecutor was Assistant US Attorney Patrick Hogeboom. One of the cases investigated by the VSP was the case regarding Rivers purchase of the F650 truck that was used as a vehicle for Battlefield Ford to pay Wynne a kick back of $43,000 plus for deposit into Wynne's Bank of the James account and then transferred to Peter Sackett's American

National Bank Account. Instead of charging or indicting the investigated Defendants, the VSP case was closed and the case remained open with the Federal agencies named Defendant. Sackett obtained over $114,000.00, no less than $74,000.00 from the use of Rivers funds signature. Rivers is entitled to a remedy of no less than $188,000.00 trebled to $564,000.00

220.     From 2010, the agencies named Defendants and the Agents employed by them, acting under color of law of the United States, and State and Commonwealth of Virginia combined, conspired and confederated together to deny Rivers and her businesses and other victims their clearly established rights and/or the right not to be deprived of property without the due process of law using the victims claims to bolster their own Federal investigation.

221.     By the time Rivers and her businesses, Serene Creek Run Riding Center, Serene Creek Run Holding Co., CVLR Performance Horses Inc, and other victims in more than one state, had lost their property, the Defendants knew or should have known that there was a pattern of RICO/Racketeering still being perpetrated on Rivers and the other victims and continued to operate illegally in the State of Virginia from within the state banks named Defendant and by the Co-Conspirators

222.     In part, the FBI, SCC, Criminal Division of the IRS, the United States and the agents, Deer, Talbott, and Prilliman named Defendant benefited from the pattern of RICO alleged herein for, among other ways: (a) increased prestige and promotions for the individual agents named in this Complaint and the Salem field offices, arising from the successful investigation into Wynne, his illegal banking enterprise and ODNB; (b) concealing from the public and courts that the Attorney General Guidelines had been systematically ignored by the Federal agencies, thus saving the State and Federal agencies from extreme embarrassment associated with its handling of the investigation of Wynne and his illegal banking investigation; (c) concealing from the public and courts

that Wynne and Twery were operating their illegal banking enterprise from Wynne's jail cell and throughout the Cities and Counties of Virginia violating the laws of the United States of America and the Commonwealth of Virginia, thus saving the Federal and State agencies and the United States from adverse publicity associated with the indictment of pillars of the community and endangering the safety and soundness of the State banks or the public revelation of the conduct alleged within this complaint; or (d) concealing from the public, courts, and litigants the conduct alleged in this complaint in order to prevent persons from challenging the legality of their convictions; (e) concealing from the public, courts and litigants the conduct alleged in this complaint, thus precluding persons/victims who had been unlawfully harmed, including the Rivers, from making claims against the Defendant United States

223.     In furtherance, the Federal agencies and agents named Defendant; (a) failed to interview potential witnesses who had information concerning Wynne and Twery's illegal banking enterprise; (b) failed to follow up on leads and evidence provided to them regarding the illegal enterprise and the suffering of Rivers; (c) otherwise failed to issue warrants for arrest and (d) failed to prosecute

224.     As a direct, proximate, foreseeable and intended result of the acts and omissions alleged in this complaint, the Federal and State agencies and their agents and employees named Defendant prevented Rivers from (a) learning the truth they had uncovered in their investigations of Wynne, the pattern of RICO activity being perpetrated by the Defendants they investigated, and the named Defendants in this complaint, the illegal banking activity of Select, SBFC, Mason, Thomas, BOJ, Chadwell, ODNB, Merrill, Potter, UBC, and Union, and thus allow Rivers, her businesses, Serene Creek Run Holding Company, CVLR Performance Horses Inc."CVLR Inc., and CVLR d/b/a, and the other female victims to continue to be victimized and suffer as a result of not allowing for criminal charges, indictment and/or prosecution, (b) precluding Rivers

from seeking civil judgment against those responsible for her suffering, and (c) denying Rivers from her clearly established constitutional rights as guaranteed by the First Amendment to the United States Constitution in that Rivers was deprived her right to seek a civil remedy since 2009 when Rivers provided SCC, FBI, VSP, Talbott, Prilliman, IRS, Deer, and the local Bedford and Lynchburg Police and Sheriff departments with her documents and evidence for review and/or to be copied and used to prosecute, to the present because the illegal activity is still on-going resulting in lost damages.

225.    Rivers, her businesses and other female victims have suffered as a result of the Defendants named above, neglecting their duties, and aiding and abetting the criminal activity of the RICO enterprises and barring local law enforcement from investigating and prosecuting John Wynne, his entities and the Defendants they investigated described further in this complaint. They decided Rivers, her businesses and other victims were expendable

### COUNT FIVE - RICO 18 U.S.C §1961 §1962 (b)(c)(d) §1964 (c)

226.    Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein. Defendants SELECT, SBFC, ODNB, UNION, UBC, MASON, THOMAS, BEACH,

227.    At all times relevant to the Complaint, the Defendants, named in this Count, who are or have been corporations, subsidiaries, officers, directors, recorded owners and agents; aligned with and continue to do and have done business with each other, operated and/or managed "enterprise" scenarios in a "pattern of racketeering activity" committing related acts within a ten year period of time and were each an enterprise as that term is defined in RICO Racketeering 18 U.S.C §1961 (5) and used in 18 U.S.C §1962(b)(c)(d)

228.     The Defendants conspired to and did derive or receive income from a pattern of racketeering activity some part of which was used to operate and conduct the affairs of the bank.

229.     The Defendants identified in this Count was associated directly or indirectly with or employed by the banks named Defendant and conspired to and did, as part of that employment or association, conduct or participate in the conduct of the affairs of the banks named Defendant through engaging in a pattern of racketeering activity. Such conduct is a violation.

230.     The actions of each of the Defendants identified in this Count, including the conduct of the affairs of the bank, through a pattern of racketeering activity, took place over a period of at ten years and included multiple acts

## THE BANKS, BANK EMPLOYEES AND INVESTORS

**PREDICATE ACT 1:**
**OBTAINING MONEY THROUGH FRAUD**

231.     Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein. Each payment received and transferred is equal to one separate predicate act

232.     On May 11, 2018; Rivers obtained "new discovery evidence"; showing that on February 19, 2009 Potter received, endorsed and exchanged Rivers $8881.35, insurance check # 2687309, payable to Rivers business CVLR Inc. and ODNB for policy #FSL4151961 01 dated 7/8/08 for a cashier's check without Rivers knowledge after Rivers attorney had the check hand delivered to ODNB along with a letter and instructions to: (a) pay CVLR invoices for work that was completed on the property, namely clean-up, equipment rental and well permit (paid for by Rivers), (b) pay for well installation, (c) lights installation, and the remainder of the check should be deposited

into the 1650 Partners LLC account (used by Rivers for expenses on the property). The money was deposited into the Catherine R Wynne DDA #xxxxxx6856

233.　　　The Defendants conspired to and did derive or receive income from a pattern of racketeering activity some part of which was used to operate and conduct the affairs of the bank.

234.　　　The Defendants identified in this Count was associated directly or indirectly with or employed by the banks named Defendant and conspired to and did, as part of that employment or association, conduct or participate in the conduct of the affairs of the banks named Defendant through engaging in a pattern of racketeering activity. Such conduct is a violation.

235.　　　The actions of each of the Defendants identified in this Count, including the conduct of the affairs of the bank, through a pattern of racketeering activity, took place over a period of at least ten years and included multiple acts of mail and wire fraud.

**PREDICATE ACT 2:**
**OBTAINING MONEY THROUGH FRAUD / MONEY LAUNDERING**

**236.**　　Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein. Each payment received and transferred is equal to one separate predicate act.

237.　　　On or about May 25, 2016; ODNB provided "new discovery evidence" to Rivers showing that ODNB intentionally (a) deposited Rivers insurance funds into accounts unrelated to Rivers, account DDA #xxxxxx6856 Catherine R Wynne Estate, (b) transferred Rivers insurance funds into a Select Bank #xxx4439 Catherine R Wynne by John L Wynne; $85,000.00 Credit Line, (c) allowed for check #1015 RE: Select Bank note 2204 to be written by John L Wynne on April 20, 2009 from account DDA #xxxxxx6856 to Select Bank for $10,315.90 funds cleared on April 27, 2009, without Rivers permission or notice to Rivers.

**PREDICATE ACT 3:**
**OBTAINING MONEY THROUGH FRAUD – MONEY LAUNDERING**

238.     Rivers incorporates the facts alleged in the above paragraphs and repeats and

recites and states her claims and facts contained in all previous allegations as if fully set

forth in paragraphs herein

239.     On or about October 16, 2016 ;Select provided Rivers with "new discovery

evidence" showing the Select Bank Interest Only Credit Line #xxx4439, note 2204, was

opened on or about July 1, 2008, by bank officer, Walter "Chip" Mason, for Catherine R

Wynne Estate, John L Wynne POA using Catherine R Wynne social security number

xxx-xx-9197 and backed by securities, 1160 shares of EXXON Mobile Corporation stock

to launder, receive and deposit Rivers insurance money without Rivers permission or

notice to Rivers.

240.     Rivers insurance money flowed from ODNB to BOJ, and from aN ODNB

Catherine R Wynne account and into the Select Bank account DDA Catherine R Wynne

Estate by John L Wynne account #xxx4439, Note 2204, without Rivers permission or

notice to Rivers.  The amount of money paid to Select Bank by ODNB $10,315.90 and

paid to Terrance White $10,315.35 is the same amount of money within cents paid to

1650 by ATC $10,514.20 on a check dated November 20, 2007 and deposited into the

same BOJ account.

241.     Select, ODNB and SBFC transferred money for John L Wynne as POA of

Catherine R Wynne estate during all times relevant to this matter.

242.     Select  and SBFC allowed Wynne to open credit lines backed by Exxon stock in

the name of deceased individuals, for whom Wynne was a POA, using their social

security numbers.  Select and SBFC allowed for Rivers closing proceeds and insurance

money to flow through to these accounts from ODNB and BOJ.

243.     Mason was in charge of and named as officer on the Wynne account forms.

Select and SBFC did not have Rivers permission and did not notify Rivers of the

transfers and deposits of her closing and insurance funds from ODNB and BOJ to the Catherine R Wynne account and credit line at Select Bank

244.     BOJ allowed money to be deposited and transferred in and out of Rivermont Banking Co Inc. and various BOJ accounts operated by John L Wynne as President of Rivermont Banking Co Inc. POA of Southgate Leigh Wynne Testamentary Trust during all times relevant to this matter. This being the same money transferred to the Select bank account maintained by Sackett for the use of a sham foreclosure.


## HISTORY

245.     Beach, Mason and Thomas agreed to allow Wynne the illegal use of 1650 Partners LLC, BMTW LLC, and WMTD LLC after he paid the claims they had against him. [10]

246.     Mason, and Thomas while under a non-compete agreement with American National Bank, and Wynne under a banking ban and only allowed to perform 3 loans a year, intentionally strategized, laid plans to open Select, SBFC, in March 2007 and obtain and use Rivers signature and equity to help open ODNB in July 2007 for a profit and obtain money through fraud. [11]

247.     Between 2007 and 2014; ODNB, Select, SBFC and BOJ opened accounts for Wynne, and RBC for the use of transferring money illegally obtained while knowing that RBC was not a certified bank authorized to transact banking business in the State of Virginia and that Wynne was barred from the banking business completely in 2006

---

[10] 1650, BMTW AND WMTD were the previous owners of Community First Bank owning the voting shares of stock until the bank ceased to operate. BMTW(Beach Mason Thomas and Wynne) is now WINTON INVESTMENTS. WMTD (Wynne Mason Thomas and Davis) is now A40.

[11] ODNB had previously been denied State Registry as a bank by the Bureau of Financial Institutions in 2004 or 2005. Wynne as a consultant helped them obtain their charter as a National Bank. Wynne ran ODNB as his own

248.     Beach conspired with Winton Investments LLC using the same open-ended

pattern of RICO as detailed in the Supreme Court of Virginia Justices opinion in *CVLR*

*Performance Horses Inc vs John Wynne, et al 2014* (assigning controlling interest of

1650 Partners LLC to Wynne to obtain money through fraud and operate his illegal

banking enterprise). Beach deliberately assigned his interest in BMTW LLC in March

2009 for profit and re-payment of no less than $287,000.00 Beach lent to Wynne after

Wynne and Rivers met with Beach in March or April of 2007 to discuss RBC lending and

Beach investing in her commercial equestrian project.

249.     The money Beach gave to Wynne was used for settling the claims Mason,

Thomas and Beach had against Wynne, by investing in the scam and obtaining money

and signatures under false pretense to start-up Select, SBFC, after Mason, Thomas and

non-compete timeframe passed, the opening ODNB, and scheme Rivers out of her

commercial equity and money and used to fraudulently convey property stolen by

Wynne, Sackett and RBC. 1650 Partners LLC was formed between 1999 and 2002 to

acquire voting shares of Community First Bank and its members were Wynne, Mason

and Thomas.  Beach was an owner of interest.

250.     Beach is currently conspiring with Winton Investments LLC who is using property

(2232 Ridgewood Dr, Lynchburg) and funds owned by Rivers that were obtained under

false pretense and transferred in and out of Sackett's bank account obtained through

fraud as collateral for a $815,000.00 BOJ Credit Line.  The property whose foreclosure

accounting has not been proven in the City of Lynchburg and currently clouded by Lis

Pendens and is being used as collateral to obtain large loans, credit lines and deeds of

trust of over $500,000.00 from and with BOJ and their trustees named Defendant in this

complaint to invest in large land deals in Forest, Bedford County

251.  Beach owns RTB Properties LLC which was the company that leased the office where and when Foster signed her August 23, 2006 Demand Note and Deed between Foster and Sackett related to Sackett's fraud and obtaining Rivers funds through fraud.

252.  Rivers alleges the Defendants criminal acts were motivated by an economic purpose

253.  The Defendants participated in the operation or management of an enterprise through a pattern of racketeering activity. *H.J. Inc. v N.W. Bell Tel. Co.* 492 US 229, 239 (1989)

254.  Rivers asks the Court to award her equitable relief pursuant to 18 U.S.C. §1964(c); RICO also provides for equitable relief, including divestiture of defendant's interest in the enterprise, restrictions on future activities, reorganization, or dissolution. *See The Proper Point of Accrual of a Private Civil RICO Action,* 65, *NYUL Rev* 172, 180 (1990)

## COUNT SIX:  NEGLIGENCE
### FAILING TO INDICT THE PARTIES DEFENDANT FOR OBTAINING MONEY AND SIGNATURE UNDER FALSE PRETENSES UNDER
### 18 U.S. Code §1341 and §18.2-178 of the Code of Virginia

**255.**  Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein

256.  The Defendants, FBI, Criminal Division of the IRS, Albemarle County, Virginia State Police and Agents, Talbott, Deer and Prilliman failed to charge and indict the parties involved in the insurance and mortgage fraud with obtaining Rivers money under false pretense and attempting to obtain money under false pretense.

257.  On May 3, 2019; Rivers learned that a case was open relating to the above criminal matter. Rivers later learned the case was worked by the FBI. The case was being worked Federally.

258.     CVLR Inc was the owner of the insurance checks submitted to ODNB who claimed to be the mortgagee. Rivers dissolved CVLR Inc on or about, November 16, 2015. Rivers is now the owner of all CVLR Inc. award, claims and equity

259.     On May 11, 2018; Rivers learned that on February 20, 2009; ODNB's Senior Vice President, Potter, accepted Rivers business insurance check #2687309 for $8881.35 payable to CVLR Inc and ODNB and exchanged it for a cashier's check and presented it to a party unknown to Rivers.

260.     Documents obtained by VSP, Special Agent James Vaughn on January 20, 2011; indicate that on February 19, 2009; ODNB submitted their accounting entries for 1650 Insurance Proceeds and Disbursements, even though 1650 did not have an insurance policy and did not own the insurance proceeds referred to, indicating that check #2687309 for $8881.35 had been received on 2/19/09 payable to CVLR Inc/ODNB and that a check #1658 was paid to Terrance White for $6837.49 and the balance of the proceeds $2043.86 was deposited to DDA #1010006856 (Catherine R Wynne Estate).

