CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

SEP 1 6 2019

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

**CRYSTAL VL RIVERS**

    **Plaintiff**

**v.**                              **Civil Action No. 6:18-cv-00061**

**UNITED STATES OF AMERICA, et.al.**

    **Defendants**

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6) AND RULE 8

Comes now, the Plaintiff, Crystal VL Rivers, "Rivers", Pro Se, in opposition to the Defendants, Liberty University "LU", and Laura Wallace "Wallace", Motion to Dismiss for Failure to State a Claim respectfully states the following:

1. The Defendants filed a Motion to Dismiss for Failure to State a Claim against the Plaintiff's Amended Complaint alleging actions relating to defamation of character, their conspiracy, involvement and history with the "bad actors", unnamed and named as Defendants' in this matter pursuant to Rules 12(b)(6) and Rule 8(c)(1).

2. The Plaintiff describes her claims in specific detail, defining statements of her claim showing that she was injured by the Defendant(s) and that she is entitled to relief. Her statements and facts are summarized from what she has learned and how she is affected by the actions of the Defendant(s) both professionally and personally. If the Defendants had not defamed the Plaintiff to the staff of Liberty University and worked with John L Wynne, and agreed to take a "kick back" on loans with Wynne as Trustee for their efforts, and begun a malicious smear campaign to oust the Plaintiff from her position as the Liberty University Equestrian coach. The Defendants both acted in a

1

concerted effort to help Wynne operate his illegal banking enterprise in an attempt to scam yet another set of victims, Matt Arrigon, Ashley Lovegrove and their business Ashmont Stables, LLC., using the Plaintiff's business, her show horses and commercial equipment, the Serene Creek Run Riding Center and oust her from her horse farm allowing the Defendants to put their own newly agreed upon coaches, Matt Arrigon and Ashley Lovegrove of Ashmont Stables LLC. in the equestrian facility to take over the Plaintiffs business earning over $20,000.00 monthly after expenses, and contracts with the Liberty University Equestrian Club Sports team students and other boarders, lesson students and eventors, causing the Plaintiff to loose profit equal to between $650 to $1250 monthly x 14 to 20 accounts for three years based on the contract between the parties and in to the future. The Defendants conspiracy with Wynne to hire his newly found victims, Arrigon, Lovegrove and Ashmont Stables LLC. also included continuing to knowingly, intentionally, and maliciously, recruit students via online, website, and mailings; without permission from the Plaintiff, using the Plaintiffs Serene Creek Run Riding Center facility, website, social media, name and riding program advertised on the Liberty University website offering the contact email as the email of instructor Crystal VL Rivers. Liberty University continued to recruit students from around the world to attend Liberty University and join the Liberty University Equestrian Club Sports Equestrian Team after April 2010 when the Defendant Liberty University decided to send a letter to the Defendant informing her that Liberty University would no longer be offering equestrian as a club sport.

2

3. The Defendants' protest that Rivers 128 page Amended Complaint is time barred by Virginia Code Section 8.01-247. If the Defendants read the Complaint in its entirety, including the footnotes, they will ascertain that the claims are not time barred.

4. The Court should reject all of Defendants arguments. Through her Amended Complaint, Rivers inarguably provides Defendants' with fair account of her statements and claims—and the host of allegations, taken as true, plausibly and squarely support each claim Rivers has pled. At the pleading stage and before any discovery has been taken, Rivers allegations as to the Defendants' both personally and as a University which slandered the Plaintiff all the while contracted with her for services, taking full advantage of the Plaintiff's generously agreed to donated equestrian facility, show horses, tack, training, coaching, driving, hauling, and advertising worth over $18,000 per month and failed to pay a promised mere $1000 stipend, are likewise sufficient, and they are also clear enough to support her claim of defamation of character.

5. Reading through the particularized allegations of the Amended Complaint from beginning to end—and accepting them as true for purposes of the Motion—unquestionably allows the Court to reasonably infer Defendants' are liable for the misconduct alleged. The Court should therefore deny Defendants' motions to dismiss relating to both Rule 8 and Rule 12(b)(6) or in the alternative, move to allow Rivers to amend her complaint. The Defendants have not denied any of the facts or allegations pled by the Plaintiff.

## I. **Summary of general factual allegations.**

Page 117:     On May 5, 2018; Rivers discovered, through "new discovery evidence", an egregious, demoralizing, defaming email circulated from Wallace to her associates at LU defaming Rivers character in 2009 at the start of school term.[1]

Page 118:     Rivers alleges the defamation of character and slander acts committed by Wallace and LU caused the "domino effect", essentially the collapse of Rivers equestrian subdivision project and business, coaching career, and caused the emotional suffering that Rivers has endured since the loss of her equestrian center.  If Wallace had not defamed Rivers and begun a campaign to replace Rivers as the equestrian coach for LU and keep LU at Rivers and continue to use the riding center, (1) Rivers name and contact information attached to her farm name, would not have been removed from the LU website, causing Rivers loss of income and future income, since 2009  (2) LU would not have begun interviewing other coaches i.e. Matt Arrigon, to replace Rivers (3) Arrigon and his girlfriend, Ashley Lovegrove would not have formed Ashmont Stables LLC to own and operate Rivers riding center, (4) Wynne would not have began searching for another victim to purchase Rivers' riding center, livestock, show horses, tack, farm equipment, show horse  trailers, show truck, outdoor arena panels, judges stands, etc. to Ashmont Stables. And (5) LU would not have negotiated with Wynne to remove Rivers and market Rivers riding center using Rivers insurance policy coverage, show horses, tack, outdoor arena panels, judges stands, farm equipment, show horse trailers, etc, and among other things. And (6) Rivers would not have lost her boarding contracts, (7) Rivers would not have had to form the Serene Creek Run Travel Team for the LU team riders to continue to show until they graduated,

