IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

| | | | |
|---|---|---|---|
| CRYSTAL VL RIVERS, | ) | | |
| Plaintiff, | ) | Civil Action No. 6:18-cv-00061 | |
| | ) | | |
| v. | ) | REPORT & RECOMMENDATION | |
| | ) | | |
| UNITED STATES OF AMERICA, et al., | ) | By:   Joel C. Hoppe | |
| Defendants. | ) | United States Magistrate Judge | |

Plaintiff Crystal VL Rivers, appearing pro se, is suing dozens of individuals and entities

who allegedly have wronged her or her closely held businesses, CVLR Performance Horses, Inc.

(CVLR) and CVLR Performances Horses d/b/a (CVLR d/b/a), over the past twelve years. *See*

*generally* Second Am. Compl. ¶¶ 11–70, 157–514, ECF No. 17. The matter is before the Court

on all remaining Defendants' motions to dismiss the Second Amended Complaint, ECF Nos. 73,

75, 78, 80, 82, 94, 107, 113, 117, 119, 121, 135, 143, 156, 175, 178, 231, 241, 246, 287, 351,

370[1]; Rivers's motions for leave to file a third amended complaint against certain of these

Defendants, ECF Nos. 163, 187, 192, 216, 220, 261, 263, 266, 270, 310; and two Defendants'

motions for summary judgment, ECF No. 84 (Lisa Schenkel); ECF No. 98 (Ted Counts Realty

Group). Having considered Rivers's pleading in its entirety, the parties' briefs, and the applicable

---

[1] Defendant Seth Twery, Esq., ECF No. 73; Defendants Travis & Jennifer Baker, Michael & Loren Friedman, Richard & Beth Rodgers, Matthew & Sarah Krycinski, Michael Bradbury, Howard & Barbara Frear, and William & Michelle Fluker (the "Homeowners"), ECF No. 75; Defendant Serene Creek Run Association (the "Serene Creek HOA"), ECF No. 78; Defendant Lisa Schenkel, Esq., ECF Nos. 80, 82; Defendant Ted Counts Realty Group, ECF No. 94; Defendants Ralph Beck and BBoys, LLC, ECF No. 107; Defendants Mark Merrill and Old Dominion National Bank, ECF No. 113; Defendants David and Kelly Edmundson, ECF Nos. 117, 119; Defendants Shana Beck Lester ("Lester") and Serenity Acres Farm, ECF No. 135; Defendants Advantage Title & Closing, Matthew Fariss, and Jennifer Richardson, ECF No. 143; Defendant Margie Callahan, ECF No. 156; Defendant Mark Loftis, Esq., ECF No. 175; Defendant S&R Farm, ECF No. 178; Defendant Kelly Potter, ECF No. 231; Defendant Union Bank & Trust ("Union Bank"), ECF No. 241; Defendant Robert Beach, ECF No. 246; Defendants Select Bank/Select Bank Financial Corp. ("Select Bank") and J. Michael Thomas, ECF No. 287; Defendant Northcreek Construction, Inc., ECF Nos. 121, 351; and Defendant Sameer Patel, Esq., ECF No. 370.

law, I respectfully recommend that the presiding District Judge grant the two motions for

summary judgment, and deny those Defendants' motions to dismiss as moot; grant the remaining

motions to dismiss; and deny without prejudice Rivers's motions to amend her complaint.[2]

## I. Background

This case is the latest in a long line of lawsuits "aris[ing] out of business dealings and

financial transactions between" Rivers, her companies, and "various business entities and

individuals."[3] *CVLR Performance Horses, Inc. v. Wynne*, 852 F. Supp. 2d 705, 708 (W.D. Va.

2012) (*CVLR I*). Rivers filed suit in May 2018, amended her complaint by right that June, and

was granted leave to amend for a second time in July 2019. R. & R. of Feb. 26, 2020, at 2, ECF

[2] I declined to hold a hearing on these motions because the material facts and legal contentions are adequately presented in the materials before the Court and oral argument would not aid the decisional process. *See* Fed. R. Civ. P. 78(b); W.D. Va. Gen. R. 4(c)(2); *CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 477 (4th Cir. 2015).

[3] *See, e.g.*, Second Am. Compl. ¶¶ 84, 88–89 (citing *CVLR Performance Horses v. Wynne et al.*, No. 6:11cv35 (W.D. Va. filed Sept. 8, 2011), *appealed*, No. 12-1591 (4th Cir. filed May 3, 2012), *and dismissed with prejudice*, Order of Mar. 27, 2014 (W.D. Va.)); *id.* ¶¶ 86, 94 (citing *CVLR Performance Horses, Inc. v. S&R Farm et al.*, No. CL-13-183 (Bedford Cir. Ct. filed Apr. 23, 2013), *j. entered in defs.' favor*, Order of Dec. 3, 2015 (Bedford Cir. Ct.)); *id.* ¶¶ 91, 108–09 (citing *Northwood Mgmt. Grp. v. Rivers*, No. CL-14-1454 (Roanoke City Cir. Ct. filed Aug. 4, 2014), *removal noticed*, No. 7:18cv82 (W.D. Va. Feb. 23, 2018), *remanded*, Order of Mar. 1, 2018 (W.D. Va.) (Dillon, J.), *and j. entered in pl.'s favor*, Order of Mar. 11, 2019 (Roanoke City Cir. Ct.)); *id.* ¶¶ 92, 99–102, 105–06, 111–12 (citing *Rivers v. Sanzone et al.*, No. CL-15-525 (Lynchburg Cir. Ct. filed July 8, 2015), *removal noticed*, No. 6:16cv43 (W.D. Va. July 27, 2016), *remanded*, Order of July 28, 2016 (W.D. Va.) (Moon, J.), *dismissed with prejudice*, Order of Aug. 2, 2016 (Lynchburg Cir. Ct.), *pet. for appeal denied*, Order of June 16, 2017 (Va. Sup. Ct.), *cert. denied*, 138 S. Ct. 1288 (Mar. 19, 2018), *and rehr'g denied*, 138 S. Ct. 2598 (May 29, 2018)); *id.* ¶¶ 95–97 (citing *Beck v. Lester et al.*, No. CL-16-31 (Bedford Cir. Ct. filed Jan. 20, 2016), *dismissed*, Order of May 29, 2018 (Bedford Cir. Ct.); *id.* ¶ 104 (citing *Rivers v. Lester*, No. CL-16-710 (Bedford Cir. Ct. filed Dec. 6, 2016), *dismissed*, Order of May 29, 2018 (Bedford Cir. Ct.); Defs. Beck & BBoys's Br. in Supp. of Mot. to Dismiss 2–3 (citing *CVLR Performance Horses v. S&R Farm et al.*, No. CL-12-867 (Bedford Cir. Ct. filed May 24, 2012), *dismissed*, Order of Sept. 11, 2013 (Bedford Cir. Ct.); *CVLR Performance Horses v. S&R Farm et al.*, No. CL-14-130 (Bedford Cir. Ct. filed Mar. 10, 2014), *j. entered in defs.' favor*, Order of Dec. 3, 2015 (Bedford Cir. Ct.))), ECF No. 108; Defs. Merrill & ODNB's Br. in Supp. of Mot. to Dismiss 3–5 (citing *Rivers v. Old Dominion Nat'l Bank et al.*, No. CL-13-598 (Albemarle Cir. Ct. filed Sept. 27, 2013), *dismissed without prejudice*, Order of June 9, 2014 (Albemarle Cir. Ct.); *Rivers v. Old Dominion Nat'l Bank*, No. CL-14-953 (Albemarle Cir. Ct. filed Dec. 4, 2014), *dismissed with prejudice*, Order of June 9, 2015 (Albemarle Cir. Ct.)); *Rivers v. Old Dominion Nat'l Bank*, No. CL-17-339 (Albemarle Gen. Dist. Ct. filed Jan. 23, 2017), *dismissed with prejudice*, Order of Nov. 2, 2017 (Albemarle Cir. Ct.)), ECF No. 114.

No. 346. In granting leave, the Honorable Elizabeth K. Dillon instructed Rivers that her "second amended complaint should not name more than one defendant unless one claim against each additional defendant is transactionally related to the claim against the first defendant or seeks joint and several relief, and involves a common question of law or fact." Mem. Op. of June 27, 2019, at 9 (citing Fed. R. Civ. P. 20(a)(2)), ECF No. 15. Judge Dillon also instructed Rivers that "each separate count or claim in her second amended complaint shall identify clearly which defendants are being named in that particular count. Simply referencing persons within the factual background for a specific count is insufficient." *Id.* (footnote omitted). Rivers's operative pleading does not follow faithfully those instructions. *See generally* R. & R. of Feb. 26, 2020, at 3–21; Mem. Op. of Mar. 24, 2020, at 1, 3, ECF No. 372.

A.      *Second Amended Complaint*

At 128 pages and 554 numbered paragraphs long, Rivers's second "amended complaint does not lend itself to a concise summary." *CVLR I*, 852 F. Supp. 2d at 709. Many of the factual allegations describe Rivers's and CVLR's tumultuous business relationship with nonparties John Wynne, Rivermont Banking Company (now Rivermont Consultants), and 1650 Partners, LLC. *See generally* R. & R. of Feb. 26, 2020, at 3–5, 8–21, *adopted by* Mem. Op. of Mar. 24, 2020, at 1. CVLR previously sued Wynne, Rivermont, and 1650 Partners under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, but settled its claims in March 2014. R. & R. of Feb. 26, 2020, at 3 (citing Second Am. Compl. ¶¶ 84, 89, 119). "Rivers was not a party to the action, but [she] signed the settlement agreement" promising not to sue them again. *Id.* (quoting Second Am. Compl. ¶ 89).

In this lawsuit, Rivers alleges that "the RICO activity continues using [her] funds and property under contract[,] all of which are related indirectly" to Wynne's "original scheme" at

3

the heart of CVLR's prior federal action. Second Am. Compl. ¶ 118; *see* R. & R. of Feb. 26,

2020, at 3–4, 8–21. She describes Wynne's scam as follows:

> Wynne being banned from banking targeted a female business woman, an entrepreneur, to lend money under the aspis that he owns a bank, for investment purposes. The women sign loan agreements, MOU's or Demand Notes. Wynne then makes a deal with the seller, trustee or owner of property to loan them money or pay them a kick back to put the property in his name or his assigns name before the property is paid for. A sham closing or foreclosure occurs (or the contract is flipped using the victims signature, insurance policy, etc), the victim is led to believe they own the property, Wynne transfers the agreed loan or kickback money to the seller as a mock payment for the property, documents are altered (Credit Line Deed of Trust, Deeds, Commitment Letters, HUD), the property is deeded or sold to Wynne prematurely, Wynne instructs his banking, title, and attorney associates involved in the transaction not to give the victim anything (documents), the victim insures and pays for the property monthly (interest only), the property is paid for by Wynne or by means about 2 years later and released to Wynne or a assigned, the victim attempts to pay for or refinance the property loans and is refused the payoffs and historical documents, the victim is sued for default or breach of contract and loses all finances and business usually resulting in bankruptcy.

Second Am. Compl. ¶ 118 (spelling and punctuation in original); *see CVLR Performance*

*Horses, Inc. v. Wynne*, 524 F. App'x 924, 925–27 (4th Cir. 2013) (*CVLR II*) (summarizing

CVLR's allegations against Wynne in similar, but more specific terms); *CVLR I*, 852 F. Supp. 2d

at 709–15 (same). Rivers told "local law enforcement" what she knew about "the crimes against

her," but "the Federal agencies" said they could not "investigate because the case [was] a mere

part of the ongoing Federal investigation being prosecuted by the US Attorney's office[, m]ore

specifically the Criminal Division of the IRS." Second Am. Compl. ¶ 118. Now, Rivers is suing

the United States and dozens of state and federal law-enforcement agencies and officials, private

attorneys, closing agents and title companies, banks and bank employees, homeowners, and one

insurance agent who allegedly helped Wynne perpetrate this fraudulent scheme.

As drafted, the Second Amended Complaint contains nineteen counts and names at least sixty defendants.[4] Seventeen counts "identify clearly," Mem. Op. of June 27, 2019, at 9, which defendants are named in that specific count:

- **Count 1:** Negligence. Defendants: United States of America, Federal Bureau of Investigation, Internal Revenue Service Criminal Division, and IRS agents Karen Deer and Marylou Prilliman; Virginia State Police ("VSP") and agent Bill Talbott[5]; Albemarle County, Bedford County, and the City of Lynchburg, Virginia.[6] *See* Second Am. Compl. ¶¶ 157–70.

- **Count 2:** Gross Negligence/Misconduct. Defendants: "Federal and State Agencies/City and County Defendants."[7] *See id.* ¶¶ 171–203.

---

[4] Most counts purport to "incorporate[] by reference . . . all of the Complaint's preceding allegations," *Negron-Bennett v. McCandless*, No. 1:13cv387, 2013 WL 3873659, at *4 (E.D. Va. July 24, 2013), totaling more than 500 paragraphs by the time one reaches the final count. R. & R. of Feb. 26, 2020, at 4 (citing Second Am. Compl. ¶¶ 157, 171, 204, 218, 226, 231, 236, 238, 255, 264, 276, 285, 310, 318, 326, 336, 360, 398, 408, 417, 422, 496, 502, 515). "'The result is that the Complaint is replete with factual allegations that could not possibly be material to each specific count, and [most] allegations that are material are buried beneath numerous pages of rambling' accusations against defendants who could not possibly be liable for the misconduct alleged." R. & R. of Feb. 26, 2020, at 5 (quoting *Negron-Bennett*, 2013 WL 3873659, at *4). And, although Rivers "makes clear [her] essential grievance" against most named defendants, *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985), she does "so in a way that forces the reader to . . . wade indeterminately through [a] morass of superfluous detail," *North Carolina v. McGuirt*, 114 F. App'x 555, 559 (4th Cir. 2005), about the many private citizens, businesses, government actors, and agencies whom she believes have wronged her. *See* R. &. R. of Feb. 26, 2020, at 4–5, 8–21.

[5] The VSP and Agent Talbott are also identified as defendants in Counts 2, 4, 6, 7, 8, 11, 13, 14, and 15. In March 2020, Rivers notified the Court that she did not intend to serve process on these defendants in accordance with Rule 4 of the Federal Rules of Civil Procedure. ECF No. 357; *see also* Order to Show Cause, ECF No. 344. Accordingly, VSP and Agent Talbott should be dismissed without prejudice from the action. Fed. R. Civ. P. 4(m).

[6] The City and County Defendants (Counts 1, 2, 4, 9, 11, 13, 14, 15) were voluntarily dismissed from the action in December 2019. *See* ECF Nos. 301, 311, 314, 316.

[7] Aside from the VSP, the Virginia State Corporation Commission (SCC) and Bureau of Financial Institutions are the only "state agencies" mentioned in the Second Amended Complaint's caption, list of defendants, or substantive allegations. Second Am. Compl. ¶¶ 18, 132–38, 164–65, 182–88, 222, 224. Both agencies, along with former SCC Commissioner E. Joseph Face Jr., were dismissed from the action in November 2019. ECF No. 293.

- **Count 3:** Civil RICO. Defendants: Peter Sackett, Sherri Sackett, Select Bank, Bank of the James, Old Dominion National Bank (ODNB), Walter Mason[8], and J. Michael Thomas. *See id.* ¶¶ 204–17.[9]

- **Count 4:** "Conspiracy to Deprive Rivers['s] Rights and Remedy to Restitution and Her Assets." Defendants: "Federal, City, County, State Agency and Agents Defendants." *See id.* ¶¶ 218–25.

- **Count 5:** Civil RICO. Defendants: Select Bank, ODNB, Union Bank, Mason, Thomas, and Robert Beach. *See id.* ¶¶ 226–54.

- **Count 6:** Negligence, failure "to indict the parties defendant for obtaining money and signature under false pretenses." Defendants: FBI, IRS Criminal Division, VSP, Albemarle County, Deer, Prilliman, and Talbott. *See id.* ¶¶ 255–63.

- **Count 7:** Negligence, failure "to indict the parties investigated for obtaining money and signature under false pretense[s]." Defendants: FBI, VSP, IRS Criminal Division, and the "Investigating Agents." *See id.* ¶¶ 264–75.

- **Count 9:** Negligence, failure to "indict or charge under conspiracy." Defendants: FBI, VSP, Albemarle County, Bedford County, City of Lynchburg, and "the agents that investigated the defendants." *See id.* ¶¶ 326–35.

- **Count 11:** Negligence, failure to "charge, indict, or prosecute the parties involved for their criminal acts including but not limited to forgery, fraud, obtaining and attempting to obtain money under false pretense[s]." Defendants: Albemarle County, Bedford County, City of Lynchburg, VSP, Deer, Prilliman, and Talbott. *See id.* ¶¶ 353–59.

---

[8] Mr. Mason is also identified as a defendant in Count 5. Despite being on notice of her obligation to do so, *see* R. & R. of Feb. 26, 2020, at 6 n.8 (citing Fed. R. Civ. P. 4), there is no indication that Rivers ever requested a summons for Mr. Mason or attempted to serve him with a summons and copy of her Second Amended Complaint. Accordingly, Mr. Mason may be dismissed without prejudice from the action. Fed. R. Civ. P. 4(m).

[9] Rivers's claims against Peter Sackett, Sherri Sackett, and Bank of the James were dismissed without prejudice on March 24, 2020. ECF No. 373 (Judge Dillon's Order accepting in part and modifying in part my report and recommendation of February 26, 2020). In April, Rivers filed a notice of interlocutory appeal from specific "portions" of Judge Dillon's March 24 Order. ECF No. 404. She did not challenge Judge Dillon's rulings with respect to these three Defendants. *See id.*

- **Count 12:** Fraudulent Conveyance. Defendants: Ralph Beck, Shana Beck Lester, S&R Farm, Serenity Acres Farm (SAF), BBoys, Northcreek Construction, Union Bank, Prescott Gay[10], Sameer Patel, and Mark Loftis. *See id.* ¶¶ 360–97.