261.     On December 28, 2010; Rivers and Special Agent James Vaughan met with former Bedford County Assistant Commonwealth Attorney Mark B Robinette to discuss Rivers accusations of larceny/fraud/embezzlement by John L Wynne. Rivers was being prevented from obtaining loan documents to pay off loans or refinance mortgages she was led to believe she had with ODNB, 1650 Partners LLC and Rivermont Banking Company Inc. She feared she, like the other victims, Karen Foster and Victoria Marsh and others was a victim of his scheme and was going to lose her farm. Robinette informed Rivers that he could not pursue the charges against Wynne in criminal court. He felt the insurance Fraud could yield evidence to pursue, and he suggested that

Vaughan narrow the focus of the investigation to that charge. Case file #10-86-02-1050-13.

262.     In February 2011; Rivers was later told by Vaughan that they weren't indicting Wynne because they could not find what he did with the insurance funds even though Rivers was able to point out to them in their own, multi-jurisdictional grand jury subpoenaed documents the actual deposits of the insurance funds into Wynne's Bank of the James account.

263.     The Defendants failure to indict or charge took away Rivers remedy for restitution and the replacement of her assets. The Defendants used Rivers claims, State and Federal to bolster the Federal case against the Defendants. The claims against the Defendants in good conscience belongs to Rivers, which Rivers is in equity and law entitled to recover

<u>COUNT SEVEN: NEGLIGENCE</u>
**FAILING TO INDICT THE PARTIES INVESTIGATED FOR OBTAINING MONEY AND
SIGNATURE UNDER FALSE PRETENSE.
UNDER 18 U.S. Code §1341 and §18.2-178 of the Code of Virginia –
DEFENDANTS, FBI, VSP, CRIMINAL DIVISION OF THE IRS, AND THE
INVESTIGATING AGENTS**

**264.**     Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein. The Defendants failed to indict or charge the investigated Defendants under the facts below

265.     On or about September 24, 2008; Rivers; Rivers contacted BB&T Equipment Finance to inquire for the pay out on a truck she purchased from Battlefield in May 2007 for $60,000.00 with a $16,000.00 deposit she borrowed from RBC. Rivers learned her pay off amount was $96,000.00.

266.     Wynne who had been banned from banking and entered an agreement with the Bureau of Financial Institutions to only transact three loans a year, and was being

investigated by the VSP, the FBI and the Criminal Division of the IRS, panicked and instructed Peter Sackett to foreclose on victim Karen Fosters home located at 2232 Ridgewood Dr, Lynchburg. Wynne used the foreclosure as a vehicle to move and hide the funds he obtained from Rivers and her signature, equity, insurance policies and contracts into accounts held at Select Bank. Sackett agreed because he was also under investigation by the Virginia State Bar and the VSP. Sackett also knew that if Wynne was indicted that the other Defendants, ODNB, Select, SBFC, the officers of the banks, Beach, Mason, Thomas, Peters Sr, and his wife would be implicated.[12]

267.    On October 14, 2008; Rivers reached out to BB&T again to inquire about the payoff on the truck.

268.    On October 15, 2008; Rivers asked BB&T to fax a copy of the loan that Rivers had never seen, to her at her lawyers office. The document was dated September 27, 2007 and revealed that (a) Rivers name was not on her loan, (b) the borrower name on the loan was RBC. (c) Rivers insurance policy information was on the loan, (d) the amount of the loan was $104,000.00, (e) the monthly payments were $1976.00. Rivers found out about the illegal loan for her F650, and immediately contacted Battlefield, John Deere Credit and ODNB to ask for all pay off amounts and documents regarding her truck loans, equipment loans, start up and mortgage loans. [13] Rivers was asking for the closing documents for the scam closing of the riding center and intended to go after Wynne criminally.[14]

---

[12] There is ongoing litigation in the City of Lynchburg CL11-05550 relating to the accounting of foreclosure and the deed of 2232 Ridgewood Dr. The Court validated on August 20, 2018 that the accounting had not been approved or recorded and the case against Sackett was not mature. Rivers has filed motions for Validation of the Deed and Motion for the Court to confirm that they have jurisdiction over the Federal matters.

[13] Rivers was not aware at the time that her name wasn't on her 11/20/07 ODNB Credit Line Deed of Trust or her Deed.

[14] Wynne was the named trustee on Joey Sanzone's personal and "Riverfront" business loans and credit lines recorded in the City of Lynchburg and Franklin County since 2003. A fact that was never divulged to Rivers. 12. Sanzone and Mark Donevant are not named Defendants but it is important to note that they intentionally lied to Rivers, warned Wynne and of Rivers findings and withheld closing documents from her. Sanzone lied to Rivers and

269.     On October 15, 2008; ODNB, within hours, received a written instruction from Wynne to remove Rivers from all 1650 accounts and not give her anything CVLR and 1650 related. President Charles Darnell sent out a memo to Mary Lou Hopkins and Kelly Potter with Wynne's instructions. removed Rivers from the acquisition loans for $25,000.00 and $475,000.00 that she had signed personally as a guarantor, from the signature authorization form for the 1650 Partners LLC and the loans and forms were changed dated October 15, 2008 and added Wynne's brother, James Wynne. Wynne immediately wired $98,000.00 to Peter Sackett's AMNB account

270.     On October 15, 2008; Mary Lou Hopkins and Kelly Potter, of ODNB spoke with Rivers and both refused to give her or send her any pay off information or documents relating to her, CVLR or 1650.

271.     ODNB was paid between $1800 and $3000 monthly between December 2007 and December 2011.

272.     Between June 2009 and January 2011; Rivers, through her attorneys were negotiating a SBA loan with Wachovia Bank and JGA Associates for $1.3 Million and $750,000.00 to be used by Rivers to refinance her loans with RBC, ODNB, John Deere Credit and her ODNB Credit Line Deed of Trust (mortgage) and perform on her memorandum of understanding and buy out 1650 for $50,000.00. Rivers paid JGA, Wells Fargo and CIT for loan applications and other processing fees, over $5000.00. In January or February 2011; the Wells Fargo loan process was completed and accepted but halted because the bank couldn't commit to the loan due to Rivers not being able to obtain the necessary historical documents she needed from the Defendants, ODNB and Battlefield Ford.

---

promised he would go after Wynne criminally if she, (a) kept "clean hands" and continued per the terms of her; (i) loan contracts with Wynne and RBC, and ODNB commitment letter, (ii) memorandum of understanding with Wynne, (iii) mortgage with ODNB, and (b) form another company to pay $15,000.00 deposit and enter into a separate agreement to acquire the riding center, and agree to give up her interest in 1650.

273. On February 14, 2011; Rivers was Court Ordered to leave the riding center property because she didn't own the property and her company was unable to obtain the financing to purchase the property.[15]

274. The Defendants failure to indict or charge took away Rivers remedy for restitution and the replacement of her assets. The Defendants used Rivers claims, State and Federal to bolster the Federal case against the Defendants. The claims against the Defendants in good conscience belongs to Rivers, which Rivers is in equity and law entitled to recovers

275. Rivers reserves her right to amend this complaint to include causes of actions against Sackett and any party involved in obtaining Rivers funds under fraud.

### COUNT EIGHT:   RICO 18 U.S.C §1961 §1962 (b)(c)(d) §1964 (c)

**276.** Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein

277. At all times relevant to the Complaint, the Defendants, named in this Count, who are or have been corporations, subsidiaries, officers, directors, recorded owners and agents; aligned with and continue to do and have done business with each other, operated and/or managed "enterprise" scenarios in a "pattern of racketeering activity" committing related acts within a ten year period of time and were each an enterprise as that term is defined in RICO Racketeering 18 U.S.C §1961 (5) and used in 18 U.S.C §1962(b)(c)(d)

278. The Defendants hold funds that in equity and good conscience belong to Rivers, which Rivers is in equity and law entitled to recover

---

[15] Rivers has not exercised her Option on the property, had not been paid consideration to remove the cloud on the property and the contract with 1650 was null and void, incomplete and did not pay Rivers for her interest in 1650

279.    The Defendants conspired to and did derive or receive income from a pattern of racketeering activity some part of which was used to operate and conduct the affairs of the bank.

280.    The Defendants identified in this Count was associated directly or indirectly with S&R, SAF, BBoyz, BBoys and Serene Creek Run Association and did conduct or participate in the conduct of their affairs through engaging in a pattern of racketeering activity. Such conduct is a violation.

281.    The Defendants identified in this Count are associated directly or indirectly with ODNB, Union, UBC, HOA, Richardson, Fariss, Baker, Wills, West, Krycinski, Bradbury, Frear, Fluker, Edmondon and Northcreek, and Patel, Day, Morrison, Twery, Schenkel, Gay and Grant and the illegal enterprise

282.    The actions of each of the Defendants identified in this Count, through a pattern of racketeering activity, took place over a period of at least ten years and included multiple acts

## COMMON RELATIONSHIP - THE SELLERS, CONTRACTORS AND BUYERS

283.    S&R applied with Bedford County to build a Subdivision in Forest Virginia and to also be classified as a Family Subdivision. That portion of the property that was to be a subdivision included amenities and Lots 1-35 and A-K. The raw land and riding center portions of the remaining S&R property were included in the family subdivision and could not be sold or conveyed to any party other than a family member or member of S&R for five years.  According to the Serene Creek Run Covenants and Declarations, the "raw-land" was to be subdivided and annexed at a later date.

284.    On April 24, 2007; S&R negotiated and signed and on February 16, 2016; agreed to (a) the Noticed Exercised Option contract between Rivers (CVLR d/b/a) and S&R, (b) the consideration both parties agreed to and that had been paid out and received, (c) the terms of the Option contract, (d) the addendum to the purchase contract for the riding

center, and (e) the contract included the raw land and certain lots located in the Serene Creek Run and Serenity Acres subdivisions

**PREDICATE ACT 1:**
**BANK FRAUD IN FRAUDULENTLY CONVEYING THE COMMERCIAL SUBDIVISON PROPERTY AND RIDING CENTER**

285.     Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein. Each payment received and transferred is equal to one separate predicate act

286.     On or about August 21, 2009, SAF was intentionally organized and registered as a Limited Liability Company to do business in the State of Virginia, by Lester and/or Lester and Beck as the member(s) and trustee(s) in liquidation of S&R under the advice of her attorneys Defendant Day and Grant, to hide assets derived from the illegal acts and omissions of Lester, Beck and S&R since 2007 and plead in this complaint

287.     On or about September 3, 2009,  BBoyz was intentionally organized and registered as a limited liability company to do business in the State of Virginia, by Beck and/or Lester and Beck as the member(s) and trustee(s) in liquidation of S&R under the advice of his attorney, to hide assets derived from the illegal acts and omissions of Beck, Lester and S&R plead in this complaint

288.     Beck, Lester and S&R agreed to, negotiated, and received consideration for the Noticed Exercised Option and First Right of Refusal contract between CVLR d/b/a and S&R that includes terms, a lease with the Serene Creek Run HOA/Assoc,  and the 2007 addendum pertaining to the riding center, the HOA membership for Rivers and named CVLR d/b/a as the purchaser of the riding center. (a) $20,000.00 deposit on or about April 20, 2007, (b)$1 on April 24, 2007, (c) $500.00 per month between July 2007 and December 2007, (d) $5000.00 deposit in July 2007, (e) $475,000.00 on November 20, 2007, and (f) $500 and $700 per month for S&R property taxes between 2008 and 2014

289.     Bank fraud is a predicate act for a violation of 18 U.S.C. §1962

290.     The Union documents received by Rivers in 2018; show that Lester had no
income in 2005, 2006, or 2007 and show the pattern of RICO activity and ongoing
activity of the enterprise(s); (a) S&R mortgage loans were coming due in March 2007,
(b) the original 2003 guarantor, Henry and Helga Beck of Tessy Plastics, refused to
guarantee new loans or a increase or extension for the credit limit for S&R, Lester or
Beck, (c) the family subdivision (development) included the riding center and the raw
land and could not be sold to any outside party other than a family or LLC member of
S&R, Beck or Lester until 2009, (d) S&R used the land that was optioned to Rivers as
collateral for a loan to build the Serene Creek Run Subdivision club house and pool
amenities and had not gifted the land to the HOA and could not due to Rivers Option, (e)
Planters Bank (Union) was the senior lien holder on the property, and (f) S&R could not
have a new appraisal done on the property to acquire new loans due to the title search
that would uncover Rivers (CVLR d/b/a) Option Lien Contract with the first right of
refusal.

291.     The Defendants coordinated, organized and perfected the scheme to
intentionally use Rivers and CVLR d/b/a debt service, commercial contracts, equity,
signature, insurance policies, property appraisals, marketing, commercial business
plans, project parameters, friendship and trust in them.

292.     On October 23, 2017; Union provided Rivers with "new discovery evidence"
related to three S&R loans on the S&R property, the sales, partial satisfactions and
releases, all documents Rivers could not have known or reviewed until that day. The
documents revealed that:

293.     A. On August 10, 2009; Richardson of ATC faxed 12 pages to Union successor
of StellarOne Corp, with a cover page informing "Beth" that she was closing on Lot 33
Riley Run in the Serene Creek Run subdivision and the S& R property lien for S&R loan

#xxxx16765, $1,700,000.00, describing the property as Tax Map #99-A-28, 99-3-1, 3, 3A, 3B, that being the same property conveyed to S&R by V.Howard Belcher and Margaret T Belcher, by deed dated November 19, 2003 of record in the aforementioned Clerk's Office as Inst #030024202. The property had not been paid off and there had been no release of the riding center property after the November 20, 2007 closing.

294.    B.   Union successor of StallarOne Corp sent the Certificate and Affidavit of Satisfaction certifying that the full amount of $1,700,000.00 had been paid in full, to Richardson of ATC to record on August 12, 2009. Rivers was not notified on or before August 10, 2009 by Union successor of StellarOne or Richardson of ATC, or Beck and Lester of S&R, that Lot 33 had been sold and was closed by Richardson of ATC and that the remaining S&R property including the riding center property had not been released on August 12, 2009.

295.    Union successor of StellarOne's, S&R Deed of Trust terms included that the bank be paid a percentage equal to 80% of lots sales as per the S&R/Deed of Trust. Union successor of StallarOne formerly Planters Bank and Trust. Planters Bank received $44,171.14 on November 21, 2007 deposited to Acct #xxxx74006, and $176,571.92 on November 26, 2007 deposited to Acct #xxxx16765 and $111,177.06 deposited to Acct #xxxx16770, paid from the "sham" closing of the riding center that was set up to dupe Rivers. Planters Bank did not obtain a release from Rivers. S&R never obtained a release from CVLR to BBoyz or SAF or S&R or the new recorded owners of the property.

296.    Union earned a substantial profit from the money it received from the sham sale of the riding center, the new loans acquired by collateralization, the continued use of the property as collateral which allowed for other loans, accounts, interest, credit lines and investments for the Defendants, the fraudulent conveyance of the other Serene Creek Run Subdivision lot sales, the bank products it provided to the Defendants from the sale

of the lots and the sale of other properties acquired from the profit the Defendants earned.

297.    Since 2007; Union has managed and operated its bank as an enterprise allowing the Defendants to obtain loans and checking accounts, collateralize for the loans, and deposit the illegally obtained funds earned from the enterprises obtained from the illegal activity into Union. Union therefore; earns a profit from: S&R, BBoyz, SAF, Lester and Beck from the sale of the S&R property, the loans acquired from collateralizing and not releasing the title to the property and the investments purchased from the sale of the property, and from Northcreek, Mrs. Edmundson and Edmundson's; (1) purchase of S&R property lots (valued at $65,000.00 per acre) #3, 2.2 acres, #6, 2 acres, #18, 4.16 acres, #34, 2.2 acres, and #J, 4.9 acres, at discounted rates, (2) obtaining substantial lot loans for the lots through First National Bank, (3) entering into sale contracts to sell the lots to buyers whose loans were inflated and large enough to pay Edmundson of Northcreek to build a home on the lots, ($250,000 - $400,000) (4) falsified applications for construction loans from First National Bank, using the property as collateral, and (5) Richardson and Fariss of ATC incomplete title searches and closings on the property and lots sold without releases or first right of refusal from Rivers. (Title examiners gave instructions to the agents that it was required that Rivers sign a release)

298.    Union successor of StellarOne knew of or should have known, that the lots, sold by BBoyz and SAF to Northcreek, Mrs. Edmundson and Edmundson purchased at an amount equal to or less than Rivers discounted rate (to avoid paying Rivers), were sold without a releases from Rivers and Northcreek, Mrs. Edmundson and Edmundson borrowed between $375,000 and $450,000 for each lot as a construction loan putting the property and the new constructed home up as collateral. The funds received by Edmundson, Mrs. Edmundson and Northcreek for the sale and building of the homes on the lots were used to purchase other property and lots and Edmundson, Mrs.