---

[1] The Statute of Limitations on Defamation of Character is 5 years after you learn it

4

(8) LU would not have ousted Rivers and the equestrian club sport, (7) Rivers and her businesses would not have filed for bankruptcy to put a stay on the riding center property, (8) LU would not have refused Rivers her employment and coaching file, (9) LU would not have interviewed Matt Arrigon as their new LU Equestrian Coach and Ashley Lovegrove as their horse trainer, (10) Ashmont Stables would not have made a deal with Wynne to lease to purchase Rivers riding center for $3000.00 per month, and (11) Ashmont Stables would not made a deal with LU to continue to operate, host IHSA horse shows and advertise the LU Equestrian Club Sport .

### . COUNT NINETEEN - DEFAMATION OF CHARACTER §18.2-417

II. Wallace and LU together, by their individual and combined acts caused torts of the distinctive *claims.*

III. Rivers alleges the defamation of character and slander acts committed by Wallace caused the "domino effect", essentially the collapse of Rivers equestrian business, coaching career, and caused the emotional suffering that Rivers has endured since the loss of her equestrian center. If Wallace had not defamed Rivers and began a campaign to replace Rivers as the equestrian coach for LU and keep LU at Rivers riding center, (1) Rivers name and contact attached to her farm name and contact information, would not have been removed from the LU website, causing Rivers loss of income and future income, (2) LU would not have began interviewing other coaches i.e. Matt Arrigon, to replace Rivers (3) Arrigon and his girlfriend, Ashley Lovegrove would not have formed Ashmont Stables LLC to own and operate Rivers riding center, (4) Wynne would not have began negotiations to sell the Rivers riding center and Rivers livestock, show horses, tack, farm equipment, show horse trailers, show truck, outdoor arena

panels, judges stands, etc. to Ashmont Stables, (5) LU would not have negotiated with Wynne to remove Rivers and continue the contract with Wynne/Arrigon/Lovegrove/Ashmont Stables to continue using and marketing Rivers riding center using Rivers insurance policy coverage, show horses, tack, outdoor arena panels, judges stands, farm equipment, show horse trailers, etc, and among other things, (6) Rivers would not have lost her boarding contracts, (7) Rivers would not have had to form the Serene Creek Run Travel Team for the LU team riders to continue to show until they graduated, (8) LU would not have ousted Rivers and the equestrian club sport, (9) Rivers and her businesses would not have filed for bankruptcy to put a stay on the riding center property

IV. As a direct and proximate result of the negligence of LU, by and through Wallace, while acting within the scope or office of their employment alleged in this complaint, Rivers and her business have suffered great pain of body and anguish of mind in that the defamatory statements led to the ousting of her position as LU's equestrian coach, which led to the loss of current and future contracts, and the loss of her stipend for three years.

V. As a direct result and proximate result of the negligence of LU, by and through Wallace, the 2009-2010 LU Equestrian Club Sports "Team" has not been recognized and honored since 2012-2013 as the "first", LU Equestrian Club Sports "team", and or as the riders of that team, and Rivers as the Coach.

VI. The actions of the Defendants described in this complaint were undertaken with fraud, malice and oppression so as to entitle Rivers to damages under applicable law. A value of her stipend $1000.00 and the value of her remaining 3-year contract at

6

$1250.00 for each team rider contract x 14 ($175,000.00) for 2 years = $353,000.00., trebled to $1,059,000.00

## Applicable legal standards

The Court is amply familiar with the legal standard that governs motions to dismiss. In **White v Volkswagon Corp.** of am. Inc 2013 WL 685298, 2 (W.D. Ark Feb 25, 2013) The Court summarized it as follows:

> In ruling on a motion to dismiss, the Court accepts as true all of the factual allegations contained in a complaint and reviews the complaint to determine whether its allegations show that the pleader is entitled to relief. **Schaaf v Residential** Funding Corp. 517 F 3d 544, 549 (8th Cir 2008). Complaints should be liberally construed in the plaintiffs favor and "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. **Rucci v City of Pacific,** 327 F 3d 651, 652 (8th Cir 2003) (quoting **Conley v Gibson**, 355 U.S. 41, 45-46 (1957). Nevertheless, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible o n its face." **Ashcroft v Iqbal**, 129 S. Ct. 1937, 1949 (2009). Pleadings that contain mere "labels and conclusions" or "a formulaic recitation of the elements of the cause of action will not do." **Bell Atlantic Corp v Twombly**, 550 U.s. 544, 555 (2009). "The plausibility standard is not akin to a "probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." **Iqbal,** 129 S.Ct. at 1949.