- **Count 13:** Negligence, "failure to indict the investigated defendants for mail and wire fraud." Defendants: FBI, IRS Criminal Division, VSP, and Bedford County. *See id.* ¶¶ 398–407.

- **Count 14:** Negligence, "failure to indict or charge the investigated defendants with money laundering." Defendants: FBI, IRS Criminal Division, Bedford County, City of Lynchburg, Deer, Prilliman, and Talbott. *See id.* ¶¶ 408–16.

- **Count 15:** Negligence, "failure to charge or indict the defendants investigated for making false statements/forg[e]ry." Defendants: Bedford County, VSP, and "the investigating agents." *See id.* ¶¶ 417–21.

- **Count 16:** Breach of contract. Defendants: Beck, Lester, and "Trustees in liquidation of S&R." *See id.* ¶¶ 422–95.

- **Count 17:** Request for specific performance "of the contracts between CVLR and S&R and/or Rivers and the trustees in liquidation for the sale of real property." *Id.* ¶ 497; *see also id.* ¶ 501.

- **Count 18:** Insurance fraud. Defendant: Margie Callahan. *See id.* ¶¶ 502–14.

- **Count 19:** Defamation. Defendants: Liberty University and Laura Wallace. *See id.* ¶¶ 515–54.[11]

*See generally* R. & R. of Feb. 26, 2020, at 5–8. The other two counts—**Count 8** (Civil RICO) and **Count 10** (Fraudulent Conveyance)—each still reference multiple defendants "within the factual background" for that count without "expressly limit[ing] the claim to those particular defendants," Mem. Op. of June 27, 2019, at 9 & n.4. *See* R. & R. of Feb. 26, 2020, at 8 (citing Second Am. Compl. ¶¶ 276–325, 336–52), *adopted by* Mem. Op. of Mar. 24, 2020, at 4.

\*

---

[10] Mr. Gay was dismissed from the action in December 2019. ECF Nos. 190, 292, 320.

[11] Both Defendants were dismissed from the action in December 2019. ECF Nos. 227, 320.

In February 2020, I recommended that Judge Dillon grant motions to dismiss filed by Defendants Bank of the James, Robert Chapman, Sherwood Day, Peter Sackett, Sherri Sackett, and Frank Morrison; deny Rivers's motions to amend her claims against Peter Sackett and Day; and dismiss with prejudice any claims against these Defendants. *See* R. &. R. of Feb. 26, 2020, at 40. I further recommended that Counts 8 and 10 be dismissed with prejudice because they violated Judge Dillon's instructions that each count must "identify clearly which defendants are being named in that particular count" and that "[s]imply referencing persons within the factual background for a specific count," Mem. Op. of June 27, 2019, at 9, did not satisfy basic pleading requirements. R. & R. of Feb. 26, 2020, at 25–26 (collecting cases).

Judge Dillon accepted my recommendation with respect to Chapman, Day, and Morrison, dismissing all claims against those three Defendants with prejudice[12] and denying with prejudice Rivers's motion to amend her claims against Day. *See* Order of Mar. 24, 2020, at 1; Mem. Op. of Mar. 24, 2020, at 5–6. She also accepted, over Rivers's partial objection, my recommendation as to Counts 8 and 10. Order of Mar. 24, 2020, at 1; *see* Mem. Op. of Mar. 24, 2020, at 3–5. Judge Dillon accepted as modified my recommendation as to the Sacketts and Bank of the James, dismissing the claims against them without prejudice and denying without prejudice Rivers's request to amend her claims against Peter Sackett. Order of Mar. 24, 2020, at 1; Mem. Op. of Mar. 24, 2020, at 5–6. On April 22, Rivers noted an interlocutory appeal from three "portions" of Judge Dillon's nonfinal order: (1) dismissal of Count 8 and Count 10 with prejudice; (2) dismissal of any claims against Chapman, Day, and Morrison; and (3) denial of her motion to

---

[12] Rivers did not name these individuals as defendants to any specific count(s). R. & R. of Feb. 26, 2020, at 36–40; *see Abdul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 294 (4th Cir. 2018) ("Faced with such resolute adherence to deficient complaints, the district court's decision to dismiss with prejudice was well within its discretion under the facts of this case.").

amend with respect to Day. Notice of Appeal 1, ECF No. 404. That matter is pending before the United States Court of Appeals for the Fourth Circuit. *See* Mem. Op. & Order of Oct. 9, 2020, at 8–9 (explaining that Rivers's premature attempt to appeal from Judge Dillon's nonfinal order did not affect the district court's authority to resolve other pending motions, even if they concerned matters "involved in" the interlocutory appeal), ECF No. 480.

In August 2020, I recommended that Judge Dillon dismiss without prejudice Rivers's negligence claims against the Federal Government Defendants (Counts 1, 2, 6, 7, 9, 11, 13, 14, 15) for lack of subject matter jurisdiction. *See generally* R. & R. of Aug. 18, 2020, at 7–8, 13–15, ECF No. 469. I also recommended that Rivers's potential constitutional claim (Count 4) be dismissed with prejudice because Defendants Karen Deer and Marylou Prilliman, federal agents sued for damages in their individual capacities under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), were entitled to qualified immunity. *See* R. & R. of Aug. 18, 2020, at 15–19. Judge Dillon accepted both recommendations over Rivers's objections. *See* Mem. Op. of Sept. 28, 2020, at 1–6; Order of Sept. 28, 2020, at 1. Rivers has asked Judge Dillon to reconsider those rulings. ECF No. 479.

The following six counts, identifying fourteen named Defendants, remain in the Second Amended Complaint:

- **Count 3:** Civil RICO. Defendants: Select Bank, ODNB, Thomas.
- **Count 5:** Civil RICO. Defendants: Select Bank, ODNB, Union Bank, Thomas, Beach.
- **Count 12:** Fraudulent Conveyance. Defendants: Beck, Lester, S&R Farm, SAF, BBoys, Northcreek Construction, Union Bank, Patel, Loftis.
- **Count 16:** Breach of contract. Defendants: Beck, Lester, "Trustees in liquidation of S&R."

- **Count 17:** Request for specific performance "of the contracts between CVLR and S&R and/or Rivers and the trustees in liquidation for the sale of real property."

- **Count 18:** Insurance fraud. Defendant: Callahan.

All other individuals or entities named in the pleading's caption and/or list of parties are not identified as Defendants to any specific count.[13] They are referenced in the factual background to certain counts. *See* Mem. Op. of Mar. 24, 2020, at 5; Mem. Op. of June 27, 2019, at 9.

**

The Second Amended Complaint's wide-ranging allegations describe various events that Rivers believes "are related indirectly to the original scheme of Wynne with the assistance of the other named Defendants in this matter." Second Am. Compl. ¶ 118. I have noted before that "[m]uch of the pleading is a 'discursive, confusing narrative,' *Negron-Bennett*, 2013 WL 3873659, at *4, that only someone who is already familiar with this years-long saga (or a mind reader) could fully grasp." R. &. R. of Feb. 26, 2020, at 8 (citing *Beaudett*, 775 F.2d at 1278; Fed. R. Civ. P. 8(d)(1)). For example,

> Rivers says over and over again that her claims relate to "the use of Rivers['s] funds and funds obtained from the use of her signature, her equity, insurance policies[,] and commercial purchase contracts," Second Am. Compl. ¶ 193; *see also id.* ¶¶ 194, 206, 212, 215, 217, 246, 266, 291, 303, 327, 349, but her pleading "generally lack[s] any comprehensible factual basis" for "these redundant allegations," *Plumhoff v. Cent. Mortg. Co.*, 286 F. Supp. 3d 699, 703–04 (D. Md. 2017) (dismissing complaint "replete with wide-ranging allegations directed at" defendants and nonparties alike where "the same general conspiracy and fraud allegations [were] repeated countless times throughout the complaint yet generally lack[ed] any comprehensible factual basis"). Similarly, unlike in CVLR's prior RICO action, Rivers provides no factual context for her allegations that Wynne and his associates used "her signature" to obtain "funds" that supposedly belonged to her. . . . She also relies predominantly on legal conclusions to describe the alleged misconduct—like "conspired," "fraudulent," "false pretenses," and "racketeering

---

[13] Those Defendants are: Serene Creek HOA, Twery, Merrill, Potter, Ted Counts Realty Group (TCRG), Advantage Title & Closing (ATC), Fariss, Richardson, Schenkel, David Edmundson, Kelly Edmundson, and Homeowners Baker, Friedman, Rodgers, Krycinski, Bradbury, Frear, and Fluker. *See* Second Am. Compl. ¶¶ 30, 33, 36–41, 46, 48, 54–55, 57–64.

activity"—lodged at "the Defendants" generally, rather than on well-pleaded facts that might "answer the basic questions: who, did what, to whom (or with whom), where, and when?," *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 709 (4th Cir. 2015) (quoting *Kendall v. Visa, U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008)). *See, e.g.*, Second Am. Compl. ¶¶ 156, 167, 198–99, 209, 220, 223, 228–29, 233–34, 279, 281, 299–300, 303, 317, 327–33, 344–47, 349, 359, 382–83, 386–89, 392–93, 406, 428, 508, 520.

R. & R. of Feb. 26, 2020, at 8–9. Nonetheless, I have tried to summarize below the Second Amended Complaint's relevant factual allegations and any reasonable inferences drawn therefrom, all of which are accepted as true and construed in Rivers's favor. *CVLR I*, 852 F. Supp. 2d at 709; *see Woods v. City of Greensboro*, 855 F.3d 639, 648–49 (4th Cir. 2017); *Houck v. Substitute Tr. Servs.*, 791 F.3d 473, 484 (4th Cir. 2015). Where necessary, I also have looked to opinions from CVLR's prior RICO action against Wynne solely to help make sense of this pleading's often ambiguous allegations against the moving Defendants.[14] *See* R. & R. of Feb. 26, 2020, at 9–10 (citing *Clatterback v. City of Charlottesville*, 708 F.3d 549, 558 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015); *Strickland-Lucas v. Citibank, N.A.*, 256 F. Supp. 3d 616, 623 (D. Md. 2017)); Mem. Op. of Mar. 24, 2020, at 3 ("[Rivers] notes that she is not relitigating her old case, but commends the R&R for weaving the facts together from the old case and this one and for understanding her allegations."). Finally, I have added a new section on *Crystal Rivers v. Joseph Sanzone et al.*, No. CL-15-525 (Lynchburg Cir. Ct.), which is just one of many state-court lawsuits Rivers alleges that she (or CVLR) has filed against certain Defendants who have moved to dismiss the Second Amended Complaint.[15] *See generally* Second Am. Compl. ¶¶ 87–115. I may take judicial notice of the facts

---

[14] Those opinions were also issued at the pleading stage. *CVLR II*, 524 F. App'x at 925; *CVLR I*, 852 F. Supp. 2d at 709; *CVLR Performance Horses, Inc. v. Wynne*, 977 F. Supp. 2d 598, 600 (W.D. Va. 2013) (*CVLR III*).

[15] The Second Amended Complaint lists four such lawsuits where Rivers or CVLR was plaintiff, and at least one lawsuit where Rivers filed a counterclaim against Beck. *See generally* Second Am. Compl. ¶¶ 87–115 ("Legal Overview/History"). I focus on *Sanzone* because Rivers's operative complaint in that

from that prior proceeding because, as explained below, the res judicata defenses asserted here

raise "no disputed issues of fact." *Andrews v. Daw*, 201 F.3d 521, 524 & n.1 (4th Cir. 2000).

      1.      *The Riding Center & The "Option Contract"*

This all began in late 2006, when Rivers contacted Wynne about leasing pastureland for

her horses. *See CVLR I*, 852 F. Supp. 2d at 709. "Rivers was in the market for an equestrian

facility with more than 86 acres," Second Am. Compl. ¶ 485, and Wynne told Rivers that

Rivermont was a bank amenable to "financ[ing] the purchase of real estate and equipment for

CVLR's horse riding business," *CVLR I*, 852 F. Supp. 2d at 709. By February 2007, Rivers

believed she had "acquired the promise of financing," presumably from Wynne on Rivermont's

behalf, to purchase the Serene Creek Run Riding Center (the "riding center") from Defendant

S&R Farm, LLC. Second Am. Compl. ¶ 485; *see CVLR II*, 542 F. App'x at 926; *CVLR I*, 852 F.

Supp. 2d at 710. A few years earlier, Defendants Ralph Beck and Shana Beck Lester, S&R

Farm's members, had received Bedford County's permission to develop this pastureland into the

Serene Creek Run and Serenity Acres Farm subdivisions. *See* Second Am. Compl. ¶¶ 189–90,

283, 290, 340. "Th[e] portion of the property that was to be a subdivision included amenities and

Lots 1–35 and A–K. The raw land and the riding center portions of the remaining S&R property

were included in the family subdivision and could not be sold or conveyed," *id.* ¶ 283, "to any

outside party other than a family or LLC member of S&R, Beck[,] or Lester until 2009," *id.* ¶

290. That land would "be subdivided and annexed at a later date." *Id.* ¶ 283. Lester and Beck got

---

lawsuit named all Defendants who argue res judicata bars any of Rivers's claims asserted against them in
this case and that action was dismissed with prejudice. *See* Def. Schenkel's Mot. for Summ. J. 1, ECF No.
84; Def. TCRG's Mot. for Summ. J. 1, ECF No. 98; Defs. Beck & BBoys's Br. in Supp. of Mot. to
Dismiss 4–7; Defs. Merrill & ODNB's Br. in Supp. of Mot. to Dismiss 3, ECF No. 114; Defs. Lester &
SAF's Br. in Supp. of Mot. to Dismiss 8–9, ECF No. 136; Defs. ATC, Fariss & Richardson's Br. in Supp.
of Mot. to Dismiss 10–12, ECF No. 144; Def. Callahan's Br. in Supp. of Mot. to Dismiss 2–5, 7, ECF No.
157; Def. S&R Farm's Br. in Supp. of Mot. to Dismiss 1–2, ECF No. 179; Def. Potter's Br. in Supp. of
Mot. to Dismiss 4, ECF No. 232; Def. Patel's Br. in Supp. of Mot. to Dismiss 2, 6–7, ECF No. 371.

divorced in 2007 or 2008. *See id.* ¶¶ 87, 424, 427, 454–56. In July 2006, "Lester was given the exclusive use and possession of the riding center and adjacent pastures," while "Beck was given the exclusive use of the marital residence and adjoining acreage." *Id.* ¶ 454.

In April 2007, "Lester, Beck, S&R, and Rivers agreed" to an "Option and Right of First Refusal" involving the land that Beck and Lester planned to develop into the subdivisions. *Id.* ¶ 477. Rivers would pay $550,000 (later negotiated to $475,000) to purchase the riding center, its logo, "and the option to cut and maintain the hay and pay the S&R taxes on Beck's interest in the adjoining" 144 acres, plus $500 a month "for Lester's interest in the riding center and adjacent pastures and the remaining 17 lots until closing of the riding center." *Id.* (emphasis omitted). In return, S&R allegedly "promised to give CVLR the Option to Purchase for $15,000.00 per acre and the First Right of Refusal" on any or all of S&R Farm's "remaining" undeveloped land, *id.* ¶ 467. *See also id.* ¶¶ 24, 29, 87, 96, 284, 338, 443, 486.[16]

Beginning in April 2007, Rivers paid Lester, Beck, and/or S&R Farm about $8,000 plus another "$20,000.00 as [a] refundable deposit toward the riding center portion of the Option at settlement." *Id.* ¶ 479. Rivers does not allege that Wynne or his companies were involved in those transactions. Nevertheless, Rivermont did agree to give Rivers "a $475,000.00 commercial loan" and $25,000 in "deposits for a commercial contract to purchase [the] riding center property mortgaged [for $500,000] through ODNB by [a] Credit Line Deed of Trust dated November 20, 2007." *Id.* ¶ 127; *see id.* ¶¶ 142, 178, 354, 400. Unbeknownst to Rivers, Wynne had been "barred from the banking business completely in 2006," *id.* ¶ 247; *see also id.* ¶¶ 19, 118, 164, 246, 266,

---

[16] Rivers does not consistently distinguish between herself, CVLR, Inc., and CVLR d/b/a, Second Am. Compl. ¶ 12, when discussing this option contract. Sometimes she describes it as an agreement "between CVLR d/b/a and S&R," *id.* ¶ 288; *see also id.* ¶¶ 24, 26–30, 87, 94, 96, 320, 338, 473, but other times Rivers alleges that she was a party to the contract in her personal capacity, *see, e.g.*, *id.* ¶¶ 284, 288, 290, 341, 355, 430–33, 488. She did not attach a copy of the contract as an exhibit to her Second Amended Complaint.

and Rivermont "was not authorized at any relevant time to engage in banking activities under Virginia law," *CVLR II*, 524 F. App'x at 927; *see also CVLR I*, 852 F. Supp. 2d at 709–10; Second Am. Compl. ¶¶ 18–19, 137, 158, 179, 212, 222, 248 (referring to Rivermont as Wynne's "illegal banking enterprise"). Wynne "had no intention actually to sell and/or purchase the property and/or provide loans to Rivers for the property, but used Rivers and her businesses as the debt service and Rivers['s] contracts as assets to earn a substantial profit, equity, credit, interest[,] and income." Second Am. Compl. ¶ 329.

        a.    *The "Scam Closing"*

Rivers alleges that Wynne paid S&R Farm, Lester, and Beck a "$20,000.00 bribe [to] set up a scam closing" on the riding center property "to dupe Rivers." Second Am. Compl. ¶¶ 474–75; *see also CVLR II*, 524 F. App'x at 925–26; *CVLR III*, 977 F. Supp. 2d at 600–01; Second Am. Compl. ¶¶ 295, 343, 358–59. On November 20, 2007, Rivers "signed various documents, thinking that the property was being conveyed to CVLR and that CVLR was giving a 'mortgage' for the riding center property." *CVLR I*, 852 F. Supp. 2d at 710. Although Wynne told Rivers that "her understanding was correct," *id.*, he in fact "cut CVLR out of the transaction and arranged for 1650 Partners to purchase the riding center with Rivers serving as a guarantor on the loan from [ODNB] to 1650 Partners," *CVLR II*, 524 F. App'x at 926.