Edmundson and Northcreek received large draws from the money. Northcreek paid Edmundson, Mrs. Edmundson and his family large profits from each loan derived from the sale of the lots without a release from Rivers.

299.     Each of the Defendants agreed to and acted in concert with the others carrying out the fraudulent scheme described above

300.     Each of the Defendants in this complaint performed acts in furtherance of the common fraudulent scheme which was part of the overall RICO activity.

301.     Rivers has suffered damages as a result of the Defendants' concerted activities as described above, for which the Defendants are jointly and severally liable.

302.     Edmundson, Mrs. Edmundson and Northcreek, S&R, Lester and Beck, BBoyz and SAF, Union, UBC, Select, SBFC, and ODNB, hold funds that in equity and good conscience belong to Rivers, which Rivers is in equity and law entitled to recover.

303.     Each of the lots and property described within Rivers Notice to Exercise the Option and First Right of Refusal contract and located in the Serene Creek Run and Serenity Acres Farm subdivisions, were sold without a release from Rivers and was fraudulently conveyed and obtained under false pretense with certain property being sold and obtained by the illegal use of Rivers signature and insurance policies under false pretense

304.     On February 23, 2016; Beck was served with the February 16, 2016 Notice to Exercise the Option and First Right of Refusal contract by Bedford County Sheriff Deputy. Lester was served with the Notice to Exercise the April 24, 2007 Option contract on February 17, 2016 by Bedford County Sheriff Deputy

305.     The actions of the Defendants were an extreme deviation from reasonable standards of conduct, undertaken intentionally with actual malice, intent to defraud and/or with a reckless disregard for their likely consequences. As a result, Rivers is entitled to an award of damages.

306.     Rivers is entitled to damages in the amount to be determined at trial but no less

than $15,000.00 deducted from $65,000.00 per acre and all the income earned from the

sale of each lot named and described within the Option to Purchase and First Right of

Refusal, trebled.

**PREDICATE ACT 2:**
**OBTAIN FUNDS THROUGH SALE CONTRACT AND LEASE**
**307.**     Each payment received and transferred is equal to one separate predicate act

308.     On or about May 22, 2018; Beck attempted to sell property located at 5040

Cottontown Rd as 4988 Cottontown Rd, Forest VA and advertise it in the MLS. Rivers

contacted all realtors that had the listing to notify them that the property was under cloud

with pending litigation, Lis Pendens and her Excerised Contract to Purchase. Rivers

asked each of them to set up a time for her to walk through the property and schedule a

time for closing per the price terms in her contract, $15, 000 per acre.

309.     On August 28, 2017; Frank Launderee provided Rivers buyers agent, Scott Estes

with a Full Disclosure form filled out and signed by Beck. The disclosure stated, "This

serves as official notification that the above property is owned by myself free and clear of

any type of lien. Once the property is under contract, two acres will be zoned off along

with the house. This will be completed prior to closing." Beck was unable to produce a

release to remove the cloud. The listing was removed from the MLS.

**PREDICATE ACT 3:**
**CONSPIRACY TO COMMIT FRAUD**
**310.**     Rivers incorporates the facts alleged in the above paragraphs and repeats and

recites and states her claims and facts contained in all previous allegations as if fully set

forth in paragraphs herein[16]

311.     The HOA, agreed to, negotiated, and paid consideration to Rivers until 2011 for

mowing the addendum as per the terms within the November 5, 2011 Addendum to the

---

[16] The Statute of Limitations for conspiracy is 2 years after the last occurrence.

Contract of Purchase between S&R and CVLR which survived the closing and is now part of the February 16, 2016 Notice to Exercise the Option (Purchase contract) As per the addendum, (a) Rivers is the HOA member, (b) the HOA paid $75 per month to Rivers (CVLR d/b/a) to maintain the mowing of the grass in the common areas around the clubhouse, pool and playground, between 2007 and 2011, (c) Rivers (CVLR d/b/a) is the purchaser, (d) the $5,000.00 deposit, escrowed by Counts Realty Group (Counts) will be refunded to Rivers (CVLR d/b/a), (e) the $20,000.00 deposit to S&R is non-refundable upon acceptable binding contract between the parties and (f) S&R will pay up to $1200.00 to CVLR d/b/a towards the connection to a new well.

312.    In 2011; The HOA refused taking membership money from Rivers and Rivers has not had full use of the amenities as defined in the recorded Serene Creek Run Covenants and Declarations dated December 2006 since 2011.

313.    Rivers has provided Lester and Beck, S&R, SAF, and HOA with all notices sent to homeowners and all pleadings filed against the Serene Creek Run subdivision property and recorded with the Bedford County Clerk's Office

**314.**    Beck, S&R, SAF, Loftis and Lester, knowing and intentionally mislead real estate agents, closing agents, buyers, and insurance agents that the Option and First Right of Refusal contract (Exercised) between S&R and Rivers (CVLR d//b/a) wasn't valid and if it was valid, had ran out to protect the Defendants and help them profit and dupe Rivers

315.    Beck, BBoyz, S&R, SAF and Lester are attempting to sell the S&R property while encumbered in this litigation, by Lis Pendens filed in the Bedford County Clerk's office Instrument No #180004869 and by Rivers Noticed Exercised Option and First Right of Refusal contract also recorded in the Clerk's office as Instrument No 160003231,

316.    Beck and Bboyz are currently using the property as collateral for the benefit of Beck, BBoyz, Lester, their entities and assigns, and are currently attempting to sell portions of the property for subdivision; although Rivers has offered to negotiate and

requests they set up a time for closing. The Defendants refuse to perform on the contract with Rivers

**317.** Based on the Defendants' fraudulent misrepresentations and other illegal actions in connection with the fraudulent conveyances, Rivers bring this action against the Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C §1961 (5) §1962 (b)(c)(d) §1964(c) *et. seq.,* and other federal and state laws. Defendants engaged in such violations directly and as co-conspirators. The state law claims arise out of the same transaction or occurrence or series of transactions or occurrences that form the basis of RICO cause of action.

**PREDICATE ACT 4:**
**FRAUD**

**318.** Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein

**319.** Defendants ATC, CTI, Richardson and Fariss facilitated the transfer of funds $475,000.00 from ODNB to S & R, Union and UBC (then Planters Bank), Beck and Lester for the benefit of the Defendants paid from the forged HUD statement.

320. As a result of Defendants proximate acts and omissions, Rivers purchased a $1,000,000.00 Life Insurance Policy to insure her estate, paid for an appraisal for the S &R to CVLRd/b/a purchase contract and ODNB accepted monthly consideration payments each month between December 2007 and February 2011 as a mortgage payment - "malicious interference with the use of property falls into category of Injury to the Person."

321. The Defendants ATC, Richardson, Fariss, engaged in Prohibited practices as set forth in Virginia Codes§18.2-169 and § 59.1-200(A)(13) by intentionally filing false

documents in the public record and operating in commerce in a biased manner inconsistent with Virginia law ."The key component is the 3rd parties' Intent" *Chaves v. Johnson,* 335 SE 2d 97 - Va: Supreme Court 1985.

322.     As a direct, proximate, foreseeable and intended result of the acts alleged in this complaint, the Defendants intentionally caused Rivers to attend a scam closing, sign loan documents that didn't pay for her property, and pay considerable amounts of money toward forged mortgages that her name was omitted from by Richardson

323.     In furtherance of the intentional forgery, Defendants ATC, and Fariss altered the final HUD statement and the pay-out amounts of $496,150.00 paid to the Defendants named on the HUD statement for the sale of the riding center property under contract to the purchaser Rivers (CVLR d/b/a)  and named in this complaint.

324.     Richardson, Fariss and ATC continued to make a profit, defraud buyers, close and settle S&R property, and issue insurance policies and certificates for the property, intentionally without obtaining releases from Rivers

325.     The actions of the Defendants Richardson, Fariss and ATC, alleged above, were an extreme deviation from reasonable standards of conduct, undertaken intentionally with actual malice, and/or with a reckless disregard for their likely consequences.  As a result, the Rivers is entitled to an award of punitive damages.

### COUNT NINE- NEGLIGENCE
**THE DEFENDANTS ALBEMARLE COUNTY, BEDFORD COUNTY, CITY OF LYNCHBURG, FBI, VSP, AND THE AGENTS THAT INVESTIGATED THE DEFENDANTS FAILED TO INDICT OR CHARGE UNDER CONSPIRACY**

**326.**     Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein. The parties referred to are Defendants BBOYZ, S&R, SAF, BBOYS, EDMUNDSON, NORTHCREEK, BAKER, FRIEDMAN, ROGERS, MATTHEW KRYCINSKI, SARAH KRYCINSKI, FREAR, FLUKER, UNION, UBC, ATC, FARRIS,

RICHARDSON, and COUNTS. The Defendants were aware of and intentionally neglected to indict and charge for the following facts:

327.    The Defendants allowed the parties to commit actions in the over 75 transactions--- the cross-collateralized loans, purchase of investment property, the sale of investment properties, fraudulent conveyances and closings of 17 lots and the riding center, the resell of at least 7 lots, the conveyance of the amenities property, ODNB's theft of Rivers insurance funds, the hiding of the insurance funds from ODNB to BOJ and Select with each transaction being a separate transaction,  and the ongoing investment and use of Rivers original equity, insurance policies and signature on contracts--- establish an ongoing, "open-ended" pattern of racketeering activity.

328.    The Defendants allowed the parties actions, individually and together, demonstrating a pattern of fraudulent activity with the following common elements:  (a) contacting and negotiating with victims and businesses interested in purchasing property, (b) offering to option and/or sell and/or finance the purchase of the property, (c) enter into contracts promising to sell and/or finance the loans to purchase the property upon payment of a deposit and/or agreement to guarantee after receiving business records, tax records, identification records and personal information is obtained by the Defendants, (d) failing to provide documents for review, (e) forging bank commitment letters, deeds of trust, deeds, project parameters, HUD statements and, (f) using Rivers consideration paid not for what she intended or what was agreed to under contract terms, (g) forging documents required to close on transactions, transferring the deposits and consideration paid, mortgage and loan money paid out by Rivers, (h) obtaining Rivers insurance proceeds, equity and interest, the Defendants derived from the schemes. Pursuant to that defined in RICO Racketeering 18 U.S.C §1961 (5) and used in 18 U.S.C §1962(b)(c)(d) §1964(c)

329.     The delay in the indictment and prosecution and Rivers loss of business caused the business and Rivers to incur additional expenses but personally enriched the Defendants, who, contrary to the representations made to Rivers and other victims, prior to signing contracts and obtaining deposits and funds for consideration, loan and insurance payments, marketing, etc, had no intention actually to sell and/or purchase the property and/or provide loans to Rivers for the property, but used Rivers and her businesses as the debt service and Rivers contracts as assets to earn a substantial profit, equity, credit, interest and income.

330.     The Defendants described above identified in this Count did intentionally allow the parties to commit, conspire to, as part of the acts and omissions, conduct or participate in the conduct of the fraudulent affairs of Union, UBC, BOJ, Select, SBFC, and the enterprises owned, managed and operated them through engaging in a pattern of racketeering activity.  Pursuant to that defined in RICO Racketeering 18 U.S.C §1961 (5) and used in 18 U.S.C §1962(b)(c)(d) and §1964(c)

331.     Through their conduct, the Defendants allowed distributed communications by United States mail which included misrepresentations of material fact regarding Rivers commercial contracts, equity, business, proceeds, chattel, and insurance policies and have made or caused to be made interstate wire transfers as a result of such misrepresentations.  Examples of such communications and transfers in furtherance of the fraudulent schemes are described in throughout this complaint

332.     By virtue of these and similar communications occurring within a ten year period, the Defendants parties to engaged in and to continue to engage in an uninterrupted series of predicate acts of mail and wire fraud, obtaining money through fraud and fraudulent conveyance that are related to one another in furtherance of the fraudulent schemes

333.     As a direct and proximate result of the conduct of the Defendants identified in this

Count as set forth herein, allowed the parties to conduct illegal acts of and investments

made in the cross-collateralizing loans, sale of the commercial property and fraudulent

conveyances, use of Rivers commercial contracts, equity, insurance policies and

identity, Rivers has been injured in her businesses and property and continues to suffer

injuries, including the amount of her equity, lost profit, investment and legal expenses.

334.     At all times relevant to the Complaint, the Defendants allowed the parties who

are described as the parties who are or have been corporations, subsidiaries, officers,

directors, recorded owners and agents; aligned with and continue to do and have done

business with each other, operated and/or managed "enterprise" scenarios in a "pattern

of racketeering activity" committing related acts within a ten year period of time and were

each an enterprise as that term is defined in RICO Racketeering 18 U.S.C §1961 (5) and

used in 18 U.S.C §1962(b)(c)(d) and §1964(c)

335.     Between October 25, 2017 and May 31, 2018, Union has provided "new

discovery evidence" to Rivers showing the RICO activity of the enterprise(s) including

but not limited to the purchase contracts and; (a) the profit earned, (b) the loans and

equity acquired, (c) the building of new infrastructure, (d) the payoff of business and

mortgage loans, (e) and cross-collateralizing the property and loans, (f) selling lots, (g)

orchestrating a scam sale of the riding center, (h) and not releasing the riding center until

2009 to allow Beck and Lester, BBoyz, S&R and SAF to pay off business and mortgage

loans and notes.

## COUNT TEN– FRAUDULENT CONVEYANCE
### FRAUDULENTLY CONVEYING THE PROPERTY WHILE UNDER CLOUD AND FAILURE TO SATISFY THE CONTRACT

336.     Rivers incorporates the facts alleged in the above paragraphs and repeats and

recites and states her claims and facts contained in all previous allegations as if fully set

forth in paragraphs herein

337.    The money earned from the sale of the lots, the deposits and closing pay outs, the commissions, proceeds checks, and sale and deposits of the newly built homes was transferred into accounts owned by Beck and Lester, SAF, BBoyz, North Creek, Mrs. Edmundson and Edmundson (and Wynne) and held at Union. The money was then used to pay for business expenses, payroll, other investments, loans, purchases of other investment property in the area and to pay Co-Conspirator Defendants named in this complaint.

338.    Union provided Rivers with "new discovery evidence" indicating that on August 30, 2007 Lester and Beck's divorce attorney(s) validated the value of the Purchase and Sale contracts between S&R and Rivers. The estimated value of the CVLR d/b/a Purchase and sale contracts for the riding center; $550,000.00 and the 17 remaining S&R lots at $1,417,166.00 and the raw land was $1,700,000.00.

339.    Union bank provided yet more "new discovery evidence" indicating that on September 5, 2007 the first deed of trust Loan #XXXXX6765 was cross-collateralized with Loan #XXXXX6770. The first Deed of Trust was collateralized by "raw land" TM#99-3-1 and the amenities property TM#99-A-28 and the riding center TM#99-3-3 and the entire parcel(s) were part of a "family subdivision (development).

340.    Pursuant to Bedford County Zoning Ordinances, land designated as "family subdivision (development) can not be sold to any party other than a family member or member of the owner trust or limited liability company until five years after the "family subdivision (development) application is approved and recorded.

341.    Between April 17, 2007 and August 7, 2007; S&R, Beck and Lester entered into and agreed to the November 5, 2007 Addendum to Purchase and sale contracts which survives the contracts. The addendum is made part of the February 16, 2016 Notice to Exercise the April 24, 2007 Option and First Right of Refusal Agreement between S&R and Rivers (CVLR d/b/a)

342.     On October 23, 2017; Union provided Rivers with "new discovery evidence" related to three S&R loans on the S&R property, the sales, partial satisfactions and releases, all documents Rivers could not have known or reviewed until that day.  The documents revealed that:

A. On August 10, 2009; Richardson of ATC faxed 12 pages to  Union successor of StellarOne Corp, with a cover page informing "Beth" that she was closing on **Lot 33** Riley Run in the Serene Creek Run subdivision and the S& R property lien for S&R loan #xxxx16765, $1,700,000.00, describing the property as Tax Map #99-A-28, 99-3-1, 3, 3A, 3B, that being the same property conveyed to S&R by V.Howard Belcher and Margaret T Belcher, by deed dated November 19, 2003 of record in the aforementioned Clerk's Office as Inst #030024202.  The property had not been paid off and there had been no release of the riding center property after the November 20, 2007 closing.