Elaborating on **Twombly** and **Iqbal**. The Court noted:

> **Twombly and Iqbal** did not abrogate the notice pleading standard of Federal Rule 8. Rather, those decisions confirmed that Rule 8(a)(2) is satisfied when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the Defendant is liable for a misconduct alleged." **Hamilton v Palm** 621 F. 3d 816, 817 (8th Cir. 2010) (quoting Iqbal 556 U.S. at 678). Where the facts alleged, taken as true, "raise a reasonable expectation that discovery will reveal evidence" in support of a Plaintiff's claim, the Court should deny a motion to dismiss. **Twombly,** 550 U.S. at 556.

## Argument and Authorities

Under a straightforward application of the applicable standards, it is quickly apparent that the Plaintiff's Amended Complaint satisfies all pleading requirements, mandating denial of Defendants motions to dismiss.

I. Rivers pleads with enough specificity to support all her claims. In actuality; Rivers Amended Complaint includes enough of such specifics for at least a full biography. The Defendants take

aim at Rivers individual allegations, engaging in a tortuous exercise in hairsplitting designed to create the impression that Rivers detailed description of the facts somehow falls short of the "who, what, when" standard. They say that in the alternative, Fed. R. Civ. P. Rule 8(a)(1) states that a pleading must set forth a short and plain statement of the basis of the Court's jurisdiction to determine the subject matter of the action. Rivers has done just that. The Federal government has done just that. The Bedford County Commonwealth Attorney has done just that. The former U.S. Attorney Patrick Hogeboom did just that. This matter of defamation is tied directly to the Defendants and their involvement with John L Wynne and his illegal banking enterprise, attempting to use the Plaintiff's property, marketing and contracts. This case has been established to be Federal and Rivers has rights as a crime victim and a party of interest to bring and plead her claims valued at over $75,000.00. In addition, the Defendants claim that the Plaintiff fails to allege sufficient plausible facts that, if proven, would entitle her to relief. Rivers is entitled to relief prayed for in her Amended Complaint and will be determined by the Court and trebled. The Defendants seem to find Rivers allegations aren't simple, concise and direct enough for them to understand. The facts speak for themselves and they have been narrowed down so that even a third grader could understand them. The case is defamation of character. Defamation statutes start when you find the defamation (May 5, 2018). Conspiracy statutes of limitations start when you find the last act. The Defendants last known act was learned on May 5, 2018 when the Plaintiff learned of the Defamation. Any and all evidence of defamation and conspiracy learned in discovery will be added as an addition act.

II.    A complaint need only meet the liberal federal notice pleading standard. ***Bell Atlantic Corp v Twombly*** 550 U.S. 544(2007). Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. A complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. ***Ashcroft v Iqbal***, 129 S. Ct. 1937, 1949 (2009). A claim has facial

8

plausibility when the Plaintiff pleads factual content that allows the Court to draw the reasonable inference that the Defendant is liable for the misconduct alleged. *Ashcroft v Iqbal*, supra. With the help of the Defendant's, operated(s) an open-ended illegal banking enterprise. ***CVLR Performance Horses Inc v John L Wynne, Rivermont Banking Company Inc.*** U. S. W. Dist. Ct. Va *(May 29, 2013)*[2]

"The district Court's (Judge Moon) analysis focused on the first example from *H.J. Inc.* and concluded that CVLR failed to plead open-ended continuity because each racketeering act did not, on its face, threaten to continue long term. However, the district Court's analysis overlooked the more general point that the Appellees conduct "projects info the future with a threat of repetition." The Amended Compliant alleges that Wynne used Rivermont and 1650 Partners for over three years in a series of racketeering acts. In particular, Rivermont's function as a bank was an integral part of the RICO operation because Wynne lured victims into the scheme by holding Rivermont out as a bank or otherwise used Rivermont to facilitate his scheme. CVLR also alleges that Rivermont continues to advertise as a bank, and the Amended Complaint creates no inference that Rivermont has ended its fraudulent activities. Therefore, the allegations in the complaint support an inference that the activity "projects into the future with a threat of repetition" and that racketeering acts are the Appellees' "regular way of doing business." See ***EPlus Technology Inc. v Aboud*** 313 F 3d 166, 182-83 (4th Cir 2002) (three examples of looting companies of assets prior to filing for bankruptcy established open-ended continuity).

The district court (Judge Moon) also concluded that the Amended Complaint fails to plead open-ended continuity because the Appellees racketeering activity had a "built-in ending point." Specifically, the district Court (Judge Moon) found it implausible that the racketeering acts would continue into the future, because all of the victims identified in the Amended Complaint" have been bilked" and, presumably, know better that to do more business with Appellees. Again, we disagree. "The lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity." ***United States v Busacca*** 936 F. 2d 232, 238 (6th Cir. 1991). Instead, the threat of continuity must be viewed at the time the racketeering activity occurred." Here, as explained above, at the time the Appellees acts occurred, the conduct "projected into the future with a threat of repetition," *H.J. Inc* 492 U. S. at 241, and there was no other indication that Wynne's conduct was to be limited to only the identified victims. Thus, the victim's discovery of the Appellees misconduct does not prevent CVLR from establishing open-ended continuity. In sum, we conclude that the Amended Complaint pleads open-ended continuity. Because the district Court based its dismissal on a conclusion to the contrary, we reverse the district Court's (Judge Moon) order granting the motion to dismiss and remand for further proceedings in the district court." **Case No 6:11-cv-00035-NKM** Argued March 21, 2013 Decided May 29, 2013 before Traxler, Chief Judge Shedd, Circuit Judge and David Faber, Senior US District Judge for the S. Dist. of WV