Defendant Jennifer Richardson, co-owner of Defendant Advantage Title & Closing, was tasked with recording the Credit Line Deed of Trust (CLDOT) on the riding center after the November 20, 2007 closing. *See* Second Am. Compl. ¶¶ 39, 41, 140, 142–43. Rivers later discovered that Richardson "altered" the original CLDOT by "omitting the name of Rivers, who had agreed to put up the riding center as collateral," *id.* ¶ 418, and adding "Wynne['s] name in addition to 1650 Partners LLC, instead of Crystal VL Rivers and/or CVLR Performance

Horses," *id.* ¶ 140. *See also id.* ¶ 354. Wynne and 1650 Partners were "not named in any contracts relating to the Option or sale of the riding center." *Id.* ¶ 418. Richardson also deleted Rivers's and Lester's names from a Department of Housing and Urban Development (HUD) statement, *see id.* ¶ 354, before having Wynne and Beck sign a "new final" statement on November 21, 2007, *id.* ¶ 419 (emphasis omitted). "The forged HUD statement was dated November 20, 2007, was not signed by Rivers personally or for CVLR or Lester of S&R[,] and [was] signed in hand by Richardson[,] not with a stamp like the original November 20, 2007 HUD statement." *Id.* ¶ 144.

On November 21, Richardson recorded the altered CLDOT and HUD statement at the Bedford County Courthouse. *Id.* ¶¶ 142, 418. While there, she "had to write a check for the difference owed," adjusted the accounting on the HUD statements, "and issued new proceeds checks based on the difference in accounting." *Id.* ¶ 419. Beck and Lester instructed ATC to pay Defendant TCRG a "5% commission on Rivers['s] contracts for the purchase of the riding center," which amounted to roughly $30,000. *Id.* ¶ 357. Defendant Seth Twery, Esq., received $1,200 for his "part in negotiating and coordinating the scam closing to dupe Rivers." *Id.* ¶ 358; *see also id.* ¶ 359 (alleging that Twery and other attorneys "were paid for coordinating, negotiating and orchestrating the fraudulent scheme and the scam closing between the Defendants to dupe Rivers and to benefit their clients"). Defendant Union Bank (formerly Planters Bank, now Atlantic Union Bank) also "earned a substantial profit from the money it received from the sham sale of the riding center." *Id.* ¶ 296. Although not entirely clear, it seems that Planters Bank held S&R Farm's mortgage on the riding center. *See id.* ¶¶ 189, 292, 295, 335, 342–43, 446. In November 2007, Planter Bank received roughly $332,000 "paid from the 'sham' closing" on this property. *Id.* ¶ 295.

15

"Even after this transaction was complete, Rivers incorrectly believed that [she and/or] CVLR owned the riding center." *CVLR II*, 524 F. App'x at 926; *see* Second Am. Compl. ¶¶ 140, 273, 295, 323. Rivers purchased insurance policies and made mortgage payments to ODNB every month between December 2007 and February 2011. *See* Second Am. Compl. ¶ 320. "On February 14, 2011, Rivers was court ordered to leave the riding center property because she didn't own the property and her company was unable to obtain the financing to purchase the property." *Id.* ¶ 273 (capitalization altered).

In the fall of 2016, "Richardson admitted to ATC changing the CLDOT when the error was caught."[17] *Id.* ¶ 148. An investigator with the Bedford County Sheriff's Office spoke to representatives from ODNB, who explained "that under the circumstances the documents are prepared by the bank and if changes are required to be made the entire document is corrected." *Id.* ¶ 149. "[A]ttorneys [who] deal in real estate law" told this investigator that "a title agent can make corrections to a deed of trust. Examples given were misspellings or other inaccuracies but nothing as in-depth as what occurred in this incident with Rivers['s] CLDOT." *Id.* ¶ 150. The Commonwealth's Attorney for Bedford County "decided not to prosecute" Richardson. *Id.* ¶ 151. Rivers provided "more documents and information," as well as "additional code sections," that the Commonwealth's Attorney could use to prosecute Richardson for fraud, "forgery[,] and altering of documents." *Id.* ¶¶ 151–52. She has asked the office to reopen its investigation into Richardson, ATC, and Defendant Matthew Fariss. *Id.* ¶ 152. Fariss co-owns ATC with Richardson. *See id.* ¶¶ 39–40.

      b.     *The "Optioned Lots"*

---

[17] Rivers does not identify or otherwise explain what "error" she is referring to. *See* Second Am. Compl. ¶¶ 140, 480 (referencing "the mistake" that Richardson made "in the accounting and changed on November 21, 2007").

Rivers alleges that the "'Option contract' between S&R [Farm] and CVLR d/b/a," *id.* ¶ 96, included the riding center and seventeen single-family lots covering at least 120 acres within the Serene Creek Run and Serenity Acres Farm subdivisions, *see id.* ¶¶ 443, 491. In August 2007, "Lester and Beck's divorce attorney(s) validated the value of the Purchase and Sale contracts between S&R and Rivers. The estimated value of the CVLR d/b/a purchase and sale contracts for the riding center [was] $550,000.00 and the 17 remaining S&R lots [was] $1,417,166.00 and the raw land was $1,700,000.00." *Id.* ¶ 338 (capitalization corrected). In 2007 and 2008, S&R Farm "deeded" certain lots to Lester, who then deeded them to Beck. *See id.* ¶¶ 370–73. S&R Farm also deeded one lot directly to Beck in August 2009. *Id.* ¶ 374.

All seventeen lots and the riding center have been sold to other people or entities. *See id.* ¶¶ 327, 342, 349, 362–70, 372–79. It appears that Union Bank financed some of the purchases and may hold funds earned from those transactions. *See id.* ¶¶ 302, 337, 349, 369. Defendants David Edmundson, Kelly Edmundson, and/or Northcreek Construction purchased several lots, improved them, and resold four of those properties to certain Defendant Homeowners. *See id.* ¶ 57 (Baker, Lot 3); *id.* ¶ 58 (Friedman, Lot 6); *id.* ¶ 60 (Krycinski, Lot 16); *id.* ¶ 62 (Bradbury, Lot 18); *id.* ¶¶ 297–98, 337, 350–51, 363–64, 368 (referencing Lots 3, 6, 18, 24, and J). Some Defendant Homeowners purchased lots directly from Beck, Lester, BBoys, and/or SAF. *See id.* ¶ 59 (Rodgers, Lot 8); *id.* ¶ 61 (Krycinski, Lots H & I); *id.* ¶¶ 63, 293–94, 375 (Frear, Lot 33, Aug. 2009); *id.* ¶¶ 64, 377 (Fluker, Lot 34, May 2012). Defendants Twery and Sameer Patel, Esq., ran title searches or prepared deeds for a few sales. *See id.* ¶¶ 377–79. Defendant Lisa Schenkel, Esq., Beck's divorce attorney, allegedly knew about Rivers's potential interest in the S&R Farm properties, but "swept the Option contract under the rug [] for the sole purpose of getting paid and allowing Beck, Lester[,] and S&R to use the S&R property as collateral to obtain loans,

refinance and renew existing loans and mortgages, [and] make a large profit from the use of Rivers['s] contracts and the sales of the property." *Id.* ¶ 388 (internal quotation marks omitted).

In February 2016, "Rivers gave Notice to Exercise her CVLR Performance Horses Option to Purchase and First Right of Refusal Agreement dated April 24, 2007, recorded it with the Bedford County Clerk's Office and served it upon . . . Beck and Lester, in liquidation of S&R." *Id.* ¶ 423; *see id.* ¶ 96 (alleging that Rivers "exercised" the option and right of first refusal by filing "her answer to Beck's complaint" in ongoing state-court litigation). Rivers believes the option agreement is now a valid "purchase contract," *id.* ¶ 481, that retroactively "extinguished any third-party interest" in the land described therein, *id.* ¶ 432, plus any improvements, investments, profits, or assignments made since April 24, 2007, *id.* ¶¶ 96, 431, 445. *See id.* ¶¶ 26–27, 30, 110, 118, 323, 355, 362–79, 501 (alleging the lots are "under contract" with Rivers to purchase). She asks the Court to hold that "each parcel of remaining S&R Farm land is unique" and to "[o]rder the seller to convey the property and all that is attached to it to the purchaser," i.e., Rivers and/or CVLR d/b/a, "according to the terms" of her February 2016 "Notice to Exercise," the April 2007 "Option to Purchase and First Right of Refusal," and the November 2011 "Addendum" to the purchase contract for the riding center. *Id.* ¶ 501; *see id.* ¶¶ 288, 311, 341, 358, 423, 418. The "addendum" relates to an agreement between "Rivers (CVLR d/b/a/)" and Defendant Serene Creek Run Association, where the latter agreed to make Rivers a member of the HOA and pay her $75 a month to mow the grass around the clubhouse, pool, and playground. *Id.* ¶ 311. Almost immediately, however, "[t]he HOA refused [to] tak[e] membership money from Rivers." *Id.* ¶ 312. "Rivers has not had full use of the amenities . . . since 2011." *Id.*

Rivers also describes two real estate transactions that took place after she filed the "notice to exercise" her purported purchase option. *See id.* ¶¶ 308, 378–79, 392–97, 425–29, 437–39, 447–48. In late 2016, Lester admitted in court documents that in September of that year she "conveyed" to Beck roughly 216 acres of "raw land" located on Cottontown Road in Forest, Virginia. *See id.* ¶¶ 427, 443. Beck listed the property for sale beginning in August 2017. *See id.* ¶¶ 425–26. In May 2018, "Rivers contacted all realtors that had the listing to notify them that the property was under cloud . . . . [She] asked each of them to set up a time for her to walk through the property and schedule time for closing per the price term in her [option] contract, $15,000 per acre." *Id.* ¶ 308. This did not happen. *See id.* ¶ 468. A year later, Rivers discovered the Cottontown Road property "had been subdivided and Beck was selling the 2 acres with the home he built on property that Rivers continues to have a cloud on." *Id.* ¶ 379. Two individuals bought this property in April or May 2019. *Id.* Patel ran the title search and acted as the closing agent in that transaction. *Id.* At some point, "Rivers learned that [Defendant Mark] Loftis had sent a release to Patel. Rivers asked repeatedly for a copy of the release [but] was refused." *Id.* ¶ 381.

       2.     *Insurance Proceeds*

On April 7, 2008, Rivers hand delivered to ODNB two insurance checks in the amounts of $2,043.86 and $24,265.38, "made payable to CVLR Performance Horses Inc. and ODNB." Second Am. Compl. ¶ 409. An ODNB employee "instructed Rivers to endorse [both] checks," but she "refused to cash" the check for $2,043.86. *Id.* Rivers does not say what happened to the check for $24,265.38. That July, Rivers received a third insurance check for $8,881.35 made "payable to Rivers['s] business CVLR Inc. and ODNB." *Id.* ¶¶ 128, 232, 411; *see CVLR I*, 852 F. Supp. 2d at 710. Rivers's and CVLR's former attorney instructed ODNB that the $8,881.35 should be used to "pay CVLR invoices for work performed on the property" with the "remainder

. . . deposited into the 1650 Partners LLC account," which Rivers "used . . . for expenses on the property." Second Am. Compl. ¶¶ 128, 232. On February 19, 2009, Defendant Kelly Potter, an employee of ODNB, "received, endorsed[,] and exchanged" the insurance check "for a cashier's check," *id.* ¶ 232, payable to "Terrance White for $6,837.49," *id.* ¶ 260. Wynne had hired Mr. White to do some work on the riding center's barn in the spring of 2008, but Mr. White never finished the job. *CVLR I*, 852 F. Supp. 2d at 710. The remaining $2,043.86 was deposited into an ODNB bank account under the name "Catherine R. Wynne Estate," which Wynne controlled. Second Am. Compl. ¶ 232; *see also id.* ¶¶ 237, 410–11. In April 2009, someone wrote a $10,315.90 check drawn on this account, $10,000 of which "was applied as a principal payment" on an "account note" or line of credit held by Defendant Select Bank. *Id.* ¶ 412. The line of credit was also under the estate's name. According to Rivers, "[t]he amount of money paid to Select Bank by ODNB $10,315.90 and paid to Terrance White $10,315.35 is the same amount of money within cents paid to 1650 [Partners] by ATC $10,514.20 on a check dated November 20, 2007 and deposited into" a Bank of the James account. *Id.* ¶ 240. Select Bank "did not have Rivers's permission and did not notify Rivers of the transfers and deposits of her closing and insurance funds from ODNB and [Bank of the James] to the Catherine R. Wynne account and credit line at Select Bank." *Id.* ¶ 243 (punctuation corrected).

   *3.    Karen Foster's Home*

   Rivers also describes a September 2008 foreclosure sale of a house that belonged to Karen Foster, one of Wynne's other victims. *See* Second Am. Compl. ¶¶ 193, 206, 209–10, 215, 232, 250, 259, 266, 409, 411, 413. "The facts alleged in this regard are many and confusing," *CVLR I*, 852 F. Supp. 2d at 711, but Rivers's essential grievance seems to be that Wynne used some of Rivers's and/or CVLR's insurance proceeds to buy Ms. Foster's home in a "sham

foreclosure," Second Am. Compl. ¶ 244; *see also id.* ¶ 266, and that proceeds from this sale ended up in bank accounts belonging to Peter and Sherri Sackett, who used the money to pay their personal and business expenses, *id.* ¶¶ 205–06, 209, 214–15. *See* R. & R. of Feb. 26, 2020, at 16–17, *adopted by* Mem. Op. of Mar. 24, 2020, at 1.

Ms. Foster "believed that Rivermont was a bank, [and] sought financing from Rivermont in early 2006." *CVLR II*, 524 F. App'x at 926. That August, "Wynne convinced Foster to execute a note agreeing to pay him $40,000 for [a] series of small loans he had made and to secure the note with Foster's home," *id.* at 926–27, located on Ridgewood Drive in Lynchburg, *see* Second Am. Compl. ¶ 206. Two years later, Wynne "panicked and instructed Peter Sackett to foreclose" on that house. Second Am. Compl. ¶ 266; *see id.* ¶ 118. Apparently, Wynne "bid-in the property for $40,000.00" even though he "knew there was a Bank of America mortgage on the property." *CVLR I*, 852 F. Supp. 2d at 714; *see* Second Am. Compl. ¶ 215. Wynne transferred between $74,000 and $114,000 to Sackett's bank account, *see* Second Am. Compl. ¶¶ 205–06, 214, 215, 219, 269, which Sackett spent on other things. In 2010, "Sackett paid over $68,000.00 to Bank of America for the mortgage" on Ms. Foster's foreclosed home. *Id.* ¶ 215; *see also CVLR I*, 852 F. Supp. 2d at 714. "The remaining funds were paid to Wynne from Sackett's escrow account." Second Am. Compl. ¶ 215 (punctuation corrected).

Rivers believes Wynne "used the foreclosure as a vehicle to move and hide the funds he obtained from Rivers and her signature, equity, insurance policies and contracts into accounts at Select Bank." *Id.* ¶ 266; *see also id.* ¶ 215 ("$74,000.00 was previously transferred from the same Select [B]ank account . . . . and paid for by Rivers['s] funds and funds obtained from the illegal use of her signature, equity and purchase contracts and insurance policies."). ODNB,

Select Bank, and Bank of the James each held some of those funds at one point. *See id.* ¶¶ 206, 208, 237, 240–42.

    4.    *State Farm Insurance Policies*

Defendant Margie Callahan was Rivers's State Farm insurance agent during the relevant time. *See* Second Am. Compl. ¶¶ 45, 504–09; *CVLR I*, 852 F. Supp. 2d at 713. In May and June 2007, Callahan "used Rivers['s] identity to . . . prepare a fake insurance policy" for Rivermont so Wynne could obtain "two separate loans" from John Deere Credit to buy a tractor/front-end loader and a hay cutter/baler. Second Am. Compl. ¶ 505; *see id.* ¶¶ 506–11. The loan terms required the borrower to show proof of insurance, and "Callahan knew that Wynne could not get an automobile policy with his criminal" driving record. *Id.* ¶ 505.

"Callahan forged insurance policies to benefit and earn large commissions by using Rivers['s] insurance policy, signature, Driver's License number and clean driving record history to conspire with Wynne" and Rivermont to insure both the John Deere equipment, valued at over $70,000 and an F650 truck that Rivers thought she purchased from Battlefield Ford, valued at over $100,000. *Id.* ¶ 508. Rivers paid more than $6,000 a year on these loans until June 2013, when "she realized that her name wasn't on either loan or title to the" farm equipment. *Id.* ¶¶ 505, 507. In May 2018, Callahan "confirmed" that the John Deere equipment was covered under Rivers's insurance policy and that this was the same policy Callahan had allowed Rivermont and Wynne to misuse "in the previous scheme." *Id.* ¶ 509; *see CVLR I*, 852 F. Supp. 2d at 713 (facts relating to Rivermont's use of Rivers's insurance policy covering a Chevrolet Tahoe). Callahan's alleged misconduct increased the cost of Rivers's insurance premiums, Second Am. Compl. ¶ 512, and took "away Rivers['s] benefit to purchase the John Deere equipment in her name," *id.* ¶ 510 (capitalization altered).