B.  Union successor of StallarOne Corp sent the Certificate and Affidavit of Satisfaction certifying that the full amount of $1,700,000.00 had been paid in full, to Richardson of ATC to record on August 12, 2009.  Rivers was not notified on or before August 10, 2009 by Union successor of StellarOne or Richardson of ATC, or Beck and Lester of S&R, that Lot 33 had been sold and was closed by Richardson of ATC and that the remaining S&R property including the riding center property had not been released on August 12, 2009.

343.     Union successor of StellarOne's, S&R Deed of Trust terms included that the bank be paid a percentage equal to 80% of lots sales as per the S&R/Deed of Trust. Union successor of StellarOne formerly Planters Bank and Trust.   Planters Bank received $44,171.14 on November 21, 2007 deposited to Acct #xxxx74006, and $176,571.92 on November 26, 2007 deposited to Acct #xxxx16765 and $111,177.06 deposited to Acct #xxxx16770, paid from the "sham" closing of the riding center that was set up to dupe Rivers. Planters Bank did not obtain a release from Rivers.  S&R never

obtained a release from CVLR to BBoyz or SAF or S&R or the new recorded owners of the property.

344.     Union earned a substantial profit from the money it received from the sham sale of the riding center, the new loans acquired by collateralization, the continued use of the property as collateral which allowed for other loans, accounts, interest, credit lines and investments for the Defendants, the fraudulent conveyance of the other Serene Creek Run Subdivision lot sales, the bank products it provided to the Defendants from the sale of the lots and the sale of other properties acquired from the profit the Defendants earned.

345.     Each of the Defendants named in this Count agreed to and acted in concert with the others carrying out the fraudulent scheme described above

346.     Each of the Defendants in this complaint performed acts in furtherance of the common fraudulent scheme which was part of the overall RICO activity.

347.     Rivers has suffered damages as a result of the Defendants' concerted activities as described above, for which the Defendants are jointly and severally liable.

348.     Edmundson, Mrs. Edmundson, Northcreek, S&R, Lester and Beck, BBoyz and SAF, and Union, hold funds that in equity and good conscience belong to Rivers, which Rivers is in equity and law entitled to recover.

349.     Each of the 17 lots and property described within Rivers Notice to Exercise the Option and First Right of Refusal contract and located in the Serene Creek Run and Serenity Acres Farm subdivisions, were sold without a release from Rivers and was fraudulently conveyed and obtained under false pretense with certain property being sold and obtained by the illegal use of Rivers signature and insurance policies under false pretense

350.     Since 2007; Union has managed and operated its bank as an enterprise allowing the Defendants to obtain loans and checking accounts, collateralize for the loans, and

deposit the illegally obtained funds earned from the enterprises obtained from the illegal activity into Union. Union therefore; earns a profit from: S&R, BBoyz, SAF, Lester and Beck from the sale of the S&R property, the loans acquired from collateralizing and not releasing the title to the property and the investments purchased from the sale of the property, and from Northcreek, Mrs. Edmundson and Edmundson's; (1) purchase of S&R property lots (valued at $65,000.00 per acre) #3, 2.2 acres, #6, 2 acres, #18, 4.16 acres, #34, 2.2 acres, and #J, 4.9 acres, at discounted rates, (2) obtaining substantial lot loans for the lots through First National Bank, (3) entering into sale contracts to sell the lots to buyers whose loans were inflated and large enough to pay Edmundson of Northcreek to build a home on the lots, ($250,000 - $400,000) (4) falsified applications for construction loans from First National Bank, using the property as collateral, and (5) Richardson and Fariss of ATC incomplete title searches and closings on the property and lots sold without releases or first right of refusal from Rivers. (Title examiners gave instructions to the agents that it was required that Rivers sign a release)

351.     Union successor of StellarOne knew of or should have known, that the lots, sold by BBoyz and SAF to Northcreek, Mrs. Edmundson and Edmundson purchased at an amount equal to or less than Rivers discounted rate (to avoid paying Rivers), were sold without a releases from Rivers and Northcreek, Mrs. Edmundson and Edmundson borrowed between $375,000 and $450,000 for each lot as a construction loan putting the property and the new constructed home up as collateral. The funds received by Edmundson, Mrs. Edmundson and Northcreek for the sale and building of the homes on the lots were used to purchase other property and lots and Edmundson, Mrs. Edmundson and Northcreek received large draws from the money. Northcreek paid Edmundson, Mrs. Edmundson and his family large profits from each loan derived from the sale of the lots without a release from Rivers.

**352.**     Rivers has suffered damages as a result of the Defendants' concerted activities as described above, for which the Defendants are jointly and severally liable at an amount valued at no less than $65,000.00 - $15,000.00 ($50,000.00) per acre (184.77) = $9,238,500.00 and the value of the income earned from the sale and transfer of the property to be determined at trial, trebled.

**COUNT ELEVEN- NEGLIGENCE**
**DEFENDANTS BEDFORD COUNTY CAMPBELL COUNTY, ALBEMARLE COUNTY, CITY OF LYNCHBURG, VSP, TALBOTT, PRILLIMAN, AND DEER**

353.     Based on the following facts, the Defendants failed to charge, indict, or prosecute the parties involved for their criminal acts including but not limited to forgery, fraud, obtaining and attempting to obtain money under false pretense

354.     In 2016; Richardson admitted to Investigator Dooley of the Bedford Police Department that she on November 21, 2007, altered the November 20, 2007 ODNB Credit Line Deed of Trust for $500,000.00 adding John Wynne's name and omitting Rivers name and on November 21, 2007 altering the HUD statement dating it November 20, 2007 and omitting Rivers and Lester's names.[17]

355.     Between 2007 and 2014 Richardson, Fariss, and ATC were been paid to notarize and prepared closing documents, insurance and title policies, HUD statements, proceeds checks and other closing documents, for property sold in the Serene Creek Run and Serenity Acres subdivisions currently under contract between S&R (Beck and Lester) and Rivers (CVLR d/b/a). The Defendants were aware of and intentionally neglected to indict and charge for the following facts:

356.     ATC, Fariss and Richardson of ATC were paid no less than $ 700.00 because they agreed to perform a sham closing on November 20, 2007 and forge the CLDOT and HUD documents obtained for Rivers contract to purchase the riding center.

---

[17] Statute of limitations of fraud is 2 years after you find it. Bedford County opened the case, performed standard procedures to investigated it

**357.**     ATC paid, by instruction of Beck and Lester, Counts an amount equal to 5% commission on Rivers contracts for the purchase of the riding center, $23,750.00 on November 20, 2007 and $5000.00 on August 8, 2008 from the forged, unsigned November 20, 2007 HUD statement

358.     Twery was paid $1200.00 by ATC from the November 20, 2007 HUD statement forged by Richardson, for his part in negotiating and coordinating the scam closing to dupe Rivers. (an amount equal to Rivers (CVLR d/b/a well allowance promised in the Addendum to the Purchase contract).

359.     Schenkel, Twery, Day and Morrison were paid for coordinating, negotiating and orchestrating the fraudulent scheme and the scam closing between the Defendants. to dupe Rivers and to benefit their clients to (a) refinance and pay off .S&R mortgage loans, $174,000.00 - $1,700,000.00 (b) obtain a new construction loan $110,000.00 to build the Serene Creek Run clubhouse and pool, (c) to pay off existing mortgages on the B&B Ice Cream Store for up to $66,000.00 and therefore earn a profit and income from the existing business, (c) to invest, purchase, and build on other property and businesses, and (d) to earn a profit and income from those businesses and property they had invested in and purchased from the equity, credit, and funds obtained under false pretense.

### COUNT TWELVE– FRAUDULENT CONVEYANCE
### DEFENDANTS BECK, LESTER, S&R, SAF, BBOYZ, BBOYS, NORTHCREEK, UNION, GAY, PATEL, LOFTIS

**360.**     Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein

**361.**     Northcreek was and is operated by Mrs. Edmundson, and Edmundson as a mere instrumentality, without observing corporate formalities, without sufficient capital to transact the business it transacted and as a fraud on creditors of those companies

362.    The Defendants used the property lots, Optioned to Rivers and several Optioned to Northcreek, and now under contract by Rivers to purchase, located in the Serene Creek Run and SAF subdivision, to (a) hold closings with Poplar Forest and ATC who paid individuals and businesses named on the HUD statements, (b) obtain loans from Union and FNB of over $250,000 – $400,000 each to build homes and then, (c)sell the homes for a personal and commercial profit. The money obtained from the sale of the homes was then used to (a) purchase other investment property to be used as collateral to (b) obtain larger loans to (c) build yet more homes to (d) sell for a larger profit.

363.    On August 9, 2011; SAF Deeded Lot 3 to Northcreek. $40,000.00 Consideration Instrument No 110007858. The Deed was prepared by Twery. The assessed value was $80,000.00. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

364.    On or about November 29, 2011; Bboyz and SAF Deeded Lot 6 to Northcreek. $48,000.00 Consideration Instrument No 110011438. The Deed was prepared by Twery. The assessed value was $72,000.00. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

365.    On January 24, 2008; SAR Deeded Lot 16 to Lester and HOA, Instrument No 120011178. . The Deed was prepared by Day. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

366.    On October 12, 2012; Lester Deeded Lot 16 to SAF. $40,000.00 Consideration Instrument No 110007858. The Deed was prepared by Grant. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

367.    On March 7, 2014; SAF sold Lot 16 to Mr and Mrs Krycinski. $95,000.00.00 Consideration Instrument No 140001823. The assessed value was $125,000.00. Rivers

has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

368.    On October 7, 2011; Bboyz and SAF sold Lot 18 to Northcreek. $55,000.00 Consideration Instrument No 100006927. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

369.    On October 7, 2011; Northcreek used Lot 18 as collateral and cross-collateralized the loan to acquire a $267,200.00 CLDOT Instrument No 110009570 with First National Bank (acquired by Union). The title company required a release from Rivers but Northcreek, Twery was named trustee. Twery and FNB went around it and decided to write the loan as a Lot loan. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

370.    On July 13, 2007; S&R Deeded Lot 21 to Lester. $500,000.00 Consideration, Day was the closing agent and prepared the Deed. $364,000.00 was used to pay off a Union (Planter Bank) note. The note was used to refinance an existing debt recorded as Instrument No #070010954. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

371.    On August 27, 2007; Lester paid off the Union (Planters Bank) $364,000.00 loan. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

372.    On November 25, 2008; Lester Deeded Lot 21 to Beck. $500,000.00 Consideration, Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

373.    On November 4, 2008; (Lester sold Lot 28 to Beck on May 22, 2008) Lester Deeded Lot 28 to Beck. Instrument No 080013853 Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

374.    On August 18, 2009; S&R Deeded Lot 33 to Beck, Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

375.    On August 18, 2009; Beck Deeded Lot 33 to Mr and Mrs Frear, $75,000.00 Consideration. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

376.    On July 26, 2010; S&R Deeded Lot 34 to Bboyz and SAF. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

377.    On May 14, 2012; Bboyz and SAF Deeded Lot 34 to Mr and Mrs Fluker, $41,000.00 Consideration. Twery prepared the Deed. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase

378.    On May 6, 2019; Beck sold a subdivided portion of Tax Map 99-3-1, 2 acres along Cottontown Rd, Forest VA to WEST and WILLS, $245,000.00 consideration. Patel performed the title search and was the settlement agent conducting the closing. Gay prepared the Deed without the benefit of a title search. Loftis provided incorrect release information. Gay, Patel and Loftis, knowingly orchestrated the sale of the property intentionally going around the cloud on the property. Rivers has never given a release on the Option to Purchase. The lot is currently under contract with Rivers to purchase.

379.    On May 6, 2019; Rivers learned that the property located at 5040 Cottontown Rd, Forest VA had been subdivided and Beck was selling the 2 acres with the home he built on property that Rivers continues to have a cloud on. The property now described as 4988 Cottontown Rd was sold for $245,000.00 to Christy West and Judy Wills Deed Instrument No 190003938. The Deed of Trust between West and Wills and United Wholesale Mortgage and United Shore Financial Services LLC, Loan #1219070788 for $232,750.00 signed 5/6/19 describes the property as being the same property conveyed

to them by Deed from Beck dated April 23, 2019 and recorded immediately hereto. Sam Patel of Anchor Title and Escrow LLC was the title searcher and settlement agent for the closing of the property.

380.     On June 5, 2019; Rivers mailed a Demand Notice to Beck, Wills, West, Lester, Bboyz, Bboys, S&R, SAF, and copied to Loftis, Patel, Anchor Title, UWM, and Emanuel Voces. Only Beck has responded to the Demand Notice. Beck disputes the demand.

381.     Through a series of telephone calls, texts messages and emails to Patel, Century 21 and Loftis, Rivers learned that Loftis had sent a release to Patel. Rivers asked repeatedly for a copy of the release and was refused. Loftis later admitted in a email that he provided Patel with prior litigation cases that had been dismissed between Beck and her former company, CVLR Inc and cases that the Court did not have jurisdiction over Beck and had been dismissed. Loftis failed to provide him with the Federal litigation that he had been made aware of by notice from Rivers.

## THE ATTORNEYS NAMED DEFENDANT

**382.**     Day negotiated, conducted illegal affairs and had an interest in and was associated with illegal enterprises, directly and indirectly and participated in the conduct of such enterprise's affairs through a pattern of racketeering activity. Day was paid $500 from the altered HUD statement and altered the Deed preparing it without a benefit of a title search.

383.     Morrison negotiated, conducted illegal affairs and had an interest in and was associated with illegal enterprises, directly and indirectly and participated in the conduct of such enterprise's affairs through a pattern of racketeering activity.

384.     Morrison as counsel for Lester, intentionally, conspired with Lester to use Rivers contracts as leverage in her divorce action against Beck and "swept the Option contract under the rug" for the sole purpose of getting paid, allowing Lester, Beck and S&R to continue to use the S&R property as collateral to obtain loans, refinance and renew

existing loans and mortgages, make a large profit from the use of Rivers contracts and the sales of the property. Morrison was paid $20,000.00 from the altered HUD statement.

385.    Morrison conspired to help launder the money and hide the option cloud and the sales and negotiations pertaining to the S& R Farm property from Rivers, any new homeowner, the title and insurance companies, and the Federal Agencies investigating the matters.

386.    Schenkel conspired to help launder the money and hide the option cloud and the sales and negotiations pertaining to the S& R Farm property from Rivers, any new homeowner, the title and insurance companies, and the Federal Agencies investigating the matters. Schenkel negotiated, conducted illegal affairs and had an interest in and was associated with illegal enterprises, directly and indirectly and participated in the conduct of such enterprise's affairs through a pattern of racketeering activity

387.    Schenkel negotiated, conducted illegal affairs and had an interest in and was associated with illegal enterprises, directly and indirectly and participated in the conduct of such enterprise's affairs through a pattern of racketeering activity.

388.    Schenkel as counsel for Beck, intentionally conspired with Beck to use Rivers contracts as leverage in his divorce action against Lester and "swept the Option contract under the rug", for the sole purpose of getting paid and allowing Beck, Lester and S&R to use the S&R property as collateral to obtain loans, refinance and renew existing loans and mortgages, make a large profit from the use of Rivers contracts and the sales of the property.

389.    Grant negotiated, by misinforming the title companies and realtors that the option had ran out and conducted illegal affairs and had an interest in and was associated with illegal enterprises, directly and indirectly and participated in the conduct of such enterprise's affairs through a pattern of racketeering activity.

390.    Grant as counsel for Lester, and SAF set up "SAF" and Trusts, intentionally, for the sole purpose of getting paid and allowing Beck, Lester, and S&R to continue to use the S&R property as collateral to obtain loans, refinance and renew existing loans and mortgages, make a large profit from the use of Rivers contracts and sales of the property.

391.    Grant conspired to help launder the money and hide the option cloud and the sales and negotiations pertaining to the S& R Farm property from Rivers, any new homeowner, the title and insurance companies, and the Federal Agencies investigating the matters

392.    Gay, Loftis and Patel negotiated and had an interest in the sale of 4988 Cottontown Rd on May 6, 2019 and was associated with illegal enterprises, directly and indirectly and participated in the conduct of such enterprise's affairs through a pattern of racketeering activity.