**III.** Defendants seek to have Rivers Amended Complaint dismissed in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state claims. However, Courts are to look to the papers, and to the complaint and accept all of plaintiff's factual allegations as true and

---

[2] Rivers was not a party or intervenor to CVLR Performance Horses Inc v Wynne, et al Case No 6:11-cv-00035-NKM

9

draw inferences from those allegations in the light most favorable to the Plaintiff. ***Friedl v City of New York***, 210 F. 3d 79, 83(2nd Cir. 2000); ***Courtenay Communications Corp. v Hall***, 334 F 3d 210, 213(2nd Cir 2003). The issue is not whether a Plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims made in the complaint. ***Courtenay Communications Corp v Hall***, *supra*. The complaint may be dismissed only where it appears beyond doubt that the Plaintiff can prove no set of facts in support of the claims asserted which would entitle the Plaintiff to relief. In this case, Rivers is entitled to relief, claw-back and restitution as a Crime Victim and as a Plaintiff. [t]he Court should, however, consider allowing Bailey the opportunity to amend his pleadings to assert any claim he may have..See ***Bailey v United States*** 2007 and 33 similar citations

**IV**. The Defendants are merely bothered that they have to trudge through and read through the facts reported and claimed in Rivers Amended Complaint. Rivers takes no grand pleasure in reliving the criminal and tortious acts committed by the Defendants and having to put them to paper. The fact that they actually understand that Rivers is asserting exactly what she plead, in COUNT NINETEEN - DEFAMATION OF CHARACTER §18.2-417 and that the Plaintiff incorporated the facts alleged in the above paragraphs of the complaint and repeated and recited and stated her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein demonstrates that they are grasping at straws trying to muddy the water. Rivers discovered the evidence when she obtained discovery in an unrelated matter.  The newly found evidence clearly indicates instant claims which show economic loss proximately caused by the Defendants. This is a combined RICO and Civil rights case and the Defendants should have been interviewed by the Criminal Division of the IRS, special agents, Defendants Karen Deed and Mary Lou Prilliman and Bill Talbott

The evidence = injury which was caused by the Defendants in this matter.

The Defendants clearly defamed the Plaintiff's character and conspired with Wynne and his illegal banking enterprise to use Liberty University as a conduit to continue to obtain money

under false pretense from the Plaintiff and other victim's, funneling it through from the University using false recruiting tactics, false internet ads, altered documents, and money obtained under false pretense. "They will know better than to do business with him next time." Norman K Moon.

## **CONCLUSION**

Wherefore; For the forgoing reasons Defendants Motion to Dismiss should be denied and a hearing set with witnesses after the United States of America files its answer.

Respectfully submitted,

Crystal VL Rivers, Pro Se
3831 Old Forest Rd, Suite 6
Lynchburg VA 24501
434-818-2921
riversparalegalservices@gmail.com

# APPENDIX

1. Rivers incorporated the facts alleged in the above paragraphs and repeats and recites and states her claims and facts contained in all previous allegations as if fully set forth in paragraphs herein

2. On May 5, 2018, Rivers discovered, through "new discovery evidence", an egregious, demoralizing, defaming email circulated from Wallace to her associates at LU defaming Rivers character in 2009 at the start of school term.[3]

3. Rivers alleged the defamation of character and slander acts committed by Wallace and LU caused the "domino effect", essentially the collapse of Rivers equestrian subdivision project and business, coaching career, and caused the emotional suffering that Rivers has endured since the loss of her equestrian center. If Wallace had not defamed Rivers and begun a campaign to replace Rivers as the equestrian coach for LU and keep LU at Rivers and continue to use the riding center, (1) Rivers name and contact information attached to her farm name, would not have been removed from the LU website, causing Rivers loss of income and future income, since 2009  (2) LU would not have begun interviewing other coaches i.e. Matt Arrigon, to replace Rivers (3) Arrigon and his girlfriend, Ashley Lovegrove would not have formed Ashmont Stables LLC to own and operate Rivers riding center, (4) Wynne would not have began searching for another victim to purchase Rivers' riding center, livestock, show horses, tack, farm equipment, show horse  trailers, show truck, outdoor arena panels, judges stands, etc. to Ashmont Stables. And (5) LU would not have negotiated with Wynne to remove Rivers and market Rivers riding center using Rivers insurance

---

[3] The Statute of Limitations on Defamation of Character is 5 years after you learn it

policy coverage, show horses, tack, outdoor arena panels, judges stands, farm equipment, show horse trailers, etc, and among other things. And (6) Rivers would not have lost her boarding contracts, (7) Rivers would not have had to form the Serene Creek Run Travel Team for the LU team riders to continue to show until they graduated, (8) LU would not have ousted Rivers and the equestrian club sport, (7) Rivers and her businesses would not have filed for bankruptcy to put a stay on the riding center property, (8) LU would not have refused Rivers her employment and coaching file,  (9) LU would not have interviewed  Matt Arrigon as their new LU Equestrian Coach and Ashley Lovegrove as their horse trainer, (10) Ashmont Stables would not have made a deal with Wynne to lease to purchase Rivers riding center for $3000.00 per month, and (11) Ashmont Stables would not made a deal with LU to continue to operate, host IHSA horse shows and advertise the LU Equestrian Club Sport .