5.      *Prior Litigation*

Rivers (or CVLR) has sued many of these Defendants at least once in state court. On July

8, 2015, Rivers filed suit in Lynchburg Circuit Court against Joseph Sanzone and twenty-three

other defendants. *See* Second Am. Compl. ¶ 92; Defs. Beck & BBoys's Br. in Supp. of Mot. to

Dismiss Ex. E, Compl. at 1–2, *Sanzone*, No. 15-525 (Lynchburg Cir. Ct. (filed July 8, 2015)),

ECF No. 108-5. The original complaint was not served. Second Am. Compl. ¶¶ 92, 99. Rivers

then filed an amended verified complaint naming as defendants almost fifty individuals or

entities, including Beck, BBoys, Lester, SAF, S&R Farm, ODNB, TCRG, ATC, Richardson,

Schenkel, and the law firm of Patel & Dalrymple, PLLC. *See* Defs. Beck & BBoys's Br. in Supp.

of Mot. to Dismiss Ex. F, First Am. Ver. Compl. ¶¶ 2, 5–8, 11, 15, 17, 23, 27, 42–43, *Sanzone*,

No. CL-15-525 (Lynchburg Cir. Ct. filed July 8, 2016), ECF No. 108-6; Def. TCRG's Br. in

Supp. of Mot. for Summ. J. Ex. A, ECF No. 103-1 (same). Rivers either did not seek, or did not

receive, leave to amend before filing that pleading. *See* Second Am. Compl. ¶¶ 92, 99.

This pleading "alleged a time-line of facts," *id.* ¶ 92, and events occurring over a fifteen-

year period that Rivers believed showed each defendant "induc[ed] or help[ed]" Wynne and

others "intentionally set out to torture [Rivers's] businesses, to commit intentional fraud, breach

contract and agreements with the Plaintiff and/or her businesses including recently the February

16, 2016 Notice to Exercise the S&R to CVLR Option and First Right of Refusal (Lien Contract)

recorded with the Bedford County Clerk of Court," First Am. Ver. Compl. ¶ 117, *Sanzone*, No.

CL-15-525. *See, e.g.*, First Am. Ver. Compl. ¶¶ 67–116, 118–33, 137–49, 163–65, 686, 700–04,

709–10, 713, *Sanzone*, No. 15-525; *see also* Second Am. Compl. ¶ 92 ("The case had sat

dormant since 2011. It alleged a time-line of facts, quoted acts committed and tactics used in

conspiracy, legal malice, conflict of interest[,] . . . aiding and abetting, [and] obtaining

23

money/signature under false pretense." (capitalization altered)). Rivers alleged facts relating to the riding center, the November 2007 closing on that property, the "option contract," and the specific lots or parcels that Rivers asserts were sold to others without notice to or release from herself or CVLR. *See, e.g.*, First Am. Ver. Compl. ¶¶ 113–17, 122–23, 134–55, 157, 163–70, 176–78, 188–89, 192, 194, 196, 201–02, 205–10, 233, 237–45, 267, 273, 282–91, 294–302, 319–58, 367, 370, 377, 389–90, 392, 395, 397, 401, 407, 418, 440, 471–80, 487, 515–16, 522–29, 548, 550, 567–72, 579, 584, 586–87, 594, 596–608, 628–29, 640–41, 665–72, 675, 678, 682–84, 686–87, 692, 699–700, 709–11, 713, 721–28, 749–51, 755–62, 774–75, 854–58, 860–62, 876–92, *Sanzone*, No. CL-15-525. She also referenced the John Deere tractor/front-end loader and hay cutter/baler that Rivers thought she purchased for CVLR in 2007, *id.* ¶¶ 119–20, 134, 477, and Callahan's alleged role in using Rivers's auto insurance policies to cover a Ford F450 truck, a Ford F650 truck, and a Chevy Tahoe owned by Rivermont and/or Wynne, *see id.* ¶¶ 197–98, 204, 213, 223 254, 265, 781.

Most of the *Sanzone* defendants moved to quash service of process or to dismiss the amended complaint. Defs. Beck & BBoys's Br. in Supp. of Mot. to Dismiss 4. In August 2016, Rivers appeared in Lynchburg Circuit Court for a motions hearing. *See id.* Ex. G, Tr. of Hr'g on Mots. at 2–3, *Sanzone*, No. CL-15-525 (Aug. 2, 2016), ECF No. 108-7; Def. TCRG's Br. in Supp. of Mot. for Summ. J. Ex. B, ECF No. 103-2 (same). The Honorable R. Edwin Burnette Jr., presiding judge, noted at the outset that he would recuse himself if the case went forward because he had "a close personal relationship with" several named defendants. *Id.* at 4. The circuit's other judges intended to follow suit. *Id.* at 4–5. The morning of the hearing, however, Judge Burnette received a proposed written order "endorsed by" Rivers as the pro se plaintiff and Sanzone's attorney that "appear[ed] to . . . dismiss the case with prejudice." *Id.* at 5. Judge

Burnette asked Rivers to clarify on the record whether the dismissal order applied to the entire action, or just to her claims against Sanzone. *Id.* at 5–6. She responded, "I prepared the order for Your Honor and I also prepared the consent to dismiss. . . . That is for the entire case to be dismissed." *Id.* at 6–7. Judge Burnette asked again to make sure everyone understood what Rivers was asking the court to do:

| | |
|---|---|
| The Court: | . . . [Y]ou had a complaint and then you had an amended complaint -- |
| Ms. Rivers: | Yes, sir. |
| The Court: | -- filed. |
| Ms. Rivers: | I filed the complaint -- |
| The Court: | Right. |
| Ms. Rivers: | -- on July the 8th [2015]. |
| The Court: | Right. |
| Ms. Rivers: | And then I amended it. |
| The Court: | Right. |
| Ms. Rivers: | I read my -- I read my Rules wrong. There's no excuse. |
| The Court: | That's all right. I just want to make sure we understand we understand what's being dismissed and -- |
| Ms. Rivers: | Everything. |
| | |
| * * * | |
| | |
| The Court: | All right. So it was your intention . . . for the initial complaint to be . . . dismissed and the amended complaint to also -- it's not your intention to go forward on that? |
| Ms. Rivers: | Correct. |
| The Court: | It's your intention to have both of those matters dismissed with prejudice? |
| Ms. Rivers: | Correct. |
| The Court: | Is that correct? |
| Ms. Rivers: | Correct. |
| The Court: | Okay. All right. Well, and you're not doing this under any type of duress or threats or anything other -- |
| Ms. Rivers: | No, sir. |

*Id.* at 8–10. Judge Burnette then asked all parties present if they consented to the court granting Rivers's motion to dismiss the action and entering a revised "dismiss with prejudice order that would address both . . . the complaint and the amended complaint and all parties associated therewith." *Id.* at 11. Rivers agreed and signed the order in open court. *See id.* at 14–15.

Judge Burnette's final order, which bears Rivers's signature under the inscription "I ask for this," expressly granted Rivers's motion and dismissed both the complaint and the amended complaint "with prejudice." Defs. Beck & BBoys's Br. in Supp. of Mot. to Dismiss Ex. H, Order of Aug. 2, 2016, *Sanzone*, No. CL-15-525 (Lynchburg Cir. Ct.), ECF No. 108-8; Def. TCRG's Br. in Supp. of Mot. for Summ. J. Ex. C, ECF No. 103-3 (same). Rivers appealed this order "due to the Judge's conflict of interest and error in [purportedly] dismissing the case on a motion not filed by Rivers but rather filed by Joseph Sanzone." Second Am. Compl. ¶ 103. The Virginia Supreme Court denied Rivers's petition for appeal in June 2017. *See* Defs. Beck & BBoys's Br. in Supp. of Mot. to Dismiss Ex. I, Order of June 16, 2017, *Rivers v. Sanzone*, No. 16-1486 (Va. Sup. Ct.) ("[T]he Court is of the opinion there is no reversible error in the judgment complained of. Accordingly, the Court refuses the petition for appeal."), ECF No. 108-9.

B.    *Pending Motions*

All remaining Defendants moved to dismiss Rivers's Second Amended Complaint under Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure. ECF Nos. 73, 75, 78, 80, 82, 94, 107, 113, 117, 119, 121, 135, 143, 156, 175, 178, 231, 241, 246, 287, 351, 370. Defendants Callahan, Beck, BBoys, Lester, SAF, S&R Farm, Merrill, ODNB, Richardson, ATC, Potter, Patel, Schenkel, and TCRG argue primarily that Rivers's claims against them are barred by res judicata because they were litigated, or could have been litigated, in *Sanzone*.[18] *See generally*

---

[18] Most Defendants raised this affirmative defense in their Rule 12(b)(6) motions. Defendants Schenkel and TCRG also moved to dismiss under Rule 8(a) and Rule 12(b)(6), ECF Nos. 80, 82, 94, but separately raised the res judicata defense in motions for summary judgment brought under Rule 56. *See* Def. Schenkel's Mot. for Summ. J. 1; Def. TCRG's Br. in Supp. of Mot. for Summ. J. 5, ECF No. 103. Although Rivers did not respond to the summary judgment motions, *see* ECF Nos. 88, 99 (*Roseboro* Notices), she did address these Defendants' res judicata defenses in her responses to their motions to dismiss, *see* Pl.'s Resp. in Opp'n to Def. Schenkel's Mot. to Dismiss 9–10 n.4 ("Rivers has never sued the Defendants in Federal court and the Lynchburg Circuit Court did not have jurisdiction over them as Defendants because the causes of action were Federal and criminal and because Rivers did not file[ a] motion for leave to amend the complaints. The amended complaint was 'moot' 'null and void' and the

Def. Callahan's Br. in Supp. of Mot. to Dismiss 2–5, 7; Defs. Beck & BBoys's Br. in Supp. of Mot. to Dismiss 4–7, 10–13; Defs. Lester & SAF's Br. in Supp. of Mot. to Dismiss 8–9; Def. S&R Farm's Br. in Supp. of Mot. to Dismiss 1–2; Defs. Merrill & ODNB's Br. in Supp. of Mot. to Dismiss 3, 4–7; Defs. ATC, Fariss & Richardson's Br. in Supp. of Mot. to Dismiss 10–12; Def. Potter's Br. in Supp. of Mot. to Dismiss 4; Def. Patel's Br. in Supp. of Mot. to Dismiss 2, 6–7; Def. Schenkel's Mot. for Summ. J. 1; Def. TCRG's Mot. for Summ. J. 1.

Defendants Twery, Fariss, the Serene Creek HOA, and the Homeowners point out they are not named as Defendants to any count and, in any event, Rivers's sparse factual allegations do not state a claim upon which relief can be granted against them. *See generally* Def. Twery's Br. in Supp. of Mot. to Dismiss 1–3, ECF No. 74; Defs. Homeowners' Br. in Supp. of Mot. to Dismiss 1–2, ECF No. 76; Def. Serene Creek HOA's Br. in Supp. of Mot. to Dismiss 1–2, ECF No. 79; Defs. ATC, Fariss & Richardson's Br. in Supp. of Mot. to Dismiss 7, 15–16. Defendants Beach, Loftis, Union Bank, Select Bank, Thomas, and Northcreek each acknowledge that they are named as Defendants to certain remaining counts, but argue that Rivers's factual allegations do not state a claim for relief under RICO or Virginia law. *See generally* Def. Beach's Br. in Supp. of Mot. to Dismiss 1–4, ECF No. 247; Def. Loftis's Br. in Supp. of Mot. to Dismiss 3–3, ECF No. 176; Def. Union Bank's Br. in Supp. of Mot. to Dismiss 7–9, ECF No. 242; Defs. Select Bank & Thomas's Br. in Supp. of Mot. to Dismiss 5–7, ECF No. 288; Def. Northcreek's Br. in Supp. of Mot. to Dismiss 2–5, ECF No. 352. Pro Se Defendants David and Kelly Edmundson similarly argue that Rivers's pleading is "merely a long list of speculations and

---

Defendants were not named in the original Complaint for the allegations plead [*sic*] against them in this matter."), ECF No. 172; Pl.'s Resp. in Opp'n to Def. TCRG's Mot. to Dismiss 7 n.4 (same), ECF No. 162.

conspiracy theories" which, even accepted as true, fail to state a claim against them. *See* Defs. Edmundson Mots. to Dismiss 1, ECF Nos. 117, 119.

Three Defendants—Lester, SAF, and Patel—also moved to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction. Defs. Lester & SAF's Mot. to Dismiss 1, ECF No. 135; Def. Patel's Mot. to Dismiss 1, ECF No. 370.[19] Lester and SAF, both allegedly citizens of Virginia, urge the Court to dismiss under Rule 12(b)(6) the federal RICO claim in Count 8 and decline supplemental jurisdiction over any state-law claims against them. *See* Defs. Lester & SAF's Br. in Supp. of Mot. to Dismiss 5–6; Defs. Lester & SAF's Reply in Supp. of Mot. to Dismiss 2, ECF No. 226. Patel asserts that Rivers's allegations do not make out a violation of federal law against Patel and, thus, fail to invoke federal "subject matter jurisdiction" over Patel. Def. Patel's Br. in Supp. of Mot. to Dismiss 14. Patel also suggests, incorrectly, that I have already concluded this Court lacks "federal jurisdiction over the many lawyers" named as Defendants in this case. *Id.* at 3; *see id.* at 13–14.

Rivers opposed most Defendants' motions to dismiss, ECF Nos. 162, 167, 172, 185, 186, 191, 215, 219, 273, 278, 279, 289, 309, 377,[20] and simultaneously moved to amend her complaint against Defendants TCRG, ECF No. 163; ODNB and Merrill, ECF No. 187; Lester and SAF, ECF No. 192; ATC, Fariss, and Richardson, ECF No. 216; Callahan, ECF No. 220; and Select Bank and Thomas, ECF No. 310.[21] She did not submit proposed amendments with

---

[19] Patel's "Motion to Dismiss and for Sanctions," ECF No. 370, also seeks a court order requiring Rivers to pay Patel monetary sanctions. This request violates Rule 11(c), which requires that a "motion for sanctions made separately from any other motion." Fed. R. Civ. P. 11(c)(2). Accordingly, Patel's motion for sanctions should be denied without prejudice.

[20] Rivers did not oppose the motions filed by Beck, BBoys, and S&R Farm. *See* ECF Nos. 111, 181 (*Roseboro* Notices); Staff Note of Sept. 12, 2019, ECF No. 142.

[21] In February 2020, I denied without prejudice Rivers's motions to amend as to Schenkel, ECF No. 173, and Twery, the Homeowners, and Serene Creek HOA, ECF No. 168, because her perfunctory requests "violate[d] both federal and local rules governing the substance of motions filed in civil cases." Order of

most of these motions.[22] Mem. Op. of Mar. 24, 2020, at 6; R. & R. of Feb. 26, 2020, at 35 ("This is the second time Rivers has sought leave to amend without providing a proposed amendment for the Court's consideration." (citing Mem. Op. of June 27, 2019, at 8–9)).

## II. Standards of Review

### A.    *Motions to Dismiss*

A Rule 12(b)(1) motion to dismiss "challenges the district court's subject matter jurisdiction, asserting, in effect, that the plaintiff lacks any 'right to be in the district court at all.'" *State Constr. Corp. v. Slone Assocs., Inc.*, 385 F. Supp. 3d 449, 457 (D. Md. 2019) (quoting

---

Feb. 26, 2020, at 1 n.1, ECF No. 345. Rivers did not file motions to amend her Second Amended Complaint with respect to Beach, David and Kelly Edmundson, Loftis, Northcreek, Patel, Potter, or Union Bank. *See generally* Pl.'s Resp. in Opp'n to Defs. Edmundsons' Mots. to Dismiss, ECF No. 185; Pl.'s Resp. in Opp'n to Def. Potter's Mot. to Dismiss, ECF No. 273; Pl.'s Resp. in Opp'n to Def. Union Bank's Mot. to Dismiss, ECF No. 278; Pl.'s Resp. in Opp'n to Def. Loftis's Mot. to Dismiss, ECF No. 289; Pl.'s Resp. in Opp'n to Def. Northcreek's Mot. to Dismiss, ECF No. 377.

[22] In fact, with one exception, Rivers did not submit any amendments until March 26, 2020, two days after Judge Dillon instructed her (for the second time) that the Court "cannot evaluate a proposed amendment without a copy of it" and denied Rivers's motions to amend with respect to Day and Peter Sackett, Mem. Op. of Mar. 24, 2020, at 6. *See* Proposed Supp. Third Am. Compl. (Mar. 26, 2020), ECF Nos. 376, 376-1, *withdrawn by* Pl.'s Notice (May 18, 2020), ECF No. 427. *But see* Pl.'s Mot. to Amend & Resp. in Opp'n to Def. Callahan's Mot. to Dismiss 13–14 (Oct. 7, 2019), ECF No. 220. In May 2020, Rivers withdrew her 706-page "Proposed Supplemented Third Amended Complaint," as well as the accompanying motion for leave to amend. ECF No. 374. On June 8, Rivers filed a "Motion for Leave to File Third Amended Complaint and Motion for Reconsideration [of] Order 428," ECF No. 438, and a 218-page proposed "Third Amended Complaint and Petition to Enforce Victim Rights," ECF Nos. 438-1, 438-2. A few days later, she "replaced" those filings with a "Supplemental Motion for Leave to File Third Amended Complaint and Motion for Reconsideration [of] Order 428" and a 219-page proposed "Supplemented Third Amended Complaint and Petition to Enforce CVRA," ECF Nos. 439 to 439-2 (June 11, 2020). *See* Pl.'s Letter of Oct. 19, 2020 ("[D]ocument 438 was replaced with [D]ocument 439."), ECF No. 486. On October 19, Rivers filed a "Supplemented Motion for Leave to File Third Amended Complaint and Motion for Reconsideration [of] Order 428" and yet another version of her proposed "Supplemented Third Amended Complaint and Petition to Enforce CVRA." ECF Nos. 485 to 485-2. This most recent motion seeks leave to file generally a 257-page third amended complaint that would (among other things) add roughly twelve new defendants and nine new "third-party defendants"; add or amend three potential *Bivens* claims; incorporate a petition brought under the Crime Victim's Rights Act (CVRA), 18 U.S.C. § 3771; add dozens of new "predicate acts" to support the RICO claims; change the theory of RICO liability in Count 5, and amend the previously dismissed Count 8 and Count 10 so they now include named Defendants. *See generally* Second Prop. Supp. Third Am. Compl. & Pet. to Enforce CVRA 1–119. These motions to amend will be addressed in due course at the court's discretion. *See* Mem. Op. of Sept. 28, 2020, at 7, ECF No. 477.

*Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012)). The

challenge can "proceed 'in one of two ways': (1) . . . a facial challenge, asserting that the

allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction; or (2)

a factual challenge, asserting 'that the jurisdictional allegations of the complaint are not true.'"

*MedSense, LLC v. Univ. Sys. of Md.*, 420 F. Supp. 3d 382, 389 (D. Md. 2019) (cleaned up)

(quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). In a facial challenge, the

facts alleged in the complaint are accepted as true, and the court must deny the Rule 12(b)(1)

motion if those facts are enough to invoke the district court's authority to entertain the legal

claim asserted. *See Kerns*, 585 F.3d at 192. In a factual challenge, on the other hand, the district

court "may regard the pleadings as mere evidence . . . and may consider evidence outside the

pleadings," *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004), "to decide disputed

issues of fact with respect to subject matter jurisdiction," *Kerns*, 585 F.3d at 192. "The plaintiff

has the burden of proving that subject matter jurisdiction exists," *Evans v. B.F. Perkins Co.*, 166

F.3d 642, 647 (4th Cir. 1999), "on a claim-by-claim basis," *U.S. ex rel. Boothe v. Sun Healthcare

Grp., Inc.*, 496 F.3d 1169, 1176 (10th Cir. 2007) (Gorsuch, J.). *See Indem. Ins. Co. of N. Am. v.

United States*, 569 F.3d 175, 180 (4th Cir. 2009); *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222,

229 & n.1 (4th Cir. 1997) (concluding there was "no federal court jurisdiction" over "parts" or

all of certain counts, and resolving Rule 12(b)(6) motion after "[f]inding subject matter

jurisdiction over what remain[ed] of the eight remaining claims").

*

A Rule 12(b)(6) motion to dismiss challenges whether a complaint sets out a "short and

plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556

U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). To get past the pleading stage, "a

complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court resolving a Rule 12(b)(6) motion "must consider the complaint in its entirety," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), "accepting as true all well-pleaded allegations . . . and drawing all reasonable factual inferences in the plaintiff's favor," *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 705 (4th Cir. 2016). Legal conclusions or labels, "formulaic recitation[s] of the elements of a cause of action," and "naked assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678, "are not entitled to the assumption of truth," but they "can provide the framework of a complaint," *id.* at 679. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief" under the governing law.[23] *Id.* at 679; *see Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002) ("Dismissal of a complaint for failure to state facts supporting each of the elements of a claim is, of course, proper.").

---

[23] Because Rivers is a lay person representing herself, she enjoys "the benefit of a liberally construed complaint," *Beaudett*, 775 F.2d at 1278, that "must be held to less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Of course, this does not excuse her from basic procedural rules and pleading standards. *Beaudett*, 775 F.2d at 1278. Rivers "requires no special legal training to recount the facts surrounding [her] alleged injury, and [s]he must provide such facts if the court is to determine whether" her pleading "makes out a claim on which relief can be granted" against each Defendant. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *see Bryant v. Wash. Mut. Bank*, 524 F. Supp. 2d 753, 756 (W.D. Va. 2007). And, just as "'courts cannot be expected to construct full blown claims out of sentence fragments'" when construing a pro se complaint, they also "recognize that a plaintiff can plead [her]self out of court by pleading facts that show [s]he has no legal claim." *Schreiber v. Dunabin*, 938 F. Supp. 2d 587, 594–95 (E.D. Va. 2013) (quoting *Beaudett*, 775 F.2d at 1278) (other quotation marks omitted); *see Liggins v. G.A. & F.C. Wagman, Inc.*, No. 5:18cv38, 2019 WL 4046563, at *1 (W.D. Va. May 22, 2019), *adopted by* 2019 WL 4039635 (W.D. Va. Aug. 27, 2019) (Dillon, J.).

A Rule 12(b)(6) motion typically is not the proper vehicle to raise an affirmative defense, such as an assertion that a claim is barred by res judicata or an expired statute of limitations. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (citing Fed. R. Civ. P. 8(c)); *Richmond, Fredericksburg & Potomac R.R. Co. v. Frost*, 4 F.3d 244, 250 (4th Cir. 1993). Nevertheless, a court may address the merits of an affirmative defense "if all facts necessary to the affirmative defense clearly appear on the face of the complaint," *Goodman*, 494 F.3d at 464 (brackets and emphasis omitted), and "the defense raises no disputed issue of fact," *Andrews*, 201 F.3d at 524 n.1. *See Performance Plumbing, Inc. v. Atl. Heating & Cooling Serv., Inc.*, No. 2:16cv649, 2017 WL 11508383, at *1–2 (E.D. Va. June 19, 2017); *United States ex rel. Palmieri v. Alpharma, Inc.*, 928 F. Supp. 2d 840, 853 (D. Md. 2013).

B.      *Motion for Summary Judgment*

"A party may move for summary judgment" on any claim or defense, or part thereof, on which judgment is sought. Fed. R. Civ. P. 56(a). "[T]he relevant inquiry" at this stage "is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). "Where, as here, the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense." *Ray Commc'ns v. Clear Channel Commc'ns*, 673 F.3d 294, 299 (4th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986)); *see* Fed. R. Civ. P. 56(c). "When the defendant has produced sufficient evidence in support of its affirmative defense, the burden of production shifts to the plaintiff to come forward with specific facts showing that there is a genuine issue for trial." *Ray Commc'ns*, 673 F.3d at 299 (internal quotation marks omitted); *see* Fed. R. Civ. P. 56(c), (e). "The court

shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

C.      *Motion to Amend*

Rivers cannot amend her complaint for a third time without the Court's leave or the opposing party's written consent. Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires," *id.*, and in keeping with the Fourth Circuit's "policy to liberally allow amendment," *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010). Nevertheless, the court "may deny a motion to amend when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile," *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 579, 603 (4th Cir. 2010). The court also may deny leave to amend where the moving party has "repeated[ly] fail[ed] to cure deficiencies by amendments previously allowed." *Foman v. Davis*, 371 U.S. 179, 183 (1962).

### III. Discussion

A.      *Subject Matter Jurisdiction*

"Subject matter jurisdiction is a threshold question that relates to the power of the court to hear a case and must be resolved before a court addresses the merits of a case," *Capital Associated Indus. v. Cooper*, 129 F. Supp. 3d 281, 299 (M.D.N.C. 2015) (citing *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479–80 (4th Cir. 2005)), including a motion to dismiss under Rule 12(b)(6), *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Accordingly, I first address the facial challenges raised Lester, SAF, and Patel's Rule 12(b)(1) motions. ECF Nos. 135, 370.

"Federal courts are courts of limited jurisdiction." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). Article III of the Constitution

"delineates the character of the controversies over which federal judicial authority may extend. And lower federal-court jurisdiction is further limited to those subjects encompassed within a statutory grant of jurisdiction." *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019) (cleaned up). Federal district courts have "original jurisdiction" over two general types of civil actions: those that arise under federal law, 28 U.S.C. § 1331, and those where the amount in controversy exceeds $75,000 and all plaintiffs are diverse from all defendants, *id.* § 1332(a). *See Home Depot*, 139 S. Ct. at 1746 ("These jurisdictional grants are known as 'federal-question jurisdiction and 'diversity jurisdiction,' respectively."). To survive a Rule 12(b)(1) motion, the complaint must contain general factual allegations, accepted as true, to show either that the plaintiff's claim(s) "arises under" federal law, or that diversity jurisdiction exists. *See MotJuste Tirade of Vim Andre Juste v. Brennan*, 16 F. Supp. 3d 716, 725–27 (N.D. W. Va. 2014). Those facts need not state a claim upon which relief can be granted. *See Steel Co.*, 523 U.S. at 89; *Kerns*, 585 F.3d at 195–96.

Additionally, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). "Whether federal law claims and state law claims form part of the same case or controversy," *Bennett v. Fasteneal Co.*, 184 F. Supp. 3d 304, 308 (W.D. Va. 2016), depends on whether "they arose out of a 'common nucleus of operative fact' such that the plaintiff would ordinarily be expected to try the claims in one judicial proceeding." *White v. Cty. of Newberry, S.C.*, 985 F.2d 168, 171 (4th Cir. 1993) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). "The claims need only revolve around a central fact pattern." *Id.* at 172. Nevertheless, a district court "may decline to exercise

supplemental jurisdiction over" such a claim if it "raises a novel or complex issue of State law," "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction," or "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(1)–(3).

Lester and SAF argue that the Second Amended Complaint "fails to invoke the subject matter jurisdiction of this Court with regard to the claims against" them because the parties are not completely diverse and "Count 8, which invokes RICO . . . . [and] presents the only federal question in which Lester and SAF are implicated" should be dismissed under Rule 12(b)(6). *See* Defs. Lester & SAF's Br. in Supp. of Mot. to Dismiss 5–6; *see also* Defs. Lester & SAF's Reply in Supp. of Mot. to Dismiss 2 ("[T]his Court has no jurisdiction over the Plaintiff's claims because: (1) diversity of citizenship is lacking; and (2) any RICO claims must be dismissed pursuant to Rule 12(b)(6)."). Lester and SAF are Defendants to Counts 12, 16, and/or 17. They assert that, without Count 8, "there can be no supplemental jurisdiction for any state-law claims against" them. Defs. Lester & SAF's Br. in Supp. of Mot. to Dismiss 6; *see* 28 U.S.C. § 1367(a), (c)(3). Patel, who is named as a Defendant to Count 12 only, asserts that the Second Amended Complaint contains "no allegation against [him] which would invoke federal jurisdiction, so he is entitled to dismissal for lack of subject matter jurisdiction." Def. Patel's Br. in Supp. of Mot. to Dismiss 14. He does not explain how Rivers's allegations against him personally would impact subject matter jurisdiction—i.e., the court's "authority over the *category of claim* in suit."[24]

---

[24] Patel also suggests, incorrectly, that I already concluded this Court lacks "federal jurisdiction over the many lawyers who have been joined as parties Defendant on account of having served clients who purchased property over which Rivers . . . claim[s] an interest." Def. Patel's Br. in Supp. of Mot. to Dismiss 3 (citing R. & R. of Feb. 26, 2020, ECF No. 346); *see also id.* at 13 ("This [jurisdictional] matter has been resolved by the Magistrate Judge's Report."). In this R. & R., I recommended that Rivers's claims against two other lawyers be dismissed with prejudice because, contrary to Judge Dillon's express instructions, Rivers failed to name them as Defendants in any specific count. These Defendants did not raise any jurisdictional arguments in their Rule 12(b)(6) motions to dismiss, *see* ECF Nos. 50, 68, 69, and

*Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999) (emphasis added). Patel also asserts that the single real estate transaction for which he prepared a deed in May 2019 "is a separate, distinct activity and is not part of any 'series of transactions or occurrences' which would allow . . . jurisdiction under the pendent jurisdiction doctrine," Def. Patel's Br. in Supp. of Mot. to Dismiss 14 (quoting Fed. R. Civ. P. 20(a)(2)(A)). *Contra Rosmer v. Pfizer Inc.*, 263 F.3d 110, 117 (4th Cir. 2001) ("Section 1367 is a broad grant of authority for supplemental jurisdiction, subject only to the express limitations in the Act; it does not contain unspoken limits on the statutory text."); *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995) ("Supplemental jurisdiction . . . allows parties to append state law claims over which federal courts would otherwise lack jurisdiction, so long as they form part of the same case or controversy as the federal claims." (citing 28 U.S.C. § 1367(a)).

Rivers's Second Amended Complaint asserts claims "arising under" the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671–2680 (Counts 1–2, 6–7, 9, 11, 13–15); the federal RICO statute, 18 U.S.C. §§ 1962, 1964 (Counts 3, 5, 8); and the Constitution of the United States (Count 4). The Court has original jurisdiction over the subject matter of those claims. *See generally Carlsbad Tech., Inc. v. HIF BIO, Inc.*, 556 U.S. 635, 640 (2009) (noting district court "had original jurisdiction over the federal RICO pursuant to 28 U.S.C. § 1331"); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66–67 (2001) (discussing *Bivens*, 403 U.S. 388); *Jarrett v. United States*, 874 F.2d 201, 203 (4th Cir. 1989) (citing 28 U.S.C. § 1346(b)). Rivers's state-law

---

there was no reason for the Court to raise that issue sua sponte, *see* Fed. R. Civ. P. 8(a)(1). Notably, a federal court should not dismiss a claim "with prejudice" if there is any question about the court's "power to adjudicate and dispose of [that] claim on the merits." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands*, 713 F.3d 175, 185 (4th Cir. 2013); *cf.* R. & R. of Aug. 18, 2020, at 14–15 ("[B]inding Fourth Circuit precedent makes clear that any dismissal for lack of subject matter jurisdiction 'must be without prejudice[] because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits.'" (quoting *Broadlands*, 713 F.3d at 185) (collecting cases)).

claims alleging fraudulent conveyance (Counts 10, 12) and breach of contract (Counts 16, 17) revolve generally around the same fact pattern as her RICO claims, some of which (Counts 3, 5) remain against certain Defendants. Thus, the Court may exercise supplemental jurisdiction over those state-law claims. 28 U.S.C. § 1367(a), (c).

B.    *Res Judicata*

Defendants Callahan, Beck, BBoys, Lester, SAF, S&R Farm, ODNB, ODNB's President Mark Merrill, Richardson, ATC, Potter, Patel, Schenkel, and TCRG argue that Rivers's claims against them are barred by res judicata because they were litigated, or could have been litigated, in *Sanzone*. In response, Rivers asserts generally that the Lynchburg Circuit Court "lacked subject matter jurisdiction to hear the Amended Complaint" because she "fail[ed] to file leave to amend the complaint" in that case, and, in any event, the "claims in this matter do not arise from the same conduct, transactions[,] and occurrences alleged in the prior lawsuit." Pl.'s Resp. in Opp'n to Def. Callahan's Mot. to Dismiss 2–3, ECF No. 219.[25] She does not dispute that Judge

---

[25] *See also* Pl.'s Resp. in Opp'n to Defs. Lester & SAF's Mot. to Dismiss 4 ("The [*Sanzone*] Amended Complaint was 'moot,' null and void and remains so. . . . The Lynchburg Circuit Court did not have jurisdiction over the . . . Amended Complaint filed without leave of the Circuit Court. The claims against the Defendant[s] have occurred since the filing of the Lynchburg Circuit Court Case."), ECF No. 191; Pl.'s Resp. in Opp'n to Defs. Merrill & ODNB's Mot. to Dismiss ("Defendant ODNB was listed on the style of the Amended Complaint but the Circuit Court did not have jurisdiction over the Defendants listed on the Amended Complaint because the Plaintiff did not obtain or ask for Leave of the Court to Amend the Complaint. The Amended Complaint was 'moot,' null and void and remains so. . . . Defendant Mark Merrill was not named in any matters against ODNB."), ECF No. 186; Pl.'s Resp. in Opp'n to Def. Potter's Mot. to Dismiss 4–5 ("[T]he original complaint was never served upon [Potter] and the original complaint is the only complaint to be recognized in the matter of law. . . . The Lynchburg City Circuit Court did not have jurisdiction over the Defendant in the claims pled in the Amended Complaint . . . because the Plaintiff did not obtain or ask for Leave of the Court to Amend the Complaint. The Amended Complaint was 'moot,' null and void and remains so."); Pl.'s Resp. in Opp'n to Def. Schenkel's Mot. to Dismiss 9–10 n.4; Pl.'s Resp. in Opp'n to Def. TCRG's Mot. to Dismiss 7 n.4; Pl.'s Resp. in Opp'n to Defs. ATC, Fariss & Richardson's Mot. to Dismiss 4 n.5 ("Plaintiff has never been a party to any Federal action filed against the Defendants. . . . Plaintiff had never filed for Leave to Amend and was never granted Leave to Amend, therefore the [Lynchburg Circuit] Court had no jurisdiction over any named party defendant on the 'moot' Amended Complaint."), ECF No. 215; Pl.'s Mot. to Strike & Resp. in Opp'n to Def. Patel's Mot. to Dismiss 2 (asserting that "Patel was not a party to the Lynchburg matter," the circuit court "did not have jurisdiction over the defendants named in the Amended Complaint because

Burnette's order expressly dismissed both the complaint and the amended complaint with prejudice. *See generally id.*

The "preclusive effect, if any, of the [*Sanzone*] action on [this] second action" must be "decided under the res judicata law of the state of Virginia," where the court sat in the first action. *Q Int'l Courier, Inc. v. Smoak*, 441 F.3d 214, 218 (4th Cir. 2006) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001)). In Virginia, the doctrine of res judicata operates to bar claims already adjudicated on the merits, as well as "any claim that could have been brought in conjunction with a prior claim, where the claim sought to be barred arose out of the same conduct, transaction, or occurrence as the previously litigated claim." *See Martin-Bangura v. Va. Dep't of Mental Health*, 640 F. Supp. 2d 729, 738 (E.D. Va. 2009) (citing Va. Sup. Ct. R. 1:6(a) (2006)) To establish this defense, the moving Defendant must show:

> (1) that the prior judgment is a final and valid judgment; (2) that the parties are identical or are in privity with each other; and (3) that the claim made in the subsequent lawsuit arises out or relates to the same occurrence, conduct, or transaction upon which the prior lawsuit was based.

*Columbia Gas Transmission, LLC v. David N. Martin Revocable Tr.*, 833 F. Supp. 2d 552, 558 (E.D. Va. 2011). The court may take judicial notice of facts from the prior judicial proceeding where the defense does not raise any issues of disputed fact. *Brooks*, 626 F.3d at 200; *Andrews*, 201 F.3d at 524 n.1.