393.    Gay, Loftis and Patel intentionally, for the sole purpose of getting paid and allowing Beck, Lester, and S&R to fraudulently convey the property and make a large profit from the use of Rivers contracts and sales of the property.

394.    Gay, Loftis and Patel were notified buy Rivers of the remaining cloud on the property and conspired to help hide the option cloud pertaining to the S& R Farm property

395.    Patel negotiated, and had an interest in and was associated with illegal enterprises, directly and indirectly and participated in the conduct of such enterprise's affairs through a pattern of racketeering activity.

396.    Patel as title agent, intentionally, for the sole purpose of getting paid and allowing Beck, Lester, and S&R to fraudulently convey the property and make a large profit from the use of Rivers contracts and sales of the property.

**397.**     Patel was notified buy Rivers of the remaining cloud on the property and

conspired to help hide the option cloud pertaining to the S& R Farm property

### COUNT THIRTEEN: NEGLIGENCE – FAILURE TO INDICT THE INVESTIGAGED DEFENDANTS FOR MAIL AND WIRE FRAUD
### _DEFENDANTS FBI, VSP, CRIMINAL DIVISION OF THE IRS, BEDFORD COUNTY, CAMPBELL COUNTY UNDER
### 18 U.S.C §1341 or §1343 AND 18 U.S.C §1341 and/or §1343

**398.**     Rivers incorporates the facts alleged in the above paragraphs and repeats and

recites and states her claims and facts contained in all previous allegations as if fully set

forth in paragraphs herein

**399.**     The Defendants investigated the fact that; In 2016, Rivers obtained "new

discovery evidence" that Beck, Lester, and S&R admitted in court pleadings that ODNB

changed Rivers Commitment Letter for the purchase of the riding center property.

400.     The Defendants investigated the fact that; On or about November 20, 2007;

ODNB, transferred $500,000.00 and BOJ, Chapman accepted the wire transfer in to

ATC, Fariss, Richardson bank account, as consideration for Rivers purchase of the

riding center, into ATC's BOJ account. The title to the property was not released to

ODNB or Rivers

401.     The Defendants investigated the fact that; Richardson emailed and/or faxed the

sham closing and forged unsigned documents to the investigated Defendants, Counts,

ODNB, Twery, Schenkel, Day, Morrison, Lester, Beck, and S&R  between November 13,

2007 and November 26, 2007.

402.     The Defendants investigated the fact that; On or about November 26, 2007;

Richardson used the United States Postal Service, to mail the sham closing documents

including unsigned documents and the forged documents to ODNB. The documents acts

would have been separate from the mailing act.

403.    The Defendants were negligent in their actions allowing each of the Defendants they investigated and described in this Count, to, through a pattern of racketeering activity, commit crimes against Rivers that is still ongoing and took place within a ten-year period and included multiple acts of <u>mail and</u> wire fraud

404.    The Defendants failed to indict the parties they investigated, and that Rivers had claims against and could realize a monetary restitution. Those parties the Defendants investigated continuously engaged in criminal activities, including, but not limited to<u>, mail and</u> wire fraud, obtaining money through fraud, RICO and forgery, as described in this complaint, as part of their overall scheme, within a ten year period and will continue indefinitely unless prevented.

405.    The Defendants investigated, *infra, did* conspire to and did engage in <u>mail and wire</u> fraud in violation of 18 U.S.C §1341 or §1343 by using, or causing to be used, the United States mail or interstate wire communications in furtherance of and for the purposes of executing schemes to defraud and to obtain and maintain money by false pretenses.  Each use of the mails or interstate wire communications in furtherance of and for the purposes of executing the schemes constitutes a separate and distinct violation of 18 U.S.C §1341 and/or §1343.  Some of the relevant uses are described and incorporated by reference herein.

406.    The Defendants investigated used mail and wire communications to collect and launder the proceeds of the fraudulent scheme, to induce Rivers to forward or cause payments to be forwarded to them, to forestall Rivers inquiry into the scheme, and to induce Rivers participation in paying the debt service.

407.    The negligence of the Defendants allowing the Defendants they investigated to use the United States mail and for the purpose of causing the use of the United States mail and interstate wire communications by others were made with the intent to defraud Rivers, and her businesses and Rivers in fact reasonably relied upon such misrepresentations, including

those relating to the nature of Rivers contracts to purchase the commercial property, and contracts to purchase, to perform on the contracts "keeping clean hands" and insure vehicles and trailers for her equine business, to her detriment.

### COUNT FOURTEEN: NEGLIGENCE – FAILURE TO INDICT OR CHARGE THE INVESTIGATED DEFENDANTS WITH MONEY LAUNDERING UNDER 18 U.S.C §1956 and 1957 – DEFENDANTS FBI, IRS, VSP, BEDFORD COUNTY, CAMPBELL COUNTY, CITY OF LYNCHBURG, TALBOTT, DEER AND PRILLIMAN

**408.** Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein

409. On April 7, 2008 ODNB received two insurance checks from Rivers who hand delivered them to the bank located in North Garden. Mary Lou Hopkins instructed Rivers to endorse the checks and refused to cash the smaller Check #2683641, $2043.86. The larger Check #2683642 was for $24,265.38. Both checks were made payable to CVLR Performance Horses Inc. and ODNB. [18]

**410.** On January 20, 2011; ODNB presented documents to the VSP, Special Agent James Vaughn for John and James Wynne. ODNB's document listing the accounts for John and James Wynne indicated that several accounts had been closed and/or purged on that same day. Also one account listed Revolving/ Commercial R/E LN account #xxxx1000, $491,520.44. ODNB had been issued subpoena for a Multi-Jurisdictional Grand Jury empaneled for February 4, 2011 in Bedford County, Virginia. One of the accounts listed on the document was in the name of Catherine R Wynne account DDA #xxxxxx6856. Rivers was not named on the account and did not have access to the account.

---

[18] CVLR Inc assigned the proceeds to Rivers in 2015 before being terminated with Virginia State Corporation Commission

411.     On the same day as above VSP, Special Agent Vaughn was presented with a list of insurance proceeds and disbursements. The document listed:

A. The checks delivered to ODNB by Rivers on April 7, 2008. One of the entries on the document lists the third check received from Rivers attorney's office, check #2687309, $8881.35 on February 19, 2009 with a comment section indicating the money had been deposited into DDA #xxxxxx6856

B. The disbursements of the check proceeds had been paid to Terrance White between May 28, 2008 and February 19, 2009 with Check #1379, $5309.54, Check #1404, $4339.84, Check #1438, $9000.00, and Check #1658, $6837.49

412.     In October 2016; Rivers received documents from Select that included document reflecting loan statements with figures and check amounts matching closely to the $10,514.20 check ATC paid to 1650 on November 20, 2007, and the $10,351.35 check ODNB paid to Terrance White on July 23, 2008 and deposited for Rivermont Banking Company into John Wynne's, BOJ account #xxx1620 on July 28, 2008, and matched identically to the $10,315.90 check #1015 that Catherine R Wynne Estate paid Select on April 27, 2009. $10,000.00 of the April 27, 2009 payment was applied as a principal payment of the Select account note #xxx4439, Catherine R Wynne Credit Line Account. That account #xxx4439 also described in the documents as port #2204 being the same number found on several check payments made to Select from John Wynne's BOJ account #xxxx1620.

413.     The checks paid to Select were drawn from the same account that ODNB deposited Rivers insurance proceeds into; account DDA #xxxx6856 Catherine R Wynne Estate. The Select Credit Line account for Catherine R Wynne /John L Wynne POA was opened on July 1, 2008 (statement date) with an application dated in the back, September 3, 2004 (before Select was open for business) by John Wynne as POA for Catherine R Wynne and collateral backed by 1160 shares of Exxon Mobile stock valued

at $77,488.00. The loan officer named on the July 1, 2008 application was Walter Mason. The front page of the application indicated a BB&T money market account owned by self/Wynne for $40,000.00. The account was paid off on November 30, 2010 for $84,314.69

414.     Sometime after May 10, 2018; Rivers received subpoenaed documents from ODNB. The documents included the account records of the Catherine R Wynne DDA #xxxxxx6856 verifying the documents received from Select and described above and was that same account that had been purged the day Special Agent James Vaughn attempted to retrieve subpoenaed documents for the Multi-Jurisdictional Grand Jury to avoid indictment and possible closing of the bank and fines

**415.**     Rivers has suffered damages as a result of the Defendants activities in concert with each other as described in this Count for which the Defendants are jointly and severally liable

416.     Rivers is entitled to the full re-payment of her insurance proceeds, trebled, plus 6% interest since the day the checks were endorsed by her and provided to ODNB for safe keeping and deposit into an account of her choice for her use only.

**COUNT FIFTEEN: NEGLIGENCE – FAILURE TO CHARGE OR INDICT THE DEFENDANTS INVESTIGATED FOR MAKING FALSE STATEMENTS/FORGURY UNDER 18 U.S.C. §1001 AND §1010 – DEFENDANTS BEDFORD COUNTY, CAMPBELL COUNTY, VSP AND THE INVESTIGATING AGENTS**

**417.**     Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein. The Defendants failed to charge or indict the investigated Defendants based on the evidence provided to them and the facts below:[19]

418.     On November 30, 2016; Rivers received a copy of the entire incident report from the Bedford Police Department concerning the investigation of settlement and closing

---

[19] Only the prosecuting agencies and their agents could prosecute the criminal violations committed against Rivers.

agent, Jennifer Richardson. Rivers learned that Richardson of ATC had admitted to altering the Credit Line Deed of Trust (which in Virginia is the mortgage) the day after the November 20, 2007 closing and before it was recorded in the Bedford County Clerk's office on November 21, 2007. Richardson omitted the name of Rivers, who had agreed to put up the riding center as collateral and instead, added a third party not named in any contracts relating to the Option or sale of the riding center. The altering and forging of the $500,000.00 mortgage makes the mortgage NULLAND VOID and the money retained by the Defendants is obtained under false pretense.

419.      The new information led Rivers to the facts that Richardson, on November 21, 2007, had to write a check for the difference owed at the courthouse when recording the altered Credit Line Deed of Trust and adjusted the accounting and prepared a NEW final HUD statement and issued new proceeds checks based on the difference in the accounting. The original November 20, 2007, HUD statement is also NULL AND VOID due to the changed accounting and the NEW final HUD being drafted and signed by Richardson, Beck and John Wynne the next day. However, the final HUD is incomplete and the settlement closing for the riding center has not been finalized because the NEW final HUD was not signed by the parties to the Option or the contract; Rivers, the purchaser, and Lester, the other 50% member Seller; the parties to the contract between CVLR Performance Horses and S&R Farm LLC

420.      Richardson altered/forged the Credit Line Deed of Trust (the mortgage) and HUD statement and made false statements relating to the sale of the S&R property.

**421.**      Rivers has suffered damages as a result of the Defendants activities in concert with each other as described in this Count for which the Defendants are jointly and severally liable. Both Campbell County and Bedford County had proven cases and failed to take the case to the magistrate to charge the Defendants they investigated. The cases

were only a small fraction of the Federal investigation being investigated by the IRS, FBI and VSP. Rivers only remedy was restitution and the recovery of her assets.

## COUNT SIXTEEN: BREACH OF CONTRACT
### S&R/ Beck/Lester/Trustees in liquidation of S&R

422.　　Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein

423.　　On February 16, 2016; Rivers gave Notice to Exercise her S&R to CVLR Performance Horses Option to Purchase and First Right of Refusal Agreement dated April 24, 2007, recorded it with the Bedford County Clerk's Office and served it upon the Defendants Beck and Lester, in liquidation of S&R. Rivers also filed a Memorandum of Lis Pendens in Bedford County along with the Notice. The contract is now a Purchase Contract and includes the original addendum to the riding center contract (addendum survives the contract S&R did not perform on) and the 30-year lease with a 10 year roll over, with the Defendants Serene Creek Run Assoc. The Notice to Exercise is valid and automatically converts back to the date of signing the contract (April 24, 2007) and is good for ten years.

424.　　A "cloud" lien contract has been on the property since the Defendants Lynchburg 2008 divorce action regarding Rivers "Option Lien Contract". The Defendants swept the issue of the Option under the rug and never addressed in a court of law so to avoid paying Rivers and to avoid releasing the title to the property. Beck's filing of his first Bedford Circuit Court action in 2013 has "tolled" the statute of limitations (non-suit December 3, 2015). Beck's de-novo action in Bedford County Circuit Court in January 2016 extends the tolling period and his contract issue with Lester had not been ruled on by the Court. The cloud remains to this day with two Lis Pendens recorded in the Bedford County Clerk's Office and now Rivers federal action in this case.

425.	On May 21, 2018 Breach; Rivers learned that Beck had listed the property located at 4988 Cottontown Rd, Forest VA 24551 on the market for sale again for $249,000.00 committing a "new breach" of the February 16, 2016 Notice to Exercise the Option (Purchase contract).

426.	On August 1, 2017 Breach, Lester, allowed Beck to intentionally put the property as described as a portion of TM#99-3-1 and situated at 4988 Cottontown Rd, Forest VA back on the market for sale, online and by signage along Cottontown Rd; as 2.0 acres for $269,000.00. Lester knew the property was encumbered and also knew, because she was present at the hearing held on December 7, 2016 between the parties to the Ralph Beck v Shana Lester and Crystal Rivers matter, CL16000031,

427.	December 7, 2016 Breach: Lester confirmed to the Court on December 7, 2016 that she had prepared Deeds for the sale of the property that had not yet been recorded. Lester's, confirmation of Deeds prepared but not yet recorded i.e. the September 19, 2016, conveyance of the property to Beck was one of three new breach of contract actions that prompted Rivers to file motion to amend the complaint in this case. Lester admitted on September 19, 2016, to conveying the property to Beck, knowing the property has been encumbered by divorce and civil legal actions since 2006; and by the Lis Pendens since 2016; and by the February 16, 2016, Notice to Exercise served upon Lester and recorded in the Bedford County Clerks' office. Rivers' cloud on the title to all the property still remains active, Rivers has not agreed to release the lien and this Court has not issued an Order granting Lester leave to sell or convey the property.

428.	On December 5, 2016; Rivers learned that on or about September 19, 2016, that Lester recorded her September 19, 2016, answer to Becks' January 20, 2016 complaint against Lester, admitting to the @September 19, 2016, and fraudulent conveyance of the property to Beck, circumventing Rivers, and establishing a new cause of breach. The new breach, from facts and new discovery, is a new breach of the Notice to

Exercise the Option contract to purchase the land between S&R and CVLR, because Lester on September 19, 2016, recorded by answer under oath, the conveyance of the property to Beck, described in the Notice to Exercise the Option , after Beck. agreed to allow Lester to file her answer 9 months late

429.     On or about May 25, 2018; S&R, Beck, and Lester as former members of S&R and trustees in liquidation breached the February 16, 2016 Notice to Exercise the Option and First Right of Refusal contract, and listed the home located on TM#99-3-1 on the market with realtor Frank Londeree to sell the home and 2.0 acres of the property online and by signage along Cottontown Rd, Forest VA.  The property is being offered for sale at $269,000.00.  Rivers has offered to purchase the property under the terms of her purchase contract and has attempted to negotiate with S&R, Beck and Lester through their counsel for a closing on all the property. Rivers has filed a Lis Pendens in this matter.

430.     Because Beck, Lester and S&R agreed to and Lester of S&R signed the April 24, 2007 Option to Purchase and First Right of Refusal Agreement with Rivers (CVLR d/b/a), they have also signed and agreed to the February 16, 2016, Notice to Exercise the Option contract.

431.     The title to the property will not relate back to the date the option was granted until Rivers obtains title to the property. As a result, any third-party interests', whatsoever, in the property that arose between the date of the option and the transfer of title to the optionee are extinguishable if the owner of interest had notice of the option. In this matter, the Option was recorded and according to Virginia law, the property owners and parties of interest to the property, are noticed by the recording of the option; including any obtained title to the property that is the subject of the option, and Rivers of CVLR d/b/a (the optionee) by way of compelling specific performance has the benefit of the "claw back or relation back" rule.