4. Rivers alleged that the email and the defamatory statements made in writing and any furtherance of the defamation by Wallace; systematically caused injury to Rivers and her business.  As a result of Wallace's acts; (a) LU breached Rivers and her businesses contract as the LU equestrian coach for three years with perks, (b) and cancelled the equestrian club sport  "the equestrian team", (c) and LU has not paid Rivers stipend, as promised, as per the LU standard for coaching staff,  (d) caused LU to block Rivers from acquiring her emails from the LU email account she had been assigned and used in her normal course of business on the website to recruit students and market Rivers equestrian subdivision project and business, (d) caused LU employees not to provide Rivers

with her file when she asked for it over the years, and (e) caused LU make false statements about and falsely advertise a LU equestrian club sport and Rivers facility, Rivers horses, Rivers as a coach, and all that Rivers offered to students and the public. By using Rivers assigned email account and her information; LU made a substantial profit from recruited students that specifically requested and desired and had interest in the LU equestrian club sport, Rivers, and/or her facility and all that Rivers offered to them and the public.

5. The Defendants conspired to defame Rivers character and reputation and negotiated with Wynne and RBC to oust Rivers from her property and business, and conspire to commit illegal affairs against Rivers and keep their interest in Rivers equestrian facility, Rivers show and team horses, Rivers riding program and contracts to maintain their place in the IHSA College Division and local Zone and Region.

6. The Defendants are named in this matter as an illegal enterprise, as conspirators and co-conspirators and participated in a conduct of such enterprise's affairs through a pattern of fraud, defamation of character and adding and abetting racketeering activity.

7. The Defendants named in this count are responsible to pay Rivers an amount equal to no less than the profit earned from each LU student that was recruited and registered and paid a fee to attend LU because, among other things; (1) LU offered an equestrian club sport using by way of advertising online and in publications, Rivers, her reputation, expertise, marketing and Serene Creek Run Riding Center facility, and/or, (2) because LU had access to Rivers Serene Creek

14

Run Riding Center facility, reputation, horses, marketing, and Rivers expertise as an instructor and equestrian facility manager, between April 2010 and December 2015, more or less

## HISTORY

8. Between May 1 and July 7, 2009, Rivers spoke with Jerry Falwell Jr. and began negotiating an agreement whereby LU would provide for the donation of her time and the 18.35 acre equestrian facility, located at 1024 Riley Run Rd, Forest Virginia. Rivers agreed to a) coach the LU equestrian team if the riders paid the necessary expenses and LU paid a reduced rate of $2000.00 in expenses instead of $8000.00 – 10,000.00 monthly for a. the use of the house barn and arena, b) professional instructor to host travel team, c) professionally trained show horses, d) NMG and instruction for travel team, e. student living quarters for travel team and visiting parents. Rivers explained to Falwell that after 2009 no more colleges would be accepted in their local IHSA region and they would have to host a show in their second year.

9. On June 22, 2009; Rivers contacted Lee Beaumont, head of LU Auxiliary Services, agreeing to volunteer her time and facility if the team riders paid the required expenses because he could not get LU to agree to the $2000.00 per month rental. Each student would get a $650.00 package deal (worth over $1250.00) for lessons on Wednesday nights, unlimited practice during the weekdays, coaching at competitions May – November, their horses boarded or leasing a horse from Serene Creek and travel expenses not including mileage.

10. On June 25, 2009; Beaumont emailed Rivers attorney, Donevant and negotiated with him that if they (LU) could get something crafted that reflected Rivers offer, LU would make Serene Creek the official LU Equestrian facility and make it an official club sport.

11. On June 26, 2009; Rivers attorney, Donevant emailed Beaumont and negotiated with him that:

"Serene Creek Run Holding Company Inc was prepared to engage in an agreement with Liberty that would provide for the donation of Ms. River's time and facility to Liberty if the girls are paying the necessary expenses. The previous proposal holds firm, with exception to the monthly expenses paid by the school. Liberty would have NO obligation to contribute any money. We would ask in return that the club be marketed to your student body as are other clubs and organizations. You are free to publicize Serene Creek as the exclusive equestrian facility for LU. I am happy to draft a written agreement, memorandum of understanding, or any other formal document to memorialize the deal."

12. On July 7, 2009; Rivers and LU entered into a Memorandum of Understanding for three years

13. On July 21, 2009; Rivers provided LU with Serene Creek Run Riding Center logos and materials to be used for marketing on LU's website and signage as agreed to between the parties. Rivers was offered the standard coach's stipend of $1000 per year and signed the Club Sports Handbook Agreement, Background and Reference Investigation authorization and release for employment purposes form *HRO 02/02/07,* Club Sport Coaching Agreement. Rivers also agreed to abide by the *LU Employee Handbook* and the policies set forth by LU. Rivers added LU to CVLR Inc. equestrian insurance policy as an additional insured at no charge to LU. Rivers abided by and operated by the

terms of the contract and her agreement with LU until LU breached the contract and terms.