Judge Burnette's order dismissing with prejudice Rivers's complaint and amended complaint in *Sanzone* is a "final and valid judgment," *Columbia Gas*, 833 F. Supp. 2d at 558, because it was issued by a court of competent jurisdiction, it adjudicated all claims against all of

---

the Plaintiff failed to obtain leave of the Court to add them as parties and failed to obtain leave to file the Amended Complaint," and the "property (claims/issues) [Patel] alludes to are in fact, new issues, by contract and by 'new discovery,' since the filing of the original complaint in July 2015"), ECF No. 399. Rivers did not respond to Beck, BBoys, and S&R Farm's motions to dismiss.

the parties, and the Virginia Supreme Court denied Rivers's petition to appeal that judgment, *Faison v. Hudson*, 417 S.E.2d 302, 305 (Va. 1992) ("[A] judgment is not final for the purposes of res judicata or collateral estoppel when it is being appealed or when the time limits fixed for perfecting the appeal have not expired."); *Reed v. Liverman*, 458 S.E.2d 446, 447 (Va. 1995) (circuit court's order granting plaintiff's motion to voluntarily dismiss prior action "with prejudice" barred subsequent action arising out of the same transaction); *Ward v. Charlton*, 12 S.E.2d 791, 796 (Va. 1941) (noting that the order must be issued "by a court of competent jurisdiction"). Rivers filing her amended complaint without leave was a procedural error. *Cf. Coloccia ex rel. Cortese v. Coloccia*, No. 1787-06-03, 2007 WL 654375, at *1 n.2 (Va. Ct. App. Mar. 6, 2007) (concluding that wife in divorce proceeding waived "any right to object to husband's failure to seek leave of court" before filing his second petition for review, as state law required, and that the "trial court implicitly granted that leave by acting on the husband's filing"). It did not affect the circuit court's original jurisdiction to adjudicate the civil action. *See* Va. Code § 17.1-513.

Rivers's amended complaint in *Sanzone* named as defendants Callahan, Beck, BBoys, Lester, SAF, S&R Farm, ODNB, Richardson, ATC, Potter, Schenkel, and TCRG, all of whom are Defendants in the present action. Thus, those parties are identical to each other. The amended complaint did not name Merrill as a defendant, but Rivers alleges that he was the president of ODNB, a defendant in *Sanzone*. Second Am. Compl. ¶ 36. By virtue of his role as president, Merrill asserts that he was in privity with the bank. *See* Defs. Merrill & ODNB's Br. in Supp. of Mot. to Dismiss 6–7 (citing *Reber v. Trident Sys., Inc.*, No. 1:13cv348, 2015 WL 1258330, at *4 (E.D. Va. Mar. 17, 2015)). Rivers's amended complaint also named as a defendant the law firm of "Patel & Dalrymple PLLC," but not Patel individually. First Am. Ver. Compl. ¶ 7, *Sanzone*,

No. CL-15-525. Patel does not explain his assertion that he, too, "was made a party defendant" in *Sanzone*, Def. Patel's Br. in Supp. of Mot. to Dismiss 2, or his argument that "there is no material legal distinction" between Patel personally and the company of which he is a "principal/employee," *id.* at 13 n.4 ("[T]hus the parties are identical in that case and this one."). In Virginia, "[t]he touchstone of privity for purposes of res judicata is that a party's interest is so identical with another that representation by one party is representation of the other's legal right." *Raley v. Haider*, 747 S.E.2d 812, 816 (Va. 2013). "Whether privity exists is determined on a case by case examination of the relationship and interests of the parties." *Id.* "Virginia courts typically find privity when the parties share a contractual relationship, owe some kind of legal duty to each other, or have another legal relationship such as co-ownership." *Columbia Gas*, 833 F. Supp. 2d at 558.

At this stage of the proceeding, the Court does not have enough undisputed information to conclude that either Merrill and the bank or Patel and the law firm were in privity with each other in *Sanzone*. *See Raley* 747 S.E.2d at 814, 817 (noting the fact that a physician and the "medical practice owned and operated by" him were "separate legal entities . . . indicate[d] that their interests may not be the same"); *cf. Columbia Gas*, 833 F. Supp. 2d at 559–60 (finding nothing in the summary judgment record suggesting that defendants in prior action "could have asserted any of the defendants' legal rights in their [prior] lawsuit"). Accordingly, I will address Merrill's Rule 12(b)(6) arguments and Patel's motion to dismiss Count 12 below.

Finally, the allegations underlying Rivers's state-law claims against Defendants Beck, BBoys, Lester, SAF, S&R Farm, and/or "Trustees in liquidation of S&R" (Counts 12, 16 & 17), and her RICO claims against ODNB (Counts 3 & 5) in this case are essentially the same as those pled in *Sanzone*. *See., e.g.*, First Am. Ver. Compl. ¶¶ 135, 141–44, 146–53, 163–70, 196, 202,

206–10, 233, 237, 306, 367, 370–71, 397, 388–89, 471, 475, 477, 492, 512–13, 515–16, 521–29, 574–76, 579, 584, 614–15, 617–18, 628, 641, 643, 667–73, 682–84, 696, 854–57, 865–80 (facts related to the option contract, the riding center closing, or specific lots or parcels conveyed without Rivers's and/or CVLR's permission); *id.* ¶¶ 699–706, 708–13 (facts related to Rivers's and/or CVLR's "Notice to exercise its Right to Purchase the Optioned property named in the recorded Option and Right of First Refusal," filed in February 2016); *id.* ¶¶ 384–85, 404, 409, 450, 457, 465, 467, 482, 517, 539–41, 578 (facts related to ODNB's handling of the insurance proceeds and Wynne's bank accounts); *see also id.* ¶¶ 721–34, 749–54, 755–77, 778–86, 812–13, 815–19 (asserting causes of action for breach of contract, fraudulent conveyance, tortious interference with business contract, fraud, and civil conspiracy against these and other defendants). Richardson, ATC, TCRG, Potter, and Schenkel are not identified as Defendants to any count in the Second Amended Complaint, but any potential causes of action against them clearly arise out of same occurrences, conduct, or transactions upon which *Sanzone* was based. *See, e.g.*, *id.* ¶¶ 116, 242, 288, 321, 341–43, 676 (facts related to TCRG's involvement in the riding center closing); *id.* ¶¶ 298, 300–02, 306–08, 310, 318–19, 329–36, 339, 351–58, 550, 678 (facts related to ATC and/or Richardson's involvement in the closing, including that Richardson allegedly "altered" the CLDOT and HUD statements); *id.* ¶¶ 289, 313, 813, 815 (facts related to Schenkel's knowledge of the "option contract" and involvement in real estate transactions); *id.* ¶¶ 384–85, 404, 404, 409, 450, 457, 465, 467, 482, 517, 539–41, 578 (facts related to ODNB's and/or Potter's handling of the insurance proceeds and Wynne's bank accounts); *see also id.* ¶¶ 734, 755–77, 778–86, 812–13, 815–19, 821–28 (asserting causes of action for fraudulent conveyance, tortious interference with a business contract, and fraud against these and other defendants).

Whether Rivers could have included her "insurance fraud" claim against Defendant Margie Callahan (Count 18) in *Sanzone* is a slightly closer question. Contrary to Callahan's assertion, this claim is not "predicated on *the same* factual circumnutates and allegations" as those pled in *Sanzone*. Def. Callahan's Br. in Supp. of Mot. to Dismiss 14 (emphasis added). There, Rivers alleged that in April and September 2007 Callahan used Rivers's insurance policies to cover a Chevy Tahoe owned by Wynne/Rivermont and two Ford trucks that Rivers thought she had purchased for CVLR's use. *See generally* First Am. Ver. Compl. ¶¶ 198, 204, 213, 223, 254, 265, 781, 846. Here, Rivers alleges that, sometime before May 2007, Callahan "used Rivers['s] identity to . . . prepare a fake insurance policy" for Rivermont so Wynne could obtain "two separate loans" from John Deere Credit to buy a tractor/front-end loader and a hay cutter/baler. Second Am. Compl. ¶ 505; *see id.* ¶¶ 506–11. The loan terms required the borrower to show proof of insurance, and "Callahan knew that Wynne could not get an automobile policy with his criminal" driving record. *Id.* ¶ 505. Rivers mentioned the farm equipment in *Sanzone*, First Am. Ver. Compl. ¶¶ 119–20, 134, but the loan-related insurance policies were not basis of her "insurance fraud" and conspiracy claims against Callahan.

That said, Rivers's insurance fraud claim in this case does "arise from the same 'conduct, transaction, or occurrence,'" *Raley*, 747 S.E.2d at 816 (quoting Va. Sup. Ct. R. 1:6(a)), as the previously litigated claims. "[D]eciding what constitutes a single transaction or occurrence under Rule 1:6 should be a practical analysis." *Funny Guy, LLC v. Lecego, LLC*, 795 S.E.2d 887, 897 (Va. 2017). "The proper approach asks," among other things, "whether the facts are related in time, space, origin, or motivation" and "whether they form a convenient trial unit. . . . No single factor is indispensable or determinative. The factors should instead be considered pragmatically with a view toward uncovering the true underlying dispute between the parties." *Id.* (cleaned up).

The "time," "origin," and "motivation" for Rivers's claims in both cases clearly are the same: From May through October 2007, Callahan misused Rivers's insurance policy for Wynne's benefit because "Callahan knew Wynne could not get an automobile policy with his criminal" driving record. Second Am. Compl. ¶ 505; *see id.* ¶¶ 504, 507–08. Callahan used "the same policy" both to help Wynne get loans for the John Deere equipment and to insure his personal Chevy Tahoe. *Id.* ¶ 509. Rivers's insurance fraud claim in this case also "fit[s] within a single factual narrative that easily forms a convenient trial unit," *Funny Guy*, 795 S.E.2d at 897, as her prior fraud claims against Callahan.

In Virginia, res judicata bars not only claims that were in fact brought in the prior suit, "but [also] every point which properly belonged to the subject of the litigation[] and which the parties, exercising reasonable diligence, might have brought forward at that time." *S. Ry. Co. v. Wash., Alexandria & Mt. Vernon Ry. Co.*, 46 S.E. 784, 787 (Va. 1904); *accord Funny Guy*, 795 S.E.2d at 892–93. Rivers knew by June 2013 "that her name wasn't on either loan or title to the" tractor/front-end loader and hay cutter/baler, Second Am. Compl. ¶¶ 505, 507, and she knew by July 2016 that her former attorney had the "[l]oan paperwork for the John Deere equipment purchases" as early as December 2008, First Am. Ver. Compl. ¶ 446. Yet, Rivers apparently waited until May 2018 to "try to figure out what [State Farm] policy had covered the . . . John Deere Credit loans." Second Am. Compl. ¶ 509; *see also id.* ¶¶ 503–04 (indicating that "Rivers reviewed her John Deere equipment loan documents for the first time" in May 2018); *id.* ¶ 507 ("Callahan did not disclose this information to Rivers and Rivers did not learn it until May 2018."); Pl.'s Resp. in Opp'n to Def. Callahan's Mot. to Dismiss 3 ("As stated in her [Second] Amended Complaint, facts . . . were withheld from Rivers until she discovered them in a May 2018 subpoena duces tecum issued to John Deere Credit, thus Rivers was able to draw on

43

documents produces in an unrelated matter."), ECF No. 219. This is when Callahan "confirmed

that the policy number was Rivers['s] and the same [one] used" for the Chevy Tahoe. Second

Am. Compl. ¶ 509. Notably, Rivers does not allege that she took *any* steps to uncover these facts

earlier—only that she did not discover them. *Cf. Zahratka v. U.S. Bank Nat'l Ass'n*, No.

2:20cv208, 2020 WL 5079054, at *8–9 (E.D. Va. July 27, 2020) (recommending, on a Rule

12(b)(6) motion, that an expired statute of limitations barred plaintiff's fraud claim where public

court records revealed the defendant's allegedly false representations and plaintiff "stated no

facts demonstrating that, despite the exercise of due diligence, [s]he could not have discovered

the alleged fraud any sooner" (quoting *Schmidt v. Household Fin. Corp. II*, 661 S.E.2d 834, 839

(Va. 2008)), *adopted by* 2020 WL 5077736 (E.D. Va. Aug. 27, 2020); *Blick v. Deutsche Bank

Nat'l Tr.*, No. 3:14cv22, 2014 WL 4052820, at *3–4 (W.D. Va. Aug. 15, 2014) (concluding on

summary judgment that res judicata barred pro se plaintiff's fraud claim where plaintiff could

have discovered his former attorney's alleged wrongdoing by reviewing publicly available court

filings); *Schmidt*, 661 S.E.2d at 839 (noting that once the defendant shows the applicable

limitations period has expired, the burden shifts to the plaintiff to show "that, despite the exercise

of due diligence, he could not have discovered the alleged fraud within" the time allowed).

Accordingly, I find that certain Defendants have established the requirements of res

judicata. Judge Burnette's August 2, 2016 order dismissing *Sanzone* "with prejudice" forever

bars Rivers's claims against Defendants Beck, BBoys, Lester, SAF, S&R Farm, "Trustees in

liquidation of S&R," ATC, Richardson, ODNB, Potter, Callahan, Schenkel, and TCRG.

Schenkel and TCRG are entitled to judgment in their favor. Fed. R. Civ. P. 56. Rivers's claims

against the other Defendants may be dismissed with prejudice. *See Thomas for Estate of Dukes v.

Craige*, No. 7:19cv181, 2020 WL 1695487, at * (E.D.N.C. Apr. 7, 2020) (granting Rule 12(b)(6)

motion and noting that "[w]here res judicata bars plaintiff's claims and it is unlikely that amendment can cure the deficiencies in plaintiff's complaint, dismissal in this instance is with prejudice"); *Storey v. Patient First Corp.*, 207 F. Supp. 2d 431, 458 (E.D. Va. 2002) (granting Rule 12(b)(6) motion on res judicata grounds and dismissing barred claims or counts with prejudice).

*

Rivers moved to amend her complaint in response to the motions to dismiss filed by TCRG, ODNB and Merrill, Lester and SAF, ATC and Richardson, and Callahan. Except for Callahan, however, she did not include proposed amendments with her motions. Instead, she asked only that she be allowed to add unspecified "newly discovered trial and testimony evidence," Pl.'s Mot. to Amend & Resp. in Opp'n to Def. TCRG's Mot. to Dismiss 12, or unidentified "factual allegations along with the new evidence obtained . . . since July 2019 and after the Court has identified how the [Second] Amended Complaint is insufficient," Pl.'s Mot. to Amend & Resp. in Opp'n to Defs. Lester & SAF's Mot. to Dismiss 11–12; Pl.'s Mot. to Amend & Resp. in Opp'n to Defs. ATC, Fariss & Richardson's Mot. to Dismiss 15. Her motion as to ODNB and Merrill simply sought leave to amend, Pl.'s Mot. to Amend & Resp. in Opp'n to Defs. Merrill & ODNB's Mot. to Dismiss 11, without articulating any grounds for such relief, Fed. R. Civ. P. 7(b)(1)(B). *See* Mem. Op. of Feb. 26, 2020, at 1 n.1 (citing Fed. R. Civ. P. 7(b)(1)(B); W.D. Va. Gen. R. 11(c)(1); *Bynum v. Berryhill*, No. 5:16cv14, 2017 WL 3669555, at *9–10 (W.D.N.C. Aug. 24, 2017); *Huffman v. Bureau of Prisons Unnamed Agents*, No. 11cv1459, 2011 WL 2613097, at *1 n.1 (D. Colo. Dec. 28, 2011)). Rivers's proposed amendment with respect to Callahan is essentially a copy of her current Count 18 redacted to exclude any reference to the Chevy Tahoe and Ford trucks. *Compare* Second Am. Compl. ¶¶

45

504–14, *with* Pl.'s Mot. to Amend & Resp. in Opp'n to Def. Callahan's Mot. to Dismiss 13–14. It does not cure the res judicata problems mentioned above.

Accordingly, I recommend that the Court deny Rivers's motions to amend, ECF Nos. 163, 187, 192, 216, 220, without prejudice. Mem. Op. of Mar. 24, 2020, at 6. Her more recent "attempt[s] to revive her claims" against these Defendants can be addressed through her pending motions to file generally a third amended complaint. Mem. Op. of Sept. 28, 2020, at 5; *see* Mem. Op. of Mar. 24, 2020, at 4.

C.      *Civil RICO: Defendants Select Bank, Union Bank, Thomas & Beach*

Select Bank, Union Bank, Michael Thomas, and Robert Beach are named as Defendants to Count 3 and/or Count 5, both of which assert a civil cause of action under RICO, 18 U.S.C. § 1964. *See* Second Am. Compl. ¶¶ 204–17 (Count 3, Select Bank & Thomas), 226–54 (Count 5, Select Bank, Union Bank, Thomas & Beach). This statute provides a special "private cause of action for '[a]ny person injured in his [or her] business or property by reason of a violation'" of 18 U.S.C. § 1962. *Hemi Grp. LLC v. City of N.Y.*, 559 U.S. 1, 6 (2010) (quoting 18 U.S.C. § 1964(c)); *see U.S. Airline Pilots Ass'n v. Awappa*, 615 F.3d 312, 317 (4th Cir. 2010) (explaining that § 1964 is a "unique cause of action concerned with eradicating organized, long term, habitual criminal activity" and provides an "extraordinary remedy" that "does not cover all instances of wrongdoing" that happen to injure a person's business or property). Section 1962, as relevant here, makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," 18 U.S.C. § 1962(c). *See* Second Am. Compl. ¶¶ 204–17 (Count 3), 227–54 (Count 5). Rivers must allege facts supporting "each of these elements" and showing that she was "injured in [her] business or property by the conduct

constituting the violation" to state a claim for relief against any Defendant named in these

counts. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496–97 (1985) ("A defendant who

violates section 1962 is not liable for treble damages to everyone he might have injured by other

conduct, nor is the defendant liable to those who have not been injured." (cleaned up)).