432.    Rivers' Exercising the Option extinguished any third-party interest in the property and (when executed) the Deed is prior to and superior to any third-party interest in the property and will have no interest in any adverse to Rivers interest in the property.

433.    Neither Rivers, of CVLR d/b/a, as buyer; or Lester of S&R Farm LLC, as director/member or trustee in liquidation of S&R Farm LLC, the seller, have ever assigned their rights under the Notice to Exercise the Option or the former Option

434.    In May of 2008; S&R Deeded the "raw land" portion of the property TM #99-3-1, 99-A-28 to Beck, without first obtaining a release from Rivers or permission from the Bedford County Zoning Commissioner, and did not record the property as removed from the family subdivision-development and recorded the Deed in January 2010; using the property to collateralize a $100,000,000 promissory note between Beck, Lester and Helga Beck and Henry Beck due and payable in December 2019.

435.    Lester did not own the property that is the subject of the Notice to Exercise the Option in her individual capacity on April 24, 2007, nor could she have owned the property in her individual capacity on April 2008 upon agreeing, personally, to deed the property to Beck in their 5th Partial (Divorce) Settlement Agreement. The property, legally, could only be transferred from S&R to Lester, as trustee in liquidation of S&R Farm LLC, upon the cancellation of S&R on or about, December 31, 2008, and only after NOTICE to Rivers, of CVLR. Any contract, agreement, or promise would be a back up contract at best!

436.    S&R was cancelled as a limited liability company on December 31, 2008. The members immediately took full ownership of interest in the S&R assets including the Option, assignments, trust agreements, subordinates and all contracts relating to the Option and the property described in the Notice to Exercise owned by Rivers

437.    On August 1, 2017; Beck and Lester individually and as trustees in liquidation of S&R, breached the Notice to Exercise the Option contract by allowing with permission,

Beck to sell and market the home and land located at 4988 Cottontown Rd, Forest VA 24551, better described in the Bedford County Records and within the Notice to Exercise as TM#99-3-1. The property is being offered for sale as a 3-bedroom, 2.5 bath, home on a 2.0 acre lot for $269,000.00

438.      On August 31, 2017, Rivers received an <u>official notification</u> received by her real estate agent, from Beck, attesting, that;

"The property located at 4988 Cottontown Rd, Forest Va 24551, is owned by himself, free and clear of any type of lien.  Once the property is under contract, two acres will be zoned off along with the house.  This will be completed prior to closing"

439.      Lester, S&R and Beck are aware that Rivers has a binding contract and is ready and willing to proceed to closing as per her letters to Steve Grant and Mark Loftis, the listing agent, Frank Londeree, Londeree's Real Estate and Property NMG, and to Lester regarding; 1. Setting up a closing date, agreeable between all parties, after and within 90 days, but not before, the owner of the title of the property obtains a settlement from Rivers or an Order from this Court ordering the sale of the property to Rivers, and; 2. Subdividing the 2 acres with the home and recording the plat in the County records, as promised by Beck,

440.      Lester, S&R and Beck intentionally, did not give Notice to Rivers of the conveyance to Beck of property, did not pay Rivers to withdraw, or agree to release the cloud from the Court and county records, while knowing a contract to purchase existed between the parties to purchase the home and the property. Lester has not recorded the Deed of any conveyance of the property from her to Beck

441.      Lester admitted in her September 19, 2016, recorded answer, that each party, Lester and Beck, were aware of the status of the Option to Purchase and that the Option was supported by consideration.  Lester had <u>merely agreed,(in her individual capacity)</u> to deed the property (described in the Notice to Exercise the Option) to Beck as described

in detail in their "5th Partial Property Settlement Agreement and Separation Agreement and Modification Agreement", (signed by Lester on April 16, 2008 and by Beck on April 23, 2008), and filed in their divorce case, City of Lynchburg Circuit Court Case No CL06-448. At the time of signing the agreement, the property was encumbered by legal proceedings and the recorded Option on the property. The Option was referred to by both Lester and Beck as a "Lien Contract" within the divorce agreement their divorce lawyers prepared and advised them to sign.

**442.** Lester also admitted that if the Court finds the Option Agreement did attach, to the property, then the (5th Partial Settlement) Agreement would have been the result of the mutual mistake of both parties. That mistake has caused Rivers to suffer severe irreparable damage.

443. In Lester's answer of record in CL16-031; Lester stated that she sold the property to Beck and in doing so, "UNDID" the Option. The sale would have been between September 15, 2016 (prepared) and September 19, 2016(recorded) and would have been the remaining land (+/- 216 acres), better known as the "farm parcel" and "raw land", the property described in the Notice to Exercise the Option. No such document has been recorded in the Bedford County Clerk's office

444. Previous Lis Pendens were filed on February 10, 2016 and Amended on August 23, 2017 and recorded against the property.

445. Upon the title being transferred to Rivers on the day of a closing of the property; will revert the "claw back" of the property and improvements back to April 24, 2007, including any/all investments, subordinates, purchases, assignments, equity transfers, interest and premium payments earned, profit earned, and any future interest regarding the property; immediately upon transfer of the title to Rivers and not before the transfer.

446. Both Beck and Lester, and S&R agreed and allowed, without Rivers knowledge, that Union Bank and Trust, formerly StellarOne, formerly Planters Bank & Trust

Company of Virginia would not release the title to the S&R Property described within the Option contract until August 10, 2009 and that it instead, be used to collateralize other accounts, investments and transactions

447.    May 6, 2019 Breach: On May 6, 2019; Beck sold a subdivided portion of Tax Map 99-3-1, 2 acres along Cottontown Rd, Forest VA to WEST and WILLS, $245,000.00 consideration. Patel performed the title search and was the settlement agent conducting the closing. Gay prepared the Deed without the benefit of a title search. Loftis provided incorrect release information. Gay, Patel and Loftis, knowingly orchestrated the sale of the property intentionally going around the cloud on the property. Rivers has never given a release on the Option to Purchase.  The lot is currently under contract with Rivers to purchase.

448.    Rivers learned that the property located at 5040 Cottontown Rd, Forest VA had been subdivided and Beck was selling the 2 acres with the home he built on property that Rivers continues to have a cloud on. The property now described as 4988 Cottontown Rd was sold for $245,000.00 to Christy West and Judy Wills Deed Instrument No 190003938. The Deed of Trust between West and Wills and United Wholesale Mortgage and United Shore Financial Services LLC, Loan #1219070788 for $232,750.00 signed 5/6/19 describes the property as being the same property conveyed to them by Deed from Beck dated April 23, 2019 and recorded immediately hereto. Sam Patel of Anchor Title and Escrow LLC was the title searcher and settlement agent for the closing of the property.

449.    On June 5, 2019; Rivers mailed a Demand Notice to Beck, Wills, West, Lester, Bboyz, Bboys, S&R, SAF, and copied to Loftis, Patel, Anchor Title, United Wholesale Mortgage, and Trustee, Emanuel Voces. Only Beck has responded to the Demand Notice. Beck disputes the demand.

450.     Through a series of telephone calls, texts messages and emails to Patel, Century

21 and Loftis, Rivers learned that Loftis had sent a release to Patel. Rivers asked

repeatedly for a copy of the release and was refused. Loftis later admitted in a email that

he provided Patel with prior litigation cases that had been dismissed between Beck and

her former company, CVLR Inc and cases that the Court did not have jurisdiction over

Beck and had been dismissed. Loftis failed to provide him with the Federal litigation that

he had been made aware of by notice from Rivers.

451.     The "raw-land" portion of the S&R property and described within the Notice to

Exercise the Option contract continues to be used to collateralize other accounts,

investments and transactions for entities the Defendants have a interest in

### HISTORY/LITIGATION RELATING TO THE COMMERCIAL PROPERTY AT ISSUE VALUED AT OVER $13 MILLION

452.     The property at issue is located in Forest Virginia, County of Bedford.  It is

identified on the Bedford County Tax Maps as numbers TM#99-10-

A,3,6,8,16,18,21,33,34,35 andTM#99-3-1, 99-A-28 and 99-3-3 and is more particularly in

a Deed dated November 19, 2003, of record in the Clerk's Office of the Bedford County

Circuit Court as Instrument No 030024202, in the Option and First Right of Refusal

Agreement as Instrument No 070006380, the General Affidavit attaching the Notice to

Exercise the Option as Instrument No 160003231, and in the Amended Lis Pendens

filed August 23, 2017 and the Lis Pendens filed on May 25, 2018..

453.     The property is also the same described property as described in the March 21,

2012, Deed Releasing Option to Purchase and Right of First Refusal, prepared by

Frank, Spicer & Cox of Blacksburg VA for and by instruction of and payment by Lester

for S&R, and SAF, without Rivers knowledge or consent describing the land included in

the Option as S&R and Rivers intended upon signing the Option.

454. On July 14, 2006; by Order of the City of Lynchburg; Lester was given the exclusive use and possession of the riding center and adjacent pastures and the personal barn; and Beck was given the exclusive use of the marital residence and adjoining acreage

455. The S&R property and improvements have been encumbered by divorce and civil legal proceedings since April 24, 2007

456. On July 28, 2007; Lester and Beck's divorce, CL06000448, was final in the City of Lynchburg and pursuant to the provisions of Virginia Code §20-121.03; the April 16 and 18 signed, 5th Partial Settlement, Separation and Modification Agreement between Lester and Beck, and the transcripts of the May 21, 2008 depositions were attached to and made part of the FINAL DECREE OF DIVORCE issued by Pro Judge ProTempre, Richard Cunningham

457. On November 15, 2007, Lester formed the Magidson Trust with her father, Stanford Magidson, as trustee of the Magidson Trust; for the use of bargaining, selling, borrowing against, refinancing, purchasing and conveying property to such person(s), and for such sum or sums of money or other consider

458. Rivers learned in 2016 from "new discovery evidence" that on May 12, 2008; Schenkel wrote a letter to Morrison stating:

"Dear Frank, As you are aware, your client is to resolve the issue of the "Crystal Rivers document". Mr. Henry Beck is having a deed of trust placed against this property and in the title search the Crystal Rivers document has surfaced and is creating problems with regard to the title. I will appreciate hearing from you as soon as possible with regard to the status of that issue."

459. On May 14, 2008; Richard Livingston wrote a letter RE: Ralph and Shana Beck/Crystal Rivers, to Day stating:

"Sherwood, As I indicated to you, Mr and Mrs Henry Beck, the parents of Ralph Beck, made a loan to Ralph and Shana Beck in the amount of $1,000,000.00 evidenced by a promissory note dated December 31, 2004. They want to secure this note by a deed of trust on a tract of approximately 128 acres being the residue of Beck's property less the

subdivisions which they formed and less their home. It is my understanding that both Mr and Mrs Beck are willing to do this."

"In checking the title to the property, we find of record the enclosed option to purchase and first right of refusal by Crystal Rivers as well as an unreleased deed of trust in favor of Planters Bank in the principal amount of $2,500,000.00. You indicated that you thought that might have been paid and I will be in touch with Bill Herbert to see what I can find out."

"At any rate, the "Option to Purchase" and the deed of trust are hurdles to recording a deed of trust to secure the note. I was advised that both of those matters have been taken care of but they have not been of record. Please let me know what you find out as I would like to conclude this matter as soon as we possibly can. In summary Iam enclosing the following: 1. Copy of plat, 2. Copy of Option to Purchase, 3. Copy of promissory note"

460.    On May 20, 2008; Richard Livingston wrote a letter to Henry and Helga Beck's

New York attorney, James E Mackin stating among other things:

"Dear Jim, Enclosed you will find a draft of the deed of trust which I would contemplate admitting to record in the Clerk's Office of the Circuit Court of Bedford County.....If this instrument seems adequate to you, please let me know and I will endeavor to obtain its execution by Mr and Mrs Beck and admit it to record in the Bedford County Circuit Court Clerk's Office. By copy of this letter to Sherwood Day, the real estate attorney for Shana Beck, I am forwarding him a copy of the letter with the request that he give me his input as well."

461.    On August 14, 2008; Livingston prepared and recorded a Deed of Trust as

Instrument No 080013853, naming Henry and Helga Beck as legal holder of the

obligation described in the said Deed of Trust conveying property described as tax map

#99-3-1, and 99-A-28 to secure the payment of the $1,000,000.00 note and made from

property conveyed to S&R by Margaret Terrell Belcher by Deed dated November

19,2003, Bedford County Instrument No 030024202 without notice to Rivers

462.    On January 29, 2010, the DOT described above as Instrument 080013853, was

modified by Grant naming Livingston as a trustee for Henry and Helga Beck (legal

holders of the within described obligation) and recorded on May 5, 2010 as Instrument

No 100004110 without notice to Rivers

463.    On May 20, 2013; in the Ralph Beck v. Shana Lester and Crystal Rivers matter,

CL13000188, Lester, represented by counsel, answered the complaint and admitted in

#7 that she lacked the legal ability to remove the option, and that the provision in the

settlement agreement (5th partial settlement agreement) presented an impossibility and therefore was void

464.     Lester also admitted in #8 of the answer referenced above, that she has made no efforts to remove the option but lacks the legal ability to do so; and in #19 she affirmatively alleged that the agreement (5th partial settlement agreement) called for impossibility on behalf of the Lester and that provision was void upon its execution. Lester affirmatively alleged defense was relative to defense of laches, impossibility and statute of limitations of actions

465.     Rivers had at all times, kept "clean hands" and performed all of her obligations under the contracts or been ready, willing, and able to perform all of her obligations under the contracts.

466.     February 10, 2016, Rivers filed Lis Pendens on all the property named within the Exercised Option to Purchase and First Right of Refusal Agreement

467.     On February 16, 2016; Rivers Exercised and Noticed; the April 24, 2007, S&R to CVLR  Option to Purchase and First Right of Refusal Agreement that S&R promised to give CVLR the Option to Purchase for $15,000.00 per acre and the First Right of Refusal on the real property described as, "any/all remaining property of S&R Farm LLC, specifically INST #03002420 TM#99-3-1 +/- 55 acres and 99-A-28 +/- 74.4 acres, which is situated either in part or whole, next to, around, and beyond, the residence of Ralph Beck TM#99-3-3 +/- 18.35 acres".

468.     On April 20, 2016; Rivers mailed to Lester and Beck a copy of the texted Notice to Cease and Desist selling, conveying any portion of the S&R property without proper notification and release from CVLR.  Rivers asked to have the realtor set up a walk through for her to view the home and land.  Rivers got no response and none of what she asked has been done.

469.     On September 5, 2016, before Rivers learned of Lester's conveyance to Beck;

Rivers submitted a DEMAND NOTICE to both Lester and Beck, demanding to be

provided with the, among other things, a complete accounting of the sales, profits

earned, liens, closing documents, HUD statements, notices to all SCR homeowners,

contract agreements, etc. no later than September 24, 2016 so that we can proceed with

a complete walk through and set up the closing of the property within 90 days after the

accounting and legalize are complete.

470.     On January 16, 2017; Rivers hired and paid for the appraisal of the raw land and

home situated on the property known as 4988 Cottontown Rd as vacant and as

improved. The market value of the property was valued at $5,800,000.00 proposed.

Rivers project estimated 1, 1-3 and 3-5 acre lots ranging in value from $58,000.00 per

acre for 82 acres to $115,000.00 per acre for 5 lots.

471.     On January 28, 2017; Rivers sent another Notice to Cease and Desist to both

Lester and Beck. Rivers asked them to;

"Please cease and desist conveying and/or collateralizing any portion of the land so named
in the Option Agreement until we resolve the issue and to stop illegally dumping materials
and toxic waste on the property Optioned, building any structure or pools without the
necessary applications and zoning permits, moving large amounts of dirt without same as
per Bedford County ordinances and stop operating and collecting money for the use of the
two Commercial Motocross tracks. Removal of the trees and dirt is affecting the land value.
The tracks are a complained nuisance to the residential homeowners."

472.     On September 5, 2017; Lester was mailed a copy of the Letter and Notice

emailed and mailed to the listing realtor, Frank Londeree of Londeree's Real Estate and

Property NMG, regarding the property listing for 4988 Cottontown Rd, Forest VA 24551.

In the letter Rivers asks Londeree to please set up a closing date, agreeable between all

parties, after and within 90 days, but not before, the owner of the title of the property

obtains a settlement from me or a Order from the Bedford Circuit Court ordering them to

sell the property to me, subdivide the 2.0 acre property and records the new plat to include the home on 2.0 acres as you have advertised and marketed for sale.