14. On July 27, 2009; Lee Beaumont emailed a copy of Rivers and Serene Creek Run Holding Company Inc. FINAL contract with LU to Laura Wallace for review.

15. On July 28, 2009; LU was added as an additional insured on CVLR Inc. $1,000,000.00 certificate of liability insurance policy with Travelers

## DEFAMATION UNKNOWN TO PLAINTIFF UNTIL 2018

16. On August 3, 2009 at 11:22 AM; Wallace emailed Grace Renee Bailey including attachments; court.docx to intentionally launch a smear campaign against Rivers defaming her character personally and professionally as successful business owner, horse trainer, riding instructor and LU's equestrian coach. Laura's defamatory email stated, among other things:

"I wrote several days ago to voice my concern about Liberty's Equestrian Team...I now saw that it is confirmed on your website. I cannot believe you would have hired someone without a background check. Ms. Rivers has a long history of legal problems. She almost always wears sunglasses in any photo posted of her..I've noticed this for quite awhile. I've been told there are outstanding warrants on her from other states but I do not personally know it this is true. Attached is a screenshot from Virginia's Court case website—she is currently facing eviction for non-payment of rent on Serene Creek Run. The guy who owns it takes her to court constantly. Look it up for yourself...it's all available to the public. Check Bedford County, Lynchburg City, Campbell County, Rockbridge...active and inactive records..you will see what has been going on with her in the court system the last several years in this area. I cannot believe Liberty would hire someone with this sort of reputation. Please please please do yourself a favor in check into her background, and start asking the other equine professionals about Crystal Rivers. You are setting yourself up for a major embarrassment and you will most definitely remember this letter. Crystal is a major con artist and will say anything about herself. She does NOT have the qualifications to teach riding on a college level. I might be willing to talk to you about it in person if you will answer this letter. Crystal Rivers has done nothing to me personally, but I have observed a lot of what she has one to others.

A very concerned person who loves horses and wants Liberty to NOT get off on the wrong foot with their first equestrian team."

17. On August 13, 2009; Rivers background and reference investigation was approved and initialed by "han", I, C, B, "nsopr", and per Todd

18. On September 8-9, 2009; Rivers began negotiating with Liberty Christian Academy Superintendent, Todd Campo, LCA's proposed IEA team for middle and high school students. Rivers provided SCRHC mission statement and objectives.

19. On September 10, 2009; Campo's email suggested:

"They (LCA) use similar thoughts as expressed in paragraph 1 in your contract with LU, that is, *Liberty (LCA) agrees to market, publicize, support (though not financially) and use Serene Creek Run Riding Center as their exclusive equestrian facility.* We can promote your services immediately, but you would have to facilitate any financial dealings. As I mentioned, if you submit a budget proposal by, let's say, January, it will be considered for 2010-2011. I was thinking that if you made an informational flier, we can send it home, put it on our website and include it in our newsletters, etc."

20. On May 26, 2010; LU edited their equestrian club sport website, removing Rivers **serenecreekrun@aol.com** email changing it to **equestrian@liberty.edu**. All Serene Creek Run Riding Center equestrian and travel team ads and phone numbers were removed from the student activities splash page without Rivers knowledge or notice whatsoever. The marketing was part of the contract agreement and valued an amount equal to or greater than $650 a month per stall for 16 stalls, up to 32 - 50 students lessons at $260 or more per month, up to 12 horses leased at $350 - $500 per month, birthday parties, special events, facility rental at $500 per day, hay sales at $7 per bale, horse sales of $5000 - $25,000 per horse, Clinique's, hauling, etc which could generate income through Rivers lifetime and the lifetime of her children or estate..

Case 6:18-cv-00061-EKD-JCH   Document 149   Filed 09/16/19   Page 18 of 26   Pageid#: 2419

21. LU continued, until June 16, 2010 to advertise Serene Creek Run Riding Center, its logo, hours of operation, Facebook page, historical and area information and the riding center program information on the new website (lessons, boarding, practice, indoor arena, riding instructions, etc) without Rivers permission, intentionally to generate and recruit new students all the while knowing they had breached the contract with Rivers and did not have a facility or a equestrian team to offer as they were advertising.

22. On April 7, 2010; LU wrote a letter to Rivers terminating her coaching services and the Memorandum of Understanding between them, thanking her for her efforts and informing her that LU no longer wanted to have a equestrian club sports team. The team riders and other students were already under contract with Rivers and CVLR Inc. for the upcoming IHSA season.

23. On June 16, 2010; Rivers learned of LU's false advertising and contacted her attorney, Donevant to notify him of LU's recruiting, marketing and false advertising fraud campaign. LU removed Serene Creek Run Riding Center and Rivers bio and riding program information from the **equestrian@liberty.edu** website and replaced the Serene Creek Run logo with a different equestrian style logo.

24. Between April 7, 2010 and 2012; LU continued to dupe the public and unsuspecting families and students that the university offered and had an equestrian club sport "team".