The term "[e]nterprise" means "any individual, partnership, corporation, association, or

other legal entity, and any union or group of individuals associated in fact although not a legal

entity." 18 U.S.C. § 1961(4). To state a claim against a defendant "under § 1962(c) one must

allege . . . the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not

simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v.*

*King*, 533 U.S. 158, 161 (2001). It is the "person" who must have violated § 1962, by his or her

association with and participation in an "'enterprise,' or tool, through which the RICO violation

occurred." *Chambers v. King Buick GMC*, 43 F. Supp. 3d 575, 588 (D. Md. 2014) (citing *Busby*

*v. Crown Supply, Inc.*, 896 F.2d 833, 840 (4th Cir. 1990)).

"In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,'

one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179

(1993) (quoting § 1962(c)). "[T]he word 'participate' makes clear that RICO liability is not

limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly

or indirectly' makes clear that RICO liability is not limited to those with a formal participation in

the enterprise[.]" *Id.* But, RICO also "is not targeted at the businesses that are innocent victims

of racketeering activity," *Thomas v. Ross & Hardies*, 9 F. Supp. 2d 547, 556 (D. Md. 1998), or

an associate who finds herself the "unwitting tool of a primary RICO violator," *Clark v. Milam*,

847 F. Supp. 409, 416–17 (S.D. W. Va. 1994). *See also Toucheque v. Price Bros. Co.*, 5 F. Supp.

2d 341, 346–49 (D. Md. 1998). "The polestar is the activity in question, not the defendant's

status." *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997). *Reves*'s "'operation and management' test expresses this requirement in a formulation that is easy to apply," 507 U.S. at 179, on an individualized, fact-specific basis.

"'[R]acketeering activity' is defined to include several so-called predicate acts," *Hemi Grp.*, 559 U.S. at 6, covering "a variety of federal and state criminal offenses," like bribery, extortion, "mail fraud, wire fraud[,] and money laundering," *Sparrow v. Bank of Am. N.A.*, No. JFM-14-0388, 2014 WL 4388350, at *7 (D. Md. Sept. 4, 2014). *See generally* 18 U.S.C. § 1961(1)(A)–(B).[26] "A pattern of racketeering requires at least two predicate acts." *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000). "[T]wo acts alone do not necessarily establish a pattern," however. *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) (citing *Sedima*, 473 U.S. at 496 n.14). "[T]he plaintiff must show that the predicate acts are related and that they 'amount to or pose a threat of continued criminal activity.'" *Id.* (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). "[R]elatedness" means the acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (quotation marks omitted). "'Continuity' is both a closed- and open-ended concept, referring either to a [substantial] closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.*; *see also id.* at 242 (explaining that a "party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of

---

[26] But, RICO's "extensive" list of qualifying predicate acts "is also exclusive." *Sparrow*, 2014 WL 4388350, at *7. For example, "it does not include common law fraud under state law," *id.*; *see* 18 U.S.C. § 1961(1)(A), or any fraud that is not otherwise "indictable" under" the listed federal statutes, 18 U.S.C. § 1961(1)(B). *See ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 181 (4th Cir. 2002) ("Because the statutory definition of racketeering activity does not include common law fraud, such activity must be predicated on violations of the mail and wire fraud statutes.").

time," and that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement").

In sum, Rivers must allege facts, accepted as true and viewed in her favor, supporting a reasonable inference that Select Bank, Union Bank, Thomas, and Beach each (1) were associated with some other individual or group, whether or not a legal entity; (2) had some part in directing that enterprise's affairs; (3) and participated, directly or indirectly, in (4) two qualifying predicate acts that were related (i.e., not isolated events) and threatened continuing criminal activity. *See Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477–81 (D. Md. 2009). Additionally, because two types of "fraud are asserted as predicate acts" in these civil RICO claims, each predicate act "must be pled with particularity," *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 844 (D. Md. 2013) (citing Fed. R. Civ. P. 9(b)). *See* Second Am. Compl. ¶¶ 204–17 (listing "wire fraud" and "obtaining money through fraud" as the two predicate acts in Count 3), ¶¶ 231–44 (listing "obtaining money through fraud" and "obtaining money through fraud/money laundering" as the predicate acts in Count 5).

\*

Select Bank is a bank doing business in Forest, Virginia. Second Am. Compl. ¶ 68. Wynne controlled two Select Bank accounts, both under the name Catherine R. Wynne Estate, during the relevant time. *See id.* ¶¶ 206, 215, 232, 237, 239–42. One was a demand deposit account, *id.* ¶¶ 206, 215, and the other was an $85,000 line of credit, *see id.* ¶¶ 237, 239. Peter Sackett also had an account there. *See id.* ¶ 244. Thomas is a Select Bank "officer/shareholder," *id.* ¶ 44, and Beach has "an investment interest" in the bank, *id.* ¶ 42. They also may have been involved in founding Select Bank after a prior banking venture went under. *See id.* ¶¶ 245–51 & n.10. In March or April 2007, Wynne and Rivers met with Beach "to discuss [Rivermont]

49

lending and Beach investing in [Rivers's] commercial equestrian project." *Id.* ¶ 246. Beach later loaned Wynne $287,000. *See id.*

Rivers asserts that Select Bank "allowed Wynne to open credit lines" in the Estate's name, *id.* ¶ 241, and "transferred money" for Wynne in his capacity as the Estate's power of attorney, *id.* ¶ 240 (Count 5). In October 2016, Rivers received information that, more than eight years earlier, "her insurance funds and funds obtained from her signature and other equity contracts" were transferred from one of Wynne's accounts at Bank of the James, into the Estate's account at Select Bank, and then "to an American National Bank account held by Sackett." *Id.* ¶ 206 (Count 3). More specifically, Wynne transferred $114,000 to Peter Sackett's bank account for the foreclosure on Ms. Foster's home in September 2008, *id.*, followed by another $98,000 via wire transfer in October of that year, *id.* ¶ 214 (Count 3). "Sherri Sackett received money from [Peter] and deposited $14,000 into a joint bank account," *id.* ¶ 209, before the Sacketts spent it on themselves, *see id.* ¶¶ 205, 214 (Count 3). "As a direct and proximate result" of Select Bank "allowing" itself "to be used as a conduit to operate an illegal banking enterprise[,] Rivers was damaged by the loss of the value of her money obtained illegally from her signature equity and purchase contracts, and insurance policies between 2007 and 2008 in an amount . . . no[t] less than $500,000.00." *Id.* ¶ 212; *see id.* ¶ 217 (alleging damages of "no less than $170,000").

In April 2009, someone wrote a $10,315.90 check drawn on an ODNB account, $10,000 of which "was applied as a principal payment" to the Wynne Estate's line of credit with Select Bank. *Id.* ¶ 412. According to Rivers, this was "the same amount of money within cents paid to 1650 [Partners] by ATC $10,514.20 on a check dated November 20, 2007 and deposited into" a Bank of the James account. *Id.* ¶ 240 (Count 5). Select Bank "did not have Rivers's permission and did not notify Rivers of the transfers and deposits of her closing and insurance funds from

ODNB and [Bank of the James] to the Catherine R. Wynne account and credit line at Select Bank." *Id.* ¶ 243 (punctuation corrected).

Union Bank (formerly Planters Bank, then StellarOne, now Atlantic Union Bank) is a bank doing business in Virginia. *Id.* ¶ 70. It is named as a Defendant to the RICO claim in Count 5, *id.* ¶ 226, but Rivers does not mention the bank in any of the factual allegations supporting this count. *See id.* ¶¶ 232, 237, 239–51; Def. Atl. Union Bank's Br. in Supp. of Mot. to Dismiss 3. Instead, she asserts only that Union Bank was one of "the Defendants" that "conspired to and did derive or receive income from a pattern of racketeering activity some part of which was used to operate and conduct the affairs of the bank." *Id.* ¶ 228. Rivers elsewhere alleges that Union Bank "earned a substantial profit from the money it received from the sham sale of the riding center," *id.* ¶ 296, and allowed other Defendants "to obtain loans" and deposit "illegally obtained funds" into checking accounts, *id.* ¶ 298 (Count 8, Civil RICO).

* *

"Rivers plausibly alleges that Wynne used an association-in-fact enterprise—consisting of banks, attorneys, and title companies that Wynne, Rivermont, and 1650 Partners regularly did business with over several years—in part to carry on his original scheme to defraud unsuspecting borrowers." R. & R. of Feb. 26, 2020, at 32 (citing Second Am. Compl. ¶¶ 118, 219), *adopted in relevant part by* Mem. Op. of Mar. 24, 2020, at 5; *see also Boyle v. United States*, 556 U.S. 938, 944–49 (2009); *CVLR II*, 524 F. App'x at 925–26; *United States v. Urban*, 404 F.3d 754, 782 (3d Cir. 2005) (explaining that an enterprise "may be comprised only of defendants, or of defendants and non-defendants" as long as it "is distinct from the pattern of activity in which it engages . . . and otherwise meets the broad statutory definition of enterprise" (internal quotation marks omitted)). "Rivers's allegations, however, do not 'allow the Court to infer that all [other]

elements' of her RICO claim[s] exist against" Union Bank, Select Bank, Thomas, or Beach. R. & R. of Feb. 26, 2020, at 32 (quoting *Bryant*, 524 F. Supp. 2d at 756), *adopted in relevant part by* Mem. Op. of Mar. 24, 2020, at 5.

Rivers does not plead any facts suggesting that Union Bank did business or was otherwise "associated" with Wynne. The facts describing Select Bank, Thomas, and Beach's involvement with Wynne may indicate "mere association with [a RICO] enterprise," which is not unlawful, *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 965 (7th Cir. 2000), but they do not show that any Defendant had "some part in directing the enterprise's affairs," *Reves*, 507 U.S. at 179. Thomas and Beach were simply shareholders who benefited from the bank's business, Second Am. Compl. ¶¶ 42, 44, 212, 217; Pl.'s Resp. in Opp'n to Defs. Select Bank & Thomas's Mot. to Dismiss 6–7. *See Reves*, 507 U.S. at 185 ("[L]iability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs."); *Handeen*, 112 F.3d at 1349 ("The polestar is the activity in question, not the defendant's status."); *The Knit With v. Knitting Fever, Inc.*, Civ. Action Nos. 8-4221, 08-4775, 2011 WL 1161716, at *7 (E.D. Pa. Mar. 30, 2011) ("[T]he simple contention that [individual defendant] was a director, officer, and shareholder of KFI who benefited from KFI's financial success does not" support a reasonable inference that she actually knew about the company's alleged misconduct); *cf.* R. & R. of Feb. 26, 2020, at 31–33 (allegations that Sherri Sackett, a former employee of Select Bank's predecessor, "knew Wynne and Peter [Sackett] were 'under investigation' for some unspecified conduct" when she deposited $14,000 into a Select Bank account did not state a RICO claim against her), *adopted in relevant part by* Mem. Op. of Mar. 24, 2020, at 5.

Select Bank "maintained customer accounts, accepted deposits, and wired customers' funds to accounts at other financial institutions—all lawful conduct considered 'the very essence of banking.'" R. & R. of Feb. 26, 2020, at 33 (quoting *In re Taylor, Bean & Witaker Mtg. Grp.*, 593 B.R. 862, 877 (Bkr. M.D. Fla. 2018)); *cf. Dahlgren v. First Nat'l Bank of Holdrege*, 533 F.3d 681, 690 (8th Cir. 2008) (noting, in the context of a post-judgment appeal, that "[b]ankers do not become racketeers by acting like bankers"); *Marlin v. Moody Nat'l Bank, N.A.*, Civ. No. H-04-4443, 2006 WL 2382325, at *3 (S.D. Tex. Aug. 16, 2006) (noting, in the context of granting summary judgment to RICO defendants, that "[i]nter- and intra-bank transfers are evidence of banking, not a crime"). "Furnishing a client with ordinary professional assistance," like Select Bank did for Wynne and Sackett, "will not normally rise to the level of participation" required by *Reves*'s operation-and-management test—"even when the client happens to be a RICO enterprise." *Handeen*, 112 F.3d at 1349; *see, e.g.*, *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 430 (S.D.N.Y. 2007) (allegation that bank "provided banking services that aided in the perpetration of the fraudulent scheme" did not plausibly establish the bank "participat[ed] in a RICO enterprise"); R. & R. of Feb. 26, 2020, at 33 (noting the same with respect to Bank of the James's services for Wynne and others). Even assuming someone at Select Bank "made a critical, erroneous decision" in letting Wynne and Sackett use its financial services, *Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993); *see, e.g.*, Second Am. Compl. ¶¶ 206, 212, 215 (Count 3); *id.* ¶¶ 237, 239–44, 247 (Count 5), this fact still would "not rise to the level of directing an enterprise," *Univ. of Md.*, 996 F.2d at 1539. *See Rosner*, 528 F. Supp. 2d at 430. Accordingly, Rivers has not plausibly alleged that any of these Defendants were involved in directing a RICO enterprise; thus, Count 3 and Count 5 should be dismissed from the action without prejudice. *See* Mem. Op. of Mar. 24, 2020, at 5–6.

***

Rivers moved to amend her complaint in response to Select Bank and Thomas's motion to dismiss. As noted, she did not attach a copy of the proposed amendment(s) to her motion. Instead, she asserted only that she has "newly found evidence . . . that clearly indicates instant claims [*sic*] which show economic loss proximately caused by the Defendant's intentional actions of fraud and conspiracy to commit RICO." Pl.'s Resp. in Opp'n to Defs. Select Bank & Thomas's Mot. to Dismiss & Mot. to Amend Compl. 20, ECF No. 310. This unspecified "new evidence" appears to relate to Peter Sackett's alleged involvement in the foreclosure on Ms. Foster's home, not to Rivers's defective RICO claims against Select Bank or Thomas. *See id.* ("Plaintiff discovered new evidence . . . from [the] deposition of Peter Sackett and his trial testimony in the matter involving the foreclosure funds claimed by Plaintiff."). Accordingly, I recommend that the Court deny Rivers's motion to amend, ECF No. 310, without prejudice. Mem. Op. of Mar. 24, 2020, at 6. Her more recent "attempt[s] to revive her claims" against these Defendants can be addressed through her pending motions to file generally a third amended complaint. Mem. Op. of Sept. 28, 2020, at 5; *see* Mem. Op. of Mar. 24, 2020, at 4.

D.     *Fraudulent Conveyance: Defendants Northcreek, Union Bank, Loftis & Patel*

Northcreek Construction, Union Bank, Mark Loftis, and Sameer Patel remain as Defendants named to Count 12, "Fraudulent Conveyance." Second Am. Compl. ¶¶ 360–97. These Defendants were involved to varying degrees in the sale of several "optioned lots," without Rivers "giv[ing] a release on the Optioned to Purchase," which Rivers believes have been "under contract with [her] to purchase" since February 2016. *Id.* ¶¶ 363–78; *see also id.* ¶¶ 96, 431–32, 481. She seeks damages, specific performance of the April 2007 "option contract," and a court order directing "the seller to convey the property[,] and all that is attached to it[,] to

the purchaser according to the terms of the Notice to Exercise and the Option to Purchase and Right of Refusal and the Addendum to the November 5, 2011 contract to purchase the riding center property." *Id.* ¶¶ 497, 501 (Count 17). Rivers alleges that she is the "purchaser" in this scenario.

Virginia's fraudulent conveyance statute, Va. Code § 55.1-400 (Oct. 1, 2019) (formerly Va. Code § 55.80), provides a cause of action and limited equitable remedy for "transactions designed to place a debtor's assets beyond his [or her] creditor's reach." *La Bella Donna Skin Care, Inc. v. Belle Femme Enters.*, 805 S.E.2d 399, 404 (Va. 2017) ("This statute condemns transactions that would otherwise be lawful when they are done with a vicious intent." (citing Va. Code § 55-80)); *see also Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 218–19 (4th Cir. 1994) (citing Virginia cases). As relevant here, the statute provides that every "conveyance, assignment, or transfer" of any real estate

> given with intent to delay, hinder, or defraud creditors, purchasers, or other persons of or from what they are or may be lawfully entitled shall, as to such creditors, purchasers, or persons or their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appears that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

Va. Code § 55.1-400; *accord La Bella Dona*, 805 S.E.2d at 403 (quoting Va. Code § 55-80). "[T]he only remedy available" under this statute is to set aside the transaction and "return the fraudulently conveyed assets to the transferor[.]" *La Bella Dona*, 805 S.E.2d at 406. "[It] does not impose liability upon the participants of a fraudulent conveyance." *Id.*; *see Bennett v. Garner*, 913 F.3d 436, 441 (4th Cir. 2019) ("Such actions do not impose liability on the participants in a fraudulent conveyance, but merely unwind 'transactions designed to place a debtor's assets beyond his creditors' reach.'" (quoting *La Bella Dona*, 805 S.E.2d at 406)).

To state a claim for relief, a complaint must contain well-pled facts supporting a reasonable inference that (1) the defendant conveyed, assigned, or transferred property (2) to which the plaintiff, in her capacity as a creditor, purchaser, or protected other person, was or might have been lawfully entitled (3) with intent to delay, hinder, or defraud the plaintiff from realizing her interest in the property. *See Estate Constr.*, 14 F.3d at 218–19; *A.G. Dillard, Inc. v. Stonehaus Constr., LLC*, No. 15-1182, 2016 WL 3213630, at *4–5 (Va. June 2, 2016); *Buchanan v. Buchanan*, 585 S.E.2d 533, 535–36 (Va. 2003). "Intent can be established by direct or circumstantial evidence," or, at the pleading stage, by alleging facts evincing "presumptions of fraud called 'badges of fraud.'" *Harvey v. GoBo, Inc.*, No. 6:16cv76, 2017 WL 972161, at *4 (W.D. Va. Mar. 10, 2017) (quoting *Fox Rest Assocs. v. Little*, 717 S.E.2d 126, 132 (Va. 2011)); *see A.G. Dillard*, 2016 WL 3213630, at *5 (noting that a complaint need only "allege[] facts that if true" would show the challenged conveyance "involved at least one badge of fraud"). These badges of fraud include:

> (1) retention of an interest in the transferred property by the transferor; (2) transfer between family members for allegedly antecedent debt; (3) pursuit of the transferor or threat of litigation by his creditors at the time of the transfer; (4) lack of or gross inadequacy of consideration for the conveyance; (5) retention or possession of the property by transferor; and (6) fraudulent incurrence of indebtedness after the conveyance.