473.    On March 8, 2018 Lester admits in Paragraph #15 of Rivers request for admissions to Lester, that she accepted the $20,000.00 consideration on April 20,2007, and in paragraph #17, she admits that $5000.00 was collected from Rivers on August 7, 2007 and also admits that an additional $20,000.00 was paid to Lester and Beck later for the July 15, 2007 Commercial Purchase Agreement between S&R and CVLR d/b/a.

474.    The additional $20,000.00 Lester referred to in her response to paragraph #17 is a bribe for $20,000.00 paid to Lester and Beck on October 24, 2007 (deposited into Suntrust account and cleared on November 6, 2007)

475.    Lester and Beck took the $20,000.00 bribe and set up a scam closing to dupe Rivers.

476.    On or about August 13, 2013, testimony was given at trial in Bedford County Circuit Court case CL12-0867 that Wynne had paid $20,000.00 to Lester and Beck . Beck testified that he had not received the money from Wynne. However, Special Agent James Vaughn of the Virginia State Police testified as to the existence of the John Wynne check, and the $20,000.00 amount payable to Ralph and Shana Beck and where it was deposited and drawn from (Bank of the James).

## CONSIDERTION AND INTENT

477.    Between April 17, 2007 and April 24, 2007; Lester, Beck, S&R, and Rivers agreed that for and in consideration of the Option and Right of First Refusal, the purchase of the riding center property contained within the Option, promises and agreements between them, Rivers agreed and would pay as consideration; $550,000.00 (later negotiated to $475,000.00) for the purchase of the riding center, the Serene Creek Run Logo, and the Option to cut and maintain the hay and pay the S&R taxes on Beck's

interest in the adjoining land @144 acres; and $500.00 per month for Lester's interest in the riding center and adjacent pastures and the remaining 17 lots until closing of the riding center. Rivers agreed to allow Lester to keep her horses on the property FREE for 6 months after closing and her children would receive FREE riding lessons for 6 months, 2 per month, and the Serene Creek Run homeowners would be allowed FREE entrance to events and receive 20% off boarding and lessons.

478.     Lester, as Manager/Director for/by S&R Farms LLC, and Rivers, as Owner for/by, paid Lester, an additional Dollar ($1) at the time the Option was executed on April 24, 2007 at the First National Bank of Altavista.

479.     April 20, 2007; S&R, Lester and Beck accepted, and Rivers paid $20,000.00 as refundable deposit toward the purchase price of the riding center portion of the Option at settlement. The riding center transaction has never been settled because Rivers and Lester did not sign the final HUD statement, S&R did not refund Rivers $20,000.00 deposit and S&R did not pay Rivers the $1200.00 well allowance as it promised to do

480.     On November 20, 2007; S&R was paid $475,000.00 for the sale of the riding center to Rivers; resulting from the consideration paid and agreed to in the ODNB Commitment Letter and the Commercial Purchase Contract. Planters Bank was paid $111,177.09, and $176,571.92 to payoff 1st and 2nd mortgages, S&R received 420,000.00, Lester received $44,020.19 after deductions from the mistake made by Jennifer Richardson in the accounting and changed on November 21, 2007, Beck received $65,820.18 after the November 21, 2007 changes, Frank Morrison received $20,000.00, Counts Realty Group received $23,750.00 commission and deducted the $5000.00 deposit from that. Lester has not refunded the $20,000.00 deposit or any consideration paid by Rivers, and has not paid Rivers the $1200.00 well allowance as promised. Lester has never given Rivers notice of default of the Notice to Exercise or any contract, agreement or promise between them

481. Between November 20, 2007 and September 2011, as per the addendum attached to Rivers contract to purchase the riding center, the HOA agreed to pay Rivers $75 per month and Rivers maintained and cut the grass in the common areas around the clubhouse and pool as agreed in the addendum of the riding center contract; and

482. Between January 2008 and December 2010; Rivers paid Beck, $500.00 per month between July 2008 and 2014 as agreed in the contract addendum regarding the Option, for the taxes on @144 acres of land that Lester and Beck of S&R agreed to allow Rivers to cut for hay until the property was sold or developed.

483. Between January 2012 and May 2014, paid $700.00 every year for the taxes until Beck, in violation of Bedford County Zoning Ordinances, built a commercial size motocross tracks throughout over 30 acres of the hay crop land; Lester, of S&R and Rivers agreed to the terms of the agreements, covenants of the Serene Creek Run Declarations and promises

484. Consideration paid would also now include any/all interest and premium paid to or by Lester, her successors, assigns, trustees, or agents, for any contracts, subordinates or assignments of, and profit or equitable interest earned from same

485. Lester met Rivers in February 2007 and knew that Rivers was in the market for a equestrian facility with more than 86 acres and had acquired the promise of financing

486. Between May 2007 and August 2007; Lester used the value of the Option Contract at $15,000.00 per acre for all the remaining S&R land, the value of the April 17, 2007 riding center contract $550,000.00 and the value of the backup July 15, 2007 riding center contract $475,000.00 to extend her maturity dates for three Union (Planters Bank and Trust) loans to December 2007.

487. S&R used the property not deeded to Rivers and the property under contract to Rivers as collateral to borrow $110,000.00 to build the club house and pool amenities for the HOA

**488.**     Upon exercising the Option, the Option was transformed into a bilateral contract

of purchase and sale, Lester and Beck as trustees in liquidation of S&R Farm LLC,

became the seller and Rivers of CVLR d/b/a, the Optionee, the buyer. As in _Claremont_

_Terrace, supra 146 Cal. App 3d at pp 406, 407, 194 Cal ; Anthony v Enzler (1976); and_

_Miller and Starr; Seeburg v El Royale Corp_

**489.**     In August 2013, Beck, Lester and S&R acknowledged and prepared responses

to CVLR Inc. Motions in Limini in opposition to their expert financial witness Mr. Dacey,

that stated that Mr. Dacey would testify that ODNB changed Rivers commitment letter.

**490.**     The February 16, 2016, Notice to Exercise the Option describes the Optioned

remaining property, TM#99-3-1, 99-A-28, and 99-3-3. The farm parcel portion of the

property, TM#99-3-1 and 99-A-28, currently has a appraised value of +/- $25,000.00 per

acre and a "proposed value" of $62,000.00-65,000.00 subdivided per acre. TM#99-3-3

was appraised in 2009 for $988,000.00

**491.**     The August 2017 and May 25, 2018 Lis Pendens describes the property as; (1)

Common Area; (2)The Riding Center; (3) Lot 3; (4) Lot 6; (5) Lot 8; (6) Lot 16; (7) Lot 18;

(8) Lot 21; (9) Lot 33; (10) Lot 34; (11) Lot 35; (12) the farm parcel, TM#99-A-28; (13)

the farm parcel, 4988 Cottontown Rd and remaining residual of the S&R Farm land (6

acres was added to TM#99-3-1); Total Acres 184.77

**492.**     The economic injury of the loss of the benefit to purchase the property to Rivers

and her businesses occurred on February 16, 2016 when Rivers exercised her option to

purchase the property which reverts back, claws back, to the day of signing on April 24,

2007 once the Deed to the property is titled to Rivers.

**493.**     Rivers has paid and is due more than ample consideration for the property and

expenses and costs of over $750,000.00 since 2007 regarding the S&R property; (1)

consideration, (2) property appraisals, (3) application fees, (4) brokerage fees, (5) traffic

studies, (6) engineering cost, (7) research, (8) investigations, (9) attorneys fees, (10)

project managers fees, (11) title searches, (12) deposits, (13) taxes, (14) utilities, and other expenses relating to the project

494.     The Defendants named and described in this count are jointly and severally liable and responsible to pay any damages to Rivers for her suffering as a result of their activities in concert with each other as described in this Count

495.     Rivers has suffered damages as a result of the Defendants activities in concert with each other as described in this Count for which the Defendants are jointly and severally liable for no less than $13,395,720.00

## COUNT SEVENTEEN:  SPECIFIC PERFORMANCE/ENFORCEMENT OF THE S&R TO CVLR CONTRACT AND ADDENDUM

496.     Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein

497.     Rivers asks the Court to order or compel the performance of the contracts between CVLR and S&R and/or Rivers and the trustees in liquidation for the sale of real property.  The real property is to include any/all invested, collateralized, purchased and/or assigned attached certain other contracts, improvements, and order claw back provisions on the property or interest thereof, pursuant to the principles of equity

498.     Rivers asks the Court to prohibit Lester against any action without permission from this Court or by Court Order, without notice to Rivers, specifically, any action which legally binds and/or liables, the property, including but not limited to, deed transfers, recordings, subordinates, assignments, lending and collateralizing, investing, leasing, covenants, building or tearing down buildings, optioning, or destruction of the property

499.     Rivers asks the Court to Order the Defendant(s) to cooperate and work with the purchaser and her attorney(s), agents, engineers, accountants, to effectuate the sale of

the property described within, as the remaining S&R Farm LLC property, as it was and has been described and recorded since April 24, 2007, or:

500.     Rivers asks that the Court Order the Defendant(s), if the Defendant(s) do not comply with the Court Order to completely satisfy Rivers lien on the property and pay Rivers the appraised value of the property as a proposed annexed subdivision to the Serene Creek Run subdivision; according to the Amended Serene Creek Run Association Declaration of Covenants, Conditions and Restriction recorded with the Bedford County Clerk's Office as Instrument No 050000909; and Order the owners of the title to the property to pay Rivers based on the value of the property as it was appraised in 2017 or as it appraises 60 days from the issuance of the Order, which ever amount is greater minus all consideration paid for the contracts and minus the $15,000.00 per acre agreed price for the property for each and every remaining S&R lot owned by S&R on April 24, 2007 and the cost to Rivers for attorney's fees and cost and expenses

501.     Reach the conclusion that each parcel of remaining S&R Farm land is unique and that a monetary award would be inadequate, and Order the seller to convey the property and all that is attached to it, to the purchaser according to the terms of the Notice to Exercise and the Option to Purchase and First Right of Refusal and the Addendum to the November 5, 2011 contract to purchase the riding center property

## COUNT EIGHTEEN:   INSURANCE FRAUD
### Code of Virginia §52-40 §18.2-178

502.     Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein

**503.** On May 2, 2018; Rivers received "new discovery evidence" from John Deere in response to her *subpoena duces tecum* served in Case No CL14-1454 that she could not have known until that day.

**504.** Callahan prepared and negotiated the insurance policies in Rivers name for RBC illegal use. Callahan caused Rivers loss of the benefit and right to own the John Deere equipment purchased in May 2007 – October 2007

**505.** Rivers reviewed her John Deere equipment loan documents for the first time. Rivers payments were $2845.90 every six months beginning on December 2007 until June 2013 for the JD 525 tractor and front-end loader. Rivers payments were $4182.82 every six months during the same timeframe for the baler and Mo-Co Cutter. The new evidence revealed that among other things that Callahan used Rivers identity to get prepare a fake policy for Rivermont Banking Company Inc in the name of Rivers as the client. The insurance policy covered two separate loans for John Deere Equipment financed for $40,820.80 on June 18, 2007 and $54,102.92 on May 29, 2007. One of the loan terms was #7 Insurance which required evidence of insurance coverage. Callahan knew that Wynne could not get a automobile policy with his criminal and DUI/Hit and Run record;

506. The evidence also revealed that on May 23, 2007 Wynne of RBC submitted information on a Customer Responsibility For Physical Damage Insurance form, application #10492625: a) the Customer was RBC, EIN #54-1853778 who claimed they had been in the agricultural business for over 13 years, b) the co-borrower was Wynne, c) date of the loan was June 18, 2007, d) Wynne used the same State Farm Automobile Insurance policy #0778584D1646 e) Margie Callahan was the Agent's name.

507. Callahan conducted illegal affairs for RBC and Wynne which allowed RBC to use Rivers insurance policy to obtain the loan on the John Deer Equipment which required the owner/borrower to provide and prove insurance to obtain financing approval through

John Deere Credit. Callahan did not disclose this information to Rivers and Rivers did not learn it until May 2018.

508.     Callahan forged insurance policies to benefit and earn large commissions by using Rivers insurance policy number, signature, Driver's License number and clean driving record history to conspire with Wynne and RBC to insure John Deere equipment and a F650 Truck Rivers purchased from Battlefield Ford which allowed Wynne and RBC to obtain illegal bank loans and ownership of the John Deere equipment valued at over $70,000.00 and ownership of the F650 Truck valued at over $100,000.00. All of which were paid for by Rivers until she learned her name wasn't on either loan or title to the products. Callahan's pattern of fraud and conspiracy continued after she was questioned about the errors and it was learned later that she even used Rivers' father, Billy Chitwood, multi car policy to insure Daniel Wynne for vehicles owned by RBC.

509.     On May 2, 2018 Rivers called several representatives with State Farm and Callahan to discuss and try to figure out what policy had covered the John Deere equipment, John Deere Credit loans. Callahan confirmed that the policy number was Rivers and the same used for RBC and Wynne's Chevy Tahoe #0778584D1646 in the previous scheme. Callahan refused to send a copy of the policy to Rivers or the request for the proof of insurance.

510.     By reason of the newly discovered fraud perpetrated on Rivers, by Callahan and taking away Rivers benefit to purchase the John Deere Equipment in her name, Callahan is liable to Rivers for the loss and replacement value of the John Deere tractor and loader equipment, bailer and Mo-Co Cutter worth over $62,000.00, trebled

511.     By reason of the newly discovered fraud perpetrated on Rivers, by the Defendants transferred Rivers insurance proceeds into bank accounts held with ODNB, Select, SBFC, BOJ, BB&T, ODNB, the Defendants Chapman, Mason, Thomas, Potter, Merrill, Select, and SBFC took away Rivers benefit of her commercial insurance

proceeds. The Defendants are liable to Rivers for the loss of the over $38,000.00, trebled insurance proceeds entirely plus interest and the cost and reimbursement of funds Rivers paid out for the commercial insurance policies.

512.     "New discovery evidence" proves that Callahan, conspired with Wynne changed, altered and forged Rivers commercial business and/or automobile policies without Rivers knowledge, notice, or permission.  The illegal acts cost Rivers increase in the cost of her insurance and refusal by insurance companies to insure her commercial business because of a claim on a Tahoe that was filed without her knowledge and the money she lost when John Deere Credit reimbursed RBC for unused insurance premiums on the illegal RBC loan with John Deere Credit for the John Deere equipment

513.     The economic injury of the loss of Rivers insurance funds occurred  on or about October 16, 2016 when Rivers first learned that the funds were transferred from ODNB into Select and BOJ and from BOJ to Select which reverts back, claws back, to the day of the insurance checks were deposited on April 7, 2008

514.     Rivers has suffered damages as a result of the Defendants activities in concert with each other as described in this Count for which the Defendants are jointly and severally liable for over $100,000.00, trebled to $300,000.00

## COUNT NINETEEN – DEFAMATION OF CHARACTER §18.2-417

515.     Rivers incorporates the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein

516.     On May 5, 2018; Rivers discovered, through "new discovery evidence", an egregious, demoralizing, defaming email circulated from Wallace to her associates at LU defaming Rivers character in 2009 at the start of school term.[20]

---

[20] The Statute of Limitations on Defamation of Character is 5 years after you learn it

517.    Rivers alleges the defamation of character and slander acts committed by Wallace and LU caused the "domino effect", essentially the collapse of Rivers equestrian subdivision project and business, coaching career, and caused the emotional suffering that Rivers has endured since the loss of her equestrian center.  If Wallace had not defamed Rivers and begun a campaign to replace Rivers as the equestrian coach for LU and keep LU at Rivers and continue to use the riding center, (1) Rivers name and contact information attached to her farm name, would not have been removed from the LU website, causing Rivers loss of income and future income, since 2009  (2) LU would not have begun interviewing other coaches i.e. Matt Arrigon, to replace Rivers (3) Arrigon and his girlfriend, Ashley Lovegrove would not have formed Ashmont Stables LLC to own and operate Rivers riding center, (4) Wynne would not have began searching for another victim to purchase Rivers' riding center, livestock, show horses, tack, farm equipment, show horse  trailers, show truck, outdoor arena panels, judges stands, etc. to Ashmont Stables. And (5) LU would not have negotiated with Wynne to remove Rivers and market Rivers riding center using Rivers insurance policy coverage, show horses, tack, outdoor arena panels, judges stands, farm equipment, show horse trailers, etc, and among other things. And (6) Rivers would not have lost her boarding contracts, (7) Rivers would not have had to form the Serene Creek Run Travel Team for the LU team riders to continue to show until they graduated, (8) LU would not have ousted Rivers and the equestrian club sport, (7) Rivers and her businesses would not have filed for bankruptcy to put a stay on the riding center property, (8) LU would not have refused Rivers her employment and coaching file,  (9) LU would not have interviewed  Matt Arrigon as their new LU Equestrian Coach and Ashley Lovegrove as their horse trainer, (10) Ashmont Stables would not have made a deal with Wynne to lease to purchase Rivers riding center for $3000.00 per month, and (11) Ashmont

Stables would not made a deal with LU to continue to operate, host IHSA horse shows and advertise the LU Equestrian Club Sport .