25. Even as late as June 8, 2010; LU while continuing to recruit students and advertise that they had an equestrian team; directed offers of .donated horses to

Mr. Nelson in the gifts department when people called to inquire about the equestrian team

26. On November 29, 2010; LU advertised in its *libertyCHAMPION*, in an article written by Jonathan Parker published November 17, 2010, *Growing up: university prepares for campus renovations,* that Liberty plans to provide equestrian services on a 67-acre farm it recently purchased, which adjoins Liberty (Candler's) Mountain and the university's 60-mile trail system.

27. As a result of Wallace's August 3, 2009 defamation emailed statement, discovered by Rivers on May 5, 2018, and LU's April 7, 2010 ousting of Rivers, her business and her contract on April 7, 2010 which resulted from the defamation of Wallace.

28. LU has never paid Rivers $1000 per year stipend they promised her for three years beginning July 2009

29. Rivers has asked LU for her stipend and her HR files since 2010.

30. LU has falsely advertised 2012-2013 as being the first year of the LU equestrian club sports "team"

31. On May 5, 2018; LU provided Rivers with responses to her *subpoena duces tecum* directed to LU. The responses included the email from Laura, defaming Rivers character, dated August 3, 2009 along with other documents that have intentionally, been withheld from Rivers, who has asked for them since 2009 inquiring about her $1000 a year stipend, including a handwritten note and letter Rivers received from Steve Foster, Office of HR Employee Benefits in April 2011, stating:

"Ms. Rivers, I have searched my records and records of LU Human Resources and find nothing to produce in response to your subpoena duces tecum dated 3/30/11."

32. On April 24, 2018; Lee Baumont emailed a response to an email he received from Laura admitting that Crystal did not get paid by the school despite being our 'coach'. A sticky note accompanied the document stating, "She was our coach, she never got paid."

33. As a result of Laura Wallace's defamation, LU and Wallace caused Rivers loss of income from advertising on the LU website because they pulled Rivers name, phone and email information from the online website but continued to promote the LU equestrian club sport and Rivers equestrian facility to recruit new students.

34. LU failed to inform students that LU had done away with the equestrian club sport and continued to take in new students whose sole purpose to come to LU was because they advertised that they offered a equestrian club sport.

35. Wallace and LU caused Rivers and her businesses no less than 3 years loss of boarding, riding lessons, horse shows, instruction, hay sales, special events, horse training, breeding, facility rental, hauling, commercial mowing, income, and future contracts when they deleted her contact information from their internet website.

36. Wallace and LU together, by their individual and combined acts caused torts of the distinctive *claims*.

37. Rivers alleges the defamation of character and slander acts committed by Wallace caused the "domino effect", essentially the collapse of Rivers equestrian business, coaching career, and caused the emotional suffering that Rivers has

endured since the loss of her equestrian center. If Wallace had not defamed Rivers and began a campaign to replace Rivers as the equestrian coach for LU and keep LU at Rivers riding center, (1) Rivers name and contact attached to her farm name and contact information, would not have been removed from the LU website, causing Rivers loss of income and future income, (2) LU would not have began interviewing other coaches i.e. Matt Arrigon, to replace Rivers (3) Arrigon and his girlfriend, Ashley Lovegrove would not have formed Ashmont Stables LLC to own and operate Rivers riding center, (4) Wynne would not have began negotiations to sell the Rivers riding center and Rivers livestock, show horses, tack, farm equipment, show horse trailers, show truck, outdoor arena panels, judges stands, etc. to Ashmont Stables, (5) LU would not have negotiated with Wynne to remove Rivers and continue the contract with Wynne/Arrigon/Lovegrove/Ashmont Stables to continue using and marketing Rivers riding center using Rivers insurance policy coverage, show horses, tack, outdoor arena panels, judges stands, farm equipment, show horse trailers, etc, and among other things, (6) Rivers would not have lost her boarding contracts, (7) Rivers would not have had to form the Serene Creek Run Travel Team for the LU team riders to continue to show until they graduated, (8) LU would not have ousted Rivers and the equestrian club sport, (9) Rivers and her businesses would not have filed for bankruptcy to put a stay on the riding center property

38. As a direct and proximate result of the negligence of LU, by and through Wallace, while acting within the scope or office of their employment alleged in this complaint, Rivers and her business have suffered great pain of body and anguish

22

of mind in that the defamatory statements led to the ousting of her position as LU's equestrian coach, which led to the loss of current and future contracts, and the loss of her stipend for three years.

39. As a direct result and proximate result of the negligence of LU, by and through Wallace, the 2009-2010 LU Equestrian Club Sports "Team" has not been recognized and honored since 2012-2013 as the "first", LU Equestrian Club Sports "team", and or as the riders of that team, and Rivers as the Coach.

40. The actions of the Defendants described in this complaint were undertaken with fraud, malice and oppression so as to entitle Rivers to damages under applicable law. A value of her stipend $1000.00 and the value of her remaining 3-year contract at $1250.00 for each team rider contract x 14 ($175,000.00) for 2 years = $353,000.00., trebled to $1,059,000.00

WHEREFORE, the Plaintiff requests and demands judgment against Defendants as follows:

    A. Damages in the amount of no less than $26,000,000.00;

    B. Compensatory and Punitive damages;

    C. Treble damages and attorneys' fees where authorized;

    D. Injunctive relief; and such other further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

23

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been mailed or emailed to the following Defendant's and the Clerk of the United States District Court for the Western District of Virginia Lynchburg Division on September 14, 2019.