*Fox Rest Assocs.*, 717 S.E.2d at 132. Finally, a plaintiff seeking to void "the title of a purchaser for valuable consideration," Va. Code § 55.1-400, must further allege facts showing that the purchaser had notice of the grantor's fraudulent intent, or of an earlier fraud rendering void the grantor's title to that property. *In re Taneja*, 453 B.R. 618, 622 (Bankr. E.D. Va. 2011) ("[A] plaintiff attacking a fraudulent conveyance under § 55-80 must always allege, as part of its cause of action, not only the debtor's fraudulent intent in making the transfer, but the transferee's notice of that intent." (citing *Bank of Commerce v. Rosemary & Thyme, Inc.*, 239 S.E.2d 909,

911–14 (Va. 1978)). While "actual knowledge of the debtor-grantor's fraudulent intent is not necessary," the complaint must plausibly allege that the grantee knew about "such facts and circumstances" that would cause a reasonable person to investigate *and* discover the grantor's vicious intent. *Rosemary & Thyme*, 239 S.E.2d at 912 (internal quotation marks omitted).

Rivers's factual allegations, accepted as true and viewed in her favor, are not "enough to raise [her] right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). First, even assuming Rivers qualifies as a creditor, purchaser, or "protected 'other person'" with respect to the so-called optioned lots, *Estate Constr.*, 14 F.3d at 218–19 (quoting Va. Code § 55-80); *see Effessiou v. Effessiou*, No. 143425, 1996 WL 1065637, at *2 (Fairfax Cir. Ct. Nov. 12, 1996), there is no allegation that Loftis, Patel, or Union Bank transferred or conveyed those properties. *Cf. Fleet Fin. v. Burke & Herbert Bank & Tr.*, No. 122305, 1992 WL 884461, at *2 (Fairfax Cir. Ct. Jan. 28, 1992) (noting, in the context of dismissing a fraudulent-conveyance claim involving property sold in a lawful foreclosure sale, that § 55-80 "speaks to the actions of debtors/borrowers rather than to the actions of trustees" or other third-party professionals). Union Bank's predecessor(s) apparently financed the sale of certain "optioned lots" in 2009–2011, and Northcreek might have deposited proceeds into Union Bank accounts. *See* Second Am. Compl. ¶¶ 302, 337, 349, 369. Patel merely "performed the title search and was the settlement agent" when Beck sold the Cottontown Road property in May 2019, and Loftis "provided incorrect release information" in connection with that transaction. *Id.* ¶ 378; *see also id.* ¶¶ 379–81, 393–94, 396–97. At most, the bank and attorneys provided professional services that "allow[ed]" other people or entities to transfer contested property. *Id.* ¶¶ 393, 396. Virginia's fraudulent-conveyance statute simply does not reach such conduct. *See Fleet Fin.*, 1992 WL 884461, at *2.

Rivers alleges that Northcreek purchased from BBoys and SAF several multi-acre lots, each "valued at $65,000.00 per acre," for an "amount equal to or less than Rivers['s] discounted rate" of $15,000 per acre in order "to avoid paying Rivers." Second Am. Compl. ¶ 351; *see also id.* ¶¶ 363–64, 368, 425–26, 467. Northcreek paid $40,000 for Lot 3 (2.2 acres); $48,000 for Lot 6 (2.0 acres); and $55,000 for Lot 34 (4.16 acres). *See id.* ¶¶ 351, 363–64, 368.[27] Even assuming these prices were "gross[ly] inadequa[te]" consideration for the conveyance, *Fox Rest Assocs.*, 717 S.E.2d at 132, Rivers does not allege any facts supporting a reasonable inference that Northcreek, the grantee, or its agents were aware of any facts or circumstances as would cause a reasonable person to suspect that Beck, Lester, or BBoys/SAF intended to hinder, delay, or defraud Rivers from realizing her claimed interest in those properties. Her vague assertion that Northcreek and its agents purchased the discounted lots "to avoid paying Rivers," Second Am. Compl. ¶ 351, is not enough. *Cf. Welch v. Highlands Union Bank*, 526 B.R. 152, 161 (W.D. Va. 2015) (denying Rule 12(c) motion where plaintiff alleged that the defendant "had actual knowledge of [grantor's] intent to hider and/or delay creditors" and the complaint set out "nine examples of circumstantial evidence" that reasonably could have put defendant on notice). Accordingly, Rivers fails to state a claim against these Defendants for fraudulent conveyance. Count 12 should be dismissed from the action without prejudice. *See* Mem. Op. of Mar. 24, 2020, at 5–6.

E.    *Remaining Defendants Not Named in Any Counts*

The remaining Defendants should be dismissed with prejudice because, contrary to Judge Dillon's instructions, Rivers's second amended complaint still does not "identify clearly," Mem.

---

[27] Taking Rivers's figures at face value, Northcreek paid $20,000 per acre for Lot 3, $16,000 per acre for Lot 6, and $13,221 per acre for Lot 34. Rivers also alleges that BBoys and SAF sold Lot 34 to the Flukers for $41,000 in May 2012. *Id.* ¶ 377. Thus, only Lot 34 allegedly was sold for less than Rivers's already heavily discounted rate of $15,000 per acre.

Op. of June 27, 2019, which counts or claims she intends to bring against them. Mem. Op. of Mar. 24, 2020, at 5 (citing *Adbul-Mumit*, 896 F.3d at 294 ("Faced with such resolute adherence to deficient complaints, the district court's decision to dismiss with prejudice was well within its discretion under the facts of this case.")); R. & R. of Feb. 26, 2020, at 36 (citing *McHenry v. Renne*, 84 F.3d 1172, 1175–77, 1179–80 (9th Cir. 1996); *Plumhoff*, 286 F. Supp. 3d at 703–04; *Bettio*, 775 F. Supp. at 1572; *Bettio v. Village of Northfield*, 775 F. Supp. 1545, 1572 (N.D. Ohio 1991)).

### 1.    *The Homeowners, Serene Creek HOA & The Edmundsons*

Defendants Travis and Jennifer Baker, Michael and Loren Friedman, Richard and Beth Rodgers, Matthew and Sarah Krycinski, Michael Bradbury, Howard and Barbara Frear, William and Michelle Fluker, David and Kelly Edmundson, and the Serene Creek HOA all purchased various "optioned lots" within the Serene Creek subdivision that Rivers believes are now "under contract with [her] to purchase." *See generally* Second Am. Compl. ¶¶ 30, 54–64, 365, 367, 375, 377. The Serene Creek HOA also agreed to allow Rivers to join the association and pay her $75 a month to mow the grass around the clubhouse, pool, and playground. *Id.* ¶ 311. "The HOA refused [to] tak[e] membership money from Rivers," however, so she "has not had full use of the amenities . . . since 2011." *Id.* ¶ 312. These Defendants are named in the pleading's caption and/or list of parties, *see id.* ¶¶ 30, 54–55, 57–64, and a few are mentioned in paragraphs that provide minimal factual background for Count 8, *id.* ¶¶ 297–98, 311–12 (Edmundsons, HOA) or Count 12, *id.* ¶¶ 367, 375, 377 (Krycinskis, Frears, Flukers). "Judge Dillon already instructed Rivers that '[s]imply referencing persons within the factual background for a specific count,' Mem. Op. of June 27, 2019, at 9, does not satisfy basic pleading requirements." R. & R. of Feb. 26, 2020, at 25. "For this reason alone," each of these Defendants "can properly be dismissed as

a party to this lawsuit." *Bettio*, 775 F. Supp. at 1572. The dismissal should be with prejudice. *See* Mem. Op. of Mar. 24, 2020, at 5.

       2.    *Matthew Fariss*

Defendant Matt Fariss manages ATC with Jennifer Richardson. *See* Second Am. Compl. ¶ 40. Rivers mentions him in the pleading's caption and list of parties, *id.*, and paragraphs that provide some factual background for Count 1, *id.* ¶ 140; Count 8, *id.* ¶¶ 297, 319, 321–23; and Count 11, *id.* ¶¶ 355–56, all of which have been dismissed. Rivers's assertions that "Richardson and Fariss" together ran "incomplete title searches and [conducted] closings on the property and lots sold without releases or first right of refusal from Rivers," *id.* ¶ 297, "facilitated the transfer of funds $475,000.00 from ODNB to S&R" and others involved in the November 2007 closing on the riding center, *id.* ¶ 321, and "altered" the final HUD statement, *id.* ¶ 323, do not state a plausible claim upon which relief can be granted against Fariss. *See Handeen*, 112 F.3d at 1348; *Rosner*, 528 F. Supp. 2d at 430; *Fleet Fin.*, 1992 WL 884461, at *2 (citing Va. Code § 55-80). Accordingly, he should be dismissed from the action with prejudice. *See* Mem. Op. of Mar. 24, 2020, at 5.

       3.    *Seth Twery*

Defendant Seth Twery is an attorney in Lynchburg, Virginia. Second Am. Compl. ¶ 33. He is mentioned in the factual background for Count 11, *id.* ¶¶ 358–59; Count 12, *id.* ¶¶ 363–64, 369, 377; and Count 13, *id.* ¶ 401. Twery "could not possibly be liable for the misconducted alleged" in Counts 11 and 13, R. & R. of Feb. 26, 2020, at 5 (quoting *Negron-Bennett*, 2013 WL 3873659, at *4), because those negligence claims were asserted against government defendants who "failed to indict" various individuals for forgery and fraud. *Id.* ¶ 353 (Count 11); *see id.* ¶ 505 (Count 13). Rivers does not dispute that she failed to name Twery as a Defendant to her

surviving fraudulent conveyance claim (Count 12). To the extent she intended to do so, however, the facts that Twery "prepared" a few deeds, *id.* ¶¶ 363–64, 377, and received closing documents from Richardson, *id.* ¶ 401, do not state a claim for relief under Virginia Code § 55.1-400. As noted, that statute does not reach third parties who assist with real estate transactions. *See Fleet Fin.*, 1992 WL 884461, at *2 (citing Va. Code § 55-80). Accordingly, Defendant Twery should be dismissed from the action with prejudice. *See* Mem. Op. of Mar. 24, 2020, at 5.

### 4.    *Mark Merrill*

Merrill is ODNB's president. Second Am. Compl. ¶ 36. He is mentioned once under Rivers's potential *Bivens* claim, *id.* ¶ 224 (Count 4), and once in connection with her insurance fraud claim against Callahan, *id.* ¶ 511 (Count 18). Rivers asserts only that Merrill was one of eleven entities or individuals investigated for "illegal banking activity," *id.* ¶ 224, and that Merrill and the other bank Defendants "took away Rivers['s] benefit of her commercial insurance proceeds," *id.* ¶ 511.  Such "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" are not enough to state a claim for relief. *Iqbal*, 556 U.S. at 678; *see* R. & R. of Feb. 26, 2020, at 36 (citing Second Am. Compl. ¶¶ 400, 511). Accordingly, Merrill should be dismissed from the action with prejudice. *See* Mem. Op. of Mar. 24, 2020, at 5.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge resolve the instant motions as follows:

1. Defendant Seth Twery's motion to dismiss, ECF No. 73, should be **GRANTED** and he should be **DISMISSED WITH PREJUDICE** because Rivers failed to name him as a Defendant to any count, contrary to the Court's prior instructions.

2. The Defendant Homeowners' motion to dismiss, ECF No. 75, should be **GRANTED** and they should be **DISMISSED WITH PREJUDICE** because Rivers failed to name them as Defendants to any count, contrary to the Court's prior instructions.

3. Defendant Lisa Schenkel's Motion for Summary Judgment on the Basis of Res Judicata, ECF No. 84, should be **GRANTED** and judgment should be entered in her favor under Rule 56(a). Her motions to dismiss, ECF Nos. 80, 82, should be **DENIED AS MOOT**.

4. Defendant Ted Counts Realty Group's motion for summary judgment, ECF No. 98, should be **GRANTED** and judgment should be entered in its favor under Rule 56(a). The motion to dismiss, ECF Nos. 94, should be **DENIED AS MOOT**.

5. Defendants Ralph Beck and BBoys LLC's motion to dismiss, ECF No. 107, should be **GRANTED** and Rivers's claims against them should be **DISMISSED WITH PREJUDICE** on res judicata grounds.

6. Defendants Mark Merrill and Old Dominion National Bank's motion to dismiss, ECF No. 113, should be **GRANTED**. Merrill should be **DISMISSED WITH PREJUDICE** because Rivers failed to name him as a Defendant to any count, contrary to the Court's prior instructions. Rivers's civil RICO claims against ODNB (Counts 3, 5) should be **DISMISSED WITH PREJUDICE** on res judicata grounds.

7. Defendant David Edmundson's motion to dismiss, ECF No. 117, should **GRANTED** and he should be **DISMISSED WITH PREJUDICE** because Rivers failed to name him as a Defendant to any count, contrary to the Court's prior instructions.

8. Defendant Kelly Edmundson's motion to dismiss, ECF No. 119, should be **GRANTED** and she should be **DISMISSED WITH PREJUDICE** because Rivers failed to name her as a Defendant to any count, contrary to the Court's prior instructions.

9.  Defendants Shana Beck Lester and Serenity Acres Farm's motion to dismiss, ECF No. 135, should be **DENIED IN PART** as to their jurisdictional argument under Rule 12(b)(1), and **GRANTED IN PART** as to their argument that Rivers has failed to state a claim under Rule 12(b)(6). Rivers's state-law claims against these Defendants (Counts 12, 16, 17) should be **DISMISSED WITH PREJUDICE** on res judicata grounds.

10. Defendants Advantage Title & Closing, Matthew Fariss, and Jennifer Richardson's motion to dismiss, ECF No. 143, should be **GRANTED**. Fariss should be **DISMISSED WITH PREJUDICE** because Rivers failed to name him as a Defendant to any count, contrary to the Court's prior instructions. Rivers's potential claims against ATC and Richardson should be **DISMISSED WITH PREJUDICE** on res judicata grounds.

11. Defendant Margie Callahan's motion to dismiss, ECF No. 156, should be **GRANTED** and Rivers's state-law fraud claim against her (Count 18) should be **DISMISSED WITH PREJUDICE** on res judicata grounds.

12. Defendant Mark Loftis's motion to dismiss, ECF No. 175, should be **GRANTED** and Rivers's state-law claim against him (Count 12) should be **DISMISSED WITHOUT PREJUDICE** under Rule 12(b)(6).

13. Defendant S&R Farm LLC's motion to dismiss, ECF No. 178, should be **GRANTED** and Rivers's state-law claim against it (Count 12) should be **DISMISSED WITH PREJUDICE** on res judicata grounds.

14. Defendant Kelly Potter's motion to dismiss, ECF No. 231, should be **GRANTED** and Rivers's potential claims against her should be **DISMISSED WITH PREJUDICE** on res judicata grounds.

15. Defendant Union Bank & Trust's motion to dismiss, ECF No. 241, should be **GRANTED** and Rivers's civil RICO claim (Count 5) and state-law fraud claim (Count 12) against Union Bank should be **DISMISSED WITHOUT PREJUDICE** under Rule 12(b)(6).

16. Defendant Robert Beach's motion to dismiss, ECF No. 246, should be **GRANTED** and Rivers's civil RICO claim against him (Count 5) should be **DISMISSED WITHOUT PREJUDICE** under Rule 12(b)(6).

17. Defendant Select Bank and J. Michael Thomas's motion to dismiss, ECF No. 287, should be **GRANTED** and Rivers's civil RICO claims against them (Counts 3, 5) should be **DISMISSED WITHOUT PREJUDICE** under Rule 12(b)(6).

18. Defendant Northcreek Construction, Inc.'s counseled motion to dismiss, ECF No. 351, should be **GRANTED** and Rivers's state-law fraud claim against it (Count 12) should be **DISMISSED WITHOUT PREJUDICE** under Rule 12(b)(6). The motion to dismiss filed on Northcreek's behalf by pro se Defendant David Edmundson, ECF No. 121, should be stricken as procedurally improper. *See* Order of Feb. 26, 2020, ECF No. 343.

19. Defendant Sameer Patel's Motion to Dismiss and for Sanctions, ECF No. 370, should be **DENIED IN PART** as to his arguments under Rules. 11(c)(2) and 12(b)(1), and **GRANTED IN PART** as to his arguments under Rule 12(b)(6). His request for Rule 11 sanctions should be **DENIED WITHOUT PREJUDICE** as procedurally improper. Fed. R. Civ. P. 11(c)(2). River's state-law fraud claim against Patel (Count 12) should be **DISMISSED WITHOUT PREJUDICE** under Rule 12(b)(6).

20. Rivers's motions to amend her complaint as to Defendants TCRG, ECF No. 163; ODNB and Merrill, ECF No. 187; Lester and SAF, ECF No. 192; ATC, Fariss, and Richardson,

ECF No. 216; Callahan, ECF No. 220; and Select Bank and Thomas, ECF No. 310,

should be **DENIED WITHOUT PREJUDICE**.

21.  To the extent any of these motions also seek attorney's fees or other sanctions, *see, e.g.*,

ECF Nos. 84, 370, those requests should be **DENIED WITHOUT PREJUDICE** as

procedurally improper.

Additionally, the Virginia State Police, Agent Bill Talbott, and Walter Mason should be

**DISMISSED WITHOUT PREJUDICE** from the action under Rule 4(m) of the Federal

Rules of Civil Procedure.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the Honorable Elizabeth K. Dillon, United States

District Judge.

The Clerk shall send certified copies of this Report and Recommendation to Rivers and

all counsel of record.

ENTER: November 10, 2020

Joel C. Hoppe

U.S. Magistrate Judge