**518.** Rivers alleges that the email and the defamatory statements made in writing and any furtherance of the defamation by Wallace; systematically caused injury to Rivers and her business. As a result of Wallace's acts; (a) LU breached Rivers and her businesses contract as the LU equestrian coach for three years with perks, (b) and cancelled the equestrian club sport "the equestrian team", (c) and LU has not paid Rivers stipend, as promised, as per the LU standard for coaching staff, (d) caused LU to block Rivers from acquiring her emails from the LU email account she had been assigned and used in her normal course of business on the website to recruit students and market Rivers equestrian subdivision project and business, (d) caused LU employees not to provide Rivers with her file when she asked for it over the years, and (e) caused LU make false statements about and falsely advertise a LU equestrian club sport and Rivers facility, Rivers horses, Rivers as a coach, and all that Rivers offered to students and the public. By using Rivers assigned email account and her information; LU made a substantial profit from recruited students that specifically requested and desired and had interest in the LU equestrian club sport, Rivers, and/or her facility and all that Rivers offered to them and the public.

519. The Defendants conspired to defame Rivers character and reputation and negotiated with Wynne and RBC to oust Rivers from her property and business, and conspire to commit illegal affairs against Rivers and keep their interest in Rivers equestrian facility, Rivers show and team horses, Rivers riding program and contracts to maintain their place in the IHSA College Division and local Zone and Region.

520. The Defendants are named in this matter as an illegal enterprise, as conspirators and co-conspirators and participated in a conduct of such enterprise's affairs through a pattern of fraud, defamation of character and adding and abetting racketeering activity.

521.     The Defendants named in this count are responsible to pay Rivers an amount equal to no less than the profit earned from each LU student that was recruited and registered and paid a fee to attend LU because, among other things; (1) LU offered an equestrian club sport using by way of advertising online and in publications, Rivers, her reputation, expertise, marketing and Serene Creek Run Riding Center facility, and/or, (2) because LU had access to Rivers Serene Creek Run Riding Center facility, reputation, horses, marketing, and Rivers expertise as an instructor and equestrian facility manager, between April 2010 and December 2015, more or less

522.     Between May 1 and July 7, 2009, Rivers spoke with Jerry Falwell Jr. and began negotiating an agreement whereby LU would provide for the donation of her time and the 18.35 acre equestrian facility, located at 1024 Riley Run Rd, Forest Virginia. Rivers agreed to a) coach the LU equestrian team if the riders paid the necessary expenses and LU paid a reduced rate of $2000.00 in expenses instead of $8000.00 – 10,000.00 monthly for a. the use of the house barn and arena, b) professional instructor to host travel team, c) professionally trained show horses, d) NMG and instruction for travel team, e. student living quarters for travel team and visiting parents.  Rivers explained to Falwell that after 2009 no more colleges would be accepted in their local IHSA region and they would have to host a show in their second year.

523. _     On June 22, 2009; Rivers contacted Lee Beaumont, head of LU Auxiliary Services, agreeing to volunteer her time and facility if the team riders paid the required expenses because he could not get LU to agree to the $2000.00 per month rental. Each student would get a $650.00 package deal (worth over $1250.00) for lessons on Wednesday nights, unlimited practice during the weekdays, coaching at competitions May – November, their horses boarded or leasing a horse from Serene Creek and travel expenses not including mileage.

524.    On June 25, 2009; Beaumont emailed Rivers attorney, Donevant and negotiated with him that if they (LU) could get something crafted that reflected Rivers offer, LU would make Serene Creek the official LU Equestrian facility and make it an official club sport.

525.    On June 26, 2009; Rivers attorney, Donevant emailed Beaumont and negotiated with him that:

"Serene Creek Run Holding Company Inc was prepared to engage in an agreement with Liberty that would provide for the donation of Ms. River's time and facility to Liberty if the girls are paying the necessary expenses. The previous proposal holds firm, with exception to the monthly expenses paid by the school. Liberty would have NO obligation to contribute any money. We would ask in return that the club be marketed to your student body as are other clubs and organizations. You are free to publicize Serene Creek as the exclusive equestrian facility for LU. I am happy to draft a written agreement, memorandum of understanding, or any other formal document to memorialize the deal."

**526.**    On July 7, 2009; Rivers and LU entered into a Memorandum of Understanding for three years

527.    On July 21, 2009; Rivers provided LU with Serene Creek Run Riding Center logos and materials to be used for marketing on LU's website and signage as agreed to between the parties. Rivers was offered the standard coach's stipend of $1000 per year and signed the Club Sports Handbook Agreement, Background and Reference Investigation authorization and release for employment purposes form *HRO 02/02/07,* Club Sport Coaching Agreement. Rivers also agreed to abide by the *LU Employee Handbook* and the policies set forth by LU. Rivers added LU to CVLR Inc. equestrian insurance policy as an additional insured at no charge to LU. Rivers abided by and operated by the terms of the contract and her agreement with LU until LU breached the contract and terms.

528.    On July 27, 2009; Lee Beaumont emailed a copy of Rivers and Serene Creek Run Holding Company Inc. FINAL contract with LU to Laura Wallace for review.

529.    On July 28, 2009; LU was added as an additional insured on CVLR Inc.

$1,000,000.00 certificate of liability insurance policy with Travelers

530.    On August 3, 2009 at 11:22 AM; Wallace emailed Grace Renee Bailey including

attachments; court.docx to intentionally launch a smear campaign against Rivers

defaming her character personally and professionally as successful business owner,

horse trainer, riding instructor and LU's equestrian coach. Laura's defamatory email

stated, among other things:

"I wrote several days ago to voice my concern about Liberty's Equestrian Team...I now saw that it is confirmed on your website. I cannot believe you would have hired someone without a background check. Ms. Rivers has a long history of legal problems. She almost always wears sunglasses in any photo posted of her..I've noticed this for quite awhile. I've been told there are outstanding warrants on her from other states but I do not personally know it this is true. Attached is a screenshot from Virginia's Court case website—she is currently facing eviction for non-payment of rent on Serene Creek Run. The guy who owns it takes her to court constantly. Look it up for yourself...it's all available to the public. Check Bedford County, Lynchburg City, Campbell County, Rockbridge...active and inactive records..you will see what has been going on with her in the court system the last several years in this area. I cannot believe Liberty would hire someone with this sort of reputation. Please please please do yourself a favor in check into her background, and start asking the other equine professionals about Crystal Rivers. You are setting yourself up for a major embarrassment and you will most definitely remember this letter. Crystal is a major con artist and will say anything about herself. She does NOT have the qualifications to teach riding on a college level. I might be willing to talk to you about it in person if you will answer this letter. Crystal Rivers has done nothing to me personally, but I have observed a lot of what she has one to others.

A very concerned person who loves horses and wants Liberty to NOT get off on the wrong foot with their first equestrian team."

531.    On August 13, 2009; Rivers background and reference investigation was

approved and initialed by "han", I, C, B, "nsopr", and per Todd

532.    On September 8-9, 2009; Rivers began negotiating with Liberty Christian

Academy Superintendent, Todd Campo, LCA's proposed IEA team for middle and high

school students. Rivers provided SCRHC mission statement and objectives.

533.    On September 10, 2009; Campo's email suggested:

"They (LCA) use similar thoughts as expressed in paragraph 1 in your contract with LU, that is, *Liberty (LCA) agrees to market, publicize, support (though not financially) and use*

*Serene Creek Run Riding Center as their exclusive equestrian facility.* We can promote your services immediately, but you would have to facilitate any financial dealings. As I mentioned, if you submit a budget proposal by, let's say, January, it will be considered for 2010-2011. I was thinking that if you made an informational flier, we can send it home, put it on our website and include it in our newsletters, etc."

534.    On May 26, 2010; LU edited their equestrian club sport website, removing Rivers

serenecreekrun@aol.com email changing it to equestrian@liberty.edu. All Serene Creek

Run Riding Center equestrian and travel team ads and phone numbers were removed

from the student activities splash page without Rivers knowledge or notice whatsoever.

The marketing was part of the contract agreement  and valued an amount equal to or

greater than $650 a month per stall for 16 stalls, up to 32 - 50 students lessons at $260

or more per month, up to 12 horses leased at $350 - $500 per month, birthday parties,

special events, facility rental at $500 per day, hay sales at $7 per bale, horse sales of

$5000 - $25,000 per horse, Clinique's, hauling, etc which could generate income through

Rivers lifetime and the lifetime of her children or estate..

535.    LU continued, until June 16, 2010 to advertise Serene Creek Run Riding Center,

its logo, hours of operation, Facebook page, historical and area information and the

riding center program information on the new website  (lessons, boarding, practice,

indoor arena, riding instructions, etc) without Rivers permission, intentionally to generate

and recruit new students all the while knowing they had breached the contract with

Rivers and did not have a facility or a equestrian team to offer as they were advertising.

536.    On April 7, 2010; LU wrote a letter to Rivers terminating her coaching services

and the Memorandum of Understanding between them, thanking her for her efforts and

informing her that LU no longer wanted to have a equestrian club sports team.  The

team riders and other students were already under contract with Rivers and CVLR Inc.

for the upcoming IHSA season.

537.     On June 16, 2010; Rivers learned of LU's false advertising and contacted her

attorney, Donevant to notify him of LU's recruiting, marketing and false advertising fraud

campaign.  LU removed Serene Creek Run Riding Center and Rivers bio and riding

program information from the equestrian@liberty.edu website and replaced the Serene

Creek Run logo with a different equestrian style logo.

538.     Between April 7, 2010 and 2012; LU continued to dupe the public and

unsuspecting families and students that the university offered and had an equestrian

club sport "team".

539.     Even as late as June 8, 2010; LU while continuing to recruit students and

advertise that they had an equestrian team; directed offers of .donated horses to Mr.

Nelson in the gifts department when people called to inquire about the equestrian team

540.     On November 29, 2010; LU advertised in its *libertyCHAMPION,* in an article

written by Jonathan Parker published November 17, 2010, *Growing up: university*

*prepares for campus renovations,* that Liberty plans to provide equestrian services on a

67-acre farm it recently purchased, which adjoins Liberty (Candler's) Mountain and the

university's 60-mile trail system.

541.     As a result of Wallace's August 3, 2009 defamation emailed statement,

discovered by Rivers on May 5, 2018, and LU's April 7, 2010 ousting of Rivers, her

business and her contract on April 7, 2010 which resulted from the defamation of

Wallace.

542.     LU has never paid Rivers $1000 per year stipend they promised her for three

years beginning July 2009

543.     Rivers has asked LU for her stipend and her HR files since 2010.

544.     LU has falsely advertised 2012-2013 as being the first year of the LU equestrian

club sports "team"

545.    On May 5, 2018; LU provided Rivers with responses to her *subpoena duces tecum* directed to LU. The responses included the email from Laura, defaming Rivers character, dated August 3, 2009 along with other documents that have intentionally, been withheld from Rivers, who has asked for them since 2009 inquiring about her $1000 a year stipend, including a handwritten note and letter Rivers received from Steve Foster, Office of HR Employee Benefits in April 2011, stating:

"Ms. Rivers, I have searched my records and records of LU Human Resources and find nothing to produce in response to your subpoena duces tecum dated 3/30/11."

546.    On April 24, 2018; Lee Baumont emailed a response to a email he received from Laura admitting that Crystal did not get paid by the school despite being our 'coach'. A sticky note accompanied the document stating, "She was our coach, she never got paid."

547.    As a result of Laura Wallace's defamation, LU and Wallace caused Rivers loss of income from advertising on the LU website because they pulled Rivers name, phone and email information from the online website but continued to promote the LU equestrian club sport and Rivers equestrian facility to recruit new students.

548.    LU failed to inform students that LU had done away with the equestrian club sport and continued to take in new students whose sole purpose to come to LU was because they advertised that they offered a equestrian club sport.

549.    Wallace and LU caused Rivers and her businesses no less than 3 years loss of boarding, riding lessons, horse shows, instruction, hay sales, special events, horse training, breeding, facility rental, hauling, commercial mowing, income, and future contracts when they deleted her contact information from their internet website.

550.    Wallace and LU together, by their individual and combined acts caused torts of the distinctive *claims*.

551. Rivers alleges the defamation of character and slander acts committed by Wallace caused the "domino effect", essentially the collapse of Rivers equestrian business, coaching career, and caused the emotional suffering that Rivers has endured since the loss of her equestrian center. If Wallace had not defamed Rivers and began a campaign to replace Rivers as the equestrian coach for LU and keep LU at Rivers riding center, (1) Rivers name and contact attached to her farm name and contact information, would not have been removed from the LU website, causing Rivers loss of income and future income, (2) LU would not have began interviewing other coaches i.e. Matt Arrigon, to replace Rivers (3) Arrigon and his girlfriend, Ashley Lovegrove would not have formed Ashmont Stables LLC to own and operate Rivers riding center, (4) Wynne would not have began negotiations to sell the Rivers riding center and Rivers livestock, show horses, tack, farm equipment, show horse trailers, show truck, outdoor arena panels, judges stands, etc. to Ashmont Stables, (5) LU would not have negotiated with Wynne to remove Rivers and continue the contract with Wynne/Arrigon/Lovegrove/Ashmont Stables to continue using and marketing Rivers riding center using Rivers insurance policy coverage, show horses, tack, outdoor arena panels, judges stands, farm equipment, show horse trailers, etc, and among other things, (6) Rivers would not have lost her boarding contracts, (7) Rivers would not have had to form the Serene Creek Run Travel Team for the LU team riders to continue to show until they graduated, (8) LU would not have ousted Rivers and the equestrian club sport, (9) Rivers and her businesses would not have filed for bankruptcy to put a stay on the riding center property

552. As a direct and proximate result of the negligence of LU, by and through Wallace, while acting within the scope or office of their employment alleged in this complaint, Rivers and her business have suffered great pain of body and anguish of mind in that the defamatory statements led to the ousting of her position as LU's equestrian coach,

which led to the loss of current and future contracts, and the loss of her stipend for three years.

553.     As a direct result and proximate result of the negligence of LU, by and through Wallace, the 2009-2010 LU Equestrian Club Sports "Team" has not been recognized and honored since 2012-2013 as the "first", LU Equestrian Club Sports "team"; and or as the riders of that team, and Rivers as the Coach.

554.     The actions of the Defendants described in this complaint were undertaken with fraud, malice and oppression so as to entitle Rivers to damages under applicable law. A value of her stipend $1000.00 and the value of her remaining 3-year contract at $1250.00 for each team rider contract x 14 ($175,000.00) for 2 years = $353,000.00., trebled to $1,059,000.00

WHEREFORE, the Plaintiff requests and demands judgment against Defendants as follows:

A.  Damages in the amount of no less than $26,000,000.00;

B.  Compensatory and Punitive damages;

C.  Treble damages and attorneys' fees where authorized;

D.  Injunctive relief; and such other further relief as the Court deems just and proper.

**PLAINTIFF  DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Crystal VL Rivers, Pro Se
3831 Old Forest Rd, Suite 6
Lynchburg, VA  24501
434-818-2921
riversparalegalservices@gmail.com

## **CERTIFICATION**

I, Crystal VL Rivers, remain subject to the Federal Rules of Civil Procedure, including Rule 11, and certify, that a copy of the foregoing will be served on the Defendants along with the Complaint within 90 days from the entry of the May 21, 2019 Order.

Crystal VL Rivers
3831 Old Forest Rd, Suite 6
Lynchburg VA 24551
434-818-2921
riversparalegalservices@gmail.com