Counsel for the Defendants, IRS, FBI, Karen Deer, and Mary Lou Prilliman
310 First St, SW Rm 906, Roanoke VA 24011
US Attorney Thomas Cullen at **Sara.Winn@usdoj.gov** and **Christy.Nicklas@usdoj.gov**

Virginia State Police
c/o Exec. Officer/Superintendent Gary T Settle, 7700 Midlothian Tkp, N. Chesterfield VA 23235

Commissioner E Joseph Face, Jr
c/o Attorney General Mark Herring 202 N Ninth St, Richmond VA 23219

Bedford Virginia "Town"
c/o County Attorney Patrick Skelley 122 E Main St, Bedford VA 24523
c/o Attorney General Mark Herring 202 N Ninth St, Richmond VA 23219

City of Lynchburg Virginia
c/o City Attorney 900 Church St, Lynchburg VA 24504
c/o Attorney General Mark Herring 202 N Ninth St, Richmond Va 23219

Albemarle County
c/o Albemarle Co. Attorney, Co Office Bldg, 401 McIntyre Rd, Charlottesville VA 22902
c/o Attorney General Mark Herring 202 N Ninth St, Richmond VA 23219

Counsel for Defendants Shana Beck Lester and Serenity Acres Farm LLC
300 Enterprise Dr, Suite D, Forest VA 24551
E Albion Armfield at **albie@overstreetsloan.com**

Counsel for BBoyz LLC and Ralph Beck
PO Box 14125, Roanoke VA 24038
Erin Ashwell at **eashwell@woodsrogers.com**

S&R Farm LLC 5040 Cottontown Rd, Forest VA 24551 and 2060 Everett Rd, Forest VA 24551

Counsel for Peter Sackett and Sherri Sackett
310 First St, Suite 700
G. Creasy at **GCreasy@jamlaw.net**

Counsel for Old Dominion National Bank and Mark Merrill
200 South 10th St, Suite 1600, Richmond VA 23219
Boyd McGuire at **mboyd@williamsmullen.com**

24

Kelly Potter 4916 Plank Rd, North Garden VA 22959

Counsel for Ted Counts Realty & Auction Co. Inc *formerly* Counts Realty Group & Auction Co
2306 Atherholt Rd, Lynchburg VA 24505
F.E. Isenhour III at **tisenhour@caskiefront.com**

Counsel for Advantage Title and Closing Co. LLC, Jennifer Richardson and Matt Farriss
PO Box 70280, Richmond VA 23255
Stanley P Wellman at **swellman@hccw.com**
M. Scott Fisher, Jr. at **sfisher@hccw.com**

Counsel for Defendants Select Bank Financial Corp and Select Bank
1328 3rd St, SW Roanoke VA 24016
Eric D Chapman at **echapman@cowanperry.com**

J. Michael Thomas
211 Gristmill Dr, Forest VA 24551

Counsel for Margie Callahan
901 E Byrd St, Suite 950, Richmond VA 23219
Alexander S de Witt at **adewitt@freeborn.com**

Counsel for Lisa Schenkel
2306 Atherholt Rd, Lynchburg VA 24501
William E Phillips at **bphillips@caskiefrost.com**

Counsel for Frank Morrison
12576 Wards Rd, Rustburg VA 24588
Thomas L Phillips Jr. at **tphillips@pmflawyers.com**

Counsel for Defendant Steve Grant
100 S Mason St, Harrisonburg VA 22801
Gregory T St. Ours at **gstours@wawlaw.com**

Mark Loftis PO Box 14125, Roanoke VA 24038 at **mloftis@woodsrogers.com**

Counsel for Prescott H Gay
 25 N Central Ave, Staunton VA 24401
Thomas G. Bell, Jr., at **tbell@timberlakesmith.com**

Sameer Patel 5200 Fort Avenue, Lynchburg Va 24502

Counsel for Liberty University Inc and Laura Wallace
13811 Village Mill Dr, Midlothian VA 23114
Mark C Nanavati at **mnanavati@snllaw.com**
G. Christopher Jones at **cjones@snllaw.com**

North Creek Inc aka North Creek Construction, Kelly Edmundson, and David Edmundson
595 Legacy Lakes Way, Aberdeen NC 28315

Counsel for Serene Creek Run HOA, Travis Baker, Michael Friedman, Richard Rogers, Matthew
and Sarah Krycinski, Michael Bradbury, Howard Frear, William Fluker, and Seth Twery
925 Main St, Suite 300, Lynchburg VA 24505
Chad A. Mooney at **cmooney@pldrlaw.com**

Atlantic Union Bankshares and Atlantic Union Bank *formerly* Union Bankshares and Union Bank
1051 E. Cary St, Suite 1200 Richmond VA 23219

Counsel for Sherwood Day
1047 Vista Park Dr, Suite D, Forest VA 24551
Richard T Gilman at **rgilman@daylawva.com**

Counsel for Bank of the James and Robert Chapman
828 Main St, 19th Floor, Lynchburg VA 24504
John W Francisco at **jfrancisco@woodsrogers.com**

Crystal VL Rivers, Pro Se
3831 Old Forest Rd, Suite 6
Lynchburg VA 24501
434-818-2921,
**riversparalegalservices@gmail.com**

26